IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-40236-can11 |
| CORENERGY INFRUSTRUCTURE TRUST, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION DATED
FEBRUARY 25, 2024, OF CORENERGY INFRASTRUCTURE TRUST, INC.**

**HUSCH BLACKWELL LLP**
Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone      (816) 983-8000
Facsimile      (816) 983-8080
Email:      mark.benedict@huschblackwell.com
           john.cruciani@huschblackwell.com

*Proposed Counsel for Debtor and Debtor in Possession*

**Dated: February 25, 2024**

1

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. ON _____ _____, 2024, THE BANKRUPTCY COURT ENTERED AN ORDER CONDITIONALLY APPROVING THIS DISCLOSURE STATEMENT. ASSUMING THE REQUISITE ACCEPTANCES OF THE PLAN ARE OBTAINED, THE DEBTOR INTENDS TO SEEK THE BANKRUPTCY COURT'S FINAL APPROVAL OF THE DISCLOSURE STATEMENT AT THE COMBINED HEARING. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE RESTRUCTURING SUPPORT AGREEMENT. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR SOLICITATION OF VOTES ON THE CHAPTER 11 PLAN OF REORGANIZATION OF CORENERGY INFRASTRUCTURE TRUST, INC. FROM THE HOLDERS OF OUTSTANDING CLAIMS AND INTERESTS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 4** | **GRIER MEMBERS CLAIM** |
| **CLASS 5** | **SENIOR NOTES** |
| **CLASS 6** | **PREFERRED STOCK** |

**IF YOU ARE IN CLASS 4, 5, OR 6, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

**THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OBJECT TO THE PLAN AND THE RELEASES PROVIDED IN THE PLAN, (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OBJECT TO THE PLAN AND THE RELEASES PROVIDED IN THE PLAN, (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OBJECT TO THE PLAN AND THE RELEASES PROVIDED IN THE PLAN, OR (V) ARE GIVEN NOTICE OF THE OPPORTUNITY TO OBJECT TO THE GRANTING OF SUCH RELEASES PROVIDED IN THE PLAN BUT DO NOT OBJECT TO PLAN AND THE RELEASES PROVIDED IN THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

<div style="border:1px solid black;">

**DELIVERY OF BALLOTS**

**IF YOU ARE IN CLASS 4, 5, OR 6 YOU MAY SUBMIT YOUR VOTE VIA:**

1. **THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE**

2. **FIRST-CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO**

   **CORENERGY BALLOT PROCESSING**
   **C/O STRETTO**
   **410 EXCHANGE, SUITE 100,**
   **IRVINE, CA 92602**

3. **THE NOTICE AND CLAIMS AGENT'S SUBMISSION PORTAL AT:**
   [_____]

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT.**

</div>

<div style="border:1px solid black;">

**THE VOTING DEADLINE IS 4:00 P.M. PREVAILING CENTRAL TIME**
**ON_____, 2024**

**(UNLESS THE DEBTOR EXTENDS THE VOTING DEADLINE)**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE NOTICE AND CLAIMS AGENT MUST _ACTUALLY_ _RECEIVE_ YOUR BALLOTS ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT:**

**CorEnergyInquiries@stretto.com**

**WITH A REFERENCE TO "CORENERGY**

**INFRASTRUCTURE TRUST, INC." In**

**THE SUBJECT LINE OR**

**(833) 345-0351 (Toll-Free)**

**(949) 340-5692 (International)**

</div>

**BENEFICIAL HOLDERS THAT HOLD THEIR CLAIMS THROUGH VOTING NOMINEES MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE VOTING NOMINEES AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR VOTING NOMINEES TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.**

**FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT SUBMITTED ON YOUR BEHALF MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU HOLD YOUR CLAIMS DIRECTLY, YOU MUST RETURN YOUR COMPLETED**

BALLOT TO THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, in accordance with the terms of the Restructuring Support Agreement, this "<u>Disclosure Statement</u>") provides information regarding the *Chapter 11 Plan of Reorganization of CorEnergy Infrastructure Trust, Inc.* (as may be amended, supplemented, or otherwise modified from time to time, in accordance with the terms of the Restructuring Support Agreement, the "<u>Plan</u>"),[1] which CorEnergy Infrastructure Trust, Inc. (the "<u>Debtor</u>" or "<u>CorEnergy</u>") is seeking to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.  The Debtor is providing the information in this Disclosure Statement to certain Holders of Claims and Interests for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtor, Grier Members and Holders of approximately 90% of the principal amount of the Senior Note Claims.

The consummation and effectiveness of the Plan are subject to certain conditions precedent set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or that, if the Bankruptcy Court does confirm the Plan, the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

You are encouraged to read this Disclosure Statement (including "<u>Certain Factors to Be Considered</u>") and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtor urges each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

The Debtor strongly encourages Holders of Claims in Class 4, 5, and 6 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

HB: 4863-9936-1961.1

**RECOMMENDATION BY THE DEBTOR**

> **THE DEBTOR'S BOARD HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT NO LATER THAN _____, 2024, AT 4:00 P.M. (PREVAILING CENTRAL TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**
>
> **As of the date hereof, the Grier Members and Holders of approximately 90% of the Senior Note Claims have already agreed, subject to the terms of the Restructuring Support Agreement (as defined herein) to vote in favor of the Plan.**

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has granted only conditional approval to this Disclosure Statement and has not reviewed the Plan. The Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense.

After the Petition Date, certain of the Securities described in this Disclosure Statement will be offered, issued, and distributed without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in Section 1145 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as may be amended from time to time, the "Bankruptcy Code"), Section 4(a)(2) of the Securities Act, and/or other exemptions under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws. To the extent that exemptions from registration under Section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. Neither the solicitation nor this Disclosure Statement shall constitute an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement has been prepared pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

The Debtor recommends that potential recipients of any new securities pursuant to the Plan consult with their own legal counsel concerning the securities laws governing the transferability of such securities.

HB: 4863-9936-1961.1

## **DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims and Interests entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtor believes that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims and Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with its own advisors. Additionally, the Bankruptcy Court has approved this Disclosure Statement on a conditional basis, but neither the SEC nor any securities regulatory authority of any state under Blue Sky Laws has approved or disapproved this Disclosure Statement.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtor's management, in consultation with its advisors, has prepared the Financial Projections (as defined below) attached hereto as Exhibit E and described in this Disclosure Statement. The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtor's management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtor's business (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtor cautions that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

None of this Disclosure Statement, the Plan, the Confirmation Order, or the Plan Supplement waives any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date. Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtor or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible

6

in any non-bankruptcy proceeding involving the Debtor or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to Holders of Claims against, or Interests in, the Debtor or any other party in interest. Please refer to Article VII of this Disclosure Statement, titled "Certain Factors to Be Considered" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtor. No person is authorized by the Debtor in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the Exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtor.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtor believes that its plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtor cannot be sure that such plans, intentions, and expectations will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtor or Persons or Entities acting on the Debtor's behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtor expressly disclaims any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

## TABLE OF CONTENTS

**Article I The Plan** ..................................................................................................................**20**

**Article II Voting Procedures and Requirements** ......................................................................**26**

  **2.1**  **Classes Entitled to Vote on the Plan** .................................................................................**26**

  **2.2**  **Votes Required for Acceptance by a Class** .......................................................................**26**

  **2.3**  **Certain Factors to Be Considered Prior to Voting**..........................................................**26**

  **2.4**  **Classes of Claims and Interest Holders Not Entitled to Vote on the Plan** ....................**27**

  **2.5**  **Solicitation Procedures** ....................................................................................................**27**

    **(a)**  **Notice and Claims Agent** ...........................................................................................**27**

    **(b)**  **Solicitation Package** ..................................................................................................**27**

    **(c)**  **Distribution of the Solicitation Package** ..................................................................**28**

  **2.6**  **Voting Procedures**............................................................................................................**28**

**Article III Business Descriptions** ............................................................................................**29**

  **3.1**  **The Debtor's Corporate Structure** ..................................................................................**29**

  **3.2**  **CorEnergy's Business Operations** ....................................................................................**30**

    **(a)**  **Overview** ....................................................................................................................**30**

    **(b)**  **History of CorEnergy** ................................................................................................**31**

    **(c)**  **CorEnergy's Current Operations** ..............................................................................**32**

    **(d)**  **CorEnergy's Employees** ............................................................................................**32**

    **(e)**  **The Debtor's Prepetition Capital Structure** .............................................................**33**

**Article IV Events Leading to the Chapter 11 Case** ..................................................................**33**

  **4.1**  **Market Conditions**..........................................................................................................**33**

  **4.2**  **Maturity of Wells Fargo Credit Facility** ..........................................................................**35**

  **4.3**  **Delisting Event** ...............................................................................................................**36**

  **4.4**  **Prepetition Restructuring Efforts and the Restructuring Support Agreement**.................**36**

  **4.5**  **SALE OF MISSOURI OPERATIONS** .............................................................................**38**

**Article V  Summary of the Plan** ..............................................................................................**38**

  **5.1**  **Administrative and Priority Claims** ..................................................................................**38**

    **(a)**  **Administrative Claims Bar Date** ...............................................................................**39**

    **(b)**  **Professional Fee Claims** ............................................................................................**39**

    **(c)**  **Restructuring Fees and Expenses** ..............................................................................**40**

    **(d)**  **Priority Tax Claims** ...................................................................................................**40**

    **(e)**  **Statutory Fees** ...........................................................................................................**40**

  **5.2**  **Classification, Treatment, and Voting of Claims and Interests** .......................................**40**

    **(a)**  **Classification of Claims and Interests** ......................................................................**40**

    **(b)**  **Treatment of Classes of Claims and Interests** ..........................................................**41**

8

**(c) Class 1—Secured Claims** ...............................................................................**41**

**(d) Class 2—Other Priority Claims** ......................................................................**42**

**(e) Class 3—General Unsecured Claims** ...............................................................**42**

**(f) Class 4—Grier Member Claims** ......................................................................**42**

**(g) Class 5—Senior Notes** ......................................................................................**44**

**(h) Class 6—Preferred Stock** .................................................................................**44**

**(i) Class 7—Common Stock** ..................................................................................**45**

**(j) Special Provisions Governing Unimpaired Claims** ........................................**46**

**(k) Controversy Concerning Impairment** .............................................................**46**

**(l) Elimination of Vacant Classes** .........................................................................**46**

**(m) Voting Classes; Presumed Acceptance by Non-Voting Classes** ....................**46**

**(n) Acceptance by Impaired Classes** .....................................................................**46**

**(o) Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**..................**46**

**5.3 Provisions for Implementation of the Plan** .............................................................**47**

**(a) General Settlement of Claims and Interests** ...................................................**47**

**(b) Restructuring Transactions** .............................................................................**47**

**(c) Corporate Action** ..............................................................................................**48**

**(d) Takeback Debt** ...................................................................................................**48**

**(e) The Revolving Credit Facility** ..........................................................................**49**

**(f) Management Incentive Plan** .............................................................................**49**

**(g) Employee Obligations** .......................................................................................**49**

**(h) Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock**................**49**

**(i) Exemption from Registration Requirements** ..................................................**50**

**(j) Subordination** ....................................................................................................**50**

**(k) Vesting of Assets in the Reorganized Debtor** ................................................**51**

**(l) Cancellation of Instruments, Certificates, and Other Documents** ...............**51**

**(m) Sources for Plan Distributions** ........................................................................**52**

**(n) Corporate Existence** ..........................................................................................**52**

**(o) New Governance Documents** ............................................................................**52**

**(p) Indemnification Provisions in Organizational Documents** ...........................**52**

**(q) Effectuating Documents; Further Transactions** .............................................**53**

**(r) Management of the Reorganized Debtor** .........................................................**53**

**(s) Section 1146(a) Exemption** ...............................................................................**53**

**(t) Preservation of Causes of Action** ....................................................................**54**

**5.4 Treatment of Executory Contracts and Unexpired Leases** ...................................**54**

**(a) Assumption and Rejection of Executory Contracts and Unexpired Leases** ...................**54**

9

    (b)   **Cure and Defaults for Assumed Executory Contracts and Unexpired Leases** ................................55

    (c)   **Rejection Damages Claims** ................................................................................................56

    (d)   **Insurance Policies** ..............................................................................................................57

    (e)   **Contracts and Leases After the Petition Date** ................................................................57

    (f)   **Reservation of Rights** .......................................................................................................57

    (g)   **Nonoccurrence of Effective Date** ....................................................................................58

**5.5**    **Provisions Governing Distributions** ...........................................................................................58

    (a)   **Distributions on Account of Claims or Interests Allowed as of Effective Date**...............58

    (b)   **Expenses Incurred On or After the Effective Date** ........................................................58

    (c)   **Special Rules for Distributions to Holders of Disputed Claims** ...................................59

    (d)   **Delivery of Distributions** ..................................................................................................59

    (e)   **Claims Paid or Payable by Third Parties** .......................................................................62

    (f)   **No Postpetition or Default Interest on Claims** ...............................................................62

    (g)   **Setoffs** ................................................................................................................................63

    (h)   **Allocation Between Principal and Accrued Interest** ......................................................63

    (i)   **Delivery of New Common Stock** .....................................................................................63

**5.6**    **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Interests**.................63

    (a)   **Allowance of Claims** .........................................................................................................64

    (b)   **Objections to Claims** ........................................................................................................64

    (c)   **Estimation of Claims** ........................................................................................................64

    (d)   **No Distribution Pending Allowance** ................................................................................64

    (e)   **Distribution After Allowance** ..........................................................................................64

    (f)   **No Interest** .........................................................................................................................65

    (g)   **Adjustment to Claims Without Objection** ......................................................................65

    (h)   **Disallowance of Claims** ....................................................................................................65

**5.7**    **Effect of Confirmation of the Plan** .............................................................................................65

    (a)   **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies**................................................................................66

    (b)   **Release by the Debtor** .......................................................................................................66

    (c)   **Releases by Holders of Claims and Interests** .................................................................68

    (d)   **Exculpation** .......................................................................................................................69

    (e)   **Injunction** ..........................................................................................................................70

    (f)   **Protection Against Discriminatory Treatment** ..............................................................72

    (g)   **Release of Liens** ................................................................................................................72

    (h)   **Reimbursement of Contribution** .....................................................................................72

    (i)   **Recoupment** ......................................................................................................................73

**5.8**    **Conditions Precedent to the Effective Date** ...............................................................................73

HB: 4863-9936-1961.1

(a)   Conditions Precedent to the Effective Date........................................................73

(b)   Waiver of Conditions Precedent ......................................................................74

(c)   Effect of Non-Occurrence of Conditions to Consummation ...........................74

(d)   Substantial Consummation ..............................................................................74

5.9    Modification, Revocation, or Withdrawal of the Plan ...............................................74

(a)   Modification of Plan .........................................................................................74

(b)   Effect of Confirmation on Modifications .........................................................75

(c)   Revocation or Withdrawal of Plan ..................................................................75

5.10   Retention of Jurisdiction ...........................................................................................75

5.11   Miscellaneous Provisions ..........................................................................................77

(a)   Immediate Binding Effect .................................................................................77

(b)   Additional Documents .......................................................................................77

(c)   Reservation of Rights .......................................................................................77

(d)   Successor and Assigns ......................................................................................77

(e)   Service of Documents ........................................................................................77

(f)   Term of Injunction or Stays ..............................................................................78

(g)   Entire Agreement ..............................................................................................78

(h)   Plan Supplement...............................................................................................78

(i)   Non-Severability ...............................................................................................79

(j)   Votes Solicited in Good Faith ..........................................................................79

(k)   Dissolution of Statutory Committees and Cessation of Fee and Expense Payment ......79

(l)   Closing of Chapter 11 Case .............................................................................79

(m)  Waiver or Estoppel ...........................................................................................79

Article VI Events During the Chapter 11 case ..................................................................80

6.1    Commencement of the Chapter 11 Case and Filing of First Day Motions ................80

(a)   Cash Management System..................................................................................80

(b)   Employee Wages and Benefits ..........................................................................80

(c)   Utilities .............................................................................................................80

(d)   Taxes.................................................................................................................81

6.2    Combined Hearing, Solicitation Procedures, and Proposed Confirmation Schedule........81

6.3    Other Procedural Motions .........................................................................................81

(a)   Ordinary Course Professionals ........................................................................81

6.4    Retention and Compensation of Professionals ..........................................................81

(a)   Restructuring Expenses ....................................................................................81

Article VII Certain Factors to be Considered ...................................................................82

7.1    General ....................................................................................................................82

7.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations........................83

(a) The Debtor Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtor's Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan ................................................................................................................................................83

(b) Risk of Non-Occurrence of the Effective Date ................................................................83

(c) If the Debtor Does Not Complete the Restructuring Transactions, it May Seek Restructuring Alternatives That Result in Less Value to Holders of Claims and Interests Than They Would Receive Pursuant to the Plan ....................................................................................................84

(d) The Bankruptcy Court May Dismiss the Chapter 11 Case ..............................................84

(e) A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtor's Classification of Claims and Interests ................................................................84

(f) The Debtor May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan 84

(g) The Support of the Ad Hoc Noteholder Group is Subject to the Terms of the Restructuring Support Agreement Which is Subject to Termination in Certain Circumstances, and the Termination of the Restructuring Support Agreement Could Adversely Affect the Chapter 11 Case ................................................................................................................................................85

(h) The Debtor May Not be Able to Obtain Confirmation of the Plan ..................................85

(i) The Debtor May Object to the Amount or Classification of a Claim ...............................86

(j) Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan ....86

(k) Nonconsensual Confirmation .........................................................................................86

(l) Continued Risk Upon Confirmation ...............................................................................87

(m) Contingencies May Affect Distributions to Holders of Allowed Claims .........................87

(n) Even if the Debtor Receives All Necessary Acceptances for the Plan to Become Effective, the Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Plan .........................87

(o) Parties May Object to the Plan on Account of the Debtor Releases, Third-Party Releases, Exculpations, or Injunction Provisions ...........................................................................87

(p) The Debtor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation ................................................................................................................88

(q) The Plan May Have Material Adverse Effects on the Debtor's Operations ...................88

(r) Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtor's Constituencies Than the Plan .......................88

(s) The Debtor's Business May Be Negatively Affected if the Debtor Is Unable to Assume its Executory Contracts ....................................................................................................................89

(t) Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers ................................................................................................................................................89

(u) Certain Tax Implications of the Plan .............................................................................89

7.3 Risk Related to the Takeback Debt and Revolving Credit Facility ..................................89

(a) Insufficient Cash Flow to Meet Debt Obligations ..........................................................90

(b) Defects in Collateral .....................................................................................................90

(c) Failure to Perfect Security Interests in Collateral .........................................................90

(d) Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtor ......................................................................................................90

12

**7.4    Risks Relating to the New Common Stock** ................................................................................**91**

    **(a)    The Reorganized Debtor May Not Be Able to Achieve its Projected Financial Results** ...............**91**

    **(b)    The Plan Exchanges Senior Indebtedness for Securities** ........................................................**91**

    **(c)    The Implied Valuation of the New Common Stock is Not Intended to Represent Trading Value of the New Common Stock** ..........................................................................................................**91**

    **(d)    Trading Market for the New Common Stock** .........................................................................**91**

    **(e)    Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities** ...........................................................................................................................**92**

    **(f)    Certain Significant Holders of New Common Stock May Have Substantial Influence Over the Reorganized Debtor Following the Effective Date** .............................................................**93**

    **(g)    The New Common Stock is Subject to Dilution** .....................................................................**93**

    **(h)    The Debtor's Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Which They Are Based** .................................................................................**93**

**7.5    Risks Relating to the Business of the Debtor and the Reorganized Debtor** .................................**94**

    **(a)    The Reorganized Debtor May Not Be Able to Repay or Refinance All of its Post-Effective Date Indebtedness, if Any** .................................................................................................................**94**

    **(b)    Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's or the Reorganized Debtor's Business** ..................................................................................................................**94**

    **(c)    Financial Results May Be Volatile and May Not Reflect Historical Trends** ..........................**95**

    **(d)    The Loss of Key Personnel Could Adversely Affect the Debtor's Operations** ........................**95**

    **(e)    The Reorganized Debtor May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case** ....................................................................................**95**

    **(f)    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's or the Reorganized Debtor's Financial Condition and Results of Operations** ...........................**96**

    **(g)    The Reorganized Debtor May Not Be Able to Accurately Report Its Financial Results** ...............**96**

    **(h)    The Reorganized Debtor May Not Continue to Be Treated as a REIT** .....................................**96**

    **(i)    Other Risks Associated with the Debtor's Business and Industry** ..........................................**97**

**7.6    Disclosure Statement Disclaimer** ..............................................................................................**98**

    **(a)    Information Contained Herein Is Solely for Soliciting Votes** ...............................................**98**

    **(b)    Disclosure Statement May Contain Forward-Looking Statements** .......................................**99**

    **(c)    This Disclosure Statement Has Not Been Approved by the SEC** .........................................**100**

    **(d)    No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement** .............**100**

    **(e)    No Admissions Made.** ..........................................................................................................**100**

    **(f)    Failure to Identify Litigation Claims or Projected Objections** ............................................**100**

    **(g)    No Waiver of Right to Object or Right to Recover Transfers and Assets** ..................................**100**

    **(h)    Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors** ......**101**

    **(i)    The Potential Exists for Inaccuracies and the Debtor Has No Duty to Update** ..........................**101**

    **(j)    No Representation Outside of the Disclosure Statement Are Authorized** ..................................**101**

**Article VIII Confirmation Procedures** .................................................................................................**101**

**8.1   The Combined Hearing** ........................................................................................................**101**

**8.2   Confirmation Standards** ....................................................................................................**102**

**8.3   Best Interests Test / Liquidation Analysis** ....................................................................**103**

**8.4   Feasibility** ............................................................................................................................**103**

**8.5   Confirmation Without Acceptance by All Impaired Classes** ......................................**104**

    **(a)   No Unfair Discrimination** ..........................................................................................**104**

    **(b)   Fair and Equitable Test** ..............................................................................................**104**

**8.6   Alternative to Confirmation and Consummation of the Plan** ....................................**105**

**Article IX Important Securities Law Disclosures** ........................................................................**105**

**9.1   Issuance of Securities under the Plan** .............................................................................**105**

**9.2   Subsequent Transfers** ........................................................................................................**106**

**9.3   The Agreement** ....................................................................................................................**108**

**Article X Certain Tax Consequences of the Plan** ........................................................................**108**

**10.1  Certain U.S. Federal Income Tax Consequences of the Plan** ......................................**108**

    **(a)   Certain REIT Considerations** ....................................................................................**110**

    **(b)   Consequences to the Debtor and the Reorganized Debtor** ....................................**111**

    **(c)   Consequences to Holders of Certain Claims and Interests** ....................................**114**

    **(d)   Tax Consequences of Owning and Disposing of New Common Stock** ....................**118**

    **(e)   U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims** ......................**120**

    **(f)   Additional Withholding Tax on Payments Made to Foreign Accounts** ....................**124**

    **(g)   Information Reporting and Withholding** ....................................................................**124**

**Article XI Conclusion and Recommendation** ................................................................................**125**

HB: 4863-9936-1961.1

**EXHIBITS**

Exhibit A       Plan of Reorganization

Exhibit B       Restructuring Support Agreement (and exhibits and attachments thereto)

Exhibit C       Historical Financial Information

Exhibit D       Liquidation Analysis

Exhibit E       Estimated Total Enterprise Value and Implied Equity Value

Exhibit F       Financial Projections

Exhibit G       Organizational Chart

HB: 4863-9936-1961.1

## EXECUTIVE SUMMARY

The Plan implements a prenegotiated restructuring agreed by and among the Debtor and certain of the Debtor's major stakeholders, including certain Holders representing approximately 90% in principal amount of the Senior Notes, which will result in a significant reduction in the Debtor's total indebtedness.

The Plan contemplates several Restructuring Transactions (as defined below). The anticipated benefits of the Plan include, without limitation, the following:

- Reduction of the Senior Notes to approximately 38% of the current indebtedness;

- the Pro Rata distribution of a cash pool of $23.6 million to Holders of Senior Note Claims, plus a full recovery to Holders of General Unsecured Claims;

- conversion of the remaining amount of indebtedness into approximately 86.41% - 88.96% of the equity in the Reorganized Debtor;

- the Pro Rata Distribution of 8.25% - 10.15% of the equity in the Reorganized Debtor to the Holders of Preferred Stock; and

- reserving the remaining equity in the Reorganized Debtor (2.79% - 3.44%) for allocation to the Grier Members consistent with Crimson LLC Operating Agreements;

- the assumption of the RSA, employment agreements, among other agreements, through the Plan as of the Effective Date; and

- prompt emergence from Chapter 11.

The Plan provides for a comprehensive restructuring of the Debtor's prepetition obligations, preserves the going-concern value of the Debtor's business and maximizes stakeholder recoveries. To evidence their support of the Debtor's restructuring, Holders of approximately 90% in principal amount of Senior Notes executed the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**.

The purpose of this Disclosure Statement is to provide Holders of Claims and Interests entitled to vote to accept or reject the Plan with adequate information about (a) the Debtor's business and certain historical events, (b) the Chapter 11 Case, (c) the rights of Holders of Claims and Interests under the Plan, and (d) other information necessary to enable each Holder of a Claim or Interest to make an informed judgment as to whether to vote to accept or reject the Plan.

## INTRODUCTION

Formed under the laws of the State of Maryland and headquartered in Kansas City, Missouri, CorEnergy operates for tax purposes as a real estate investment trust ("REIT"). Its stock is widely held and it operates under the oversight of a board of directors that meets the independence standards of the New York Stock Exchange ("NYSE"). Since its founding, CorEnergy has focused on owning and leasing energy midstream infrastructure assets, or operating energy midstream companies. Between February 2021 and January 2024, CorEnergy's business consisted principally of owning businesses that own and operate (1) a natural gas pipeline and related assets in Missouri and (2) crude oil pipelines in California.

In anticipation of the need to reduce the Company's debt, in early 2023, the Board of Directors

initiated a process to sell CorEnergy's Missouri assets. This sale was completed in early 2024, and the proceeds were used to retire all $109 million, including accrued interest and expenses, of the Company's secured bank debt, leaving the Company with approximately $65 million in cash and the California crude oil pipelines as its principal assets.

CorEnergy has approximately $118 million in principal amount of Senior Notes as its only debt (other than trade accounts payable that are current).

CorEnergy has operated in industries severely impacted by the COVID-19 pandemic, the war in Ukraine's impact on global crude supply, and changing regulations that have simultaneously reduced the demand for its services and raised operating costs. These challenges led to a significant decline in the Company's prospects and cash flows and in early 2023, the Board of Directors halted dividends on the Company's common and Preferred Stock. Because the Preferred Stock dividend is cumulative, meaning that undeclared dividends must be paid before any distribution can be made on the common stock, the prospects for resuming the common stock dividend became increasingly doubtful. As a result, CorEnergy's common stock traded down below thresholds required to maintain its listing on the NYSE.

The Bond Indenture for the Senior Notes provides that if CorEnergy's Common Stock ceases to be listed or quoted on the NYSE, then CorEnergy must initiate certain procedures which would offer to repurchase the Senior Notes at par value. In the second half of 2023, it became apparent that the Common Stock would be delisted from the NYSE. Because CorEnergy does not have the ability to repay the Senior Notes, it became apparent that CorEnergy would default on the Senior Notes.

In light of the foregoing, since the end of 2023, CorEnergy has actively engaged with an ad hoc group of noteholders (the "Ad Hoc Noteholder Group") who collectively hold approximately 90% of the Senior Notes and their advisors regarding its support for a potential restructuring of CorEnergy's balance sheet. This engagement process involved substantial diligence, discussion, and interaction among the parties.

On the Petition Date (immediately prior to the filing of the voluntary petition), following extensive, good-faith negotiations, CorEnergy and the Ad Hoc Noteholder Group entered into the Restructuring Support Agreement attached hereto as **Exhibit B**. The transactions contemplated by the Restructuring Support Agreement, which will be implemented through the Plan, include a balance sheet restructuring that will reduce the Debtor's debt obligations and minimize the time and expense associated with the Chapter 11 Case.

If confirmed and consummated, the Plan should: (a) reduce debt from approximately $118 million to $45 million; (b) provide sufficient liquidity for the Company to wait out the results of its applications to the California Public Utilities Commission ("CPUC") to substantially increase its pipeline tariffs; (c) distribute New Common Stock to the Holders of the Senior Note Claims, which will provide the Holders of the Senior Note Claims with approximately 87-89% of the equity in the Reorganized Debtor, subject to dilution on account of the Management Incentive Plan; (d) allow Holders of Administrative Claims, Other Priority Claims, Priority Tax Claims, Secured Claims, and General Unsecured Claims to remain Unimpaired; and (e) maintain critical business relationships with customers, vendors, and employees.

CorEnergy strongly believes that the Plan and the Restructuring Transactions are in the best interests of its Estate and represents the best available alternative for all of its stakeholders. CorEnergy is confident that it can implement its restructuring pursuant to the terms of the Plan for the benefit of all of its stakeholders.

WHERE TO FIND ADDITIONAL INFORMATION: CorEnergy currently files quarterly and

17

annual reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement. Reports filed with the SEC on or after the date of this Disclosure Statement are also incorporated by reference herein.

- Annual Report on Form 10-K for the fiscal year ended December 31, 2022;

- The information specifically incorporated by reference into the Company's Annual Report on Form 10-K for the year ended December 31, 2022 from its definitive proxy statement on Schedule 14A filed with the SEC on April 18, 2023;

- Quarterly Reports on Form 10-Q for the periods ending March 31, June 30 and September 30, 2023; and

- Current Reports on Form 8-K filed with the SEC on January 17, 2023, January 26, 2023, February 16, 2023, March 6, 2023, March 7, 2023, March 9, 2023, March 24, 2023, May 24, 2023, May 25, 2023, September 13, 2023, December 4, 2023, January 25, 2024, and February 16, 2024.

HB: 4863-9936-1961.1

**PLEASE TAKE NOTE OF THE FOLLOWING KEY DATES AND DEADLINES FOR THE
CHAPTER 11 CASE AS SET FORTH HEREIN AND IN THE RESTRUCTURING SUPPORT
AGREEMENT.[2]**

| | |
|---|---|
| Voting Record Date | _____ \_\_\_\_\_, **2024** |
| Deadline for entry of an order approving the Disclosure Statement: | **April 25, 2024 (60 calendar days after the Petition Date)** |
| Deadline to object to entry of (i) an order approving the Disclosure Statement on a final basis and (ii) the Confirmation Order: | **4:00 p.m. (Prevailing Central Time) on** _____ \_\_\_\_\_, **2024** |
| Voting Deadline for Holders of Secured Debt Claims and General Unsecured Claims to vote to accept or reject the Plan: | **4:00 p.m. (Prevailing Central Time) on** _____ \_\_\_\_\_, **2024** |
| Deadline for entry of the Confirmation Order: | **June 10, 2024 (105 calendar days after the Petition Date)** |
| Deadline for the occurrence of the Effective Date: | **30 calendar days after the date of entry of the Confirmation Order** |

---

[2] The foregoing dates and deadlines may be modified or amended in accordance with the terms of the Restructuring Support Agreement.

HB: 4863-9936-1961.1

# ARTICLE I
# THE PLAN

## 1.1    Treatment of Claims and Interests

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes each Claim's and Interest's classification, treatment, and voting rights under the Plan. Except to the extent that the Debtor and a Holder of an Allowed Claim or Allowed Interest agree to less favorable treatment, each Holder will receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, will receive the following treatment on the Effective Date, or as soon as reasonably practicable thereafter. The following table is qualified in its entirety by reference to the full text of the Plan. A more detailed summary of the terms and provisions of the Plan is provided in the summary of the Plan set forth in Article IV of this Disclosure Statement. The analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is provided in the Valuation Analysis set forth in Article 1. and Exhibit E hereof.

| Class | Description | Treatment | Projected Amount of Claims | Projected Recovery |
|---|---|---|---|---|
| Class 1 | Secured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.<br><br>Not Entitled to Vote (Deemed to Accept) | N/A | N/A |
| Class 2 | Other Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.<br><br>Not Entitled to Vote (Deemed to Accept) | N/A | 100% |

HB: 4863-9936-1961.1

| Class 3 | General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, Payment in full in Cash on account of such Claim either (i) on the Effective Date or (ii) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

Not Entitled to Vote (Deemed to Accept) | Undetermined | 100% |
| Class 4 | Grier Member Claims | Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claim constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date | Undetermined | Undetermined |

HB: 4863-9936-1961.1

| | | | | |
|---|---|---|---|---|
| | | Cash); and<br><br>With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan; *provided, however,* that for the avoidance of doubt the Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units.<br><br>Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.<br><br>Entitled to Vote | | |
| Class 5 | Senior Notes | Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture. The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.<br><br>Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:<br><br>Its Pro Rata share of the Senior Note Payment;<br><br>Its Pro Rata share of the Takeback Debt Principal Amount;<br><br>Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; *provided, however,* that if the Senior Notes receive | $118,242,651 | 89.6 – 95.1% |

| | | | | |
|---|---|---|---|---|
| | | Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and<br><br>Its Pro Rata share of the Excess Effective Date Cash, if any.<br><br>Entitled to Vote | | |
| Class 6 | Preferred Stock | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such share of Preferred Stock, each Holder of a Preferred Stock shall receive either:<br><br>If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or<br><br>If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.<br><br>If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5. For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.<br><br>Entitled to Vote | $141,356,524 | 2.3-2.8% |
| Class 7 | Common Stock | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock or Allowed Crimson Employee Claims, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which | N/A | 0% |

| | | amount is estimated to be $0.00 and the Common Stock shall be cancelled.<br><br>Not Entitled to Vote (Deemed to Reject) | | |
|---|---|---|---|---|

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim or Interest entitled to vote to accept or reject the Plan. Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those they may project, and the Debtor undertakes no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VII of this Disclosure Statement, titled "**Certain Factors to be Considered**."

## 1.2    New Capital Structure

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will effectuate the Restructuring Transactions which require (a) issuing the Takeback Debt in the amount of $45 million; (b) issuing to Holders of Senior Note Claims a number of shares of New Common Stock that will represent approximately 86.41% - 88.96% of the Reorganized Debtor (subject to dilution by the Management Incentive Plan); and (c) issuing to Holders of Preferred Stock a number of shares New Common Stock that will represent approximately 8.25% - 10.15% of the Reorganized Debtor (subject to dilution by the Management Incentive Plan). The New Board will adopt the Management Incentive Plan, which plan will reserve for the management of the of Reorganized Debtor shares of New Common Stock on a fully diluted and as-converted/exchanged basis with structure and grants to be determined by pursuant to the Management Incentive Plan.

All documents in connection with the above-listed transactions will become effective in accordance with their terms and the Plan, and will be filed with the Plan Supplement as applicable.

## 1.3    Liquidation Analysis

The Debtor believes that the Plan provides Holders of Allowed Claims and Allowed Interests the same or greater recovery as would be achieved if the Debtor were to liquidate under Chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including that: (a) the Debtor's primary assets would likely need to be sold on a piecemeal basis in a Chapter 7 liquidation; (b) the additional Administrative Claims that would be incurred associated with the appointment of a trustee and the trustee's retention of professionals if the case was converted to a Chapter 7 along with the other costs associated therewith; and (c) the loss in value of the Debtor's assets attributable to an expeditious liquidation.

The Debtor, with the assistance off its restructuring advisor, Teneo Capital LLC, prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit D** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan. Teneo Capital LLC prepared the Liquidation Analysis based on a forced-liquidation valuation of the assets prepared by KPMG LLP. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtor in a hypothetical case under Chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Allowed Interests under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a Chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions as well as legal rulings. Therefore, the actual liquidation value of the Debtor could vary

materially from the estimate provided in the Liquidation Analysis.

## 1.4    Valuation Analysis

The Plan provides for the distribution of the New Common Stock to Holders of Senior Notes and Preferred Stock upon consummation of the Plan. Accordingly, the Debtor estimated the total enterprise value and implied equity value of the Debtor on a going-concern basis as of February 20, 2024 (the "Valuation Analysis"). Based on the Valuation Analysis, which is attached hereto as **Exhibit E**, the Debtor estimates that the Reorganized Debtor will have a total enterprise value of $70 million at the midpoint and an implied equity value at emergence of approximately $36 million at the midpoint.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article VII of this Disclosure Statement titled "Certain Factors to be Considered." The Valuation Analysis is based on data and information available as of February 20, 2024. The Debtor makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTOR AND ITS ASSETS AND BUSINESS, WHICH ASSUMES THAT THE REORGANIZED DEBTOR CONTINUES AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTOR, ITS SECURITIES OR ITS ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTOR MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

## 1.5    Financial Information and Projections

In connection with developing the Plan, the Debtor, with the assistance of its advisors, prepared projections for fiscal years 2024 through 2028, which are attached hereto as **Exhibit F** (the "Financial Projections"), including management's assumptions related thereto. For purposes of the Financial Projections, the Debtor has assumed an Effective Date of June 30, 2024. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms, except as otherwise disclosed in the Financial Projections as Exhibit F. The Debtor is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtor's prospects.

**The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.**

## ARTICLE II
## VOTING PROCEDURES AND REQUIREMENTS

The procedures and instructions for voting and/or making elections and related deadlines are set forth in the order approving the Disclosure Statement on a conditional basis (the "Disclosure Statement Order"). The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement.

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE PROCEDURES GOVERNING THE SOLICITATION, VOTING, AND TABULATION PROCESS. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE DISCLOSURE STATEMENT ORDER, THE DISCLOSURE STATEMENT ORDER GOVERNS.

### 2.1    Classes Entitled to Vote on the Plan

Eligible Holders within the following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| CLASS 4 | GRIER MEMBERS CLAIM |
| CLASS 5 | SENIOR NOTES |
| CLASS 6 | PREFERRED STOCK |

If you are not an eligible Holder of a Claim or Interest in one of the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below) containing the Solicitation Materials. If you are an eligible Holder of a Claim or Interest in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompany the applicable Solicitation Package, if any, or the Ballot(s) that the Debtor, or the Notice and Claims Agent on behalf of the Debtor, otherwise provided to you. If you are an eligible Holder of a Claim or Interest in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

All Holders of Claims in Class 4 – Grier Members Claim, Class 5 – Senior Notes, and Class 6 – Preferred Stock are eligible to vote on the Plan.

### 2.2    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, whether a plan of reorganization has been accepted requires the amount and number of Claims that voted to accept the plan to be calculated. A class of claims is determined to have accepted a plan if creditors voting on the plan that hold at least two-thirds in amount and a majority in number of the allowed claims in the class vote in favor of the plan.

### 2.3    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the

26

Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtor can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtor may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with Section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in the Voting Classes pursuant to Section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VII of this Disclosure Statement.

## 2.4    Classes of Claims and Interest Holders Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are Unimpaired by the proposed plan or if they will receive no recovery under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtor are not entitled to vote to accept or reject the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7 | Common Stock | Impaired | No (deemed to reject) |

Holders that are not entitled to vote on the Plan (the "Non-Voting Holders") will receive notices of non-voting status.

## 2.5    Solicitation Procedures

### (a)    Notice and Claims Agent

The Debtor has retained Stretto, Inc. to act as, among other things, the Notice and Claims Agent in connection with the solicitation of votes to accept or reject the Plan.

### (b)    Solicitation Package

HB: 4863-9936-1961.1

Only record Holders of Claims and Interests in the Voting Classes as of _____ _____, 2024 (the "<u>Voting Record Date</u>") are entitled to vote on the Plan. The Voting Classes will receive a solicitation package consisting of the following materials (the "<u>Solicitation Package</u>"):

- this Disclosure Statement;

- the exhibits to the Disclosure Statement, which include (i) the Plan, (ii) the Restructuring Support Agreement and the exhibits thereto, (iii) historical financial information; (iv) the Liquidation Analysis, (v) the Valuation Analysis, and (v) the Financial Projections; provided, that the Plan Supplement documents shall not be part of the Solicitation Package;

- the Disclosure Statement Order (without any exhibits);

- a Ballot and applicable voting instructions, together with a pre-paid, pre-addressed return envelope;

- the notice of the Combined Hearing; and

- the Debtor's cover letter in support of the Plan.

**(c)    <u>Distribution of the Solicitation Package</u>**

The Debtor will cause the Notice and Claims Agent to distribute the Solicitation Package to eligible Holders of Claims and Interests in the Voting Classes on _____ _____, 2024 (or as soon as reasonably practicable thereafter), which is at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Central Time) on _____ ____, 2024).

The Solicitation Package (except the Ballots) may also be obtained from the Notice and Claims Agent by: (a) calling the Notice and Claims Agent at (833) 345-0351 (Toll-Free) and (949) 340-5692 (International), (b) emailing CorEnergyInquiries@stretto.com and referencing "CorEnergy Infrastructure Trust, Inc." in the subject line, (c) visiting the Notice and Claims Agent's website at https://cases.stretto.com/corenergy, and/or (d) writing to the Notice and Claims Agent at CorEnergy Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.  You may also obtain copies of the Plan, the Disclosure Statement, and any pleadings filed with the Bankruptcy Court for a fee via PACER at https://www.pacer.gov/.

**2.6    <u>Voting Procedures</u>**

The Voting Record Date is the date that was used for determining which Holders of eligible Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtor's solicitation and voting procedures will apply to all of the Debtor's creditors, shareholders, and other parties in interest.

For the Holder of a Claim or Interest in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope, (b) via first class mail, overnight courier, or hand delivery to CorEnergy Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, or (c) uploading the Ballot to the Notice and Claims Agent's submission portal, so that such Holder's Ballot is actually received by the Notice and Claims Agent on or before the Voting Deadline.

Nominees may return master ballots via electronic mail to the Notice and Claims Agent at PublicSecurities@stretto.com (with "CorEnergy Master Ballot Submission" in the subject line).

If you hold a Claim or Interest in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class, coded by Class number, and a set of Solicitation Materials. You may also receive more than one Ballot if you hold Claims or Interests through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims or Interests held by affiliates in a particular Class will not be aggregated, and the vote of each such affiliate will be treated as a separate vote to accept or reject the Plan, as applicable. If you hold any portion of a single Claim or Interest, you and all other Holders of any portion of such Claim or Interest will be (a) treated as a single Holder for voting purposes and (b) required to vote every portion of such Claim or Interest collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTOR DETERMINES OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS PROPERLY EXECUTED BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.

BY SIGNING AND RETURNING A BALLOT, EACH ELIGIBLE HOLDER OF A CLASS 4 – GRIER MEMBER CLAIMS, CLASS 5 – SENIOR NOTES, AND CLASS 6 – PREFERRED STOCK WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM OR INTEREST AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST ELIGIBLE TO VOTE IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. SUBJECT TO THE TERMS OF THE PLAN AND/OR THE RESTRUCTURING SUPPORT AGREEMENT, NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTOR'S PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### ARTICLE III
### BUSINESS DESCRIPTIONS

**3.1**    **The Debtor's Corporate Structure**

CorEnergy has issued and outstanding 15,817,532 shares of common stock (the "Common Stock") and 51,810 shares of Series A Cumulative Redeemable Preferred Stock 7.375% with a liquidation preference of $2,500 per share (the "Preferred Stock"). There is a cumulative aggregate dividend arrearage

HB: 4863-9936-1961.1

of approximately $11.8 million applicable to the Preferred Stock. This means that the Preferred Stock in the aggregate is entitled to (51,810 * $2,500) plus + $11.8 million, or approximately $141 million before the Common Stock receives a distribution.

Prior to the Petition Date, CorEnergy had issued and outstanding 683,761 shares of Class B Common Stock (the "Class B Stock"). There were seven stockholders of record of the Class B Stock. The Class B Stock was subordinated to the Common Stock with respect to dividends and liquidation preferences. CorEnergy did not list the Class B Stock on any exchange. On February 12, 2024, in accordance with the terms of the Class B stock, it was converted into common stock at a ratio of .68 shares of Common Stock for each share of Class B Stock, resulting in the cancellation of all of the Class B Stock and issuance of 464,958 new shares of Common Stock.

Although not direct securities of the Debtor, limited liability company interests in an affiliated entity, Crimson Midstream Holdings, LLC ("Crimson"), are linked to the Common Stock and Preferred Stock. Specifically, the Class A-1 units of Crimson are entitled to received distributions from Crimson that are equivalent to distributions received by shares of Preferred Stock and the Class A-2 and A-3 units of Crimson are entitled to receive distributions that are equal to distributions received by shares of Common Stock. Under certain circumstances, the Crimson A-1 units can be converted into Preferred Stock and the Crimson A-2 and A-3 units can be converted into Common Stock.

As of the Petition Date, CorEnergy owns 49.5% of the voting interest and all of the Class B-1 equity ownership interests of Crimson. The Grier Members holding the remaining 50.50% voting interests. The Class B-1 equity interests entitle CorEnergy to all distribution rights in excess of amounts paid to the Class A-1, A-2 and A-3 of Crimson.

Following, the Restructuring Transactions, the ownership of the Class A and Class B units in Crimson will not change, but the link between the Crimson Class A units and the stock of CorEnergy will change. With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with approximately 2.79-3.34% of the New Common Stock, subject to dilution by the Management Incentive Plan. With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan. The Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units into New Common Stock.

**3.2    CorEnergy's Business Operations**

**(a)    Overview**

CorEnergy is a Maryland corporation formed in 2005 as a Business Development Company under the Investment Company Act of 1940, but since 2012 has operated for tax purposes as a REIT. Its stock is widely held, and it operates under the oversight of a board of directors that meets the independence standards of the NYSE. Since its conversion to a REIT in 2012, CorEnergy has focused on owning and leasing energy midstream infrastructure and operating energy midstream companies. Between February 2021 and January 2024 CorEnergy's business consisted principally of owning businesses that own and operate (1) a natural gas pipeline and related assets in Missouri (the "MoGas Operations" and the "Omega Operations," collectively, the "Missouri Operations") and (2) crude oil pipelines in California (the "Crimson Operations").

30

As a REIT, CorEnergy must, among other things, generally distribute at least 90% of its REIT taxable income (determined without regard to the dividends paid deduction and by excluding any net capital gain) and satisfy certain other requirements to avoid liability for federal corporate income taxes.

Prior to the Petition Date, CorEnergy owned directly or indirectly, the entities comprising the Missouri Operations. As discussed below, the entities comprising the Missouri Operations were sold.

Crimson owns various entities that that comprise the Crimson Operations (hereinafter Crimson, with such entities is referred to as the "Crimson Entities").  An organization chart is attached hereto as **Exhibit G**.

Only CorEnergy filed for bankruptcy. None of its subsidiaries or affiliated companies have commenced bankruptcy actions and do not currently intend to do so.

**(b)     History of CorEnergy**

CorEnergy was founded in 2005. It originally started as Tortoise Capital Resources Corporation and was created to invest primarily in privately held and micro-cap public companies in the U.S. energy infrastructure sector. Tortoise Capital Resources acquired Omega Pipeline among other business interests, and shortly after becoming a REIT, acquired MoGas which was connected to Omega Pipeline. The MoGas Operations include an approximately 263-mile interstate natural gas pipeline regulated by the Federal Energy Regulatory Commission, which provides natural gas to markets in Missouri and Illinois from numerous natural gas supply basins across the U.S. The Omega Operations include an approximately 75-mile natural gas distribution system, connected to the MoGas Operations in south-central Missouri and primarily serves the U.S. Department of Defense and Fort Leonard Wood. On January 19, 2024, wholly owned subsidiaries of CorEnergy completed the sale of the Missouri Operations and related assets for $175 million – a gain of $68 million (the "Missouri Sale").

Between December 2012 and June 2015, CorEnergy executed two sale-leaseback transactions, in which CorEnergy, through subsidiaries, purchased petroleum infrastructure assets and then leased these properties back to the sellers under long duration operating leases:

- December 2012 – Pinedale Liquids Gathering System (LGS), with Ultra Petroleum as the tenant

- June 2015 – Grand Isle Petroleum Gathering System (GIGS), with Energy XXI as the tenant

In 2016, the operators of both assets filed for bankruptcy reorganization, and each agreed to continue to pay rent in full under the terms of their leases. In 2020, during the global pandemic, Ultra Petroleum again filed bankruptcy reorganization but rejected the lease and as a result CorEnergy sold the assets and recognized a loss on the value of the LGS and a loss of significant revenue. Also during the pandemic, Energy XXI stopped paying rent and CorEnergy sought collection of rents. Energy XXI was not in compliance with payment and other lease terms, while halting payments to other vendors. CorEnergy transferred GIGS to Crescent Midstream Holdings, LLC as partial consideration for the acquisition of 49.5% of Crimson in 2021, recognizing a loss on the value of GIGS and a loss of significant revenue. Energy XXI subsequently (again) filed for bankruptcy protection.

From the date of acquisition of Crimson through 2022, the earnings from Crimson, MoGas and Omega were sufficient to enable CorEnergy to continue servicing its debt and paying dividends to holders of its preferred and common stock at the level reflecting the loss of revenue from the sales of the LGS and

31

GIGS at a loss.

(c)    **CorEnergy's Current Operations**

(i)    Crimson

In February 2021, CorEnergy acquired an equity interest in Crimson, an approximately 2,000-mile crude oil transportation pipeline system, including approximately 1,100 active miles, with associated storage facilities located in southern California and the San Joaquin Valley. The Crimson Pipeline System includes four pipeline systems that provide a critical link between California crude oil production and California refineries. The vast majority of Crimson's customers are these oil refineries. The CPUC regulates the rates and administration of the transportation tariffs, which comprise the majority of our revenue generating activities.

| Asset | Location | |
|---|---|---|
| Sol Cal Pipeline | Southern California | ~760 miles of pipe; 8 tanks and 6 pump stations |
| KLM Pipeline | San Joaquin Valley to Northern California | ~620 miles of pipe; 5 tanks and 7 pump stations. Transports crude oil from San Joaquin Valley to Bay Area refineries. |
| San Pablo Bay Pipeline | San Joaquin Valley to Northern California | ~540 miles of heated pipe from San Joaquin Valley to Northern California; ~2.3 Mbbls tank capacity. Transports crude oil from San Joaquin Valley to Bay Area refineries. |
| Proprietary Pipeline | South of Bakersfield | ~100 miles of pipe. Connects Crimson system to rail |

The CPUC establishes rates for common carriers like Crimson such that these public utilities are allowed to recover their prudently incurred operating costs and earn a rate of return on invested capital. The crude oil pipeline rates established by the CPUC have traditionally been, and currently are, a fixed price per barrel of oil delivered. The rate per barrel assumes a certain level of costs will be incurred and that volumes will be a certain level. Thus, the combination of the rate per barrel times the volume of oil delivered should be sufficient for Crimson to recover its costs and earn a profit.

(ii)    Historical Operations

Historically, CorEnergy had other operations. As a result, CorEnergy currently has an ownership interest in various subsidiaries and affiliates that are dormant. These dormant entities may have an ownership interest in another entity (which is also dormant), but otherwise have no assets.

(d)    **CorEnergy's Employees**

CorEnergy has eleven (11) employees, located in Colorado, Missouri and Texas. These employees perform leadership, accounting, business development, finance and legal functions.

On February 7, 2024, CorEnergy paid bonuses to its employees for 2023 performance in accordance with the terms of annual incentive program established by the independent Compensation Committee of the Debtor's Board of Directors ("Compensation Committee"). The aggregate amount paid

32

by the Debtor to the principal executive officer, principal financial officer, or a named executive officer was approximately $550,000. In addition, the Debtor's non-principal level executives and employees received payments pursuant to the terms of the terms of annual and long-term incentive programs. In addition, certain employees were entitled to and received transactions bonuses in connection with the Missouri Sale. The amount paid to the Debtor's principal executive officer, principal financial officer, or a named executive officer was approximately $170,000, and additonal amounts were paid to the Debtor's non-principal level executives and employees.

CorEnergy is a party to Employment Agreements with all eleven (11) of the employees. The employees covered by the Employment Agreements provide accounting, finance, legal and leadership roles. Pursuant to the Plan, the Reorganized Debtor will assume all eleven of the Employment Agreements.

The Employment Agreements establish the compensation and benefits to be paid to the employees and provide severance benefits in the event of actual or constructive termination without cause. The compensation and severance amounts were established by the Compensation Committee in consultation with the Compensation Committee's compensation consultant, Compensation Advisory Partners, LLC. It is expected that the new board of directors of CorEnergy will determine whether to retain or terminate some or all of the CorEnergy employees following its emergence from bankruptcy.

Due to the Company's thin staffing, complex history, challenges and status as an SEC reporting company, the employees were sorely needed and would have been very difficult and costly to replace or outsource. These employees fulfilled critical roles in the past year, which were critical to successful closing of the Missouri Sale, the successful negotiations with the Ad Hoc Noteholder Group culminating in the Restructuring Support Agreement, and the implementation of the Restructuring Transactions.

**(e)** **The Debtor's Prepetition Capital Structure**

CorEnergy has issued and outstanding $118,050,000 of unsecured convertible senior notes bearing interest at a rate of 5.875% (the "Senior Notes"). Interest on the Secured Notes accrues at a rate of 5.875% per annum and is payable semi-annually in arrears on February 15 and August 15 of each year. The maturity date of the Senior Notes is August 15, 2025.

The proceeds from the Missouri Sale were used to repay $109 million of bank debt of the Crimson Entities that was secured by the Missouri pipeline and other assets of affiliates of the Debtor.

Except for the Senior Notes, there is no other debt of the Debtor or any of its subsidiaries or affiliates, their trade credit is current, and they presently have sufficient liquidity to continue to operate in the ordinary course.

The Crimson Entities owe approximately $140 million in intercompany loans to CorEnergy and its subsidiaries for the retirement of the $109 million secured bank debt and to fund temporary operating losses and cash flows at the Crimson Entities due to certain regulatory requirements. Several of the operating Crimson Entities do not file consolidated tax returns with CorEnergy.

**ARTICLE IV**
**EVENTS LEADING TO THE CHAPTER 11 CASE**

**4.1** **Market Conditions**

Following worldwide lockdowns from the Covid-19 pandemic going into effect in April 2020, crude oil prices fell briefly into negative territory for the first time in history pushing both the Pinedale and

GIGS systems into dire financial situations. Petroleum production serving GIGS shut down and lease payments to CorEnergy ceased in April 2020, never to resume. Ultra Petroleum re-entered bankruptcy and rejected CorEnergy's lease, resulting in the system being sold for $18 million in June 2020. CorEnergy's potential claim for significant damages against Ultra Petroleum was unsecured and there was no material recovery possible beyond the sale value. These two transactions left CorEnergy with a significant amount of debt and lost revenue. CorEnergy's stock price dropped over 90% and never recovered.

Following the acquisition of the Crimson Operations in February of 2021, several unforeseeable headwinds developed within the first 24 months after the acquisition. The primary headwinds were 1) increased oversight of oil production and transportation in the state of California; 2) reduction in crude-oil drilling permits in California, 3) increased integrity management expenses due to California State Fire Marshal ("Fire Marshal") compliance orders, 4) significant increase in interest rates and 5) shift in the crude-oil supply chain for California refineries.

Recently state and local governments in California increased their oversight of oil production and transportation in the state, such as by restricting the issuance of new drilling permits. Well permitting was reduced by over 90% since 2019 which has resulted in significantly fewer new wells, and resulting crude-oil production coming online to help partially offset natural decline. As a result, crude-oil volumes have declined significantly faster than the historical 30-year average of 3-4% per year. As oil and gas producers have sought other ways to reduce decline, the state regulators and third parties have blocked those activities. For example, Kern County, California, the source of the majority of California's crude oil production, attempted to increase issuance of drilling permits but has been blocked by the state regulators and through the courts. The high crude-oil decline rates have placed significant pressure on Crimson's profitability. It is unclear if permitting activity will ever return to sufficient levels to decrease current natural decline rates.

Crimson has been working closely with the Fire Marshal on several areas integrity management of the Crimson Operations. While Crimson is supportive of all the integrity management focus areas discussed with the Fire Marshal, it has resulted in significant increases in integrity management expenses. The 2023 integrity management expenditures were $24 million compared to $14 million in 2022, an increase of approximately 70%. Crimson expects these expenditures to remain at elevated levels for the foreseeable future. In addition to maintenance and inspection costs, other soft costs of regulatory compliance, including annual fees to the California State Fire Marshall have risen. The double impact of declining revenues and rising costs eliminated Crimson's profitability and cash flows.

The interest rate of the Crimson credit facility, which was repaid in January 2024, was not fixed but rather determined based on a spread over the Secured Overnight Financing Rate ("SOFR"), which is correlated to the Federal Funds Target Rate ("FFTR").   In an effort to battle raising inflation, the FFTR has increased from 0-0.25 percent in March 2020 to 5.25-5.50 percent as of November 2023, the highest target rate since 2000.   The interest rate on the Crimson credit facility increased from 5.7 percent in 2022 to 10.2 percent as of the fourth quarter 2023, a 79 percent increase.   The resulting cash interest expense was $5.4 million in 2022 and the fourth quarter 2023 run-rate at an annualized $10.6 million, a 96 percent increase.

Additionally, global events have led to unexpected shifts in volumes demanded by historic shippers. These actions substantially reduced the amount of oil being transported on the Crimson crude oil pipelines, while at the same time dramatically increasing the costs of maintaining the system while increasing the cost of transportation in order to assure flow rates at lower volumes. The process for increasing the rates Crimson charges for transporting crude oil involves filing an application with the CPUC to demonstrate that the current rate per barrel is too low in light of the lower volumes and higher costs. Although Crimson currently has applications pending with the CPUC to substantially increase its rates, the CPUC process is adversarial and lengthy, taking up to two years and has taken longer in some cases to resolve a case. While the CPUC

rules allow for a recovery of newly approved rates back to the application date, the extended delay has turned Crimson cash flow negative and it has had to rely on loans from CorEnergy to funds its operations.

The biggest event, which by itself placed CorEnergy in significant financial distress, was the shift in the crude-oil supply chain for California refineries. Crimson lost approximately 25,000 barrels per day on the San Pablo Bay ("SPB") pipeline primarily during Q2 2022. The SPB pipeline represents the majority of Crimson's operating cash flow and the volume lost between Q4 2021 and Q2 2022 represents an approximate 30% decrease in SPB pipeline volumes and revenue. Given the vast majority of expenses on a pipeline are fixed, this also represented a significant reduction in operating cash flow. The loss of volume is thought to primarily be due to the Ukraine war and the resulting changes in crude oil supply chains in California since California imports more than 75% of its crude oil from around the world. It is unknown when or if the shift in the crude-oil supply chain in California might revert back to pre-2021 behaviors but has not as of February 2024.

Crimson would have been in significant financial distress in Q3 2022 but for a competing pipeline being temporarily shut down due to mechanical issues. As a result, Crimson received temporary relief in Q3 and Q4 of 2022 from the Q2 2022 SPB pipeline volume decline. However, in January 2023 the pipeline was repaired and SPB pipeline volumes returned to the Q2 2022 levels starting February 2023 and once again placed Crimson in significant financial distress. The return to lower volumes on the SPB pipeline resulted in Crimson revenue not even covering cash expenses throughout most of 2023 and is expected to continue through much of 2024.

While all the negative circumstances mentioned above were out of Crimson's control, as a regulated utility, Crimson should be able to adjust its tariffs to offset decrease in volume and escalating of expenses. On August 26, 2022, Crimson filed for a 35% rate increase on its southern California pipeline system. On January 27, 2023, Crimson filed for a 36% tariff increase on the SPB pipeline which filing was made as soon as the additional temporary volumes discussed above were lost and SPB volumes returned to Q2 2022 levels. On March 3, 2023, Crimson filed for total combined 127% tariff increase on the KLM pipeline system which is physically integrated with the SPB pipeline system. While Crimson responded quickly to the unprecedented revenue and expenses challenges, the process at the CPUC to receive rate relief takes approximately two years and has taken longer in some cases. Given the significant financial distress Crimson found itself under, Crimson made an emergency rate relief application with the CPUC on November 7, 2023 requesting immediate increases on SPB and KLM pipelines to at least allow Crimson to cover cash costs. This application was quickly denied on December 4, 2023 which meant Crimson would need to fund negative operating cash flows for at least the first half of 2024.

For calendar year-end 2022, the Debtor posted gross revenues of approximately $133,647,607.00 million, compared to $128,133,796.00 million for 2021 and $11,338,071.00 million for 2020.

On February 6, 2023, CorEnergy announced that due to the significant decline in the Crimson business, the Board of Directors suspended dividends on the Company's common and Preferred Stock. Because the Preferred Stock dividend is cumulative, meaning that undeclared dividends must be paid before any distribution can be made on the Common Stock, the prospects for resuming the Common Stock dividend became increasingly doubtful. The growing burden of the cumulative Preferred Stock dividend was a significant contributing factor in the precipitous decline of CorEnergy common stock price in 2023.

## 4.2   Maturity of Wells Fargo Credit Facility

The other challenge Crimson and CorEnergy faced in early 2023 was the maturity of the Crimson credit facility led by Wells Fargo. The credit facility matured February 3, 2024, and needed to be refinanced early 2023 to avoid the credit facility from becoming a current liability which would have likely resulted

in a going-concern audit opinion at CorEnergy. A going-concern audit opinion was an event of default under the credit agreement. However, given the significant financial distress of the company due to low volumes, escalating expenses and elongated CPUC process to adjust rates, the credit facility could not be refinanced given the uncertainty in the business. CorEnergy was able to get the bank group to extend the maturity of the credit facility to May 3, 2024, which allowed the CorEnergy audit to be finalized without a going concern qualification. The covenants were also adjusted to account for the deterioration of the business. In order to amend the credit facility, CorEnergy agreed to sell the Missouri Operations to fully repay the facility.

In early 2023, the Board of Directors initiated the process to sell Missouri Operations to repay the Crimson credit facility and use excess cash to begin to address the Senior Notes which are due August 15, 2025, and have a principal amount of approximately $118 million. The Senior Notes are the only debt at CorEnergy (other than trade accounts payable that are current). The sale was announced in May 2024 and expected to close in early July 2023. However, the Federal Trade Commission ("FTC") submitted a second request which delayed the closing until January 19, 2024. The proceeds were used to retire all $109 million of the Company's secured bank debt, resulting in estimated gain on sale in the approximate amount of $68 million.

While the sale of the CorEnergy Missouri Operations allowed Crimson to avoid bankruptcy and fully repay the facility, the combination of negative cash flow at Crimson, the regulatory lag of the CPUC rate making process, the delay in the closing of the Missouri Sale and the growing cumulative Preferred Stock dividend has resulted in the CorEnergy stock declining approximately 90% over the last 12 months. As CorEnergy discussed below on December 4, 2023, CorEnergy was notified by the NYSE that its Common Stock would be delisted from the NYSE since it no longer meets the listing requirements due to the company's market capitalization being too small.

## 4.3    Delisting Event

Until recently, the Common Stock and Preferred Stock traded on the NYSE, however, trading and quoting was suspended on December 1, 2023, due to the failure of CorEnergy to continue to meet the NYSE listing standards related to the Common Stock minimum price, including its market capitalization declining below $15 million over a consecutive 30 trading day period. CorEnergy appealed, but expects to withdraw its appeal to maintain its NYSE listing following the filing of its bankruptcy petition and that the Common Stock will thereafter be formally delisted by the NYSE.

As a result of the delisting event, the securities were transferred to the "OTC Pink Market" and, consequently, the Common Stock and Preferred Stock are trading under the symbols CORR and CORRL, respectively.

While the maturity date of the Senior Notes is 2025, the indenture for the Senior Notes provides that if the Common Stock ceases to be listed or quoted from the NYSE, the Debtor must initiate certain procedures provided on the Senior Notes instrument to offer to repurchase the Senior Notes at par value. If a majority of the Senior Notes were to accept this offer, the Debtor would not have sufficient funds to repurchase the Senior Notes. The Debtor is not able to refinance the Senior Notes or otherwise raise capital to repurchase them. Because of the low interest rate and because the notes have traded at a substantial discount to par value, it is expected that all or a substantial majority of the Senior Notes would accept any repurchase offer. This would result in a default on the Senior Notes and accelerate their maturity. For this reason, CorEnergy elected to engage in negotiations with the Ad Hoc Noteholder Group, resulting in the Restructuring Support Agreement.

## 4.4    Prepetition Restructuring Efforts and the Restructuring Support Agreement

In light of the foregoing challenges, CorEnergy engaged in extensive, ongoing restructuring efforts since late 2022. To that end, CorEnergy began working with Evercore Partners to pursue and evaluate options to address strategic alternatives focused on the sale of all or a portion of the Missouri Operations and Crimson Operations. This process culminated in the Company entering into a definitive agreement to sell the Missouri Operations in May 2023 subject to anti-trust clearance from the FTC. The efforts did not produce any material interest with respect to the Crimson Operations for several key reasons, including the unique regulatory headwinds in California and Crimson's historic volatility.

Miller Buckfire was retained on June 15, 2023, as a co-advisor with Evercore to pursue financing and exchange alternatives to improve the company's capital structure following a successful sale of the Missouri Operations. As a result of the delay in the sale of the Missouri Operations due to pending FTC approval coupled with poor financial performance, declining market capitalization and potential delisting event, Miller Buckfire engagement was amended to include the evaluation of all strategic alternatives on October 31, 2023. Given the uncertainty of the sale of the Missouri Operations, potential delisting event, poor financial performance and tightening liquidity, Miller Buckfire began discussions with the Noteholders and their advisors regarding a potential transaction in October 2023.

Concurrent with the restructuring efforts, Miller Buckfire and management also pursued a targeted process to evaluate a sale of the Crimson Operations as well as other alternative transactions. Six parties were contacted and four executed NDAs. Ultimately, none of those parties proposed an alternative transaction or submitted a term sheet for the purchase of the Crimson Operations.

As discussed above, in December 2023, the Company received notice that the NYSE commenced proceedings to delist shares of its Common and Preferred Stock, and a delisting of CorEnergy's Common Stock from the NYSE would trigger a requirement to repurchase the Senior Notes at par value.

Given the foregoing issues, after considering in- and out-of-court proposals, the Debtor determined that a restructuring effectuated through a Chapter 11 plan of reorganization was optimal, as it maintains the maximum achievable creditor support, is fair to all creditors and other stakeholders, and best positions the Debtor for success upon emergence. The extensive restructuring efforts initiated in October 2023 with the Noteholders and their advisors culminated in the RSA being executed on February 25, 2024, a copy of which is attached hereto as **Exhibit B**. The RSA is supported by approximately 90% of Noteholders.

The Restructuring Transactions are set forth in the Restructuring Support Agreement and the Plan annexed thereto. Pursuant to the Restructuring Support Agreement and subject to the conditions specified therein, the Ad Hoc Noteholder Group has agreed, among other things, to support the Restructuring Transactions and vote in favor of the Plan.

The Restructuring Support Agreement contains several milestones (the "Milestones") including the following:

| Milestone | Date |
|---|---|
| Petition Date | February 25, 2024 |
| File Disclosure Statement, Disclosure Motion, and Solicitation Materials | On or before February 26, 2024 |
| Entry of Disclosure Statement Order | On or before April 25, 2024 |

HB: 4863-9936-1961.1

| Entry of the Confirmation Order | On or before June 10, 2024 |
|---|---|
| Effective Date of the Plan | Within 30 days after the entry of the Confirmation Order, which would be July 10, 2024, if the Confirmation Order was entered on the date above |

Failure to meet such Milestones may give rise to certain termination rights in favor of the Ad Hoc Noteholder Group under the Restructuring Support Agreement.

Given the substantial benefits of the Restructuring Transactions, the proposed Restructuring Transactions currently represent the best available path forward to right-size the Debtor's balance sheet and position CorEnergy for future success following this Chapter 11 Case. Reaching consensus on the Restructuring Transactions prior to commencing this Chapter 11 Case was critical to ensuring a smooth landing in chapter 11 and providing CorEnergy with a plan on which to build additional stakeholder support for the Debtor's restructuring, which will maximize the value of the CorEnergy's estate and its going-concern business resulting ultimately in a successful emergence.

## 4.5   SALE OF MISSOURI OPERATIONS

In early 2023, the CorEnergy Board of Directors initiated a process to sell the Missouri Operations. The investment banking firm of Evercore Partners conducted a competitive process that included contacting seventy-one potential counterparties, signing nineteen non-disclosure agreements, receiving eight first round proposals and three final round proposals. The Board of Directors elected to accept the highest bid and following a lengthy regulatory review, the transaction was completed on January 19, 2024, for cash consideration of $175 million, resulting in an estimated gain on sale in the approximate amount of $68 million.

<div align="center">

**ARTICLE V**
**SUMMARY OF THE PLAN**

</div>

THE FOLLOWING SUMMARIZES CERTAIN OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN. IN THE CASE OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL GOVERN IN ALL RESPECTS.

## 5.1   Administrative and Priority Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### A.   Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the

Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**(a)     Administrative Claims Bar Date**

All requests for payment of an Administrative Claim (other than Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court or Notice and Claims Agent, as applicable, and served on the Debtor and the Ad Hoc Noteholder Group no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Reorganized Debtor may also choose to object to any Administrative Claim no later than 90 days after the Administrative Claims Bar Date, except as otherwise ordered by the Court, subject to extensions by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor, as applicable, or agreement in writing of the parties. Unless the Debtor or the Reorganized Debtor object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and if so, in what amount.

**(b)     Professional Fee Claims**

**A.     Final Fee Applications**

All final requests for Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) calendar days after the Effective Date. After notice and the opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid in Cash in full.  For the avoidance of doubt, the Restructuring Fees and Expenses shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with Article 2.03 of the Plan, the Restructuring Support Agreement, and the Plan, as applicable.

**B.     Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided in the Plan or the Confirmation Order, from on and after the Confirmation Date, the Reorganized Debtor shall pay in Cash the reasonable and documented legal fees and expenses incurred by the Debtor or the Reorganized Debtor in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Confirmation Date, any requirement that Retained Professionals comply with Sections 327 through 331 and 1103 of the

39

Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to Sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtor or Reorganized Debtor, as applicable, the Ad Hoc Noteholder Group, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

### (c)    Restructuring Fees and Expenses

The reasonable Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Case on the dates on which such amounts would be required to be paid under the Restructuring Support Agreement) without the requirement to file a fee application with the Bankruptcy Court, without the need for time detail, and without any requirement for review or approval by the Bankruptcy Court. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtor at least two (2) Business Days before the anticipated Effective Date; *provided*, *that*, such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Fees and Expenses.

### (d)    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Reorganized Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

### (e)    Statutory Fees

All fees due and payable pursuant to section 1930 of title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor in full on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to file post-confirmation quarterly reports and pay quarterly fees to the U.S. Trustee until the earliest date upon which the Chapter 11 Case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## 5.2    Classification, Treatment, and Voting of Claims and Interests

### (a)    Classification of Claims and Interests

The Plan is being proposed by the Debtor within the meaning of Section 1121 of the Bankruptcy Code. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with Section 1122 of the Bankruptcy Code.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described in Article II of the Plan.

A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date.  Any Class that does not contain any Allowed Claims or Allowed Interests with respect to the Debtor will be treated in accordance with Article 3.05 of the Plan.

Below is a chart assigning each Class a number for purposes of identifying each separate Class:

**Summary of Classification and Treatment of Claims and Interests**

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 4 | Grier Member Claims | Impaired | Yes |
| 5 | Senior Notes | Impaired | Yes |
| 6 | Preferred Stock | Impaired | Yes |
| 7 | Common Stock | Impaired | No (deemed to reject) |

     **(b)**       **Treatment of Classes of Claims and Interests**

Except to the extent that the Debtor and a Holder of an Allowed Claim or Interest agrees to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

     **(c)**       **Class 1—Secured Claims**

     (i)       *Classification*: Class 1 consists of Secured Claims.

     (ii)       *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall

41

receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(iii)    *Impairment and Voting*: Class 1 is Unimpaired. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

**(d)**    <u>**Class 2—Other Priority Claims**</u>

(i)    *Classification*: Class 2 consists of Other Priority Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.

(iii)    *Impairment and Voting*: Class 2 is Unimpaired. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

**(e)**    <u>**Class 3—General Unsecured Claims**</u>

(i)    *Classification*: Class 3 consists of General Unsecured Claims.

(ii)    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, Payment in full in Cash on account of such Allowed General Unsecured Claim either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(iii)    *Impairment and Voting*: Class 3 is Unimpaired. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

**(f)**    <u>**Class 4—Grier Member Claims**</u>

(i)    *Classification*: Class 4 consists of the Grier Member Claims.

(ii)  *Allowance*: Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claims constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii)  *Treatment*: Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

  (1)  With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); and

  (2)  With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan. The Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units into New Common Stock.

  (3)  Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.

(iv)  Impairment and Voting: Class 4 is Impaired. Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. Pursuant to the Restructuring Support

HB: 4863-9936-1961.1

Agreement, the Grier Members have agreed to support the Plan, subject to the fiduciaries duty of John Grier, as a member of the Board of Directors of the Debtor, to withdraw his support for the Plan in certain circumstances.

**(g)**    **Class 5—Senior Notes**

(i)    *Classification*: Class 5 consists of Senior Notes.

(ii)    *Allowance*: Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture. The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii)    *Treatment*: Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:

    (1)    Its Pro Rata share of the Senior Note Payment;

    (2)    Its Pro Rata share of the Takeback Debt Principal Amount;

    (3)    Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; provided, however, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and

    (4)    Its Pro Rata share of the Excess Effective Date Cash, if any.

(iv)    *Impairment and Voting*: Class 5 is Impaired.  Holders of Senior Notes in Class 5 are entitled to vote to accept or reject the Plan. If Class 5 votes to reject the Plan, the Plan will be cancelled. Pursuant to the Restructuring Support Agreement, Holders of 90% of the principal amount of the Senior Notes have committed to support the Plan.

**(h)**    **Class 6—Preferred Stock**

(i)    *Classification*: Class 6 consists of Preferred Stock.

(ii)    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of,

HB: 4863-9936-1961.1

and in exchange for, such share of Preferred Stock, each Holder of a Preferred Stock shall receive either:

(1)     If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan; provided, however, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or

(2)     If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on Exhibit D to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.

(3)     If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5.  For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.

(iii)    *Impairment and Voting*: Class 6 is Impaired. Holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.

**(i)**     **Class 7—Common Stock**

(1)     Classification: Class 7 consists of Common Stock and, pursuant to § 510(b) of the Bankruptcy Code, the Certain Crimson Employee Claims.

(2)     Treatment: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock or Allowed Crimson Employee Claims, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on Exhibit D to the Disclosure Statement, which amount is estimated to be $0.00 and the Common Stock shall be cancelled.

(3)     Impairment and Voting: Class 7 is Impaired. Holders of Interests in Class 7 are conclusively presumed to have rejected the Plan

45

pursuant to Section 1126(g) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

### (j)      Special Provisions Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Claim.

### (k)      Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### (l)      Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing, shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

### (m)      Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### (n)      Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

An Impaired Class of Interests shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Interests actually voting in the Class have voted to accept the Plan.

### (o)      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class. The Debtor shall seek Confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor reserves the right to modify the Plan in accordance with Article X of the Plan (subject to the terms of the Restructuring Support Agreement) to the extent that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired, Impaired or otherwise to the

HB: 4863-9936-1961.1

extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan at any time before the Confirmation Date.

### 5.3    Provisions for Implementation of the Plan

#### (a)    General Settlement of Claims and Interests

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and Confirmation Order, upon the Effective Date, the provisions of the Plan and Confirmation Order shall constitute an integrated and global good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan relating to the contractual, legal, and subordination rights of Holders with respect to such Allowed Claims and Interests or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's integrated and global approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article IV of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

#### (b)    Restructuring Transactions

On or about the Effective Date, the Debtor and/or the Reorganized Debtor, as the case may be, shall take all actions necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary and/or appropriate to effectuate the Restructuring Support Agreement and the Plan (collectively, the "Restructuring Transactions"), including, but not limited to: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, contribution, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree, including the documents comprising the Plan Supplement; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable law; (d) such other transactions that are required to effectuate the Restructuring Transactions in a tax efficient manner for the Debtor, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law and that are consistent with the Plan and the Restructuring Support Agreement.

The Confirmation Order shall and shall be deemed to, pursuant to Sections 363 and 1123 of the Bankruptcy Code, authorize the Restructuring Transactions, which shall and shall be deemed to occur in the sequence set forth therein.

The Confirmation Order shall and shall be deemed to, pursuant to both Sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions consistent with the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**(c)**      **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (a) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (b) the appointment of the New Board; (c) the adoption and/or filing of any other amended organizational documents required to implement the Restructuring Transactions; (d) the issuance and distribution, or other transfer, of the New Common Stock as provided herein; (e) the implementation of the Restructuring Transactions; (f) the Debtor's entry into, delivery, and performance of the Takeback Debt Documents and Revolving Credit Facility Documents; and (g) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether proposed to occur before, on, or after the Effective Date). All matters provided for in the Plan involving corporate action required by the Debtor, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security Holders, directors, managers, authorized persons, or officers of the Debtor. On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions consistent with the Plan and the Restructuring Support Agreement) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article 4.03 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**(d)**      **Takeback Debt**

On the Effective Date, the Reorganized Debtor shall issue the Takeback Debt in the amount of the Takeback Debt Principal Amount (in which, subject to the occurrence of the Effective Date, interest shall accrue as of April 4, 2024, regardless of the day on which the Takeback Debt becomes fully operative) to the Holders of the Senior Notes consistent with the terms as **Exhibit A** to the Plan, as may be supplemented through a Plan Supplement.. For the avoidance of doubt, if the Effective Date does not occur, no interest shall be due under the Takeback Debt.

All terms of the Takeback Debt, including without limitation, covenants and governance, shall be reasonably acceptable to the Debtor and the Ad Hoc Noteholder Group and otherwise consistent with the Restructuring Support Agreement. Any terms of the Takeback Debt may be modified subject to the consent of the Debtor and the Ad Hoc Noteholder Group.

On the Effective Date, the Debtor shall execute and deliver the Takeback Debt Documents and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Takeback Debt Documents shall constitute legal, valid, and binding obligations of the Debtor and shall be enforceable in accordance with their respective terms. The terms and conditions of the Takeback Debt Documents shall bind the Debtor and each other Entity that enters into such Takeback Debt Documents. Any Entity's acceptance of Takeback Debt shall be deemed as its agreement to the terms of the Takeback Debt Documents, as amended, amended and restated, supplemented, or otherwise modified from time to time following the Effective Date in accordance with their terms.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Takeback Debt and the Takeback Debt Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the

48

Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to issue the Takeback Debt and such other documents as may be required to effectuate the treatment afforded by the Takeback Debt.

### (e)    The Revolving Credit Facility

On the Effective Date, the Reorganized Debtor shall enter into the Revolving Credit Facility Documents with the holders of the Senior Notes who are subject to the terms of the Restructuring Support Agreement at the discretion of such eligible holders. Confirmation of the Plan shall be deemed approval of the Revolving Credit Facility and authorization for the Debtor and Reorganized Debtor, as applicable, to take any and all actions necessary or appropriate to consummate the Revolving Credit Facility, including executing and delivering the Revolving Credit Facility Documents without any further notice to or order of the Bankruptcy Court.

The proceeds of the Revolving Credit Facility will be used exclusively for emergency purposes only, in accordance with the Revolving Credit Facility Documents.

### (f)    Management Incentive Plan

On the Effective Date, the Reorganized Debtor shall enter into the Management Incentive Plan. All grants under the Management Incentive Plan shall ratably dilute all New Common Stock issued pursuant to the Plan.

The Management Incentive Plan will reserve exclusively for participants a pool of stock-based awards in the Reorganized Debtor in the form of (a) warrants for 5.0% of New Common Stock and (b) 5.0% of the New Common Stock, both determined on a fully diluted and fully distributed basis (the "MIP Pool"), which shall be reserved for distribution in accordance with the Management Incentive Plan.

On the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to the current management. No later 90 days following the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to management employees of the Reorganized Debtor as determined at the discretion of the New Board. The remaining 50.0% of the MIP Pool shall be allocated to management employees at the discretion of the New Board.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Management Incentive Plan and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to enter into and execute the Management Incentive Plan and such other documents as may be required to effectuate the treatment afforded by the Management Incentive Plan.

### (g)    Employee Obligations

CorEnergy is a party to Employment Agreements with all eleven (11) of its employees. The employees covered by the Employment Agreements provide accounting, finance, legal and leadership roles. Pursuant to the Plan, the Reorganized Debtor will assume all eleven of the Employment Agreements.

### (h)    Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock

Prior to or as soon as reasonably practicable following the Effective Date, in accordance with all applicable federal and state rules and regulations, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Debtor or the Reorganized Debtor, as applicable, intend to take steps to de-register the existing Common Stock and Preferred Stock and to terminate and/or suspend its reporting obligations under the Exchange Act, including filing a Form 15 with the SEC to deregister its existing Common Stock and Preferred Stock.

The Confirmation Order shall authorize the issuance of New Common Stock in one or more issuances without the need for any further corporate action, and the Debtor or Reorganized Debtor, as applicable, is authorized to take any action necessary or appropriate in furtherance thereof. On or about the Effective Date or as soon as reasonably practicable thereafter, applicable Holders of Senior Notes and Preferred Stock shall receive shares of New Common Stock pursuant to Articles 3.02(e) and (f) of the Plan.

All of the shares of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessed. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and the terms and conditions of the instruments evidencing or relating to such distribution or issuance.

The Reorganized Debtor does not intend to obtain a stock exchange listing for the New Common Stock, and the Reorganized Debtor does not intend to be subject to any reporting requirements promulgated by the SEC following the de-registration actions described above. The Reorganized Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules.

**(i)      Exemption from Registration Requirements**

The offering, issuance, and distribution of the New Common Stock pursuant to the Plan (other than Securities issuable under the Management Incentive Plan) will be exempt from the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on Section 1145 of the Bankruptcy Code. Pursuant to Section 1145 of the Bankruptcy Code, such New Common Stock  will be freely tradable in the United States without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the New Governance Documents.

All Persons shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion whether the New Common Stock or other Securities issued under or otherwise acquired pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services. Notwithstanding anything to the contrary in the Plan or otherwise, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether such New Common Stock or other Securities are validly issued, fully paid and non-assessable, exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

**(j)      Subordination**

The allowance, classification, and treatment of satisfying all Claims and Interests proposed under the Plan takes into consideration any and all subordination rights, whether arising by contract or under

50

general principles of equitable subordination, Sections 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  Except as provided in the Plan, on the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently.  Accordingly, distributions under the Plan to Holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; *provided*, *that*, any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder, or the Plan is revoked or withdrawn.

### (k)    Vesting of Assets in the Reorganized Debtor

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property in the Debtor's Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (l)    Cancellation of Instruments, Certificates, and Other Documents

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, the New Common Stock, the Plan Supplement, or any agreement instrument, or other document entered into in connection with our pursuant to the Plan or the Restructuring Transactions, the obligations of the Debtor under the Bond Indenture, and any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtor giving rise to any Claim or Interest shall be cancelled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; *provided*, *that*, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest shall continue in effect solely for (a) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided herein, and (b) permit the Trustee to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees, and expenses (i) due to the Trustee, or (ii) incurred by the Trustee in making such distributions, to the extent not otherwise satisfied by the Debtor.  Except as provided in the Plan, on the Effective Date, the Trustee and its  respective agents, successors and assigns shall be automatically and fully discharged of all duties and obligations associated with the Bond Indenture; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan.  The commitments and obligations of the lenders or Holders under the Bond Indenture to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or any successors or assigns under the Bond Indenture, to the extent there were any remaining commitments or obligations, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, only such matters that, by their express terms, survive the termination of the Bond Indenture shall survive the occurrence of the Effective Date, including the rights of the Trustee, as applicable, to expense

HB: 4863-9936-1961.1

reimbursement, indemnification, and similar amounts.

**(m)      Sources for Plan Distributions**

The Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations. The Reorganized Debtor will pay or cause to be paid the Cash payments to be made pursuant to the Plan.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the Reorganized Debtor deems appropriate.

**(n)      Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including, but not limited to the Restructuring Transactions), on the Effective Date, the Debtor shall continue to exist after the Effective Date as a separate corporation with all the powers of a corporation pursuant to applicable Law, except to the extent such formation documents are amended and restated, converted or otherwise modified by the Plan, the Plan Supplement, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

**(o)      New Governance Documents**

On the Effective Date, or as soon thereafter as is reasonably practicable, the New Governance Documents, consistent with the terms attached hereto as **Exhibit B**, as may be supplemented through a Plan Supplement, shall be adopted and amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the New Governance Documents, and the Restructuring Support Agreement, as applicable, and the Bankruptcy Code. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtor will file its Agreement or applicable New Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of formation in accordance with the applicable laws thereof. The New Governance Documents shall, among other things: (a) authorize the issuance of the New Common Stock and (b) pursuant to and only to the extent required by Section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. Subject to Article 4.15 of the Plan, the Reorganized Debtor may amend and restate its formation and constituent documents as permitted by applicable law and the terms of the New Governance Documents, the Restructuring Support Agreement, and the Plan.

Certain Holders of the New Common Stock may enter into and be subject to the terms of a shareholder agreement (the "Shareholder Agreement"), which may restrict such Holder of New Common Stock for the purposes of preserving net operating losses. It is the intent that any restrictions on trading in any Shareholder Agreement will not apply to small holders holding less than 5% of the New Common Stock who are not qualified institutional buyers as defined in Rule 144A of the Securities Act. The Reorganized Debtor intends to apply for the New Common Stock to be quoted in the OTC markets and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with OTC rules.

**(p)      Indemnification Provisions in Organizational Documents**

HB: 4863-9936-1961.1

As of the Effective Date and consistent with applicable law, the Reorganized Debtor's formation documents shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor or Reorganized Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as set forth in the Indemnification Provisions, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. The Reorganized Debtor shall not amend and/or restate its organizational documents after the Effective Date to terminate or materially adversely affect (a) any Indemnification Provision or (b) the rights of such directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) referred to in the immediately preceding sentence. For the avoidance of doubt, as used in Article 4.16 of the Plan, "current" refers to covered Entities that serve as of the Petition Date, regardless of whether such Entities cease serving in such capacities thereafter.

**(q)**     **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtor, and the officers, manager, and members of the board of managers (or other governing body) thereof, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the Restructuring Transactions, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**(r)**     **Management of the Reorganized Debtor**

On the Effective Date, the board of directors at CorEnergy shall be replaced with the New Board. The New Board shall initially include five (5) members appointed by the new equity holders, on arrangements to be agreed to by, and in the sole discretion of, the Ad Hoc Noteholder Group and as set forth in the Shareholder Agreement.

Provisions regarding the removal, appointment, and replacement of members of the New Board will be set forth in the New Governance Documents or Shareholder Agreement.

**(s)**     **Section 1146(a) Exemption**

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Takeback Debt or the Revolving Credit Facility, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring

Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax, or other similar tax or governmental assessment. All appropriate state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**(t)** **Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action, including Avoidance Actions, against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to commence, pursue, and prosecute any and all Causes of Action against any Entity, including Avoidance Actions, except as otherwise expressly provided herein. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article 4.20 of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of Article 4.20 of the Plan that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**5.4** **Treatment of Executory Contracts and Unexpired Leases**

**(a)** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, including without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed

54

on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts or leases to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtor or Reorganized Debtor, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### (b)     Cure and Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtor or the Reorganized Debtor, as applicable, shall pay undisputed Cure Claims, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter as dictated by the Debtor's ordinary course of business, for Executory Contracts and Unexpired Leases assumed as of the Effective Date or (b) the assumption effective date, if different than the Effective Date. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor of the Cure Claim; provided, that nothing herein shall prevent the Reorganized Debtor from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtor also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Claim payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided, that, the Reorganized Debtor may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity.

At least fourteen (14) days prior to the Combined Hearing, the Debtor shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Claim amounts to be sent to applicable third parties (with such Cure Claim being $0.00 if no amount is listed in the notice), which

notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assumption and assignment on any grounds or related amount of the Cure Claim must be Filed, served, and actually received by the Debtor no later than the date specified in the notice (which specified date shall be at least fourteen (14) days following service of the notice). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption will be deemed to have assented to such assumption or assumption and assignment and any objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, Order, or approval of the Bankruptcy Court. The Debtor or Reorganized Debtor, as applicable, reserves the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or Reorganized Debtor, as applicable, shall have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date. In the event of a timely Filed objection regarding (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption or the cure payments required by Section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article 5.02 of the Plan, in the amount and at the time dictated by the Debtor's ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article 5.02 of the Plan, in the amount and at the time dictated by the Debtor ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(c)    **Rejection Damages Claims**

In the event that the rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is Filed with the Notices and Claims Agent and served upon counsel for the Debtor, the Reorganized Debtor, and counsel for the Ad Hoc Noteholder Group no later than fifteen (15) days after the date of entry of a Final Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease. Any such Claims, to the extent Allowed, shall be classified as General

Unsecured Claims and shall be treated in accordance with Article III of the Plan.

> **(d)** **Insurance Policies**

To the extent the Debtor is a party thereto or a named insured, any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code.

To the extent applicable, the Debtor or the Reorganized Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect as of the Petition Date. Any current and former directors, officers, managers, and employees of the Debtor who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date subject to the terms of such policy. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor shall retain the ability to supplement (but not reduce) such D&O Liability Insurance Policy as the Debtor or Reorganized Debtor may deem necessary.

The Debtor shall continue to satisfy any applicable insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtor's insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, with respect to any policies where the Debtor is a named insured or a counterparty: (a) the Debtor shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtor.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of all such insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

> **(e)** **Contracts and Leases After the Petition Date**

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed under Section 365 of the Bankruptcy Code, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

> **(f)** **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or the Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

(g)     **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**5.5    Provisions Governing Distributions**

(a)     **Distributions on Account of Claims or Interests Allowed as of Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, which shall be the same day as of the Effective Date, the distribution agent (the "Distribution Agent") shall make initial distributions under the Plan on account of Claims or Interests Allowed on or before the Effective Date or as soon as reasonably practical thereafter; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article 2.04 hereof. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

The Debtor and the Reorganized Debtor, as applicable, shall take such reasonable actions as may be required to cause the distributions to Holders of the Preferred Stock in accordance with and as contemplated under the Plan. Notwithstanding anything in the Plan to the contrary, to the extent a holder of Preferred Stock holds such interests through DTC, distributions attributable to such Holders shall be effectuated through the facilities of DTC, to the extent practicable. The distributions to Holders of Preferred Stock shall be deemed issued on the Effective Date regardless of when the distribution actually occurs.

A.      **Powers of Distribution Agent**

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan, provided, however, that such Distribution Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Senior Noteholders may be made to or at the direction of the Trustee, who may act as Distribution Agent (or direct the Distribution Agent) for distributions to Senior Noteholders, in accordance with the Plan and the Bond Indenture. As applicable, the Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with customary practices of DTC.

(b)     **Expenses Incurred On or After the Effective Date**

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of such Distribution Agent without the need for any approvals, authorizations, actions, or consents, except as otherwise ordered by the Bankruptcy Court. The Distribution Agent shall submit invoices to the Debtor or the Reorganized Debtor, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtor or the Reorganized Debtor, as applicable, shall pay those amounts that either deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor or the Reorganized Debtor, as applicable, deem to be unreasonable. In the event that the Debtor or the Reorganized Debtor, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Reorganized Debtor, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtor or the Reorganized Debtor, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(c)     **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

(d)     **Delivery of Distributions**

(i)     Record Date for Distributions

As of the Distribution Record Date, the various transfer registers for each Class of Claims or Interests entitled to distributions under the Plan as maintained by the Debtor or its respective agents shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Debtor's publicly traded Preferred Stock or Common Stock, the distributions to which will be conducted in accordance with the DTC's standard procedures and customary practices.

(ii)     Distribution Process

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims or Interests at the address for each such Holder as indicated on the applicable register or in the Debtor's records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; provided, that, the manner of such distributions shall be determined at the discretion of the Reorganized Debtor.

(iii)     Compliance Matters

59

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all applicable withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each Holder of an Allowed Claim or Interest or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Notwithstanding any provision in the Plan, any document included in the Plan Supplement, or any other Definitive Document to the contrary, the Reorganized Debtor and the Distribution Agent shall have the right, but not the obligation, to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (a) withholding distributions pending receipt of information necessary to facilitate such distributions and (b) in the case of a non-Cash distribution that is subject to withholding, withhold an appropriate portion of such property and either liquidate such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Any amounts withheld or reallocated pursuant to Article 6.03(c) of the Plan shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Reorganized Debtor and the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, IRS Form W-9 or, if the payee is a foreign Person, an applicable IRS Form W-8, or any other forms or documents reasonably requested by the Reorganized Debtor or the Distribution Agent to reduce or eliminate any withholding required by Governmental Unit. If such request is made by the Reorganized Debtor or the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, and the Holder fails to comply within ninety (90) days after not less than two (2) requests have been made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor as applicable, and any Claim or Interest in respect of such distribution shall be forever barred from assertion against any Debtor, the Reorganized Debtor and their respective property.

<div align="center">(iv)   Foreign Currency Exchange Rate</div>

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

<div align="center">(v)   Fractional, Undeliverable, and Unclaimed Distributions</div>

       (1)   *Fractional Distributions*. No fractional New Common Stock shall be distributed. Whenever any distribution of fractional units of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding down of such fraction to the nearest unit of New Common Stock. Any Cash distributions shall reflect a rounding down of such Cash to the nearest penny. No consideration shall be provided in lieu of fractional shares or Cash amounts that are rounded down. None of the Reorganized Debtor or the Distribution Agent shall have any obligation to make a distribution that is less than one (1) share of

<div align="center">60</div>

New Common Stock. DTC shall be considered a single holder for distribution purposes.

(2) *Undeliverable Distributions*. If any distribution to a Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder within thirty (30) days of receipt of the Holder's then current address or other necessary information. Undeliverable distributions shall remain in the possession of the Reorganized Debtor as applicable, for one (1) year after the Effective Date at which time such distribution reverts to the Reorganized Debtor as applicable, or is cancelled pursuant to Article 6.03(e)(4) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(3) *Failure to Present Checks*. Checks issued by the Reorganized Debtor (or its Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days of the Effective Date shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtor or its property.

Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment laws, all such distributions shall revert to the Reorganized Debtor. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

(4) *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of one (1) year after the Effective Date shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock shall be deemed cancelled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

61

<p style="text-align:center">(vi)      Surrender of Cancelled Instruments or Securities</p>

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or Interest that has been cancelled shall be deemed to have surrendered such certificate or interest to the Debtor or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such certificate or instrument shall be cancelled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding the foregoing paragraph, Article 6.03(f) of the Plan shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

**(e)      Claims Paid or Payable by Third Parties**

<p style="text-align:center">(i)      Claims Paid by Third Parties</p>

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not the Debtor or the Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

<p style="text-align:center">(ii)      Claims Payable by Insurance Carriers</p>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

<p style="text-align:center">(iii)      Applicability of Insurance Policies</p>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**(f)      No Postpetition or Default Interest on Claims**

<p style="text-align:center">62</p>

Unless otherwise specifically provided for in the Plan or the Confirmation Order, and notwithstanding any documents that govern the Debtor's prepetition funded indebtedness to the contrary, (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (i) interest accruing on or after the Petition Date on any such Claim; or (ii) interest at the contract default rate, as applicable.

**(g)**      **Setoffs**

Except as otherwise expressly provided for herein and with respect to the Allowed Claim of the holders of the Senior Notes and/or the Trustee, the Reorganized Debtor, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

**(h)**      **Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein or as otherwise required by law (as reasonably determined by the Reorganized Debtor), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for federal income tax purposes) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

**(i)**      **Delivery of New Common Stock**

On the Effective Date, the Reorganized Debtor is authorized to issue or cause to be issued and shall issue the New Common Stock for distribution in accordance with the terms of the Plan without the need for any further board, shareholder or other corporate action. All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Each holder of New Common Stock shall be deemed, without further notice or action, to have agreed to be bound by the New Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms. The New Governance Documents shall be binding on all Entities receiving New Common Stock (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the New Governance Document. Notwithstanding the foregoing, the Reorganized Debtor, may condition the distribution of any New Common Stock issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtor or the Reorganized Debtor, as applicable, counter-signatures to one or more New Governance Documents.

**5.6**      **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Interests**

**(a)**      <u>Allowance of Claims</u>

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim. The Debtor or Reorganized Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

**(b)**      <u>Objections to Claims</u>

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtor, and after the Effective Date, the Reorganized Debtor, shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (c) administer and adjust the Debtor's Claims register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Causes of Action retained pursuant to Article 4.20 of the Plan. A motion to extend the Claims Objection Deadline shall automatically extend the deadline until the Court enters an order on such motion.

**(c)**      <u>Estimation of Claims</u>

Before or after the Effective Date, the Debtor or Reorganized Debtor, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

**(d)**      <u>No Distribution Pending Allowance</u>

If an objection, motion to estimate, or other challenge to a Claim is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**(e)**      <u>Distribution After Allowance</u>

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any)

shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

      **(f)**      **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

      **(g)**      **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims register, to the extent applicable) by the Reorganized Debtor without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, Order, or approval of the Bankruptcy Court.

      **(h)**      **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtor under Sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order. All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the Reorganized Debtor elects to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed to by the Debtor or the Reorganized Debtor, as applicable, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

**5.7**      **Effect of Confirmation of the Plan**

HB: 4863-9936-1961.1

(a)      **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies**

**Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including the Takeback Debt and the Revolving Credit Facility): (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims and Interests after the Effective Date by the Reorganized Debtor, and Causes of Action against the Debtor of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtor prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities against, liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, its successors and assigns, and its assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not: (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.**

**Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and its Estate and Causes of Action against other Entities.**

(b)      **Release by the Debtor**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE**

REORGANIZED DEBTOR, AND ITS ESTATE FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, OR ITS ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, THE DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, OR (C) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF

67

**THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR THE DEBTOR'S ESTATE ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

      **(c)**        <u>**Releases by Holders of Claims and Interests**</u>

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED THE DEBTOR, REORGANIZED DEBTOR, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, THE TAKEBACK DEBT OR THE REVOLVING CREDIT FACLIITY, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, (C) OBLIGATIONS UNDER THE BOND INDENTURE, THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION THEREOF, INCLUDING THE**

**RIGHTS OF THE TRUSTEE TO EXPENSE REIMBURSEMENT, INDEMNIFICATION AND SIMILAR AMOUNTS, OR (IV) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

(d)     <u>Exculpation</u>

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON**

HB: 4863-9936-1961.1

OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, AND OTHER DOCUMENTS, INSTRUMENTS AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

(e)  __Injunction__

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AND AFFILIATES, AND EACH OF THEIR SUCCESSORS AND ASSIGNS, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM OR INTEREST THAT IS EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE 8.02 OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE 8.03 OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE 8.04 OF THE PLAN, OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE REORGANIZED DEBTOR, THE RELEASED PARTIES, AND/OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS;

**(3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS DISCHARGED, RELEASED, EXCULPATED, SETTLED AND/OR TREATED, ENTITLED TO A DISTRIBUTION, OR CANCELLED PURSUANT TO THE PLAN.**

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE PREPETITON DOCUMENTS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASE, THE FILING OF THE CHAPTER 11 CASE, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST THE DEBTOR, REORGANIZED DEBTOR, OR ANY SUCH EXCULPATED PARTY OR RELEASED PARTY.**

**THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSES OF ACTION.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN, THE CONFIRMATION ORDER OR UNDER ANY OTHER DEFINITIVE DOCUMENT OR OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN, THE CONFIRMATION ORDER OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER. THE INJUNCTION IN THE PLAN SHALL EXTEND TO ANY SUCCESSORS AND ASSIGNS OF THE DEBTOR AND THE REORGANIZED DEBTOR AND ITS RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

(f) <u>Protection Against Discriminatory Treatment</u>

In accordance with Section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which the Reorganized Debtor has been or is associated, solely because the Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case, but before the Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

(g) <u>Release of Liens</u>

Except as otherwise specifically provided in the Plan, the Takeback Debt, the Revolving Credit Facility (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest related to the Takeback Debt and/or the Revolving Credit Facility), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor, the Trustee or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtor or the Reorganized Debtor, the Trustee shall execute and deliver all documents reasonably requested by the Debtor, Reorganized Debtor or administrative agent(s) for the Takeback Debt and/or the Revolving Credit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtor and its designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

(h) <u>Reimbursement of Contribution</u>

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**(i)**      **Recoupment**

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**5.8      Conditions Precedent to the Effective Date**

**(a)**      **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article 9.02 of the Plan:

(a)      The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

(b)      The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated and all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Restructuring Support Agreement by the Debtor or the Ad Hoc Noteholder Group for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Case and the related automatic stay;

(c)      The Grier Members' consent to the Restructuring Support Agreement shall remain in full force and effect;

(d)      The Plan, any other Definitive Documents, and all documents contained in the Plan Supplement, including any exhibits, schedules, annexes, amendments, modifications, or supplements thereto shall have been executed and/or filed with the Bankruptcy Court and shall be consistent in all respects with the Restructuring Support Agreement;

(e)      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring Transactions, the Restructuring Support Agreement or any of the Definitive Documents contemplated thereby;

(f)      The conditions precedent to the effectiveness of the Takeback Debt, if any, (as determined in any Takeback Debt documentation) shall have been satisfied or duly waived in writing and any documents or instruments related to the Takeback Debt shall have closed or will close simultaneously with the effectiveness of the Plan;

(g)      The conditions precedent to the effectiveness of the Revolving Credit Facility, if any, (as determined in the Revolving Credit Facility Documents) shall have been satisfied or duly waived in writing and any documents or instruments related to the Revolving Credit Facility shall have closed or will close simultaneously with the effectiveness of the Plan;

(h)      The Debtor shall have obtained any and all requisite regulatory approvals, and any other

73

authorizations, consents, rulings, or documents required to implement and effectuate the Plan and the Restructuring Transactions;

(i)      The Debtor shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement;

(j)      All conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Governance Documents shall have been waived or satisfied in accordance with the terms thereof;

(k)      To the extent required under applicable non-bankruptcy law, any amendments to the Debtor's governance and organizational documents, shall have been duly filed with the applicable authorities in the relevant jurisdictions; and

(l)      All Restructuring Fees and Expenses for which an invoice has been received by the Debtor on or before two (2) Business Days before the expected Effective Date and professional fees and expenses of Retained Professionals approved by the Bankruptcy Court shall have been paid in full.

**(b)**     **Waiver of Conditions Precedent**

The Debtor (with the express consent of the Ad Hoc Noteholder Group pursuant to the same percentages as required in the Restructuring Support Agreement, in writing), may waive any of the conditions to the Effective Date set forth in Article 9.01 of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time (subject to the consent of the Ad Hoc Noteholder Group).

**(c)**     **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, or if, prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then (except as provided in any such Final Order): (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

**(d)**     **Substantial Consummation**

"*Substantial Consummation*" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**5.9**     **Modification, Revocation, or Withdrawal of the Plan**

    **(a)**     **Modification of Plan**

HB: 4863-9936-1961.1

Effective as of the date hereof: (a) the Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtor (subject to the terms of the Restructuring Support Agreement and the consents required therein) or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein. Notwithstanding anything to the contrary herein, the Debtor or the Reorganized Debtor, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Restructuring Support Agreement.

### (b)    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute (a) approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to Section 1127(a) of the Bankruptcy Code; and (b) a finding that such modifications to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### (c)    Revocation or Withdrawal of Plan

The Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) the Restructuring Support Agreement will be null and void in all respects; (c) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (d) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## 5.10    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against the Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary,

75

liquidate, any Cure or Claims arising therefrom, including pursuant to Section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article 6.03 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to Section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

14.      enter an order or Final Decree concluding or closing the Chapter 11 Case;

15.      enforce all orders previously entered by the Bankruptcy Court; and

HB: 4863-9936-1961.1

16.      hear any other matter not inconsistent with the Bankruptcy Code;

*provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to the Takeback Debt, Revolving Credit Facility, and the New Governance Documents. The Takeback Debt, Revolving Credit Facility, and the New Governance Documents shall be governed by the respective jurisdictional provisions therein.

**5.11    Miscellaneous Provisions**

**(a)      Immediate Binding Effect**

Subject to Article 9.01 of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**(b)      Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan Reservation of Rights.

**(c)      Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**(d)      Successor and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**(e)      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be served on:

| Debtor | Counsel to the Debtor |
|---|---|

| | |
|---|---|
| CorEnergy Infrastructure Trust, Inc.<br>Attn: Chris Reitz<br>1100 Walnut St., Kansas City, MO 64106<br>E-mail: creitz@corenergy.reit | Husch Blackwell LLP<br>4801 Main Street, Suite 1000<br>Kansas City, MO 64112-2551<br>Attn:<br>Mark T. Benedict and<br>John J. Cruciani<br>Email:<br>mark.benedict@huschblackwell.com<br>john.cruciani@huschblackwell.com |
| **Office of United States Trustee** | **Counsel to the Ad Hoc Noteholder Group** |
| Office of United States Trustee for Region 13 | Faegre Drinker Biddle & Reath LLP<br>1177 Avenue of the Americas, 41st Floor<br>New York, New York 10036, USA<br>Attn:<br>James H. Millar and<br>Laura E. Appleby<br>Email:<br>james.millar@faegredrinker.com<br>laura.appleby@faegredrinker.com |

After the Effective Date, the Reorganized Debtor has authority to send a notice to Entities informing them that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**(f)**      **Term of Injunction or Stays**

**Unless otherwise provided herein, in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**(g)**      **Entire Agreement**

Except as otherwise indicated or as set forth in the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**(h)**      **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date, consistent with the Restructuring Support Agreement. After the exhibits and

78

documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Notice and Claims Agent's website at https://cases.stretto.com/corenergy or the Bankruptcy Court's website at www.mow.uscourts.gov/bankruptcy.

**(i)      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

**(j)      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor, and its respective Affiliates, agents, representatives, members, principals, shareholders, officers, trustees, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**(k)      Dissolution of Statutory Committees and Cessation of Fee and Expense Payment**

On the Effective Date, any Statutory Committee appointed in the Chapter 11 Case shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case, except with respect to final fee applications of the Retained Professionals and any consent or consultation rights of the Statutory Committee that remain applicable after the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees or expenses incurred by the members or Retained Professionals of any Statutory Committee or any other statutory committee appointed in the Chapter 11 Case after the Effective Date except with respect to any consent or consultation rights of any Statutory Committee that remain applicable after the Effective Date.

**(l)      Closing of Chapter 11 Case**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**(m)      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any

argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers.

## ARTICLE VI
## EVENTS DURING THE CHAPTER 11 CASE

### 6.1    Commencement of the Chapter 11 Case and Filing of First Day Motions

In accordance with the Restructuring Support Agreement, CorEnergy filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 25, 2024 (the "Petition Date"). The filing of the petition commenced the Chapter 11 Case, at which time the Debtor was afforded the benefits, and became subject to the limitations, of the Bankruptcy Code. The Debtor intends to continue to operate its business in the ordinary course consistent with past practices and subject to and in accordance with the terms and conditions of the Restructuring Support Agreement during the pendency of the Chapter 11 Case as it had prior to the Petition Date.

To allow for a smooth transition into Chapter 11, the Debtor filed, on the Petition Date, various motions (the "First Day Motions") seeking relief from the Bankruptcy Court. The First Day Motions will ensure a seamless transition between the Debtor's prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Case, and minimize any disruptions to the Debtor's operations. The First Day Motions, and all orders for relief entered in the Chapter 11 Case will be available upon the filing, and can be viewed free of charge at https://cases.stretto.com/corenergy.

The following is a brief overview of the relief sought in the First Day Motions to enable the Debtor to maintain its operations in the ordinary course.

### (a)    Cash Management System

The Debtor maintains a cash management system designed to receive and distribute cash. On the Petition Date, the Debtor sought authority from the Bankruptcy Court to continue the use of its existing cash management system, bank accounts, and related business forms to avoid a disruption in the Debtor's operations and facilitate the efficient administration of the Chapter 11 Case.

### (b)    Employee Wages and Benefits

The Debtor's business relies upon various employees. To minimize the uncertainty and potential distractions associated with the Chapter 11 Case and the potential disruption of the Debtor's operations resulting therefrom, the Debtor filed, on the Petition Date, a motion seeking authority from the Bankruptcy Court to continue to honor its obligations to its workforce in the ordinary course of business, including: (i) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, if any; (ii) the payment of pre- and postpetition accrued and unpaid employee benefits; and (iii) the continuation of certain of the Debtor's benefit and incentive programs and policies and other workforce programs.

### (c)    Utilities

In connection with the operation of its business, CorEnergy uses certain utilities. Most, but not all the utilities are provided as part of the lease, and CorEnergy has no contract with the utility providers. CorEnergy separately uses telephone and internet, but CorEnergy does not directly contract with the relevant utility providers. CorEnergy is a party to an administrative services agreement with a subsidiary,

Corridor Infratrust Management, LLC, pursuant to which the subsidiary entered into the necessary contracts with utility providers. Historically, the subsidiary paid such service providers and was then paid by CorEnergy. However, for the last several years, CorEnergy has paid all such providers directly, although the contract remains with the subsidiary. Thus, CorEnergy has not filed and does not anticipate needing to file a motion with respect to utility service providers.

     **(d)**     **Taxes**

Because of its status as a REIT and because of its organizational structure, CorEnergy does not regularly pay taxes, fees, or similar charges and assessments to taxing, regulatory, or other governmental authority in the ordinary. Accordingly, CorEnergy has not filed and does not anticipate needing to file a motion with respect to the payment of pre-petition taxes.

**6.2**     **Combined Hearing, Solicitation Procedures, and Proposed Confirmation Schedule**

The Debtor anticipates filing, in the near term, a motion (the "Disclosure Statement Motion") requesting that the Bankruptcy Court, among other things, (a) schedule a hearing to consider the adequacy of the Disclosure Statement on a final basis and confirmation of the Plan, (b) approve the Debtor's proposed solicitation procedures with respect to the Plan and this Disclosure Statement, (c) approve the form and manner of notices, and (d) conditionally approve the Disclosure Statement. The Debtor anticipates that notice of the Combined Hearing will be published and mailed to all known Holders of Claims and Interests at least 28 days before the date by which objections to Confirmation must be filed with the Bankruptcy Court.

The Restructuring Support Agreement requires that the Debtor proceed in accordance with the Milestones, including securing confirmation of the Plan by no later than 11:59 p.m. (EST) on June 10, 2024. Although the Debtor will request that the Bankruptcy Court approve the timetable set forth in the Restructuring Support Agreement, there can be no assurance that the Bankruptcy Court will grant such relief. Achieving the various Milestones under the Restructuring Support Agreement is crucial to maintaining the support of the Ad Hoc Noteholder Group and reorganizing the Debtor successfully.

**6.3**     **Other Procedural Motions**

     **(a)**     **Ordinary Course Professionals**

As of the Petition Date, the Debtor employed various professionals in the ordinary course of business, consisting of various law firms, attorneys, auditors, tax professionals, and other non-attorney professionals. The Debtor anticipates filing, in the near term, a motion to authorize the retention of those professionals in the ordinary course.

**6.4**     **Retention and Compensation of Professionals**

To assist the Debtor in carrying out its duties as debtor in possession and to otherwise represent the Debtor's interests in this Chapter 11 Case, the Debtor has filed or will file applications to retain and employ the following advisors: (a) Husch Blackwell LLP and Stinson LLP, as counsel to the Debtor; (b) Miller Buckfire, Teneo Capital LLC, and KPMG as financial advisors; and (c) Ernst & Young LLP, as accountant to the Debtor.

     **(a)**     **Restructuring Expenses**

Most of the Professionals will seek compensation for the time based on the time spent in connection

with the Chapter 11 Case. Certain Professionals, however, are entitled to certain fees in connection with the consummation of the Restructuring Transactions. The chart below summarizes the types of compensation each Professional may be entitled to, including success fees, and, where able, provides the estimated amount of such compensation.

| Professional | Hourly Compensation | Monthly Flat Fee | Transaction Success Fee | Financing Fee |
|---|---|---|---|---|
| ***Estate's Professionals*** | | | | |
| Husch Blackwell LLP | Yes | No | No | No |
| Stinson LLP | Yes | No | No | No |
| Miller Buckfire | No | Yes $100,000 | Yes $2,900,000 | Yes $100,000 |
| Teneo Capital LLC | Yes | No | No | No |
| KPMG LLP | Yes | No | No | No |
| Ernst & Young LLP | Yes | No | No | No |
| ***Creditor's Professionals*** | | | | |
| Faegre Drinker Biddle & Reath LLP | Yes | No | No | No |
| Spencer Fane LLP | Yes | No | No | No |
| Perella Weinberg Partners LP | No | Yes $125,000 | Yes $2,125,000 | Yes $0 |

## ARTICLE VII
## CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

## 7.1    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, Holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information (in the factors) set forth or otherwise incorporated by reference in this Disclosure Statement, including in documents filed with the SEC by CorEnergy.

HB: 4863-9936-1961.1

**7.2**     **Risks Relating to the Plan and Other Bankruptcy Law Considerations**

**(a)**     **The Debtor Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtor's Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtor estimates that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 105 days from the Petition Date and that Consummation will occur between 15 and 30 days thereafter, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy, and the Debtor cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, the pendency of the bankruptcy proceeding could itself have an adverse effect on the Debtor's business. There is a risk, due to uncertainty about the Debtor's future that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, customers, or other business partners could attempt to terminate their relationship with the Debtor or demand financial assurances or enhanced performance, any of which could impair the Debtor's prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtor's business.

Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

The disruption that the bankruptcy process would have on the Debtor's business could increase with the length of time it takes to complete the Chapter 11 Case. If the Debtor is unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtor may be forced to operate in bankruptcy for an extended period of time while it tries to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

**(b)**     **Risk of Non-Occurrence of the Effective Date**

There can be no assurance as to the timing for achieving the Effective Date or even as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the occurrence of the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not occur and the Plan will not be Consummated, and then any order entered by the Bankruptcy Court confirming the Plan may be vacated—in which event, no distributions would be made under the Plan, the Debtor and all holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to claims and interests would remain unchanged.

83

(c)   **If the Debtor Does Not Complete the Restructuring Transactions, it May Seek Restructuring Alternatives That Result in Less Value to Holders of Claims and Interests Than They Would Receive Pursuant to the Plan**

If the Debtor does not consummate the Restructuring Transactions, it may pursue an alternative plan or plans of reorganization. There can be no assurance that the Debtor would be able to effect any such alternative plan of reorganization or that any such alternative plan of reorganization would be on terms as favorable to the Holders of Claims and Interests as the terms of the restructuring pursuant to the Plan. In addition, the Debtor's creditors may take certain legal actions against the Debtor, which could include foreclosure or liquidation of the Debtor's assets. If a liquidation or protracted reorganization of the Debtor were to occur, there is a substantial risk that the value of the Debtor's assets (and ultimately the value of the Debtor) would be eroded to the detriment of all stakeholders.

(d)   **The Bankruptcy Court May Dismiss the Chapter 11 Case**

Certain parties in interest may contest the Debtor's authority to commence and/or prosecute the Chapter 11 Case. If, pursuant to any such proceeding, the Bankruptcy Court finds that the Debtor could not commence the Chapter 11 Case for any reason, the Debtor may be unable to Consummate the transactions contemplated by the Restructuring Support Agreement and the Plan. If the Chapter 11 Case is dismissed, the Debtor may be forced to cease operations due to insufficient funding and/or liquidate its business in another forum to the detriment of all parties in interest.

(e)   **A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtor's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes of Claims and Interests are substantially similar to the other Claims and Interests in each such Class. A Holder of a Claim or Interest could, however, challenge the Debtor's classification. In such an event, the cost of the Chapter 11 Case and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtor's classification. If the Bankruptcy Court concludes that the classification of Claims and Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtor may need to modify the Plan (subject to the terms of the Restructuring Support Agreement). Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtor's classification of Claims and Interests is not appropriate.

(f)   **The Debtor May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor may seek Confirmation as promptly as practicable thereafter. If the Plan does not receive the required support from Class 4 or Class 5, the Debtor may elect to, among other things, amend the Plan, seek an alternative restructuring transaction under Chapter 11 of the Bankruptcy Code, or seek to sell its assets pursuant to Section 363 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative Chapter 11 plan or sale pursuant to Section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as the Restructuring Transactions contemplated by the Plan.

(g)    **The Support of the Ad Hoc Noteholder Group is Subject to the Terms of the Restructuring Support Agreement Which is Subject to Termination in Certain Circumstances, and the Termination of the Restructuring Support Agreement Could Adversely Affect the Chapter 11 Case**

Pursuant to the Restructuring Support Agreement, the Ad Hoc Noteholder Group has agreed to support the Restructuring Transactions set forth in the Plan. The Restructuring Support Agreement contains provisions that give the Debtor and the Ad Hoc Noteholder Group the ability to terminate the Restructuring Support Agreement if certain conditions are not satisfied or waived, including the failure to achieve certain milestones. Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of creditors holding Claims in number and amount sufficient to obtain Confirmation the Plan. Termination of the Restructuring Support Agreement could result in a protracted Chapter 11 Case, which could significantly and detrimentally impact the Debtor and its relationships with vendors, employees, customers, and other business partners or potentially the conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code.

(h)    **The Debtor May Not be Able to Obtain Confirmation of the Plan**

The Debtor cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of Section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor has entered into the Restructuring Support Agreement with certain of its creditors, including in the aggregate, more than 90% in principal amount of Senior Notes, to support the Plan, the Debtor may not receive the requisite acceptances of constituencies in the Chapter 11 Case to confirm the Plan. Even if all voting classes vote in favor of the Plan or the Bankruptcy Code requirements for "cramdown" are met with respect to any class that voted to reject or was deemed to reject the Plan, the Bankruptcy Court, which may exercise its substantial discretion as a court of equity, may choose not to confirm the Plan. The precise requirements and evidentiary showing for confirming a plan, notwithstanding its rejection by one or more impaired classes of claims or equity interests, depends upon a number of factors including, without limitation, the status and seniority of the claims or equity interests in the rejecting class (*i.e.*, secured claims or unsecured claims or subordinated or senior claims). With respect to impaired classes of claims or interests that do not accept a plan of reorganization, Section 1129(b) of the Bankruptcy Code requires such plan be fair and equitable (including, without limitation, compliance with the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of Section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan. If and when the Plan is filed with the Bankruptcy Court, there can be no assurance that modifications to the Plan would not be required in order to obtain Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could also fail to approve this Disclosure Statement, which would extend the timeline for confirming the Plan and emerging from Chapter 11.

If the Plan is not confirmed, the Chapter 11 Case may be converted into a case under Chapter 7 of

the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtor's analysis thereof are set forth in the unaudited Liquidation Analysis, attached hereto as Exhibit D. The Debtor believes that liquidation under Chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to Holders of Claims and Interests than those provided for in the Plan because of:

- the potential absence of a market for the Debtor's assets on a going concern basis;

- additional administrative expenses involved in the appointment of a Chapter 7 trustee; and

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of Unexpired Leases and other Executory Contracts in connection with a cessation of the Debtor's operations.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor would be able to reorganize its business and what, if anything, Holders of Claims against the Debtor would ultimately receive with respect to their Claims under a subsequent plan of reorganization (or liquidation).

Even if the Plan is confirmed by the Bankruptcy Court, it may not become effective because it is subject to the satisfaction of certain conditions precedent (some of which are beyond the Debtor's control) and, thus, the satisfaction of these conditions cannot be assured. If one or more conditions is not satisfied, emergence from the Chapter 11 Case could be (a) delayed or (b) compromised altogether. If emergence is delayed, the Debtor may not have sufficient cash available to operate its business. In that case, the Debtor may need new or additional post-petition financing, and there is no certainty that such financing will be obtainable. If, alternatively, the failure to satisfy one or more of these conditions renders the Debtor unable to successfully reorganize, it may not be able to continue its operations.

**(i)     The Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(j)     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**(k)     Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a

bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under Section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with Subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### (l)    Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, further disruptions to the industry and the global economy, changes in the industry, potential revaluing of its assets due to the Chapter 11 Case, and increasing expenses.

### (m)    Contingencies May Affect Distributions to Holders of Allowed Claims

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### (n)    Even if the Debtor Receives All Necessary Acceptances for the Plan to Become Effective, the Debtor May Fail to Meet All Conditions Precedent to Effectiveness of the Plan

Although the Debtor believes that the Effective Date would occur shortly after the Confirmation Date, there can be no assurance as to such timing. The Confirmation process could be subject to numerous, unanticipated potential delays, including a delay in the Bankruptcy Court's commencement of the Combined Hearing regarding the Plan.

The Confirmation and Consummation of the Plan are subject to certain conditions that may or may not be satisfied. The Debtor cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to consummation is not met or waived, the Effective Date will not occur. In the event that the Plan is not confirmed or is not consummated, the Debtor may seek Confirmation of an alternative plan of reorganization.

### (o)    Parties May Object to the Plan on Account of the Debtor Releases, Third-Party Releases, Exculpations, or Injunction Provisions

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtor, Reorganized Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtor's reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtor's reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

Any party in interest could object to the releases set forth in the Plan. Although the Debtor would oppose any such objection, in response to such an objection, the Bankruptcy Court could determine that these provisions are not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision, with the consent of the parties to the Restructuring Support Agreement in accordance with the Restructuring Support Agreement. This determination could result in substantial delay in Confirmation of the Plan, the Plan not being confirmed at all, the loss of support for the Plan from the parties to the Restructuring Support Agreement, or certain Released Parties may withdraw their support for the Plan.

(p)    **The Debtor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtor reserves the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the Restructuring Support Agreement necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtor seeks to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest Holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(q)    **The Plan May Have Material Adverse Effects on the Debtor's Operations**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Case could adversely affect the relationships between the Debtor and its respective customers, employees, partners, and other parties. Such adverse effects could materially impair the Debtor's operations.

(r)    **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtor's Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of one hundred twenty (120) days from the Petition Date. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were entered, parties in interest other than the Debtor would then have the opportunity to propose alternative plans of reorganization.

If another party in interest proposed an alternative plan of reorganization following expiration or termination of the Debtor's exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests and may seek to exclude such Holders from retaining any equity under their proposed plan.

The Debtor considers maintaining relationships with its stakeholders, customers, and other partners as critical to maintaining the value of its enterprise following the Effective Date and has sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtor's assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Case likely would become longer, more complicated, more litigious, and much more expensive. If this were to occur, or if the Debtor's stakeholders or other constituencies important to the Debtor's business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing Sections also could occur.

**(s)      The Debtor's Business May Be Negatively Affected if the Debtor Is Unable to Assume its Executory Contracts**

An executory contract is a contract as to which performance remains due to some extent by both contract parties. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases as of the Effective Date, subject to certain exceptions, as set forth in Article 5.01 of the Plan. The Debtor intends to preserve as much of the benefit of its existing Executory Contracts and Unexpired Leases as possible. However, if the Debtor is unable for any reason to assume its Executory Contracts and Unexpired Leases as of the Effective Date, then it would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

**(t)      Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within ninety (90) days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtor's material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer. Notwithstanding the above, the Debtor does not believe it has made any transactions that constitute a fraudulent conveyance, preference, or would otherwise be subject to avoidance under the Bankruptcy Code.

**(u)      Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article X of this Disclosure Statement titled "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" to determine how the tax implications of the Plan and the Chapter 11 Case may affect the Debtor, the Reorganized Debtor, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

**7.3      Risk Related to the Takeback Debt and Revolving Credit Facility**

(a)    **Insufficient Cash Flow to Meet Debt Obligations**

The Reorganized Debtor's ability to make scheduled payments on, or refinance its debt obligations, depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtor's control. The Reorganized Debtor may be unable to maintain a level of cash flow sufficient to permit the Reorganized Debtor to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings under the Takeback Debt and the Revolving Credit Facility.

(b)    **Defects in Collateral**

The indebtedness under the Takeback Debt and the Revolving Credit Facility will be secured, subject to certain exceptions and permitted liens, on a first-priority basis by direct or indirect security interests in certain of the Reorganized Debtor's assets, which may be subject to exceptions, defects, encumbrances, liens, and other imperfections. It cannot be assured that the remaining proceeds from a sale of such collateral would be sufficient to repay holders of the debt under the Takeback Debt and the Revolving Credit Facility all amounts owed to them. The fair market value of the such collateral is subject to fluctuations based on factors that include, among others, the ability to sell such collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtor's failure or success to implement their business strategy, and similar factors. The amount received upon a sale would be dependent on numerous factors, including the actual fair market value of such collateral at such time, and the timing and manner of the sale. By its nature, portions of the collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the collateral will be sufficient to pay the Reorganized Debtor's obligations under the Takeback Debt and the Revolving Credit Facility, in full or at all. There can also be no assurance that the collateral will be saleable and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Takeback Debt and the Revolving Credit Facility.

(c)    **Failure to Perfect Security Interests in Collateral**

The failure to properly perfect liens on the collateral securing the Takeback Debt and the Revolving Credit Facility could adversely affect ability to enforce the respective lender's rights with respect to the Takeback Debt and the Revolving Credit Facility and the collateral under the same. In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that appropriate actions will be taken to perfect a security interest in such future acquired property and rights. Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

(d)    **Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtor**

Any future pledge of collateral in connection with the Takeback Debt and the Revolving Credit Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Takeback Debt and the Revolving Credit Facility to receive a greater recovery than if the pledge had not been given, or a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

**7.4**     <u>**Risks Relating to the New Common Stock**</u>

**(a)**     <u>**The Reorganized Debtor May Not Be Able to Achieve its Projected Financial Results**</u>

The Reorganized Debtor may not be able to achieve its projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtor's management team's best estimate of the Reorganized Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor's operations, as well as the United States and world economies in general, and the industry segments in which the Debtor operates in particular. While the Debtor believes that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Reorganized Debtor does not achieve its projected financial results, the value of the New Common Stock may be negatively affected and the Reorganized Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

**(b)**     <u>**The Plan Exchanges Senior Indebtedness for Securities**</u>

If the Plan is confirmed and consummated, certain Holders of Senior Notes will receive New Common Stock, subject to the conditions contained in the Plan. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for the New Common Stock, which will be subordinate to all future creditor claims.

**(c)**     <u>**The Implied Valuation of the New Common Stock is Not Intended to Represent Trading Value of the New Common Stock**</u>

The Reorganized Debtor's valuation is not intended to represent the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. While it is not anticipated that there will be an active trading market for the New Common Stock, if a market were to develop, actual market prices of such securities at issuance will depend on the following considerations, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Stock may be volatile. Many factors, including factors unrelated to the Reorganized Debtor's actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued under the Plan does not reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

**(d)**     <u>**Trading Market for the New Common Stock**</u>

While the Reorganized Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules, there can be no assurance as to the development or liquidity of any market for the New Common Stock. The Reorganized Debtor will be under no obligation to list the New Common Stock on any national securities exchange. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. If an active trading market for the New Common Stock does not develop or is not

maintained, the market price and the liquidity of these securities will be adversely affected and such Holders may not be able to sell their securities at desired times or prices, or at all. In addition, on the date of emergence, it is expected that the Reorganized Debtor will not be required under United States securities laws to file any reports with the SEC following de-registration of the Common Stock and Preferred Stock which may further impair liquidity. Accordingly, holders of the New Common Stock may bear certain risks associated with holding securities for an indefinite period of time.

(e)   **Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

The New Common Stock will not be registered under the Securities Act or any state securities laws and, subject to the discussion below and in Article IX to this Disclosure Statement entitled "**Important Securities Law Disclosure**," unless so registered, may not be reoffered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. The Debtor does not intend to register the New Common Stock under the Securities Act or to offer to exchange the New Common Stock in an exchange offer registered under the Securities Act. As a result, the New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws. The New Common Stock (other than Securities issuable under the Management Incentive Plan) may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such securities as discussed further below.

The New Common Stock issued under the Plan  (other than Securities issuable under the Management Incentive Plan) may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in Section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, such securities will not be freely tradeable if, at the time of transfer, the Holder is an "Affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act or had been such an "Affiliate" within 90 days of such transfer. Such Affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. In addition, such Holders would need to comply with any transfer requirements set forth in the Governance Documents and Shareholder Agreement.

The Securities issuable under the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act or other available exemptions from registration under the Securities Act. To the extent that securities issued pursuant to the Plan are not covered by Section 1145(a) of the Bankruptcy Code, such securities will be issued pursuant to Section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "Affiliate" of the issuer, as defined in Rule 144. A non-Affiliate who has not been an Affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-Affiliate may resell after a one-year holding period.

An Affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the Affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

The New Common Stock will not initially be registered under the Securities Act or any state securities laws. The Debtor makes no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock. The Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules.  However, there can be no assurance that the Debtor will be able to make publicly available the requisite information regarding the Debtor required under Rule 144, and, as a result, after the requisite holding period, Rule 144 may not be available for resales of the New Common Stock by Persons deemed to be underwriters or affiliates. In addition to the transfer restrictions discussed above, such Holders would need to comply with any transfer requirements set forth in the New Governance Documents and Shareholder Agreement. See Article IX to this Disclosure Statement, titled "**Important Securities Law Disclosure**."

(f)    **Certain Significant Holders of New Common Stock May Have Substantial Influence Over the Reorganized Debtor Following the Effective Date**

Assuming that the Effective Date occurs, Holders of Claims who receive distributions representing a substantial percentage of the outstanding New Common Stock may be in a position to influence matters requiring approval by the Holders of New Common Stock, including, among other things, the approval of a change of control of the Reorganized Debtor. If the Plan is confirmed and consummated, Holders of Allowed Senior Note Claims will own approximately 86.8-89% of the New Common Stock, subject to dilution as set forth in the Plan. The Holders may have interests that differ from those of the other Holders of New Common Stock and may vote in a manner adverse to the interests of other Holders of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtor and consequently impact the value of the New Common Stock and the tax attributes of the Reorganized Debtor. In addition, a Holder of a significant number of New Common Stock may sell all or a large portion of its securities within a short period of time, which sale may adversely affect the trading price of the New Common Stock. A Holder of a significant number of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtor's business, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtor. Such actions by Holders of a significant number of New Common Stock may have a material adverse impact on the Reorganized Debtor's business, financial condition, and operating results.

(g)    **The New Common Stock is Subject to Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the issuance of equity under the Management Incentive Plan, issuances made by the Reorganized Debtor after the Effective Date and the conversion of any options, warrants, convertible securities, exercisable securities or other securities that may be issued post-emergence. In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtor could adversely affect the value of the New Common Stock. The amount and dilutive effect of any of the foregoing could be material.

(h)    **The Debtor's Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Which They Are Based**

The Debtor's Financial Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of

the Reorganized Debtor; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtor and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement or subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtor's operations. These variations may be material and may adversely affect the ability of the Debtor to make payments with respect to indebtedness following Consummation. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtor does not intend to update the projections and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

**7.5**   **Risks Relating to the Business of the Debtor and the Reorganized Debtor**

**(a)**   **The Reorganized Debtor May Not Be Able to Repay or Refinance All of its Post-Effective Date Indebtedness, if Any**

The Reorganized Debtor's ability to repay or refinance its post-Effective Date debt obligations, if any, depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtor's control. The Reorganized Debtor may be unable to maintain a level of Cash flow from sufficient to permit the Reorganized Debtor to repay or refinance its post-Effective Date indebtedness.

**(b)**   **Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's or the Reorganized Debtor's Business**

The Debtor's and the Reorganized Debtor's future results will be dependent upon the successful confirmation and implementation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's and the Reorganized Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Case continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's and the Reorganized Debtor's business. In addition, the longer the proceedings related to the Chapter 11 Case continue, the more likely it is that customers and suppliers will lose confidence in the Debtor's ability to reorganize its business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Case continue, the Debtor may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Case. If the Chapter 11 Case lasts longer than anticipated, the Debtor may require debtor-in-possession financing to fund the Debtor's operations. If the Debtor is unable to obtain such financing should those circumstances arise, the chances of successfully reorganizing the Debtor's business may be seriously jeopardized, the likelihood that the Debtor will instead be required to liquidate or sell its assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for the liabilities

HB: 4863-9936-1961.1

that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### (c)      Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Case, the Debtor expects that its financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtor's consolidated financial statements. As a result, the Debtor's historical financial performance likely will not be indicative of its financial performance after the Petition Date.

In addition, if the Debtor emerges from Chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization. The Debtor also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852, in which case its assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtor's consolidated balance sheets. The Debtor's financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in Exhibit F attached hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### (d)      The Loss of Key Personnel Could Adversely Affect the Debtor's Operations

As a result of the Chapter 11 Case, the Debtor or the Reorganized Debtor may experience increased levels of employee attrition, since the Debtor's and the Reorganized Debtor's employees may face considerable distraction and uncertainty. The Debtor's or the Reorganized Debtor's future operational performance depends to a significant degree upon the continued service of key members of their management as well as marketing, sales and operations personnel. A loss of one or more of the Debtor's or the Reorganized Debtor's key personnel or material erosion of employee morale could have a material adverse effect on their businesses and results of operations. The uncertainty caused by the Chapter 11 Case could also cause the Debtor and the Reorganized Debtor to be a less desirable employer and make it more difficult to identify and recruit replacement employees as needed. This could impair ability to execute the Debtor's business strategies and implement operational initiatives, which would be likely to have a material adverse effect on its business, financial condition and results of operations as well. The Debtor and the Reorganized Debtor believe their future success will also depend in large part upon their ability to attract, retain and further motivate highly skilled management, marketing, sales and operations personnel. The Debtor or the Reorganized Debtor may experience intense competition for personnel, and they may not be able to retain key employees or be successful in attracting, assimilating and retaining personnel in the future.

In addition, the Debtor's or the Reorganized Debtor's ability to attract, recruit and retain key personnel may be negatively impacted by the Debtor's emergence from the Chapter 11 Case and the uncertainties currently facing the industry in which it operates. Accordingly, the Debtor's and Reorganized Debtor's employee recruitment, retention, and motivation efforts are critical to the success of the Chapter 11 Case and the Debtor's and the Reorganized Debtor's ability to operate on a go-forward basis.

### (e)      The Reorganized Debtor May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case

While prepetition litigation claims will be treated and discharged in accordance with the terms of

the Plan, the Reorganized Debtor may become parties to litigation in the future. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtor's financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to completely predict the potential litigation that the Reorganized Debtor may become party to nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtor's business and financial stability, however, could be material.

### (f) Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's or the Reorganized Debtor's Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to a debtor's filing of its Chapter 11 petition or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the reorganized debtor's financial condition and results of operations on a post-reorganization basis.

### (g) The Reorganized Debtor May Not Be Able to Accurately Report Its Financial Results

The Debtor has established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtor's financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtor fails to maintain the adequacy of its internal controls, the Debtor may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtor's financial reporting under any applicable OTC or SEC rules and regulations or the terms of the agreements governing the Debtor's indebtedness. Any such difficulties or failure could materially adversely affect the Debtor's business, results of operations, and financial condition. Further, the Debtor may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtor's business, results of operations, and financial condition.

### (h) The Reorganized Debtor May Not Continue to Be Treated as a REIT

The Reorganized Debtor may not intend to continue to be treated as a REIT for U.S. federal income tax purposes following the Effective Date. Even if the Reorganized Debtor intends to continue to be treated as a REIT after the Effective Date, the Reorganized Debtor may not meet the conditions for qualification as a REIT or compliance with the REIT requirements may hinder the Reorganized Debtor's ability to grow, which could adversely affect the value of the Reorganized Debtor and its stock, or cause holders of the stock to incur tax liabilities in excess of cash distributions.

If, with respect to any particular taxable year, the Reorganized Debtor fails to maintain its qualification as a REIT, the Reorganized Debtor would not be allowed to deduct distributions to shareholders in computing its taxable income and federal income tax. The corporate level income tax would apply to the Reorganized Debtor's taxable income at regular corporate rates. As a result, the amount available for distribution to holders of the Reorganized Debtor's equity that would otherwise receive dividends would be reduced for the taxable year(s) involved, and the Reorganized Debtor would not be

required to make distributions to shareholders. In addition, unless entitled to relief under the relevant statutory provisions, the Reorganized Debtor would be disqualified from treatment as a REIT for four subsequent taxable years.

**(i)**     <u>**Other Risks Associated with the Debtor's Business and Industry**</u>

The risks associated with the Debtor's business and industry are more fully described in the Debtor's SEC filings, including its most recent Annual Report on Form 10-K. The risks associated with the Debtor's business and industry described in the Debtor's SEC filings include, but are not limited to, the following:

- the impact of regulatory actions in California to curtail oil production;

- changes in economic and business conditions in the energy infrastructure sector where the Debtor's investments are concentrated, including the financial condition of its customers or borrowers and general economic conditions in the U.S. and in the particular sectors of the energy industry served by each of its infrastructure assets, including inflationary and recessionary risks;

- systemic pressures in the banking system, including potential disruptions in credit markets;

- competitive and regulatory pressures on the revenues of the Debtor's California intrastate crude oil transportation business and its interstate natural gas transmission business;

- risks associated with the receipt of CPUC approval for the Debtor to obtain operational control over Crimson's CPUC-regulated pipeline assets;

- the impact of environmental, pipeline safety and other laws and governmental regulations applicable to certain of the Debtor's infrastructure assets, including additional costs imposed on its business or other adverse impacts as a result of any unfavorable changes in such laws or regulations;

- the Debtor's ability to comply with covenants in instruments governing its indebtedness;

- the potential impact of greenhouse gas regulation and climate change on the Debtor or its customers' business, financial condition and results of operations;

- risks associated with security breaches through cyber-attacks or acts of cyber terrorism or other cyber intrusions, or any other significant disruptions of the Debtor's information technology (IT) networks and related systems;

- risks associated with the age of Crimson's assets, which were constructed over many decades, and which may increase future inspection, maintenance or repair costs, or result in downtime that could have a material adverse effect on the Debtor's business and results of operations;

- the loss of any member of the Debtor's management team;

97

- changes in interest rates under the Debtor's debt arrangements that it may enter into in the future;

- the Debtor's dependence on key customers for significant revenues, and the risk of defaults by any such customers;

- the ability of the Debtor's customers to secure adequate insurance and risk of potential uninsured losses, including from natural disasters;

- the continued availability of third-party pipelines or other facilities interconnected with certain of the Debtor's infrastructure assets;

- risks associated with owning, operating or financing properties for which the Debtor's or its customers' operations may be impacted by extreme weather patterns and other natural phenomena;

- market conditions and related price volatility affecting the Debtor's securities;

- changes in federal or state tax rules or regulations that could have adverse tax consequences;

- the Debtor's ability to maintain internal controls and processes to ensure that all transactions are properly accounted for, that all relevant disclosures and filings are timely made in accordance with all rules and regulations, and that any potential fraud or embezzlement is thwarted or detected;

- changes in federal income tax regulations (and applicable interpretations thereof), or in the composition or performance of our assets, that could impact the Debtor's ability to continue to qualify as a REIT for federal income tax purposes;

- conflicts of interest that some of the Debtor's directors and officers may have with respect to certain other business interests related to the Crimson Transaction;

- risks related to potential terrorist attacks, acts of cyber-terrorism, or similar disruptions that could disrupt access to the Debtor's information technology systems or result in other significant damage to its business and properties, some of which may not be covered by insurance;

- the loss of crude oil volumes on pipelines indirectly owned by Crimson due to lower than expected oil production in California or changes in customer shipping practices; and

- other risks referenced from time to time in filings with the SEC and those factors listed or incorporated by reference into this Disclosure Statement.

**7.6**   **Disclosure Statement Disclaimer**

**(a)**     **Information Contained Herein Is Solely for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances

of the Plan and may not be relied upon for any other purpose.  Specifically, this Disclosure Statement is not legal advice to any Person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

<div align="center">

**(b)**    **Disclosure Statement May Contain Forward-Looking Statements**

</div>

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtor considers all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- business strategy;

- financial condition, revenues, cash flows and expenses;

- levels of indebtedness, liquidity and compliance with debt covenants;

- financial strategy, budget, projections and operating results;

- the amount, nature and timing of capital expenditures;

- availability and terms of capital;

- costs of conducting the Debtor's operations;

- general economic and business conditions;

- counterparty credit risk;

- uncertainty regarding the Debtor's future operating results;

- plans, objectives and expectations;

- adequacy of the Debtor's capital resources and liquidity;

- the Debtor's ability to satisfy future cash obligations;

- potential financing sources;

- the bankruptcy process;

- the Debtor's ability to obtain approval from the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Chapter 11 case;

- the effects of Chapter 11 on the interests of various constituents; and

- the ability to confirm and consummate the Plan.

Statements concerning these and other matters are not guarantees of the Debtor's future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the Financial Projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtor's estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those they may project, and the Debtor undertakes no obligation to update any such statement.

### (c)      This Disclosure Statement Has Not Been Approved by the SEC

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

### (d)      No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

### (e)      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtor) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims, or any other parties-in-interest.

### (f)      Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. All Parties, including the Debtor, reserve the right to continue to investigate Claims and file and prosecute objections to Claims.

### (g)      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor to object to that Holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether

any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

**(h)** **Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors**

Counsel to and other Advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other Advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

**(i)** **The Potential Exists for Inaccuracies and the Debtor Has No Duty to Update**

The Debtor makes the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered by the Bankruptcy Court.

**(j)** **No Representation Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE VIII
## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 8.1 The Combined Hearing

Under Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtor will request, through the Disclosure Statement Motion, that the Bankruptcy Court approve the Plan and Disclosure Statement. The Combined Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing. Subject to Section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

HB: 4863-9936-1961.1

Additionally, Section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtor, in the Disclosure Statement Motion, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 8.2    <u>Confirmation Standards</u>

Among the requirements for Confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to Section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Debtor believes that the Plan fully complies with all the applicable requirements of Section 1129 of the Bankruptcy Code set forth below, other than those pertaining to voting, which has not yet taken place.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor (or any other proponent of the Plan) has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtor (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, in connection with the Plan and incident to the Chapter 11 Case is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor (or any other proponent of the Plan) has disclosed or will disclose the identity and affiliations of any individual proposed to serve, after Confirmation, as a director or officer, of the Reorganized Debtor, any Affiliate of the Debtor reorganized under the Plan, or any successor to the Debtor under the Plan. The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

- The Debtor (or any other proponent of the Plan) has disclosed or will disclose the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such insider.

- With respect to each Holder within an Impaired Class of Claims or Interests, as applicable, each such Holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below); *see* <u>Section 9.5</u> of the Plan ("<u>Confirmation Without Acceptance by All Impaired Classes</u>").

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of Section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor, or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, if any, as that term is defined in Section 1114 of the Bankruptcy Code, at the level established pursuant to Subsection (e)(1)(B) or (g) of Section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the applicable Debtor has obligated itself to provide such benefits.

## 8.3    Best Interests Test / Liquidation Analysis

As described above, Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Based on the unaudited Liquidation Analysis attached hereto as Exhibit D, the Debtor believes that, if the Chapter 11 Case were converted to a case under Chapter 7 of the Bankruptcy Code, the value of any distributions would be no greater than the value of distributions under the Plan. As a result, the Debtor believes Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical Chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF THE DEBTOR FOR ANY PURPOSE.

## 8.4    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor prepared the Financial Projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit F**. Based on these Financial Projections, the Debtor believes the deleveraging contemplated by the Plan meets the financial feasibility

103

requirement.  Moreover, the Debtor believes that sufficient funds will exist to make all payments required by the Plan.  Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

**8.5    Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so- called "cram down" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

**(a)    No Unfair Discrimination**

The no "unfair discrimination" test applies to Classes of Claims and Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtor does not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtor believes the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

**(b)    Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Allowed Interests in such class.  As to a dissenting class, the test sets different standards depending on the type of Claims or Interests in such class.  To demonstrate that a plan is fair and equitable with respect to a dissenting class, the plan proponent must demonstrate the following:

- Secured Creditors:  Each holder of a secured claim (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors:  Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the plan.

- Holders of Interests:  Either (a) each holder of an impaired interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

The Debtor believes that the Plan and treatment of all Classes of Claims and Interests therein satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to

reject the Plan.

**8.6      Alternative to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, subject to the requirements of the Restructuring Support Agreement, the Debtor may seek to (a) prepare and present to the Bankruptcy Court an alternative plan for confirmation, (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code, or (c) liquidate its assets and business under Chapter 7 of the Bankruptcy Code. If the Debtor were to pursue a liquidation of its assets and business in Chapter 7, the Debtor would convert the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on creditors' recoveries and the Debtor is described in the unaudited Liquidation Analysis attached hereto as **Exhibit D**.

## ARTICLE IX
## IMPORTANT SECURITIES LAW DISCLOSURES

The Debtor believes that the New Common Stock and the Securities  to be issued pursuant to the Management Incentive Plan will be "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and any applicable Blue Sky Laws. No registration statement will be filed under the Securities Act, or pursuant to any Blue Sky Law with respect to the offer and distribution of securities under the Plan.

**9.1      Issuance of Securities under the Plan**

The offering, issuance and distribution of all of the New Common Stock pursuant to the Plan (other than Securities issuable to the participants in the Management Incentive Plan) will be exempt from the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on Section 1145 of the Bankruptcy Code as described in more detail below. The Securities issuable under the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act and other applicable law.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property. The Debtor believes that the offer and sale of the New Common Stock in exchange for the Claims satisfy the requirements of Section 1145(a) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any similar federal, state, or local law.

The Securities issuable under the Management Incentive Plan will be offered, issued, and distributed in reliance on Section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act and other applicable law. As a result, these Securities will be considered "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and applicable state securities laws.

Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Laws. As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

**9.2**    **Subsequent Transfers**

The New Common Stock issuable in exchange for the Claims (but excluding Securities issuable under the Management Incentive Plan) may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of such Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is (1) an "underwriter" with respect to such Securities, (2) an "affiliate" of the Debtor as defined in Rule 144(a)(1) of the Securities Act, (3) has been such an "affiliate" within 90 days of such transfer or (4) has acquired such Securities from an "affiliate" within one year of such transfer. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor may be deemed to be a "controlling person" of the debtor or successor under a plan of reorganization, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of Section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a call of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the New Common Stock offered, issued, and distributed pursuant to the Plan in reliance on Section 1145 of the Bankruptcy Code by entities deemed to be "underwriters" are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

Under certain circumstances, Holders of shares of New Common Stock offered, issued, and distributed pursuant to the Plan in reliance on Section 1145 of the Bankruptcy Code who are deemed to be "underwriters" may be entitled to resell shares of such New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act or another exemption under the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other

HB: 4863-9936-1961.1

conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "controlling person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely resell such New Common Stock. The Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules.  However, there can be no assurance that the Debtor will be able to make publicly available the requisite information regarding the Debtor, and, as a result, after the holding period, Rule 144 may not be available for resales of the New Common Stock by Persons deemed to be underwriters or otherwise at such time.

Unlike the Securities that will be issued pursuant to Section 1145 of the Bankruptcy Code, any Securities issued under the Management Incentive Plan in reliance on Section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act, and otherwise in compliance with any applicable state or foreign securities laws.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain public information regarding the issuer and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period described above if at the time of the sale certain current public information regarding the issuer is available. The Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules. However, there can be no assurance that the Debtor will be able to make publicly available the requisite information regarding the Debtor, and, as a result, after the holding period, Rule 144 may not be available for resales of the New Common Stock by affiliates. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the grater of one percent of the outstanding securities of the same class being sold and, if the class is listed on a stock exchange or automated quotation system, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must electronically file with the SEC a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice

107

unless an amended notice is filed.

Resales or transfers of New Common Stock may be further limited due to: (i) required compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (ii) restrictions, if any, on the transferability of such securities and instruments, including any restrictions on the transferability under the terms of the New Governance Documents or Shareholder Agreement; and (iii) applicable regulatory approvals.

**Because of the complex subjective nature of the question of whether a particular Person may be an underwriter or an affiliate and the highly fact-specific nature of the availability of an exemption from registration under the Securities Act, including the exemptions available under Section 1145 of the Bankruptcy Code and Rule 144 under the Securities Act, the Debtor makes no representation concerning the ability of a person to dispose of the Securities to be issued under or otherwise acquired pursuant to the Plan. Accordingly, the Debtor recommends that potential recipients of the Securities to be issued under or otherwise acquired pursuant to the Plan consult their own counsel concerning their ability to freely trade such Securities without compliance with the federal law and any applicable Blue Sky Laws. In addition, the New Common Stock will not be registered under the Exchange Act or listed on any national securities exchange.**

**All Persons shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the issuances of New Common Stock or other Securities issued under or otherwise acquired pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services. Notwithstanding anything to the contrary in the Plan or otherwise, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether such New Common Stock or other Securities are validly issued, fully paid and non-assessable, exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.**

**9.3    The Agreement**

Holders of the New Common Stock may enter into and be subject to the terms of a Shareholder Agreement, which will contain terms customary for this type of instrument and may restrict such Holder of New Common Stock for the purposes of preserving net operating losses.

**ARTICLE X**
**CERTAIN TAX CONSEQUENCES OF THE PLAN**

**10.1    Certain U.S. Federal Income Tax Consequences of the Plan**

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor, the Reorganized Debtor, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired, deemed to accept or reject the Plan or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue

Code of 1986, as amended (the "Tax Code"), regulations promulgated by the United States Department of the Treasury under the Tax Code (the "Treasury Regulations"), judicial authorities, published rules, positions, and pronouncements of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts. Accordingly, there can be no assurance that the IRS would not take a contrary position as to the U.S. federal income tax consequences described herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances, or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of one of various provisions of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, trusts, governmental authorities or agencies, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in foreign currency, Holders who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, Holders using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, Holders subject to the alternative minimum tax or the "Medicare" tax on net investment income and Holders who are accrual method taxpayers that report income on an "applicable financial statement" (as defined in section 451 of the Tax Code)). In addition, this discussion does not address U.S. federal taxes other than income taxes.

Additionally, this discussion assumes that (i) the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

(a)    **Certain REIT Considerations**

(i)    Failure to Qualify as a REIT Would Have Serious Adverse Consequences

CorEnergy has elected tax treatment as a REIT beginning with its tax year beginning January 1, 2013. CorEnergy has continued to report as a REIT on its annual federal income tax returns and other tax filings up to the date hereof and believes it has qualified as a REIT for U.S. federal income tax purposes under the Tax Code and intends to continue to do so through the time of consummation of the Plan. CorEnergy intends to continue operating in such a manner as to continue to qualify as a REIT following the consummation of the Plan. However, qualification as a REIT involves the application of highly technical and complex Tax Code provisions for which there are only limited judicial and administrative interpretations. For example, to qualify as a REIT, CorEnergy must derive at least 75% and 95% of its gross income in any year from certain qualifying sources. In addition, as described in further detail below, CorEnergy generally (i) must pay dividends to its stockholders aggregating annually at least 90% of its REIT taxable income (determined without regard to the dividends paid deduction and by excluding any net capital gain), (ii) must satisfy specified asset tests on a quarterly basis and (iii) must satisfy certain ownership tests. The determination of various factual matters and circumstances not entirely within CorEnergy's control may affect its ability to qualify as a REIT.

If CorEnergy loses its REIT status, it will face several adverse tax consequences that would substantially reduce its cash available for distribution, including cash available to pay Holders, because:

- it would be subject to U.S. federal income tax on its net income at the regular corporate rate for the years it did not qualify for taxation as a REIT (and, for such years, would not be allowed a deduction for dividends paid to stockholders in computing its taxable income);

- unless it is entitled to relief under applicable statutory provisions, neither it nor any "successor" company could elect to be taxed as a REIT until the fifth taxable year following the year during which it was disqualified; and

- for five years following re-election of REIT status, upon a taxable disposition of certain assets owned as of such re-election, it could be subject to corporate level tax with respect to any built-in gain inherent in such assets at the time of re-election and would have to distribute all of its non-REIT earnings and profits in taxable dividends before the end of its first taxable year.

As a result of all these factors, CorEnergy's failure to qualify as a REIT could materially adversely affect certain Holders.

(ii)    In Certain Circumstances, Even if the Reorganized Debtor Qualifies as a REIT, It and its Subsidiaries May be Subject to Certain U.S. Federal, State, and Other Taxes

To qualify as a REIT, CorEnergy generally will be required each year to distribute to stockholders

at least 90% of its REIT taxable income (determined without regard to the dividends paid deduction and by excluding any net capital gain), which REIT taxable income may be reduced by any net operating loss carryovers to such year allowed pursuant to section 172 of the Tax Code, which, for tax years beginning after 2017, generally provides that up to 80% of the REIT taxable income in a given year can be offset by such net operating loss carryovers. In addition, it will be subject to a 4% nondeductible excise tax on the amount, if any, by which certain distributions made by it with respect to the calendar year are less than the sum of (i) 85% of its ordinary income, (ii) 95% of its capital gain net income for that year, and (iii) any undistributed taxable income from prior periods. CorEnergy intends to make distributions to its stockholders to comply with the 90% distribution requirement and to avoid the nondeductible excise tax. However, differences in timing between taxable income and cash available for distribution could require it to borrow funds or to issue additional equity to enable it to meet the 90% distribution requirement (and therefore to maintain its REIT status) and to avoid the nondeductible excise tax. There can be no assurance that any of these sources of funds, if available at all, would be available to meet CorEnergy's distribution and tax obligations, and CorEnergy may at times incur the excise tax.

### (b)   Consequences to the Debtor and the Reorganized Debtor

#### (i)      Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("COD") income for U.S. federal income tax purposes if its outstanding indebtedness is satisfied for total consideration less than the amount of such indebtedness. In general, the amount of COD income is the excess of (a) the adjusted issue price of the satisfied indebtedness over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the debtor issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor), in each case, given in satisfaction of such indebtedness at the time of the exchange.

However, COD income is excluded from income to the extent that a corporate borrower is a debtor in a bankruptcy case and the discharge occurs pursuant to a court order or a plan approved by the court. Generally, under the Tax Code, any COD income excluded from income of a taxpayer in bankruptcy under this exception must be applied against and reduce certain tax attributes of the taxpayer. Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against the taxpayer's net operating losses (or "NOLs") (including NOLs from the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, and tax basis of property. A debtor with COD income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code prior to effecting any other reductions in tax attributes set forth above. Even though COD income does not result in taxable income when it is discharged as part of the bankruptcy case, the COD income will result in adjustments to the taxpayer's tax attributes after bankruptcy and can impact whether debt issued in the bankruptcy will be treated as having original issue discount, as discussed further below.

CorEnergy, is classified for U.S. federal income tax purposes as a REIT. As discussed above, qualification as a REIT requires satisfaction of numerous requirements, including the 75% and 95% incomes tests, which respectfully provide that the REIT must derive at least 75% and 95% of its gross income in any year from certain qualifying sources. In addition, a REIT must pay dividends to its stockholders aggregating annually at least 90% of the REIT's taxable income (determined without regard to the dividends paid deduction and by excluding capital gains) and must satisfy specified asset tests on a quarterly basis. COD income is excluded from gross income for purposes of both the 75% and 95% gross income tests, but is generally subject to the REIT distribution requirement, subject to certain rules that apply to excess non-cash income, or a REIT would incur corporate income tax and a 4% nondeductible excise tax with respect to any COD income.

The Debtor could realize COD income upon implementation of the Plan, depending on the amount of cash, the fair market value of the New Common Stock and the issue price of the Takeback Debt, among other things, exchanged for the Senior Notes. Under the Tax Code, the Debtor generally will recognize COD income to the extent that the principal amount due on the Senior Notes exceeds the sum of the cash paid, the fair market value of the New Common Stock and the issue price of the Takeback Debt. The issue price of the Takeback Debt is computed under different rules, depending upon whether the Senior Notes or the Takeback Debt are treated as publicly traded under the Treasury Regulations. If neither the Senior Notes nor the Takeback Debt are treated as publicly traded, the issue price of the Takeback Debt should be the stated principal amount of the Takeback Debt. If either the Senior Notes or the Takeback Debt are publicly traded, the issue price of the Takeback Debt generally will be determined based on the fair market value of the debt that is publicly traded. If the issue price of the Takeback Debt is less than the face amount of the portion of the Senior Notes exchanged therefor, the Debtor generally should recognize COD income equal to such difference.

In general, a debt instrument will be treated as publicly traded if (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.

The Debtor does not believe that the Takeback Debt is publicly traded under the small issue exception under the original issue discount ("OID") Treasury Regulations, although the Senior Notes may be considered publicly traded, depending upon the facts and circumstances. Thus, if the Senior Notes are determined to be publicly traded, to the extent that face amount of the portion of the Senior Notes exchanged for the Takeback Debt exceeds the fair market value of such portion of the exchanged Senior Notes, COD income could be realized. Under such circumstances, the Debtor cannot determine at this time the amount, if any, of COD income that could be realized in that such determination is dependent upon the fair market value of the Senior Notes at the time of the exchange. If the Senior Notes are not determined to be publicly traded, the Debtor believes that it would not realize any COD income.

(ii)    Utilization of Net Operating Loss Carryovers

After giving effect to the reduction in tax attributes, if any, resulting from excluded COD income, the Reorganized Debtor's ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

In general, when there is a fifty percent (50%) ownership change of a corporation during a three-year period, the ownership change rules in section 382 of the Tax Code limit the utility of NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes on an annual basis to the product of the fair market value of the corporate equity immediately before the ownership change, multiplied by a hypothetical interest rate published monthly by the IRS called the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs) (the "Section 382 Limitation"). In any given year, this limitation may be increased by certain built-in gains realized after, but accruing economically before, the ownership change and the carryover of unused Section 382 Limitation from prior years. On the other hand, if at the date of an ownership change, the adjusted basis for federal income tax purposes of a debtor's assets exceeds the fair market value of such assets by prescribed amounts (a "net unrealized built-in loss") then, upon the realization of such net unrealized built-in losses during a five-year period beginning on the date of the ownership change, such losses are treated as if they were part

112

of the NOL, rather than the current deduction, and are also subject to the Section 382 Limitation.

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation under the jurisdiction of a court in a title 11 case receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy under title 11) under a confirmed plan (the "Section 382(l)(5) Exception"). Under the Section 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis, but instead NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the Section 382(l)(5) Exception applies and a debtor undergoes another ownership change within two years after the effective date of the plan of reorganization, then the debtor's pre-change losses effectively are eliminated in their entirety. For purposes of the Section 382(l)(5) Exception, a "qualified creditor" generally consists of certain long-term creditors (who held the claims continuously for at least 18 months prior to the filing of the bankruptcy petition) or ordinary course creditors (*e.g.*, trade creditors). If a debtor qualifies for the Section 382(l)(5) Exception, the exception applies unless the debtor affirmatively elects for it not to apply.

Where the Section 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the Section 382(l)(5) Exception), a second special rule will generally apply (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the annual limitation generally will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor could undergo a change of ownership within two years of the Effective Date without triggering the complete elimination of its pre-change losses.

As discussed in Section 10.1(b)(i), "Cancellation of Debt Income" above, CorEnergy cannot determine the amount of COD income, if any, as it likely is dependent on a determination of the fair market value of the Senior Notes at the time of the exchange, assuming that the Senior Notes are determined to be publicly traded. If such fair market value of the Senior Notes closely approximates the sum of the cash, the anticipated fair market value of the New Common Stock and the face amount of the Takeback Debt, CorEnergy generally should not realize any substantial amount of COD income upon the implementation of the Plan. In that case, CorEnergy would not be required to materially reduce any tax attributes, including NOLs. The implementation of the Plan is expected to give rise to an ownership change for purposes of section 382 of the Tax Code. As a result, any NOLs and certain other tax attributes of the Reorganized Debtor will be subject to the Section 382 Limitation unless the Reorganized Debtor is eligible for, and does not elect out of, the Section 382(l)(5) Exception. Because the Debtor is under the jurisdiction of a court in a title 11 case and the Debtor believes existing shareholders and qualifying creditors will own at least 50% of the stock in the Reorganized Debtor, the Debtor anticipates being eligible for the Section 382(l)(5) Exception and does not expect to elect out of such exception. To avoid another ownership change within two years of the Effective Date of the Plan, which would eliminate certain NOLs and tax attributes, the Debtor expects that any Holder of New Common who owns 5% or greater of the total New Common Stock issued pursuant to the Plan will enter into a shareholders agreement restricting their ability to transfer any the New Common Stock for a period of two years. The Debtor does not expect any substantial reduction in its NOLs from the disallowance of interest deductions on Senior Notes converted to New Common Stock in the bankruptcy reorganization.

CorEnergy estimates that, as of December 31, 2022 (the amount as of December 31, 2023 has not yet been determined), it had approximately $321 million in federal net operating loss ("NOL") carryforwards and may have other favorable tax benefits (including asset tax basis of the Debtor in excess of value, a so-called "built-in loss") as of December 31, 2023 in amounts that have not yet been determined, (collectively, the "Tax Attributes"). The amount of any such NOLs and other Tax Attributes remains subject to further analysis of CorEnergy and adjustment by the IRS.

### (c)   Consequences to Holders of Certain Claims and Interests

In general, the U.S. federal income tax treatment of U.S. Holders of Claims will depend, in part, on whether the receipt of such consideration under the Plan qualifies as an exchange of stock or securities pursuant to a tax-free reorganization or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition. Whether the receipt of New Common Stock or Takeback Debt under the Plan qualifies for tax-free reorganization treatment will depend on, among other things, whether the Claim being exchanged and the consideration being received constitute "securities" and the manner in which the Plan is implemented.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

Each U.S. Holder of a Claim should consult its own tax advisor regarding the U.S. federal income tax consequences to it of the treatment of the implementation of the Plan as a taxable transaction or a tax-free reorganization.

Under section 368(a)(1)(E) of the Tax Code, a recapitalization is a tax-free reorganization, which generally involves the exchange of stock or securities in a corporation for stock or securities in the same corporation pursuant to a plan of reorganization. If the shareholder or creditor receives money or other property in addition to stock or securities of the corporation, the recipient of such "boot" must recognize its gain on the exchange, if any, to the extent of the boot received. Boot includes the fair market value of the excess of the principal amount of securities received over the principal amount of securities surrendered. The basis of the property received by the shareholder or creditor in the tax-free exchange is the basis of the property surrendered, but adjusted for any boot received, dividends deemed distributed and gain or loss recognized by the shareholder or creditor on the exchange.

### (i)   Preferred Stock Interests

The Debtor believes that the satisfaction of Preferred Stock Interest with New Common Stock may constitute a tax-free recapitalization under Tax Code section 368(a)(1)(E) since it involves the exchange of stock for new stock in a single corporation, the Debtor. If true, the Holder of such Interest should not recognize gain or loss on the exchange and will take a tax basis in the New Common Stock received equal to their basis in the Preferred Stock surrendered in the exchange. If the Preferred Stock is held as a capital

114

asset, the Preferred Stock Holder should receive a carryover holding period.  Because such stock is not subject to the transfer lock-up provisions to protect the section 382 Limitation, such Holder could sell such New Common Stock and would recognize any gain or loss on the sale.

<div align="center">(ii)        Senior Note Claims</div>

The Debtor believes that the satisfaction of Senior Note Claims with cash, Takeback Debt and the New Common Stock may also constitute a tax-free recapitalization, based upon its conclusion the Senior Notes constitute securities for U.S. federal income tax purposes. If true, the Senior Note Holders generally will recognize gain on the exchange, to the extent of the lesser of the gain realized or the boot received. An exchanging Senior Note Holder cannot recognize a loss on a tax-free reorganization exchange. Thus, if the only boot received is the cash, the Senior Note Holders generally will recognize gain on the exchange, to the extent of the lesser of the cash received or the gain realized. Such gain may be treated as capital gain, except to the extent that such gain is attributable to accreted market discount, in which case the gain may be treated as ordinary income.

The Debtor believes that the Takeback Debt may constitute a security for Federal income tax purposes based upon the term of such debt and the facts and circumstances regarding such debt. If true, the receipt of the Takeback Debt should be treated as a tax-free recapitalization. The Holder's basis in the Senior Notes exchanged, after taking into account the basis, if any, taken into account with respect to the boot received, is then allocated between the New Common Stock and the Takeback Debt, based upon their relative aggregate fair market values. The holding period should include the holding period of the Senior Notes exchanged.

If, however, the Senior Note Claims are not securities for U.S. federal income tax purposes, and the exchange constitutes a taxable transaction, the Senior Note Holders will recognize gain or loss on the exchange in an amount equal to the difference between the fair market value of the consideration received in the exchange and the basis of the Senior Notes. Installment sale reporting would be available for the portion of the gain attributable to the Takeback Debt only if the Senior Notes are not traded on an established securities market and the Takeback Debt is not readily tradeable, both within the meaning of section 453 of the Tax Code and the Treasury Regulations promulgated thereunder. Because the Debtor believes that the Senior Notes likely constitute securities for U.S. federal income tax purposes, the Debtor has not discussed in detail the potential ramifications of such a characterization.

If the Senior Notes are treated as a security, but the Takeback Debt fails to constitute a security, the Takeback Debt will constitute boot, along with the cash, and the Holders of the Senior Notes generally would recognize gain on the exchange to the extent of the lesser of the gain realized or the sum of the cash received and the fair market value of the Takeback Debt. Such gain may be treated as capital gain, except to the extent that such gain is attributable to accreted market discount, in which case such portion of the gain will likely be treated as ordinary income.

To the extent a U.S. Holder of a Claim receives consideration that is attributable to unpaid accrued interest on the Claim, the U.S. Holder will be required to treat such consideration as a payment of interest (except to the extent of unpaid accrued interest previously included in gross income by the U.S. Holder). In this regard, the Plan provides that distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims. Notwithstanding this provision in the Plan, there is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat

<div align="center">115</div>

payments as allocated first to any accrued but untaxed interest. A U.S. Holder's tax basis in property received pursuant to the Plan that is considered attributable to unpaid accrued interest should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A U.S. Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. Although not entirely clear, such a loss may be treated as an ordinary loss rather than a capital loss.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.**

(iii)    Grier Member Claims

Under the Plan, the Grier Member Claims are addressed through effective amendments to the Third and Fourth Amended and Restated Limited Liability Company Agreements of Crimson Midstream Holdings, LLC, pursuant to which the Grier Members lose the right to certain operational and liquidation distributions from Crimson, based upon the treatment of the CorEnergy stock that relates to the Crimson Units. The Debtor believes, such changes likely would not result in a taxable sale, exchange or disposition of Crimson Units. The shifting of these rights and obligations may result in the reallocation of Crimson debt among its members, which may result in either deemed cash contributions or deemed cash distributions by the Grier Members. Generally, a member, treated as a partner of a partnership for U.S. federal income tax purposes, does not recognize any gain or loss with respect to a contribution or a distribution, other than a distribution of cash (or deemed distribution of cash), but only to the extent that the cash distribution was in excess of the member's basis in the partnership.

(iv)    Market Discount

A U.S. Holder that purchased its Senior Note from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with market discount if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in such instrument is less than (i) the stated redemption price at maturity or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to the product of 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity).

Under the market discount rules, assuming that the U.S. Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Senior Note (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Senior Note as of the date of the exchange.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Senior Note to their maturity date, unless the holder irrevocably elected to compute the accrual on a constant yield basis.

To the extent that an exchange of a Senior Note subject to the market discount rules for cash, Takeback Debt and the New Common Stock constitutes a tax-free recapitalization, although not entirely clear, it appears that accrued market discount with respect to the Senior Note would be recognized to the extent of any gain on the boot received in the recapitalization. In addition, the Takeback Debt will be attributed the portion of market discount attributable to the Senior Notes exchanged for the Takeback Debt.

116

(v)     Limitation on Use of Capital Losses

A U.S. Holder of an Allowed Claim or Interest who recognizes capital losses as a result of the implementation of the Plan will be subject to limits on the use of such capital losses. For a noncorporate holder, capital losses generally may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A noncorporate Holder may carry over unused capital losses and apply them against future capital gains and a similar portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate Holder that has more capital losses than may be used in a tax year generally may carry back unused capital losses to the three years preceding the capital loss year and may carry over unused capital losses for only the five years following the capital loss year.

(vi)     Certain Considerations Regarding the Takeback Debt

As discussed in Section 10.1(b)(i), "Cancellation of Debt Income", above, the "issue price" of the Takeback Debt generally depends on whether either the Senior Notes or the Takeback Debt is publicly traded. If neither are publicly traded, the issue price of the Takeback Debt generally would be its stated principal amount (because the interest rate on the Takeback Debt is expected to exceed the applicable federal rate published by the IRS). If the Takeback Debt is publicly traded, the issue price of the Takeback Debt will be the fair market value of such debt instrument on the issue date as determined by such trading. If the Senior Notes are publicly traded and the Takeback Debt is not, the issue price of the Takeback Debt will be the fair market value of the portion of the Senior Notes exchanged for the Takeback Debt upon the exchange. To the extent that the issue price is below the face amount of the Takeback Debt, such amount may be treated as OID.

In addition to any potential OID described in the preceding paragraph, the Takeback Debt may be treated as issued with OID, since the stated interest payable on the Takeback Debt likely does not constitute qualified stated interest due to the Debtor's ability to issue a note for the first year's interest payment. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described above) by more than a de minimis amount. The "stated redemption price at maturity" of the Takeback Debt for this purpose would include all principal and interest payable over the term of such debt instrument, other than "qualified stated interest," (i.e., stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer)).

If the Takeback Debt is issued with OID, a U.S. Holder of such Takeback Debt generally will be required to include OID in gross income as it accrues over the term of the debt in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the U.S. Holder receives cash payments of interest on the obligation.

Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the holder's adjusted tax basis in the Takeback Debt. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the Takeback Debt; instead, such payments will reduce the U.S. Holder's adjusted tax basis in the Takeback Debt by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on the Takeback Debt for each day during the taxable year on which such Holder holds the Takeback Debt, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual

117

period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the Takeback Debt at the beginning of the accrual period multiplied by the yield to maturity of the Takeback Debt, less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of the Takeback Debt at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the Takeback Debt in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the Takeback Debt, other than qualified stated interest. If the periodic interest on the Takeback Debt is not qualified stated interest, the interest would have to be reported on the accrual basis. If there is no additional OID due to the computation of the Takeback Debt issue price on the exchange for a portion of the Senior Notes, the accrued OID income may be comparable to the periodic interest payments made.

**The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, each holder of the Takeback Debt is urged to consult its tax advisor regarding the possible application of the OID rules to the Takeback Debt.**

Unless a non-recognition provision applies, a U.S. Holder of the Takeback Debt generally will recognize capital gain or loss upon the sale, redemption, or other disposition of the Takeback Debt, subject to potential application of the market discount rules. Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in the Takeback Debt is more than one year. Long-term capital gain of an individual taxpayer generally is taxed at preferential rates. The deductibility of capital loss is subject to significant limitations.

### (d)    Tax Consequences of Owning and Disposing of New Common Stock

The following is a summary of certain material U.S. federal income tax consequences of the ownership and disposition of the New Common Stock applicable to taxable U.S. Holders.

For any taxable year for which the Reorganized Debtor qualifies for taxation as REIT, amounts distributed to taxable U.S. Holders will be taxed as follows.

#### (i)    Distributions Generally

Distributions to U.S. Holders, other than capital gain dividends discussed below, will constitute dividends to those holders up to the amount of the Reorganized Debtor's current or accumulated earnings and profits and are taxable to the stockholders as ordinary income. These distributions are not eligible for the dividends-received deduction for corporations. To the extent that the Reorganized Debtor makes distributions in excess of its current or accumulated earnings and profits, the distributions will first be treated as a tax free return of capital, reducing the tax basis in the U.S. Holder's shares, and distributions in excess of the U.S. Holder's tax basis in its shares are taxable as gain realized from the sale of the shares. Dividends declared by the Reorganized Debtor in October, November or December of any year payable to a U.S. Holder of record on a specified date in any of these months will be treated as both paid by the Reorganized Debtor and received by the U.S. Holder on December 31 of the year, provided that the Reorganized Debtor actually pays the dividend during January of the following calendar year. U.S. Holders may not include on their own income tax returns any of the Reorganized Debtor's tax losses.

In general, dividends paid by REITs are not eligible for the reduced tax rates on "qualified dividend income" and, as a result, the Reorganized Debtor's ordinary REIT dividends will continue to be taxed at the higher ordinary income tax rate. However, dividends received by a noncorporate stockholder could be treated as "qualified dividend income" to the extent the Reorganized Debtor has dividend income from taxable corporations (such as a taxable REIT subsidiary) and to the extent the Reorganized Debtor's

118

dividends are attributable to income that is subject to tax at the Reorganized Debtor level (for example, if the Reorganized Debtor distributed less than 100% of its taxable income). In general, to qualify for the reduced tax rate on qualified dividend income, a stockholder must hold the Reorganized Debtor's stock for more than 60 days during the 121 -day period beginning on the date that is 60 days before the date on which the New Common Stock becomes ex-dividend. Pursuant to section 857(g) of the Tax Code, the aggregate amount of dividends designated by the Reorganized Debtor as qualified dividend income or capital gain dividends (discussed below) with respect to any taxable year is limited to the amount of dividends paid by the Reorganized Debtor with respect to such year. For these purposes, dividends paid after the close of the taxable year pursuant to section 858 of the Tax Code shall be treated as paid with respect to such year. The Reorganized Debtor will be treated as having sufficient earnings and profits to treat as a dividend any distribution it makes up to the amount required to be distributed in order to avoid imposition of the 4% excise tax under section 4981 of the Tax Code. As a result, the Reorganized Debtor's stockholders may be required to treat certain distributions that would otherwise result in a tax-free return of capital as taxable dividends. Moreover, any deficiency dividend will be treated as a dividend—an ordinary dividend or a capital gain dividend, as the case may be—regardless of the Reorganized Debtor's earnings and profits.

Under the Tax Cuts and Jobs Act of 2017, for tax years beginning after December 31, 2017 and prior to January 1, 2026, noncorporate stockholders are generally eligible to deduct up to 20% of the amount of ordinary REIT dividends that are not designated as capital gain dividends or qualified dividend income, subject to certain limitations.

(ii)    Dividends Paid Through a Combination of Cash and Issuance of Additional Shares of Stock

To maintain the Reorganized Debtor's qualification as a REIT, the Reorganized Debtor generally is required each year to distribute to stockholders at least 90% of its net taxable income after certain adjustments. The Reorganized Debtor reserves the right to pay any or all of its quarterly New Common Stock dividends in a combination of shares of New Common Stock and cash in accordance with any applicable IRS guidance. As a result of such a distribution, a U.S. Holder generally must include the sum of the value of the New Common Stock and the amount of cash received in its gross income as dividend income to the extent that such holder's share of such a distribution is made out of its share of the portion of the Reorganized Debtor's current and accumulated earnings and profits allocable to such distribution. The value of any New Common Stock received as part of a distribution generally is equal to the amount of cash that could have been received instead of the New Common Stock. Depending on the circumstances of the holder, the tax on the distribution may exceed the amount of the distribution received in cash, in which case such U.S. Holder would have to pay the tax using cash from other sources. If a U.S. Holder sells the stock it receives as a dividend to pay this tax and the sales proceeds are less than the amount required to be included in income with respect to the dividend, such holder could have a capital loss with respect to the stock sale that could not be used to offset such dividend income. (Furthermore, with respect to Non-U.S. Holders, the Reorganized Debtor may be required to withhold U.S. tax with respect to such dividend, including the portion that is payable in stock. For additional information, see "—U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims" below.) A holder that receives New Common Stock pursuant to a distribution generally has a tax basis in such New Common Stock equal to the amount of cash that could have been received instead of such common stock, and a holding period in such New Common Stock that begins on the payment date for the distribution.

Future dividends are determined in the discretion of the Reorganized Debtor's board of directors and depend on actual and projected cash flow, financial condition, funds from operations, earnings, capital requirements, the annual REIT distribution requirements, contractual prohibitions or other restrictions, applicable law and such other factors as the Reorganized Debtor's board of directors deems relevant.

HB: 4863-9936-1961.1

(iii)     Capital Gain Dividends

Dividends to U.S. Holders that the Reorganized Debtor properly designates as capital gain dividends will be treated as long-term capital gain, to the extent they do not exceed the Reorganized Debtor's actual net capital gain and to the extent they do not exceed the limitation under section 857(g) of the Tax Code discussed above, for the taxable year without regard to the period for which the stockholder has held its stock. Capital gain dividends are not eligible for the dividends-received deduction for corporations, and, corporate stockholders may be required to treat up to 20% of certain capital gain dividends as ordinary income.

Noncorporate taxpayers are generally taxable at a current maximum tax rate of 20% for long-term capital gain, but such capital gains also will be subject to the 3.8% Medicare tax on certain U.S. Holders. A portion of any capital gain dividends received by noncorporate taxpayers might be subject to tax at a 25% rate to the extent attributable to gains realized on the sale of real property that correspond to the Reorganized Debtor's "unrecaptured section 1250 gain."

If the Reorganized Debtor elects to retain capital gains rather than distribute them, a U.S. Holder will be deemed to receive a capital gain dividend equal to the amount of its proportionate share of the retained capital gains. In this case, a U.S. Holder will receive certain tax credits and basis adjustments reflecting the deemed distribution and deemed payment of taxes by the U.S. Holder.

(iv)     Sale or Other Taxable Disposition

A U.S. Holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Common Stock. Subject to the recapture rules under section 108(e)(7) of the Tax Code, any such gain or loss generally will be capital gain or loss, provided the New Common Stock is held as a capital asset, and will be long-term capital gain or loss if the U.S. Holder has held the New Common Stock for more than one year as of the date of disposition. U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers.

(e)     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Allowed Claims and the ownership, exercise and disposition of New Common Stock.

(i)     Distributions in Discharge of Claims

Whether a Non-U.S. Holder will recognize gain or loss in connection with the receipt of cash, Takeback Debt, or New Common Stock in satisfaction of their Claims pursuant to the Plan, will be determined as described above under the discussion applicable to U.S. Holders. If a Non-U.S. Holder recognizes gain on such exchange, subject to the discussions below regarding FATCA (as defined below) and backup withholding, any such gain recognized by a Non-U.S. Holder on the exchanges generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale,

120

exchange or other taxable disposition occurs and certain other conditions are met, or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed its capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder. Such gain generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Payments made to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10% or more of the total capital or profits interests in the Company and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W- 8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)). A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(ii)     FIRPTA

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property, including interests in corporations (including REITs) the assets of which predominantly consist of interests in U.S. real property (in each case other than an interest solely as a creditor) ("USRPIs") is generally subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected income ("ECI") that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business. It is expected that shares of New Common Stock will be considered USRPIs, subject to the availability of any applicable exception

121

(discussed below).

Under the domestically controlled REIT exception, if Non-U.S. Holders own less than 50% (by value) of the stock of a REIT at all times during a specific period, the interests in such REIT will not be treated as a USRPI and, as a result, a Non-U.S. Holder would not be subject to substantive taxation under FIRPTA or FIRPTA withholding upon a disposition of its shares in any such REIT. No assurance can be given that the Debtor will be a domestically controlled REIT at emergence or thereafter.

Non-U.S. Holders of an Allowed Claim should consult with their own tax advisors regarding the complex tax rules that govern the disposition of a USRPI.

<div align="center">(iii)    Distributions on New Common Stock</div>

Any distributions made with respect to New Common Stock, including distributions treated as made as described above under the discussion applicable to U.S. Holders, will constitute dividends for U.S. federal income tax purposes to the extent such distributions are paid out of the Reorganized Debtor's current or accumulated earnings and profits as determined for U.S. federal income tax purposes. Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Unless the Reorganized Debtor's stock constitutes a USRPI, distributions by the Reorganized Debtor which are not paid out of its current and accumulated earnings and profits will not be subject to U.S. income or withholding tax. If it cannot be determined at the time a distribution is made whether or not such distribution will be in excess of the Reorganized Debtor's current and accumulated earnings and profits, the distribution will be subject to withholding at the rate applicable to dividends. However, the Non-U.S. Holder may seek a refund of such amounts from the IRS if it is subsequently determined that such distribution was, in fact, in excess of the Reorganized Debtor's current and accumulated earnings and profits. If the Reorganized Debtor's New Common Stock constitutes a USRPI, a distribution in excess of current and accumulated earnings and profits will be subject to a 15% withholding tax and may be subject to additional taxation under FIRPTA. However, the 15% withholding tax will not apply to distributions already subject to the 30% dividend withholding.

A Non-U.S. Holder generally should expect the Reorganized Debtor to withhold U.S. federal income tax at the rate of 30% on the gross amount of any distributions of ordinary income made to a Non-

<div align="center">122</div>

U.S. Holder unless (1) a lower treaty rate applies and proper certification is provided or (2) the Non-U.S. Holder files an IRS Form W- 8ECI with the Reorganized Debtor claiming that the distribution is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. Holder). However, the Non-U.S. Holder may seek a refund of such amounts from the IRS if it is subsequently determined that such distribution was, in fact, in excess of the Reorganized Debtor's current and accumulated earnings and profits.

<p style="text-align:center">(iv)      Capital Gains Dividends</p>

Under FIRPTA, a distribution made by the Reorganized Debtor to a Non-U.S. Holder, to the extent attributable to gains ("USRPI Capital Gains") from dispositions of USRPIs, will be considered effectively connected with a U.S. trade or business of the Non-U.S. Holder and therefore will be subject to U.S. income tax at the rates applicable to U.S. Holders, without regard to whether such distribution is designated as a capital gain dividend. The properties owned by Crimson generally are USRPIs. Distributions subject to FIRPTA may also be subject to a 30% branch profits tax in the hands of a corporate Non-U.S. Holder that is not entitled to treaty exemption.

Distributions attributable to the Reorganized Debtor's capital gains which are not USRPI Capital Gains generally will not be subject to income taxation, unless (1) investment in the shares is effectively connected with the Non-U.S. Holder's U.S. trade or business (or, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. Holder), in which case the Non-U.S. Holder will be subject to the same treatment as U.S. Holders with respect to such gain (except that a corporate Non-U.S. Holder may also be subject to the 30% branch profits tax) or (2) the Non-U.S. Holder is a non-resident alien individual who is present in the United States for 183 days or more during the taxable year and certain other conditions are present, in which case the nonresident alien individual will be subject to a 30% tax on the individual's capital gains.

The Reorganized Debtor generally will be required to withhold and remit to the IRS 21% (or 20% to the extent provided in Treasury Regulations) of any distributions to Non-U.S. Holders that are designated as capital gain dividends, or, if greater, 21% of a distribution that could have been designated as a capital gain dividend. Distributions can be designated as capital gains to the extent of the Reorganized Debtor's net capital gain for the taxable year of the distribution. The amount withheld is creditable against the Non-U.S. Holder's U.S. federal income tax liability. This withholding will not apply to any amounts paid to a holder of not more than 10% of the Reorganized Debtor's common shares while such shares are regularly traded on an established securities market. Instead, those amounts will be treated as described above under "— Distributions on New Common Stock." The Reorganized Debtor does not currently expect the New Common Stock to be regularly traded on an established securities market.

<p style="text-align:center">(v)      Gain Recognition from the Sale, Redemption or Repurchase of New Common Stock or Takeback Debt</p>

Unless New Common Stock constitutes a USRPI, gain realized on a sale of New Common Stock or a sale of Takeback Debt by a Non-U.S. Holder generally will not be subject to U.S. federal income taxation unless (1) such gain is effectively connected with the Non-U.S. Holder's U.S. trade or business, in which case, as discussed above, the Non-U.S. Holder would be subject to the same treatment as U.S. Holders on the gain, (2) such gain is attributable to a permanent establishment that the Non-U.S. Holder maintains in the United States if that is required by an applicable income tax treaty as a condition for subjecting the Non-U.S. Holder to U.S. taxation on a net income basis, in which case the same treatment would apply to the Non-U.S. Holder as to U.S. Holders with respect to the gain or (3) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the taxable year and who has a tax home in the United States, in which case the nonresident alien individual

<p style="text-align:center">123</p>

will be subject to a 30% tax on the individual's capital gain.

The New Common Stock will constitute a USRPI unless the Reorganized Debtor is a domestically controlled REIT at all times during a specified period. A domestically controlled REIT is a REIT in which at all times during a specified testing period less than 50% in value of its shares is held directly or indirectly by Non-U.S. Holders. No assurance can be given that the Reorganized Debtor will be a domestically controlled REIT at emergence or thereafter.

If the New Common Stock constitutes a USRPI the gain on the sale of New Common Stock will be subject to taxation under FIRPTA, and a Non-U.S. Holder will be subject to U.S. income tax (including any alternative minimum tax) on any gain and withholding on proceeds. Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal, state, local and foreign income and other tax consequences of owning New Common Stock.

### (f)    Additional Withholding Tax on Payments Made to Foreign Accounts

Pursuant to the Foreign Account Tax Compliance Act ("FATCA"), withholding at a rate of 30% generally will be required on certain U.S.-source payments such as dividends or interest held by or through (i) a foreign financial institution (including investment funds) that does not qualify under certain exemptions, unless such institution enters into, and complies with, an agreement with the United States government to collect and provide to the United States tax authorities (or, pursuant to an applicable intergovernmental agreement, such institution provides the required information to the tax authority of such institution's jurisdiction of tax residence) substantial information regarding United States account holders of such institution (which would include certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with United States owners) and agrees to withhold on certain payments or (ii) a foreign entity that is not a financial institution that does not qualify under certain exemptions, unless such entity certifies to the applicable withholding agent that such entity does not have "substantial United States owners" (as defined in the Tax Code) (which generally includes any United States person who directly or indirectly owns more than 10% of the entity) or provides the applicable withholding agent with information regarding the entity's substantial United States owners, which the withholding agent will in turn provide to the United States government. Accordingly, the entity through which the Claim is held will affect the determination of whether such withholding is required. Foreign financial institutions and foreign entities that are not financial institutions may be subject to the provisions of an intergovernmental agreement between the United States and the jurisdiction in which such financial institution or foreign entity is located that may modify these requirements. A holder of consideration received pursuant to the Plan should consult its own tax advisors regarding these rules and whether they may be relevant to the ownership and disposition of the consideration received pursuant to the Plan. Proposed Treasury Regulations, upon which taxpayers are permitted to rely, currently suspend indefinitely the application of withholding under FATCA to gross proceeds from the disposition of assets that can produce certain U.S. source payments including dividends and interest.

Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such holders' exchange of any of its Claims pursuant to the Plan.

### (g)    Information Reporting and Withholding

The Debtor, the Reorganized Debtor, Disbursing Agent and applicable withholding agents will be required to withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and

124

withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (at the then-current rate) with respect to distributions or payments made pursuant to the Plan or in connection with payments made on account of consideration received pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**ARTICLE XI**
**CONCLUSION AND RECOMMENDATION**

The Debtor believes that Confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all Holders of Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Notice and Claims Agent no later than 4:00 p.m. (prevailing Central Time) on _____ ____, 2024.

Dated: February 25, 2024          **CORENERGY INFRASTRUCTURE TRUST, INC.**

By:  _/s/ Mark T. Benedict_____
Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone        (816) 983-8000
Facsimile        (816) 983-8080
Email:          Mark.Benedict@huschblackwell.com
                John.Cruciani@huschblackwell.com

HB: 4863-9936-1961.1

Proposed Counsel for Debtor and Debtor in Possession

## Exhibit A

**Plan of Reorganization**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No. 24-40236-can11 |
| | ) | |
| CORENERGY INFRASTRUCTURE TRUST, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**PLAN OF REORGANIZATION OF
CORENERGY INFRASTRUCTURE TRUST, INC.
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**HUSCH BLACKWELL LLP**

Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone      (816) 983-8000
Facsimile      (816) 983-8080
Email:      mark.benedict@huschblackwell.com
             john.cruciani@huschblackwell.com

*Proposed Counsel for Debtor and Debtor in Possession*

---

[1]The Debtor's address is 1100 Walnut, Ste. 3350 Kansas City, MO 64106.  The last four digits of the Debtor's taxpayer identification number are 1375.

i

## Table of Contents

Article I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES .................................................................... 4

    1.01    Defined Terms ................................................................................................. 4

    1.02    Rules of Interpretation .................................................................................. 16

    1.03    Computation of Time ..................................................................................... 17

    1.04    Governing Law .............................................................................................. 17

    1.05    Reference to Monetary Figures ..................................................................... 17

    1.06    Reference to the Debtor or the Reorganized Debtor ..................................... 17

    1.07    Controlling Document .................................................................................... 17

    1.08    Consent Rights ............................................................................................... 18

Article II ADMINISTRATIVE AND PRIORITY CLAIMS ........................................... 18

    2.01    Administrative and Priority Claims ............................................................... 18

    2.02    Professional Fee Claims ................................................................................ 19

    2.03    Restructuring Fees and Expenses .................................................................. 20

    2.04    Priority Tax Claims ........................................................................................ 20

    2.05    Statutory Fees ................................................................................................ 20

Article III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ..................................................................................................................... 21

    3.01    Classification of Claims and Interests .......................................................... 21

    3.02    Treatment of Classes of Claims and Interests .............................................. 21

    3.03    Special Provisions Governing Unimpaired Claims ....................................... 26

    3.04    Controversy Concerning Impairment ........................................................... 26

    3.05    Elimination of Vacant Classes ...................................................................... 26

    3.06    Voting Classes; Presumed Acceptance by Non-Voting Classes ................... 27

    3.07    Acceptance by Impaired Classes ................................................................... 27

    3.08    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code 27

Article IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN .......................... 27

    4.01    General Settlement of Claims and Interests .................................................. 27

    4.02    Restructuring Transactions ............................................................................ 28

    4.03    Corporate Action ........................................................................................... 28

    4.04    Takeback Debt ............................................................................................... 29

    4.05    The Revolving Credit Facility ....................................................................... 30

HB: 4866-7395-7801.1

4.06    Management Incentive Plan ................................................................ 30

4.07    Employee Obligations ...................................................................... 30

4.08    Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock ........................................................................................ 31

4.09    Exemption from Registration Requirements ......................................... 31

4.10    Subordination .................................................................................. 32

4.11    Vesting of Assets in the Reorganized Debtor ....................................... 32

4.12    Cancellation of Instruments, Certificates, and Other Documents ........... 32

4.13    Sources for Plan Distributions .......................................................... 33

4.14    Corporate Existence ........................................................................ 33

4.15    New Governance Documents ............................................................ 33

4.16    Indemnification Provisions in Organizational Documents ...................... 34

4.17    Effectuating Documents; Further Transactions ................................... 34

4.18    Management of the Reorganized Debtor .............................................. 35

4.19    Section 1146(a) Exemption .............................................................. 35

4.20    Preservation of Causes of Action ...................................................... 35

Article V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 36

5.01    Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 36

5.02    Cure and Defaults for Assumed Executory Contracts and Unexpired Leases .......... 37

5.03    Rejection Damages Claims ............................................................... 38

5.04    Insurance Policies .......................................................................... 39

5.05    Contracts and Leases After the Petition Date ....................................... 39

5.06    Reservation of Rights ...................................................................... 40

5.07    Nonoccurrence of Effective Date ....................................................... 40

Article VI PROVISIONS GOVERNING DISTRIBUTIONS .................................... 40

6.01    Distributions on Account of Claims or Interests Allowed as of Effective Date ......... 40

6.02    Special Rules for Distributions to Holders of Disputed Claims ................. 41

6.03    Delivery of Distributions .................................................................. 42

6.04    Claims Paid or Payable by Third Parties ............................................. 44

6.05    No Postpetition or Default Interest on Claims ...................................... 45

6.06    Setoffs ......................................................................................... 45

6.07    Allocation Between Principal and Accrued Interest ............................... 46

6.08    Delivery of New Common Stock ....................................................... 46

Article VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS ........................................................... 46

7.01    Allowance of Claims .................................................................................. 46

7.02    Objections to Claims ................................................................................. 47

7.03    Estimation of Claims ................................................................................. 47

7.04    No Distribution Pending Allowance ........................................................... 47

7.05    Distribution After Allowance ..................................................................... 47

7.06    No Interest ................................................................................................ 48

7.07    Adjustment to Claims Without Objection ................................................... 48

7.08    Disallowance of Claims ............................................................................. 48

Article VIII EFFECT OF CONFIRMATION OF THE PLAN ................................... 49

8.01    Discharge of Claims and Termination of Interests; Compromise and Settlement of
Claims, Interests, and Controversies ......................................................... 49

8.02    Release by the Debtor ............................................................................... 50

8.03    Releases by Holders of Claims and Interests ............................................. 51

8.04    Exculpation .............................................................................................. 53

8.05    Injunction ................................................................................................ 54

8.06    Protection Against Discriminatory Treatment ............................................ 56

8.07    Release of Liens ....................................................................................... 56

8.08    Reimbursement of Contribution ................................................................ 57

8.09    Recoupment ............................................................................................. 57

Article IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................... 57

9.01    Conditions Precedent to the Effective Date ............................................... 57

9.02    Waiver of Conditions Precedent ................................................................ 58

9.03    Effect of Non-Occurrence of Conditions to Consummation ........................ 59

9.04    Substantial Consummation ....................................................................... 59

Article X MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ............. 59

10.01    Modification of Plan ................................................................................ 59

10.02    Effect of Confirmation on Modifications .................................................. 59

10.03    Revocation or Withdrawal of Plan ........................................................... 59

Article XI RETENTION OF JURISDICTION .......................................................... 60

Article XII MISCELLANEOUS PROVISIONS ......................................................... 61

12.01    Immediate Binding Effect ........................................................................ 61

12.02    Additional Documents ............................................................................. 62

12.03    Reservation of Rights .............................................................................. 62

12.04    Successor and Assigns ............................................................................. 62

12.05    Service of Documents .............................................................................. 62

HB: 4866-7395-7801.1

12.06    Term of Injunction or Stays ........................................................................... 63

12.07    Entire Agreement ........................................................................................... 63

12.08    Plan Supplement ............................................................................................ 64

12.09    Non-Severability ............................................................................................ 64

12.10    Votes Solicited in Good Faith ........................................................................ 64

12.11    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment ... 64

12.12    Closing of Chapter 11 Case ........................................................................... 65

12.13    Waiver or Estoppel ........................................................................................ 65

HB: 4866-7395-7801.1

**<u>Exhibits</u>**

Exhibit A  - Exit Facility Term Sheet

Exhibit B – Corporate Governance Term Sheet

HB: 4866-7395-7801.1

## **Introduction**

CorEnergy Infrastructure Trust, Inc., as debtor and debtor-in-possession in the above-captioned Chapter 11 Case, proposes this Plan (as defined below) pursuant to Section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims (as defined below) against, and Interests (as defined below) in, the Debtor. The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. Reference is made to the accompanying Disclosure Statement (as defined below) for a discussion of the Debtor's history, businesses, properties, operations, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated herein, and certain other related matters.

The Plan contemplates certain transactions and differing treatment for different Classes of Claims and Interests, including, without limitation, the following treatment of these Holders of Claims and Interests (described in greater detail in Article III herein and in the Disclosure Statement):

(a)   <u>Secured Claims</u>: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(b)   <u>Other Priority Claims</u>: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.

(c)   <u>Grier Member Claims</u>: Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claim constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

1

Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

> With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); and

> With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan; *provided, however,* that for the avoidance of doubt the Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units.

> Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.

(d)  <u>General Unsecured Claims</u>: In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, Payment in full in Cash on account of such Claim either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(e)  <u>Senior Notes</u>: Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture (including those costs and expenses to which the indenture trustee pursuant to the Bond Indenture is contractually entitled). The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims

to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:

> Its Pro Rata share of the Senior Note Payment;

> Its Pro Rata share of the Takeback Debt Principal Amount; and

> Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and

> Its Pro Rata share of the Excess Effective Date Cash, if any.

(f)   Preferred Stock: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Preferred Stock, each Holder of a Preferred Stock shall receive either:

> If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan and; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or

> If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on Exhibit D to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.

HB: 4866-7395-7801.1

If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5. For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.

(g) <u>Common Stock</u>: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Common Stock will be cancelled.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.**

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

1.01 **Defined Terms**

1. "*Ad Hoc Noteholder Group*" means that certain ad hoc group comprising certain Senior Noteholders listed on the signature pages to the Restructuring Support Agreement, and any other future holders (if any) of Senior Notes that becomes bound to that Restructuring Support Agreement by means of a signature of that certain Joinder provided therein; ***provided***, ***however***, that whenever the reference refers to the consent rights of or with respect to the Ad Hoc Noteholder Group, it shall mean the consent of the percent or members of the Ad Hoc Noteholder Group as required by the Restructuring Support Agreement.

2. "*Administrative Claim*" means a Claim incurred by the Debtor on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Case entitled to priority under Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate and operating the Debtor's businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estate pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code.

3. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code), which shall be 30 days after the Effective Date.

4. "*Affiliate*" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

5.     "*Allowed*" means, with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed by the Claim Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Claims Bar Date, if any, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtor as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved, or Final Order that has been entered, by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interest shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including Sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to Section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtor or Reorganized Debtor, as applicable.

6.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

7.     "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

8.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

9.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Western District of Missouri and, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Western District of Missouri.

10.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case and the general, local, and chambers rules of the Bankruptcy Court.

11.    "*Bond Indenture*" means that certain Indenture, dated August 12, 2019, between the Company and U.S. Bank National Association, as Trustee for the Senior Notes.

HB: 4866-7395-7801.1

12. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday in New York, as defined in Bankruptcy Rule 9006(a).

13. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, money market funds and other cash equivalents.

14. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, contribution, and franchises of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to Sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Section 558 of the Bankruptcy Code.

15. "*Certain Crimson Employee Claims*" means any and all Claims by Larry Alexander, Valerie Jackson, and Nester Taura against CorEnergy, including but not limited to the Claims asserted in the letter dated October 23, 2023 from Brook Barnes related to equity awards.

16. "*Certificate*" means any instrument evidencing a Claim or an Interest.

17. "*Chapter 11 Case*" means the case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

18. "*Claim*" means any claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor.

19. "*Claims Bar Date*" means the applicable deadline set by the Bankruptcy Court pursuant to the Plan, Claims Bar Date order, or other Final Order for filing Proofs of Claim in this Chapter 11 Case.

20. "*Claim Objection Deadline*" means the deadline for objecting to a Claim asserted against the Debtor, which shall be with respect to all Claims (other than Administrative Claims and Professional Fee Claims), the later of (a) the first Business Day that is at least 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtor or the Reorganized Debtor, as applicable, or by an Order of the Bankruptcy Court for objecting to such Claims.

21. "*Class*" means a category of Holders of Claims or Interests classified as set forth in <u>Article III</u> hereof pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

HB: 4866-7395-7801.1

22.    "*Class A-1 Crimson Units*" means the Class A-1 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

23.    "*Class A-2 Crimson Units*" means the Class A-2 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

24.    "*Class A-3 Crimson Units*" means the Class A-3 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

25.    "*Combined Hearing*" means the hearing(s) before the Bankruptcy Court under Section 1128 of the Bankruptcy Code to consider confirmation of the Plan and final approval of the Disclosure Statement pursuant to Sections 1125 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

26.    "*Common Stock*" means the common stock of CorEnergy.

27.    "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Case.

28.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

29.    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement on a final basis, subject to the consent rights set forth in <u>Article 1.8</u> hereof.

30.    "*Consummation*" means the occurrence of the Effective Date.

31.    "*Creditors' Professionals*" means (a) Faegre Drinker Biddle & Reath LLP and Spencer Fane LLP as counsel to the Ad Hoc Noteholder Group and (b) Perella Weinberg Partners LP, as financial advisor to the Ad Hoc Noteholder Group, and (c) such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by the Ad Hoc Noteholder Group or any Statutory Committee.

32.    "*Crimson*" means Crimson Midstream Holdings, LLC, a Delaware limited liability company.

33.    "*Crimson LLC Agreement*" means that certain *Revised Third Amended and Restated Limited Liability Company Agreement* dated as of June 30, 2021, by and among the Debtor, Crimson, and the Grier Members.

34.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by the Debtor under Section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to Section 365(b)(2) of the Bankruptcy Code.

7

35.     "*D&O Liability Insurance Policy*" means all unexpired directors', managers', and officers' liability insurance policy (including any "tail policy" and all agreements, documents, or instruments related thereto) that have been issued or provide coverage to current and former directors, managers, officers, and employees of the Debtor.

36.     "*Debtor*" or "*CorEnergy*" means CorEnergy Infrastructure Trust, Inc.

37.     "*Debtor Release*" means the releases set forth in Article 8.02 of the Plan.

38.     "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

39.     "*Disclosure Statement*" means the Disclosure Statement for the Plan of Reorganization of CorEnergy Infrastructure Trust, Inc. Pursuant to Chapter 11 of the Bankruptcy Code, as the same may be amended, modified, or supplemented from time to time, including all exhibits, schedules, appendices, supplements, and related documents, and in each case, subject to the consent rights set forth in the Restructuring Support Agreement.

40.     "*Disputed*" means, with respect to a Claim or Interest, any Claim or Interest that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under Sections 502, 503, or 1111 of the Bankruptcy Code; (b) is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or Proof of Claim has been filed; (c) is otherwise disputed by either the Debtor or the Reorganized Debtor in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order; or (d) the Debtor or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order. If the Debtor disputes only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtor does not dispute, and Disputed as to the balance of such Claim.

41.     "*Distribution Agent*" means, as applicable, the Reorganized Debtor or any other Entity the Reorganized Debtor selects to make or to facilitate distributions in accordance with the Plan.

42.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtor or the Reorganized Debtor consistent with this Plan, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

43.     "*Distribution Record Date*" means the Effective Date of the Plan or such other time as agreed upon between the Debtor and the Ad Hoc Noteholder Group. For the avoidance of doubt, no distribution record date shall apply to the holders of public Securities, including the existing Preferred Stock, the Holders of which shall receive a distribution in accordance with Article III of this Plan.

44.     "*DTC*" means Depository Trust Company.

45.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article 9.01 of the Plan have been (a) satisfied or (b) waived in accordance with Article 9.02 of the Plan, and on which the Restructuring Transactions become effective or are consummated.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

46.     "*Effective Date Cash*" means the amount of Cash of the Debtor and its Subsidiaries on the Effective Date as set forth in the Plan Supplement.

47.     "*Employment Agreements*" means the employment agreements entered into between CorEnergy and its employees.

48.     "*Entity*" means an entity as defined in Section 101(15) of the Bankruptcy Code.

49.     "*Estate*" means the estate of the Debtor created under Section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

50.     "*Estate's Professionals*" means (a) Husch Blackwell LLP and Stinson LLP, as counsel to the Debtor; (b) Stifel, Nicolaus & Co, Inc.[2], Teneo Capital LLC, and KPMG LLP as financial advisors; and (c) Ernst & Young LLP, as accountant to the Debtor; and (d) such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by the Debtor.

51.     "*Excess Effective Date Cash*" means the amount equal to the positive difference, if any, between Effective Date Cash less $12 million, not to exceed $8.5 million.

52.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended

53.     "*Exculpated Party*" means each of the following, solely in its capacity as such: (a) the Debtor; (b) the Ad Hoc Noteholder Group and its members, (c) any Statutory Committee and its members; and the (d) Professionals; and (e) each Related Party of each Entity in clause (a) through (d).

54.     "*Executory Contract*" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

55.     "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

56.     "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing in the Chapter 11 Case with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent.

---

[2]Stifel, Nicolaus & Co, Inc., is the primary investment banking and broker-deal subsidiary of Stifel Financaili Corp, which uses the trade name "Miller Buckfire for its restructuring-focused investment bankruptcy practice.  References to "Miller Buckfire" are to the legal entity Stifel, Nicholaus & Co., Inc.

57.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

58.    "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided*, *that*, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

59.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Senior Note Claim, or a Section 510(b) Claim against the Debtor.

60.    "*Governmental Unit*" has the meaning set forth in Section 101(27) of the Bankruptcy Code.

61.    "*Grier Members*" means John D. Grier and M. Bridget Grier, individually, and John D. Grier, as Trustee of the Bridget Grier Spousal Support Trust dated December 18, 2012; Robert G. Lewis, as Trustee of the Hugh David Grier Trust dated October 15, 2012; and Robert G. Lewis, as Trustee of the Samuel Joseph Grier Trust dated October 15, 2012.

62.    "*Grier Member Claims*" means any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement.

63.    "*Holder*" means an Entity holding a Claim against or an Interest in the Debtor; for the avoidance of doubt when the term "*Holder*" is used with respect to an Interest in Debtor, it shall mean the record holder and not any potential beneficial holders.

64.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

65.    "*Indemnification Provision*" means the Debtor's existing and future indemnification obligations pursuant to the Debtor's bylaws, operating agreement, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of the Debtor to indemnify, defend, reimburse, or limit the liability of, or to advances fees and expenses to, any of the Debtor's current directors, officers, equity holders, managers, members, employees, accountants, investment bankers,

attorneys, other professionals, and professionals of the Debtor, and such current directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such. For the avoidance of doubt, "current" refers to covered Entities that serve as of the Petition Date, regardless of whether such Entities cease serving in such capacities thereafter.

66.    "*Interest*" means any equity security as such term is defined in Section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible (***provided***, ***however***, that for the avoidance of doubt, this definition does not include the Senior Notes), exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

67.    "*Lien*" means a lien as defined in Section 101(37) of the Bankruptcy Code.

68.    "*Management Incentive Plan*" or "*MIP*" means the CorEnergy Infrastructure Trust, Inc. 2024 Omnibus Incentive Plan, to be set forth in the Plan Supplement, for certain participating employees of the Reorganized Debtor and its Affiliates, to be established and implemented in accordance with Article 4.06 of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be allowed and distributed.

69.    "*MIP Pool*" has the meaning set forth in Article 4.06 hereof.

70.    "*New Board*" means the new board of directors that will replace the board of directors at CorEnergy as of the Effective Date and the identities of such directors or managers, as applicable, shall be set forth in the Plan Supplement to the extent known as of the Plan Supplement Filing Date, and a process for selection of any remaining directors or managers shall be disclosed no later than the commencement of the Combined Hearing; ***provided***, ***however***, that the identities of any such remaining directors or managers shall be disclosed no later than the Effective Date.

71.    "*New Common Stock*" means Common Stock in the Reorganized Debtor.

72.    "*New Governance Documents*" means any document that may be included with the Plan Supplement with respect to the governance of the Reorganized Debtor following the consummation of the Restructuring Transactions, and any certificate of formation, charter, certificate or article of incorporation, bylaws, operating agreements, limited liability company agreements or other applicable organization documents or charter documents and other shareholder documents, in each case, in accordance with the Restructuring Support Agreement.

73.    "*Notice and Claims Agent*" means Stretto, Inc., the noticing, claims, and solicitation agent retained by the Debtor in the Chapter 11 Case.

74.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code.

75.     "*Person*" means a person as defined in Section 101(41) of the Bankruptcy Code.

76.     "*Petition Date*" means the date on which the Debtor filed its voluntary petition for relief commencing its Chapter 11 Case.

77.     "*Plan*" means this chapter 11 plan, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement and all appendices, exhibits, schedules and supplements thereto), as it may be amended, modified, or supplemented from time to time in accordance with the terms hereof, the Confirmation Order and the Restructuring Support Agreement, and in each case, subject to the consent rights set forth in Article 1.08 hereof.

78.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed no later than the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the Restructuring Support Agreement, including, but not limited to the following documents: the Takeback Debt Documents, the Revolving Credit Facility Documents, the MIP, the New Governance Documents, the Shareholder Agreement, the identification of the New Board, to the extent known as of the Plan Supplement Filing Date, the identification of the Effective Date Cash, the Schedule of Rejected Executory Contracts and Unexpired Leases.  The Plan Supplement shall be in accordance with the Restructuring Support Agreement.  Through the Effective Date, the Debtor shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of (a) the Plan, (b) the Restructuring Support Agreement, and (c) the Confirmation Order, and consistent with the terms and conditions provided for in the the Restructuring Support Agreement.

79.     "*Plan Supplement Filing Date*" means the date that is four (4) days before the Voting Deadline.

80.     "*Preferred Stock*" means the 7.375% Series A Cumulative Redeemable Preferred Stock of CorEnergy.

81.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

82.     "*Pro Rata*" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that respective Class.

83.     "*Professional Fee Claim*" means all Administrative Claims for the compensation of Retained Professionals and the reimbursement of expenses incurred by such Retained Professionals through and including the Confirmation Date under Sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

HB: 4866-7395-7801.1

84.     "*Professionals*" means the Creditors' Professionals and the Estate's Professional.

85.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

86.     "*Reinstate,*" "*Reinstated,*" or "*Reinstatement*" means, leaving a Claim Unimpaired under the Plan.

87.     "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or special committee member or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees and, solely with respect to the Debtor, the former directors, managers, officers of its Affiliates.

88.     "*Released Party*" means collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Ad Hoc Noteholder Group and its members; (d) the Trustee; and (e) each Related Party of each Entity in clause (a) through (d); ***provided, however***, that notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

89.     "*Releasing Party*" means each of the following, solely in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Affiliates; (d) the Estate; (e) the Ad Hoc Noteholder Group; (f) the Professionals; (g) all Holders of Claims or Interests; (h) each Related Party of each Entity in clause (a) through (g).

90.     "*Reorganized Debtor*" means the Debtor as reorganized pursuant to and under the Plan, or any successor thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date in accordance with the Restructuring Transactions.

91.     "*Restructuring Fees and Expenses*" means all reasonable and documented fees, costs and expenses of each of the Creditors' Professionals, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing, including, but not limited to fees and expenses incurred in connection with the Chapter 11 Case, and, to the extent applicable, consistent with any engagement letters entered into with the Company.

92.     "*Restructuring Support Agreement*" means that certain binding Restructuring Support Agreement dated as of February 25, 2024, and all exhibits, schedules and attachments thereto, by and among the Debtor and the Ad Hoc Noteholder Group and any subsequent Entity

13

that becomes a party thereto pursuant to the terms thereof, attached as **Exhibit B** to the Disclosure Statement.

93.      "*Restructuring Transactions*" has the meaning set forth in <u>Article 4.02</u> of the Plan.

94.      "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with Sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to (i) Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention, or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

95.      "*Revolving Credit Facility*" means the revolving loan with a maximum borrowing amount of $10 million made by certain Holders (identified in the Revolving Credit Facility Documents) of the Senior Notes to CorEnergy on the terms and conditions set forth in the term sheet attached hereto as **Exhibit A**.  The Revolving Credit Facility shall be senior following the occurrence of one or more events of default, as more fully set forth in the governing documents thereto to the Takeback Debt (as defined below) and may be included as a part of the Takeback Debt Documents.

96.      "*Revolving Credit Facility Documents*" means all agreements, documents, and instruments delivered or to be entered into in connection with the Revolving Credit Facility.

97.      "*Revolving Credit Facility Loans*" means loans issued under the Revolving Credit Facility.

98.      "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means a schedule (including any amendments or modifications thereto) that will be Filed as part of the Plan Supplement and will include a list of all Executory Contracts and Unexpired Leases that the Debtor will reject pursuant to the Plan, as amended by the Debtor from time to time in accordance with the Plan, if any, subject to the consent rights set forth in <u>Article 1.08</u> hereof.

99.      "*SEC*" means the United States Securities and Exchange Commission.

100.     "*Section 510(b) Claim*" means any Claim against the Debtor: (a) arising from the rescission of a purchase or sale of a Security of the Debtor or an affiliate of the Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution Allowed under Section 502 of the Bankruptcy Code on account of such a Claim; or (d) otherwise subordinated pursuant to Section 510(b) of the Bankruptcy Code.

101.     "*Secured*" means any Claim to the extent (a) secured by a lien on property in which the Debtor has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to Section 553 of the Bankruptcy Code, to the extent of the value of the interest of the Holder of such Claim in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) and any other applicable provision of the Bankruptcy Code or (b) allowed, pursuant to the Plan or a Final Order of the Bankruptcy Court, as a secured Claim.

102.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

103.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

104.    "*Security*" has the meaning set forth in Section 101(49)of the Bankruptcy Code.

105.    "*Senior Note Payment*" means $23.6 million minus (ii) the negative difference, if any between the Effective Date Cash less $12 million.

106.    "*Senior Notes*" means the 5.875% Convertible Senior Notes due 2025 issued by CorEnergy pursuant to the Bond Indenture.

107.    "*Senior Noteholder*" means the Holder of one or more Senior Notes.

108.    "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

109.    "*Shareholder Agreement*" means the agreement among certain Holders of New Common Stock consistent with the terms and conditions set forth in the term sheet attached hereto as **Exhibit B**.

110.    "*Solicitation Materials*" means all documents, ballots, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to Sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

111.    "*Statutory Committee*" means any official committee of unsecured creditors, equity holders, or otherwise appointed in the Chapter 11 Case by the U.S. Trustee.

112.    "*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies. For the purposes of this definition, Crimson and its subsidiaries are subsidiaries of the Debtor.

113.    "*Takeback Debt*" means a loan made by the Holders of the Senior Notes to CorEnergy on the Effective Date on the terms and conditions set forth in the term sheet attached hereto as **Exhibit A**.

114.    "*Takeback Debt Principal Amount*" means the term loan facility, which comprises the exchange of the Senior Notes for: (a) an amount equal to $45 million; ***provided***, ***however***, that if the amount of the Senior Note Payment is less than 20% of the Senior Notes Claim, then the Takeback Debt Principal Amount shall be increased by the difference between 20% of the Senior Notes Claim less the Senior Note Payment.

115. "*Takeback Debt Debt Documents*" means, collectively, the loan agreement by and among the Reorganized Debtor and the lender parties thereto and all other agreements, documents, and instruments delivered or entered into in connection therewith.

116. "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

117. "*Third-Party Release*" means the releases set forth in <u>Article 8.03</u> hereof.

118. "*Trustee*" means U.S. Bank Trust Company, National Association, in its capacity as successor indenture trustee under the Bond Indenture.

119. "*U.S. Trustee*" means the Office of the United States Trustee for Region 13.

120. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's or Reorganized Debtor's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

121. "*Unexpired Lease*" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

122. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not impaired within the meaning of Section 1124 of the Bankruptcy Code.

123. "*Voting Deadline*" means the date and time by which the Notice and Claims Agent must actually receive the Ballots, as set forth on the Ballots.

1.02 **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise

16

defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to statutes, regulations, orders, rules of court and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (k) any immaterial effectuating provisions may be interpreted by the Debtor or the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (l) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

## 1.03   Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## 1.04   Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles; *provided* that corporate governance matters relating to the Debtor shall be governed by the laws of the state of incorporation of the Debtor or Reorganized Debtor, as applicable.

## 1.05   Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## 1.06   Reference to the Debtor or the Reorganized Debtor

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

## 1.07   Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, or any other Definitive Document, the terms of the applicable document included in the Plan Supplement or other Definitive Document shall control.  In the event of an inconsistency between the Plan, any document included in the Plan Supplement, or other

HB: 4866-7395-7801.1

Definitive Document, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control, unless provided otherwise.

1.08    **Consent Rights**

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement to the extent set forth in the Restructuring Support Agreement (without enhancement or expansion thereof) with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, the Disclosure Statement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article 1.01 hereof) and fully enforceable as if stated in full herein. In case of a conflict between the consent rights of the applicable parties that are set forth in the Restructuring Support Agreement and those parties' consent rights that are set forth in the Plan or the Plan Supplement, unless otherwise set forth in this Plan, the consent rights in the Restructuring Support Agreement shall control. Any and all consent rights referenced in the Plan or the Restructuring Support Agreement, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

2.01    **Administrative and Priority Claims**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

(a)    **Administrative Claims**

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

HB: 4866-7395-7801.1

(b)      **Administrative Claims Bar Date**

All requests for payment of an Administrative Claim (other than Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court or Notice and Claims Agent, as applicable, and served on the Debtor and the Ad Hoc Noteholder Group no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Reorganized Debtor may also choose to object to any Administrative Claim no later than 90 days after the Administrative Claims Bar Date, except as otherwise ordered by the Court, subject to extensions by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor, as applicable, or agreement in writing of the parties. Unless the Debtor or the Reorganized Debtor object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

2.02   **Professional Fee Claims**

(a)      **Final Fee Applications**

All final requests for Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) calendar days after the Effective Date. After notice and the opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid in Cash in full. For the avoidance of doubt, the Restructuring Fees and Expenses shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with Article 2.03 hereof, the Restructuring Support Agreement, and the Plan, as applicable.

(b)      **Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided in the Plan or the Confirmation Order, from on and after the Confirmation Date, the Reorganized Debtor shall pay in Cash the reasonable and documented legal fees and expenses incurred by the Debtor or the Reorganized Debtor in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Confirmation Date, any requirement that Retained Professionals comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      **Substantial Contribution Compensation and Expenses**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to Sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtor or Reorganized Debtor, as applicable, the Ad Hoc Noteholder Group, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

## 2.03    Restructuring Fees and Expenses

The reasonable Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Case on the dates on which such amounts would be required to be paid under the Restructuring Support Agreement) without the requirement to file a fee application with the Bankruptcy Court, without the need for time detail, and without any requirement for review or approval by the Bankruptcy Court. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtor at least two (2) Business Days before the anticipated Effective Date; *provided*, *that*, such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Fees and Expenses.

## 2.04    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Reorganized Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## 2.05    Statutory Fees

All fees due and payable pursuant to Section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor in full on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to file post-confirmation quarterly reports and pay quarterly fees to the U.S. Trustee until the earliest date upon which the Chapter 11 Case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

3.01    **Classification of Claims and Interests**

The Plan is being proposed by the Debtor within the meaning of Section 1121 of the Bankruptcy Code. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with Section 1122 of the Bankruptcy Code. In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described in Article II.

A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. Any Class that does not contain any Allowed Claims or Allowed Interests with respect to the Debtor will be treated in accordance with Article 3.05 below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class:

**Summary of Classification and Treatment of Claims and Interests**

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 4 | Grier Member Claims | Impaired | Yes |
| 5 | Senior Notes | Impaired | Yes |
| 6 | Preferred Stock | Impaired | Yes |
| 7 | Common Stock | Impaired | No (deemed to reject) |

3.02    **Treatment of Classes of Claims and Interests**

Except to the extent that the Debtor and a Holder of an Allowed Claim or Interest agrees to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange

21

for, such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(a)     **Class 1: Secured Claims**

(i)     *Classification*: Class 1 consists of Secured Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(iii)   *Impairment and Voting*: Class 1 is Unimpaired. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(b)     **Class 2: Other Priority Claims**

(i)     *Classification*: Class 2 consists of Other Priority Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.

(iii)   *Impairment and Voting*: Class 2 is Unimpaired. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(c)     **Class 3: General Unsecured Claims**

(i)     *Classification*: Class 3 consists of General Unsecured Claims.

(ii)    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or

Reorganized Debtor, as applicable, Payment in full in Cash on account of such Allowed General Unsecured Claim either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(iii)  *Impairment and Voting*: Class 3 is Unimpaired. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(d)  **Class 4: Grier Member Claims**

(i)  *Classification*: Class 4 consists of the Grier Member Claims.

(ii)  *Allowance*: Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claims constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii)  *Treatment*: Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

a)  With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred

23

Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); and

b) With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan. The Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units into New Common Stock.

c) Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.

(iv) *Impairment and Voting*: Class 4 is Impaired. Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. Pursuant to the Restructuring Support Agreement, the Grier Members have agreed to support the Plan, subject to the fiduciaries duty of John Grier, as a member of the Board of Directors of the Debtor, to withdraw his support for the Plan in certain circumstances.

(e) **Class 5: Senior Notes**

(i) *Classification*: Class 5 consists of Senior Notes.

(ii) *Allowance*: Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture. The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii) *Treatment*: Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:

a)  Its Pro Rata share of the Senior Note Payment;

b)  Its Pro Rata share of the Takeback Debt Principal Amount;

c)  Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and

d)  Its Pro Rata share of the Excess Effective Date Cash, if any.

(iv)  *Impairment and Voting*: Class 5 is Impaired. Holders of Senior Notes in Class 5 are entitled to vote to accept or reject the Plan. If Class 5 votes to reject the Plan, the Plan will be cancelled. Pursuant to the Restructuring Support Agreement, Holders of 90% of the principal amount of the Senior Notes have committed to support the Plan.

(f)  **Class 6: Preferred Stock**

(i)  *Classification*: Class 6 consists of Preferred Stock.

(ii)  *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such share of Preferred Stock, each Holder of a Preferred Stock shall receive either:

a)  If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or

b)  If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.

HB: 4866-7395-7801.1

c)    If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5. For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.

(iii)    *Impairment and Voting*: Class 6 is Impaired.  Holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.

(g)    **Class 7: Common Stock**

(i)    *Classification*: Class 7 consists of Common Stock and, pursuant to § 510(b) of the Bankruptcy Code, the Certain Crimson Employee Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock or Allowed Crimson Employee Claims, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Common Stock shall be cancelled.

(iii)    *Impairment and Voting*: Class 7 is Impaired. Holders of Interests in Class 7 are conclusively presumed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

### 3.03   <u>Special Provisions Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Claim.

### 3.04   <u>Controversy Concerning Impairment</u>

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.05   <u>Elimination of Vacant Classes</u>

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing, shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

3.06   **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

3.07   **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

An Impaired Class of Interests shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Interests actually voting in the Class have voted to accept the Plan.

3.08   **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class. The Debtor shall seek Confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor reserves the right to modify the Plan in accordance with Article X hereof (subject to the terms of the Restructuring Support Agreement) to the extent that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired, Impaired or otherwise to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan at any time before the Confirmation Date.

## ARTICLE IV
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

4.01   **General Settlement of Claims and Interests**

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and Confirmation Order, upon the Effective Date, the provisions of the Plan and Confirmation Order shall constitute an integrated and global good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan relating to the contractual, legal, and subordination rights of Holders with respect to such Allowed Claims and Interests or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's integrated and global approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and is within the range

HB: 4866-7395-7801.1

of reasonableness. Subject to this <u>Article IV</u>, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

### 4.02   **Restructuring Transactions**

On or about the Effective Date, the Debtor and/or the Reorganized Debtor, as the case may be, shall take all actions necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary and/or appropriate to effectuate the Restructuring Support Agreement and the Plan (collectively, the "<u>Restructuring Transactions</u>"), including, but not limited to: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, contribution, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree, including the documents comprising the Plan Supplement; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable law; (d) such other transactions that are required to effectuate the Restructuring Transactions in a tax efficient manner for the Debtor, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law and that are consistent with the Plan and the Restructuring Support Agreement.

The Confirmation Order shall and shall be deemed to, pursuant to Sections 363 and 1123 of the Bankruptcy Code, authorize the Restructuring Transactions, which shall and shall be deemed to occur in the sequence set forth therein.

The Confirmation Order shall and shall be deemed to, pursuant to both Sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions consistent with the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 4.03   **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (a) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (b) the appointment of the New Board; (c) the adoption and/or filing of any other amended organizational documents required to implement the Restructuring Transactions; (d) the issuance and distribution, or other transfer, of the New Common Stock as provided herein; (e) the implementation of the Restructuring Transactions; (f) the Debtor's entry into, delivery, and performance of the Takeback Debt Documents and Revolving Credit Facility Documents; and (g) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan

HB: 4866-7395-7801.1

(whether proposed to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving corporate action required by the Debtor, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security Holders, directors, managers, authorized persons, or officers of the Debtor.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions consistent with the Plan and the Restructuring Support Agreement) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this <u>Article 4.03</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

4.04    **Takeback Debt**

On the Effective Date, the Reorganized Debtor shall issue the Takeback Debt in the amount of the Takeback Debt Principal Amount (in which, subject to the occurrence of the Effective Date, interest shall accrue as of April 4, 2024, regardless of the day on which the Takeback Debt becomes fully operative) to the Holders of the Senior Notes consistent with the terms attached hereto as **Exhibit A**, as may be supplemented through a Plan Supplement.  For the avoidance of doubt, if the Effective Date does not occur, no interest shall be due under the Takeback Debt.

All terms of the Takeback Debt, including without limitation, covenants and governance, shall be reasonably acceptable to the Debtor and the Ad Hoc Noteholder Group and otherwise consistent with the Restructuring Support Agreement.  Any terms of the Takeback Debt may be modified subject to the consent of the Debtor and the Ad Hoc Noteholder Group.

On the Effective Date, the Debtor shall execute and deliver the Takeback Debt Documents and such documents shall become effective in accordance with their terms.  On and after the Effective Date, the Takeback Debt Documents shall constitute legal, valid, and binding obligations of the Debtor and shall be enforceable in accordance with their respective terms.  The terms and conditions of the Takeback Debt Documents shall bind the Debtor and each other Entity that enters into such Takeback Debt Documents.  Any Entity's acceptance of Takeback Debt shall be deemed as its agreement to the terms of the Takeback Debt Documents, as amended, amended and restated, supplemented, or otherwise modified from time to time following the Effective Date in accordance with their terms.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Takeback Debt and the Takeback Debt Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to issue the Takeback Debt and such other documents as may be required to effectuate the treatment afforded by the Takeback Debt.

4.05    **The Revolving Credit Facility**

On the Effective Date, the Reorganized Debtor shall enter into the Revolving Credit Facility Documents with the holders of the Senior Notes who are subject to the terms of the Restructuring Support Agreement at the discretion of such eligible holders. Confirmation of the Plan shall be deemed approval of the Revolving Credit Facility and authorization for the Debtor and Reorganized Debtor, as applicable, to take any and all actions necessary or appropriate to consummate the Revolving Credit Facility, including executing and delivering the Revolving Credit Facility Documents without any further notice to or order of the Bankruptcy Court.

The proceeds of the Revolving Credit Facility will be used exclusively for emergency purposes only, in accordance with the Revolving Credit Facility Documents.

4.06    **Management Incentive Plan**

On the Effective Date, the Reorganized Debtor shall enter into the Management Incentive Plan. All grants under the Management Incentive Plan shall ratably dilute all New Common Stock issued pursuant to the Plan.

The Management Incentive Plan will reserve exclusively for participants a pool of stock-based awards in the Reorganized Debtor in the form of (a) warrants for 5.0% of New Common Stock and (b) 5.0% of the New Common Stock, both determined on a fully diluted and fully distributed basis (the "MIP Pool"), which shall be reserved for distribution in accordance with the Management Incentive Plan.

On the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to current management.  No later 90 days following the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to management employees of the Reorganized Debtor as determined at the discretion of the New Board.  The remaining 50.0% of the MIP Pool shall be allocated to management employees at the discretion of the New Board.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Management Incentive Plan and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to enter into and execute the Management Incentive Plan and such other documents as may be required to effectuate the treatment afforded by the Management Incentive Plan.

4.07    **Employee Obligations**

CorEnergy is a party to Employment Agreements with all eleven (11) of its employees. The employees covered by the Employment Agreements provide accounting, finance, legal and leadership roles.  Pursuant to the Plan, the Reorganized Debtor will assume all eleven of the Employment Agreements.

HB: 4866-7395-7801.1

4.08    **Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock**

Prior to or as soon as reasonably practicable following the Effective Date, in accordance with all applicable federal and state rules and regulations, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Debtor or the Reorganized Debtor, as applicable, intend to take steps to de-register the existing Common Stock and Preferred Stock and to terminate and/or suspend its reporting obligations under the Exchange Act, including filing a Form 15 with the SEC to deregister its existing Common Stock and Preferred Stock.

The Confirmation Order shall authorize the issuance of New Common Stock in one or more issuances without the need for any further corporate action, and the Debtor or Reorganized Debtor, as applicable, is authorized to take any action necessary or appropriate in furtherance thereof.  On or about the Effective Date or as soon as reasonably practicable thereafter, applicable Holders of Senior Notes and Preferred Stock shall receive shares of New Common Stock pursuant to Articles 3.02(e) and (f).

All of the shares of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessed.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and the terms and conditions of the instruments evidencing or relating to such distribution or issuance.

The Reorganized Debtor does not intend to obtain a stock exchange listing for the New Common Stock, and the Reorganized Debtor does not intend to be subject to any reporting requirements promulgated by the SEC following the de-registration actions described above. The Reorganized Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules.

4.09    **Exemption from Registration Requirements**

The offering, issuance, and distribution of the New Common Stock pursuant to the Plan (other than Securities issuable under the Management Incentive Plan) will be exempt from the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on Section 1145 of the Bankruptcy Code.  Pursuant to Section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the United States without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the New Governance Documents.

All Persons shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion whether the New Common Stock or other Securities issued under or otherwise acquired pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services. Notwithstanding

31

anything to the contrary in the Plan or otherwise, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether such New Common Stock or other Securities are validly issued, fully paid and non-assessable, exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

## 4.10    **Subordination**

The allowance, classification, and treatment of satisfying all Claims and Interests proposed under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, Sections 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  Except as provided in the Plan, on the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently.  Accordingly, distributions under the Plan to Holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; *provided*, *that*, any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder, or the Plan is revoked or withdrawn.

## 4.11    **Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property in the Debtor's Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## 4.12    **Cancellation of Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, the New Common Stock, the Plan Supplement, or any agreement instrument, or other document entered into in connection with our pursuant to the Plan or the Restructuring Transactions, the obligations of the Debtor under the Bond Indenture, and any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtor giving rise to any Claim or Interest shall be cancelled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; *provided*, *that*, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest shall continue in effect solely for (a) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided

32

herein, and (b) permit the Trustee to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees, and expenses (i) due to the Trustee, or (ii) incurred by the Trustee in making such distributions, to the extent not otherwise satisfied by the Debtor. Except as provided in this Plan, on the Effective Date, the Trustee and its respective agents, successors and assigns shall be automatically and fully discharged of all duties and obligations associated with the Bond Indenture; *provided*, *further*, that the preceding *proviso* shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan. The commitments and obligations of the lenders or Holders under the Bond Indenture to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or any successors or assigns under the Bond Indenture, to the extent there were any remaining commitments or obligations, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, only such matters that, by their express terms, survive the termination of the Bond Indenture shall survive the occurrence of the Effective Date, including the rights of the Trustee, as applicable, to expense reimbursement, indemnification, and similar amounts.

## 4.13 Sources for Plan Distributions

The Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations. The Reorganized Debtor will pay or cause to be paid the Cash payments to be made pursuant to the Plan.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the Reorganized Debtor deems appropriate.

## 4.14 Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including, but not limited to the Restructuring Transactions), on the Effective Date, the Debtor shall continue to exist after the Effective Date as a separate corporation with all the powers of a corporation pursuant to applicable Law, except to the extent such formation documents are amended and restated, converted or otherwise modified by the Plan, the Plan Supplement, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

## 4.15 New Governance Documents

On the Effective Date, or as soon thereafter as is reasonably practicable, the New Governance Documents, consistent with the terms attached hereto as **Exhibit B**, as may be supplemented through a Plan Supplement, shall be adopted and amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the New Governance Documents, and the Restructuring Support Agreement, as applicable, and the

33

Bankruptcy Code.  To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtor will file its Agreement or applicable New Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of formation in accordance with the applicable laws thereof.  The New Governance Documents shall, among other things: (a) authorize the issuance of the New Common Stock and (b) pursuant to and only to the extent required by Section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  Subject to this Article 4.15 of the Plan, the Reorganized Debtor may amend and restate its formation and constituent documents as permitted by applicable law and the terms of the New Governance Documents, the Restructuring Support Agreement, and the Plan.

Certain Holders of the New Common Stock may enter into and be subject to the terms of a shareholder agreement (the "Shareholder Agreement"), which may restrict such Holder of New Common Stock for the purposes of preserving net operating losses.  It is the intent that any restrictions on trading in any Shareholder Agreement will not apply to small holders holding less than 5% of the New Common Stock who are not qualified institutional buyers as defined in Rule 144A of the Securities Act. The Reorganized Debtor intends to apply for the New Common Stock to be quoted in the OTC markets and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with OTC rules.

## 4.16    Indemnification Provisions in Organizational Documents

As of the Effective Date and consistent with applicable law, the Reorganized Debtor's formation documents shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor or Reorganized Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as set forth in the Indemnification Provisions, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  The Reorganized Debtor shall not amend and/or restate its organizational documents after the Effective Date to terminate or materially adversely affect (a) any Indemnification Provision or (b) the rights of such directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) referred to in the immediately preceding sentence.  For the avoidance of doubt, as used in this Article 4.16, "current" refers to covered Entities that serve as of the Petition Date, regardless of whether such Entities cease serving in such capacities thereafter.

## 4.17    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers, manager, and members of the board of managers (or other governing body) thereof, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the

Restructuring Transactions, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

4.18    **Management of the Reorganized Debtor**

On the Effective Date, the board of directors at CorEnergy shall be replaced with the New Board. The New Board shall initially include five (5) members appointed by the new equity holders, on arrangements to be agreed to by, and in the sole discretion of, the Ad Hoc Noteholder Group and as set forth in the Shareholder Agreement.

Provisions regarding the removal, appointment, and replacement of members of the New Board will be set forth in the New Governance Documents or Shareholder Agreement.

4.19    **Section 1146(a) Exemption**

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Takeback Debt or the Revolving Credit Facility, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax, or other similar tax or governmental assessment.  All appropriate state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

4.20    **Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the

Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action, including Avoidance Actions, against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to commence, pursue, and prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article 4.20 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article 4.20 that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 5.01 <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, including without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts or leases to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges,

immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtor or Reorganized Debtor, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 5.02 Cure and Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtor or the Reorganized Debtor, as applicable, shall pay undisputed Cure Claims, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter as dictated by the Debtor's ordinary course of business, for Executory Contracts and Unexpired Leases assumed as of the Effective Date or (b) the assumption effective date, if different than the Effective Date. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor of the Cure Claim; *provided*, *that* nothing herein shall prevent the Reorganized Debtor from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtor also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Claim payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided*, *that*, the Reorganized Debtor may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity.

At least fourteen (14) days prior to the Combined Hearing, the Debtor shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Claim amounts to be sent to applicable third parties (with such Cure Claim being $0.00 if no amount is listed in the notice), which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment on any grounds or related amount of the Cure Claim must be Filed, served, and actually received by the Debtor no later than the date

specified in the notice (which specified date shall be at least fourteen (14) days following service of the notice). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption will be deemed to have assented to such assumption or assumption and assignment and any objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, Order, or approval of the Bankruptcy Court. The Debtor or Reorganized Debtor, as applicable, reserves the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or Reorganized Debtor, as applicable, shall have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date. In the event of a timely Filed objection regarding (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption or the cure payments required by Section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article 5.02, in the amount and at the time dictated by the Debtor's ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article 5.02, in the amount and at the time dictated by the Debtor ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

5.03   **Rejection Damages Claims**

In the event that the rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is Filed with the Notices and Claims Agent and served upon counsel for the Debtor,

the Reorganized Debtor, and counsel for the Ad Hoc Noteholder Group no later than fifteen (15) days after the date of entry of a Final Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with Article III hereof.

5.04    **Insurance Policies**

To the extent the Debtor is a party thereto or a named insured, any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code.

To the extent applicable, the Debtor or the Reorganized Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect as of the Petition Date. Any current and former directors, officers, managers, and employees of the Debtor who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date subject to the terms of such policy. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor shall retain the ability to supplement (but not reduce) such D&O Liability Insurance Policy as the Debtor or Reorganized Debtor may deem necessary.

The Debtor shall continue to satisfy any applicable insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtor's insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, with respect to any policies where the Debtor is a named insured or a counterparty: (a) the Debtor shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtor.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of all such insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

5.05    **Contracts and Leases After the Petition Date**

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed under Section 365 of the Bankruptcy Code, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business.

Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

### 5.06   **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or the Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

### 5.07   **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

### 6.01   **Distributions on Account of Claims or Interests Allowed as of Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, which shall be the same day as the Effective Date, the distribution agent (the "Distribution Agent") shall make initial distributions under the Plan on account of Claims or Interests Allowed on or before the Effective Date or as soon as reasonably practical thereafter; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article 2.04 hereof. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

The Debtor and the Reorganized Debtor, as applicable, shall take such reasonable actions as may be required to cause the distributions to Holders of the Preferred Stock in accordance with and as contemplated under the Plan. Notwithstanding anything in the Plan to the contrary, to the extent a holder of Preferred Stock holds such interests through DTC, distributions attributable to such Holders shall be effectuated through the facilities of DTC, to the extent practicable. The distributions to Holders of Preferred Stock shall be deemed issued on the Effective Date regardless of when the distribution actually occurs.

(a)   **Powers of Distribution Agent**

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof, ***provided***, ***however***, that such Distribution Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Senior Noteholders may be made to or at the direction of the Trustee, who may act as Distribution Agent (or direct the Distribution Agent) for distributions to Senior Noteholders, in accordance with the Plan and the Bond Indenture. As applicable, the Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with customary practices of DTC.

(b)    **Expenses Incurred On or After the Effective Date**

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of such Distribution Agent without the need for any approvals, authorizations, actions, or consents, except as otherwise ordered by the Bankruptcy Court. The Distribution Agent shall submit invoices to the Debtor or the Reorganized Debtor, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtor or the Reorganized Debtor, as applicable, shall pay those amounts that either deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor or the Reorganized Debtor, as applicable, deem to be unreasonable. In the event that the Debtor or the Reorganized Debtor, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Reorganized Debtor, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtor or the Reorganized Debtor, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

6.02    <u>**Special Rules for Distributions to Holders of Disputed Claims**</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

41

6.03   **Delivery of Distributions**

(a)     **Record Date for Distributions**

As of the Distribution Record Date, the various transfer registers for each Class of Claims or Interests entitled to distributions under the Plan as maintained by the Debtor or its respective agents shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Debtor's publicly traded Preferred Stock or Common Stock, the distributions to which will be conducted in accordance with the DTC's standard procedures and customary practices.

(b)     **Distribution Process**

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims or Interests at the address for each such Holder as indicated on the applicable register or in the Debtor's records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *that*, the manner of such distributions shall be determined at the discretion of the Reorganized Debtor.

(c)     **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all applicable withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each Holder of an Allowed Claim or Interest or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Notwithstanding any provision in the Plan, any document included in the Plan Supplement, or any other Definitive Document to the contrary, the Reorganized Debtor and the Distribution Agent shall have the right, but not the obligation, to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (a) withholding distributions pending receipt of information necessary to facilitate such distributions and (b) in the case of a non-Cash distribution that is subject to withholding, withhold an appropriate portion of such property and either liquidate such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Any amounts withheld or reallocated pursuant to this Article 6.03(c) shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Reorganized Debtor and the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, IRS Form W-9 or, if the payee is a foreign Person, an applicable IRS Form W-8, or any other forms or documents reasonably requested by the Reorganized Debtor or the Distribution Agent to reduce or eliminate any withholding required by Governmental Unit. If such request is made by the Reorganized Debtor or the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, and the Holder fails to comply within ninety (90) days after not less than two (2) requests have been made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor as applicable, and any Claim or Interest in respect of such distribution shall be forever barred from assertion against any Debtor, the Reorganized Debtor and their respective property.

(d)    **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

(e)    **Fractional, Undeliverable, and Unclaimed Distributions**

(i)    *Fractional Distributions:* No fractional New Common Stock shall be distributed. Whenever any distribution of fractional units of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding down of such fraction to the nearest unit of New Common Stock. Any Cash distributions shall reflect a rounding down of such Cash to the nearest penny. No consideration shall be provided in lieu of fractional shares or Cash amounts that are rounded down. None of the Reorganized Debtor or the Distribution Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock. DTC shall be considered a single holder for distribution purposes.

(ii)   *Undeliverable Distributions:* If any distribution to a Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder within thirty (30) days of receipt of the Holder's then current address or other necessary information. Undeliverable distributions shall remain in the possession of the Reorganized Debtor as applicable, for one (1) year after the Effective Date at which time such distribution reverts to the Reorganized Debtor as applicable, or is cancelled pursuant to Article 6.03(e)(iv) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)  *Failure to Present Checks:* Checks issued by the Reorganized Debtor (or its Distribution Agent) on account of Allowed Claims shall be null and void if

43

not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days of the Effective Date shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtor or its property.

Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment laws, all such distributions shall revert to the Reorganized Debtor. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

(iv)    *Reversion:* Any distribution under the Plan that is an Unclaimed Distribution for a period of one (1) year after the Effective Date shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock shall be deemed cancelled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

(f)    **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or Interest that has been cancelled shall be deemed to have surrendered such certificate or interest to the Debtor or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such certificate or instrument shall be cancelled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding the foregoing paragraph, this Article 6.03(f) shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

6.04    **Claims Paid or Payable by Third Parties**

(a)    **Claims Paid by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim

44

receives a payment on account of such Claim from a party that is not the Debtor or the Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

(b)    **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.05    **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, and notwithstanding any documents that govern the Debtor's prepetition funded indebtedness to the contrary, (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (i) interest accruing on or after the Petition Date on any such Claim; or (ii) interest at the contract default rate, as applicable.

6.06    **Setoffs**

Except as otherwise expressly provided for herein and with respect to the Allowed Claim of the holders of the Senior Notes and/or the Trustee, the Reorganized Debtor, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor, as applicable, may hold against the Holder

of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); ***provided***, ***however***, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

6.07    **Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein or as otherwise required by law (as reasonably determined by the Reorganized Debtor), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for federal income tax purposes) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

6.08    **Delivery of New Common Stock**

On the Effective Date, the Reorganized Debtor is authorized to issue or cause to be issued and shall issue the New Common Stock for distribution in accordance with the terms of the Plan without the need for any further board, shareholder or other corporate action. All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Each holder of New Common Stock shall be deemed, without further notice or action, to have agreed to be bound by the New Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms.  The New Governance Documents shall be binding on all Entities receiving New Common Stock (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the New Governance Document. Notwithstanding the foregoing, the Reorganized Debtor, may condition the distribution of any New Common Stock issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtor or the Reorganized Debtor, as applicable, counter-signatures to one or more New Governance Documents.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS**

7.01    **Allowance of Claims**

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it

46

becomes a Final Order), in the Chapter 11 Case allowing such Claim.  The Debtor or Reorganized Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

7.02  **Objections to Claims**

Except as otherwise specifically provided in this Plan or the Confirmation Order, the Debtor, and after the Effective Date, the Reorganized Debtor, shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (c) administer and adjust the Debtor's Claims register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Causes of Action retained pursuant to Article 4.20 of the Plan.  A motion to extend the Claims Objection Deadline shall automatically extend the deadline until the Court enters an order on such motion.

7.03  **Estimation of Claims**

Before or after the Effective Date, the Debtor or Reorganized Debtor, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

7.04  **No Distribution Pending Allowance**

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.05  **Distribution After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of

HB: 4866-7395-7801.1

the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

7.06    **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.07    **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims register, to the extent applicable) by the Reorganized Debtor without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, Order, or approval of the Bankruptcy Court.

7.08    **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtor under Sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.  All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the Reorganized Debtor elects to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed to by the Debtor or the Reorganized Debtor, as applicable, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such Claims may not**

receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

## ARTICLE VIII
## EFFECT OF CONFIRMATION OF THE PLAN

8.01    **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies**

**Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including the Takeback Debt and the Revolving Credit Facility): (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims and Interests after the Effective Date by the Reorganized Debtor, and Causes of Action against the Debtor of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtor prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities, liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, its successors and assigns, and its assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not: (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.**

**Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of**

49

**Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and its Estate and Causes of Action against other Entities.**

8.02    **Release by the Debtor**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE REORGANIZED DEBTOR, AND ITS ESTATE FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, OR ITS ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, THE DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE**

50

DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, OR (C) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR THE DEBTOR'S ESTATE ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

8.03    <u>Releases by Holders of Claims and Interests</u>

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED THE DEBTOR, REORGANIZED DEBTOR, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN

**SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST- EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, THE TAKEBACK DEBT OR THE REVOLVING CREDIT FACLIITY, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, (C) OBLIGATIONS UNDER THE BOND INDENTURE, THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION THEREOF, INCLUDING THE RIGHTS OF THE TRUSTEE TO EXPENSE REIMBURSEMENT, INDEMNIFICATION AND SIMILAR AMOUNTS, OR (IV) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE**

HB: 4866-7395-7801.1

**AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

8.04    **Exculpation**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.**

**THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF**

**SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, AND OTHER DOCUMENTS, INSTRUMENTS AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

8.05   **Injunction**

**UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AND AFFILIATES, AND EACH OF THEIR SUCCESSORS AND ASSIGNS, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM OR INTEREST THAT IS EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE 8.02 OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE 8.03 OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE 8.04 OF THE PLAN, OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE REORGANIZED DEBTOR, THE RELEASED PARTIES, AND/OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST**

ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS DISCHARGED, RELEASED, EXCULPATED, SETTLED AND/OR TREATED, ENTITLED TO A DISTRIBUTION, OR CANCELLED PURSUANT TO THE PLAN.

NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE PREPETITON DOCUMENTS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASE, THE FILING OF THE CHAPTER 11 CASE, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST

HB: 4866-7395-7801.1

**THE DEBTOR, REORGANIZED DEBTOR, OR ANY SUCH EXCULPATED PARTY OR RELEASED PARTY.**

**THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSES OF ACTION.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN, THE CONFIRMATION ORDER OR UNDER ANY OTHER DEFINITIVE DOCUMENT OR OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN, THE CONFIRMATION ORDER OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER. THE INJUNCTION IN THE PLAN SHALL EXTEND TO ANY SUCCESSORS AND ASSIGNS OF THE DEBTOR AND THE REORGANIZED DEBTOR AND ITS RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

8.06   **Protection Against Discriminatory Treatment**

In accordance with Section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which the Reorganized Debtor has been or is associated, solely because the Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case, but before the Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

8.07   **Release of Liens**

Except as otherwise specifically provided in the Plan, the Takeback Debt, the Revolving Credit Facility (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest related to the Takeback Debt and/or the Revolving Credit Facility), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor, the Trustee or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtor or the Reorganized Debtor, the Trustee shall execute and deliver all documents reasonably requested by the Debtor,

Reorganized Debtor or administrative agent(s) for the Takeback Debt and/or the Revolving Credit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtor and its designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

## 8.08    **Reimbursement of Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## 8.09    **Recoupment**

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

<div align="center">

**ARTICLE IX**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

</div>

## 9.01    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article 9.02 of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

(b)    The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated and all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Restructuring Support Agreement by the Debtor or the Ad Hoc Noteholder Group for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Case and the related automatic stay;

(c)    The Grier Members' consent to the Restructuring Support Agreement shall remain in full force and effect;

(d)    The Plan, any other Definitive Documents, and all documents contained in the Plan Supplement, including any exhibits, schedules, annexes, amendments, modifications, or supplements thereto shall have been executed and/or filed with the Bankruptcy Court and shall be consistent in all respects with the Restructuring Support Agreement;

<div align="center">57</div>

(e)      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring Transactions, the Restructuring Support Agreement or any of the Definitive Documents contemplated thereby;

(f)      The conditions precedent to the effectiveness of the Takeback Debt, if any, (as determined in any Takeback Debt documentation) shall have been satisfied or duly waived in writing and any documents or instruments related to the Takeback Debt shall have closed or will close simultaneously with the effectiveness of the Plan;

(g)      The conditions precedent to the effectiveness of the Revolving Credit Facility, if any, (as determined in the Revolving Credit Facility Documents) shall have been satisfied or duly waived in writing and any documents or instruments related to the Revolving Credit Facility shall have closed or will close simultaneously with the effectiveness of the Plan;

(h)      The Debtor shall have obtained any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Plan and the Restructuring Transactions;

(i)      The Debtor shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement;

(j)      All conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Governance Documents shall have been waived or satisfied in accordance with the terms thereof;

(k)      To the extent required under applicable non-bankruptcy law, any amendments to the Debtor's governance and organizational documents, shall have been duly filed with the applicable authorities in the relevant jurisdictions; and

(l)      All Restructuring Fees and Expenses for which an invoice has been received by the Debtor on or before two (2) Business Days before the expected Effective Date and professional fees and expenses of Retained Professionals approved by the Bankruptcy Court shall have been paid in full.

## 9.02   **Waiver of Conditions Precedent**

The Debtor (with the express consent of the Ad Hoc Noteholder Group pursuant to the same percentages as required in the Restructuring Support Agreement, in writing), may waive any of the conditions to the Effective Date set forth in Article 9.01 of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time (subject to the consent of the Ad Hoc Noteholder Group).

HB: 4866-7395-7801.1

9.03    **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, or if, prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then (except as provided in any such Final Order): (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

9.04    **Substantial Consummation**

"*Substantial Consummation*" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

10.01    **Modification of Plan**

Effective as of the date hereof: (a) the Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtor (subject to the terms of the Restructuring Support Agreement and the consents required therein) or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.  Notwithstanding anything to the contrary herein, the Debtor or the Reorganized Debtor, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Restructuring Support Agreement.

10.02    **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute (a) approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to Section 1127(a) of the Bankruptcy Code; and (b) a finding that such modifications to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

10.03    **Revocation or Withdrawal of Plan**

The Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if Confirmation

or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) the Restructuring Support Agreement will be null and void in all respects; (c) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (d) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against the Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to Section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article 6.03 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to Section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Case;

15.     enforce all orders previously entered by the Bankruptcy Court; and

16.     hear any other matter not inconsistent with the Bankruptcy Code;

17.     *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to the Takeback Debt, Revolving Credit Facility, and the New Governance Documents. The Takeback Debt, Revolving Credit Facility, and the New Governance Documents shall be governed by the respective jurisdictional provisions therein.

### ARTICLE XII
### MISCELLANEOUS PROVISIONS

#### 12.01  **Immediate Binding Effect**

Subject to Article 9.01 hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan

HB: 4866-7395-7801.1

Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

### 12.02   **Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan Reservation of Rights.

### 12.03   **Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 12.04   **Successor and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 12.05   **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be served on:

| Debtor | Counsel to the Debtor |
|--------|----------------------|
|        |                      |

HB: 4866-7395-7801.1

| CorEnergy Infrastructure Trust, Inc.<br>Attn: Chris Reitz<br>1100 Walnut St., Kansas City, MO 64106<br>E-mail: creitz@corenergy.reit | Husch Blackwell LLP<br>4801 Main Street, Suite 1000<br>Kansas City, MO 64112-2551<br>Attn:<br>Mark T. Benedict and<br>John J. Cruciani<br><br>Email:<br>mark.benedict@huschblackwell.com<br>john.cruciani@huschblackwell.com |
| --- | --- |
| **Office of United States Trustee** | **Counsel to the Ad Hoc Noteholder Group** |
| Office of United States Trustee for Region 13 | Faegre Drinker Biddle & Reath LLP<br>1177 Avenue of the Americas, 41st Floor<br>New York, New York 10036, USA<br>Attn:<br>James H. Millar and<br>Laura E. Appleby<br><br>Email:<br>james.millar@faegredrinker.com<br>laura.appleby@faegredrinker.com |

After the Effective Date, the Reorganized Debtor has authority to send a notice to Entities informing them that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## 12.06  Term of Injunction or Stays

Unless otherwise provided herein, in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 12.07  Entire Agreement

Except as otherwise indicated or as set forth in the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

HB: 4866-7395-7801.1

12.08   **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date, consistent with the Restructuring Support Agreement. After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Notice and Claims Agent's website at https://cases.stretto.com/corenergy or the Bankruptcy Court's website at www.mow.uscourts.gov/bankruptcy.

12.09   **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

12.10   **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with Section 1125(g) of the Bankruptcy Code, and pursuant to Section 1125(e) of the Bankruptcy Code, the Debtor, and its respective Affiliates, agents, representatives, members, principals, shareholders, officers, trustees, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

12.11   **Dissolution of Statutory Committees and Cessation of Fee and Expense Payment**

On the Effective Date, any Statutory Committee appointed in the Chapter 11 Case shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case, except with respect to final fee applications of the Retained Professionals and any consent or consultation rights of the Statutory Committee that remain applicable after the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees or expenses incurred by the members or Retained Professionals of

any Statutory Committee or any other statutory committee appointed in the Chapter 11 Case after the Effective Date except with respect to any consent or consultation rights of any Statutory Committee that remain applicable after the Effective Date.

## 12.12   **Closing of Chapter 11 Case**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## 12.13   **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers.

Dated: February 25, 2024.          **CORENERGY INFRASTRUCTURE TRUST, INC.**

By:  _/s/ Mark T. Benedict_____
Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone      (816) 983-8000
Facsimile      (816) 983-8080
Email:          Mark.Benedict@huschblackwell.com
                    John.Cruciani@huschblackwell.com


Proposed Counsel for Debtor and Debtor in Possession

HB: 4866-7395-7801.1

## **Exhibit A**

**Exit Facility Term Sheet**

# CORENERGY INFRASTRUCTURE TRUST, INC.

## Exit Facility Term Sheet

This term sheet (this "***Term Sheet***") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed term and revolving credit loans described below, to be entered into in connection with the voluntary case commenced by CorEnergy Infrastructure Trust, Inc. (the "***Company***") under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware pursuant to a "prepackaged" chapter 11 plan of reorganization (the "***Restructuring Transaction***"). This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to the Lenders (as hereinafter defined) as well as the satisfactory completion of reasonable due diligence.

This Term Sheet and any associated documents that may be provided in furtherance of negotiations between the parties are provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

| Parties | |
|---|---|
| **Borrower:** | The Company, CorEnergy Infrastructure Trust, Inc. |
| **Guarantors:** | All present and future, direct and indirect subsidiaries of the Borrower or Crimson Midstream Holdings, LLC, other than (a) any subsidiary for which a guaranty would require CPUC authorization or consent and such authorization or consent has not been obtained (as of the date hereof, Crimson California Pipeline, L.P. and San Pablo Bay Pipeline Company, LLC) and (b) any subsidiary identified as dormant that will be liquidated and dissolved, or merged into another subsidiary, within a reasonable period after closing. <br><br> A structure chart is attached hereto as Exhibit A. |
| **Lenders:** | Term Loan Facility Lenders: holders of Senior Notes (defined below) <br><br> Revolving Loan Facility Lenders: holders of Senior Notes that have agreed to make revolving loans under the Revolving Credit Facility. |

| Administrative Agent: | UMB Bank N.A. |
|---|---|

| **Summary of Exit Facility** | |
|---|---|
| **Term Loan Facility:** | Exchange of the Company's 5.875% Convertible Senior Notes due 2025 ("**_Senior Notes_**") for:<br><br>(a)  $45,000,000 of term loan notes under the Term Loan Credit Agreement;<br><br>(b)  cash in accordance with the terms of the Restructuring Transaction; and<br><br>(c)  equity of the Company in accordance with the terms of the Restructuring Transaction. |
| **Revolving Loan Facility:** | Commitment for up to $10,000,000 of new money revolving loans under the Revolving Loan Credit Agreement. |
| **Priority:** | The Revolving Loan Facility and all guaranties and security interests in connection therewith will be (i) senior to the Term Loan Facility and the guaranties and security interests in connection therewith (together with any subsequent refinancings thereof in an aggregate principal amount not to exceed $10,000,000 at any time outstanding, and whether with the same or different lenders) and (ii) junior to certain existing intercompany debt. Absent an event of default, all scheduled payments of principal and interest will be applied to the Revolving Loan Facility and the Term Loan Facility in accordance with their terms. All unscheduled prepayments and, after an event of default, all scheduled payments of principal and interest will be applied first to outstanding obligations under the Revolving Loan Facility and thereafter to outstanding obligations under the Term Loan Facility.<br><br>The Term Loan Facility and all guaranties and security interests in connection therewith will be senior to all other indebtedness and obligations of the Company and its subsidiaries, consistent with the Amended and Restated Credit Agreement, dated as of February 4, 2021 (as amended), among Crimson Midstream Operating, LLC and the other Borrowers party thereto, the Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank, National Association (the "**_Wells Fargo Facility_**"), except that it will be junior to certain existing intercompany debt. |

| Term Loan Facility | |
|---|---|
| **Maturity:** | The earlier of five (5) years from the deemed issuance date of April 4, 2024 (the "***Deemed Issuance Date***") or the acceleration of the loans upon the occurrence of an event of default. |
| **Interest:** | 12% per annum commencing on the Deemed Issuance Date. |
| | Interest will PIK until the Confirmation Order. |
| | After the Confirmation Order, interest will be paid quarterly; *provided that* the Company may PIK interest at its option until the first anniversary of the Confirmation Order. |
| **Repayments and Prepayment:** | Amortization of $1,000,000 per quarter in arrears, commencing with the first full calendar quarter after the first anniversary of the Confirmation Order. |
| | The Company may prepay all or any portion of the Term Loan Facility on or after the first anniversary of the Confirmation Order. |
| | Mandatory prepayment of not less than $9 million (the "***CO2 Paydown Amount***") in connection with the CO2 Joint Venture (as defined below). |
| | Other mandatory prepayments consistent with the Wells Fargo Facility. |
| | All prepayments will be subject to a prepayment premium equal to: |
| | • Prior to the second anniversary of the Effective Date, a 3.00% premium of the aggregate principal amount repaid; <br> • From the second anniversary through the third anniversary, a 2.00% premium of the aggregate principal amount repaid; and <br> • From the third anniversary through the fourth anniversary, 1.00%. |
| Revolving Credit Facility | |
| **Use of Proceeds:** | To remedy emergencies and disasters with respect to regulated assets as required by laws and regulations. In no event shall the proceeds of any Revolving Advances be used to purchase or carry margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board). |
| **Conditions to Borrowing:** | Consistent with the Wells Fargo Facility. |

3

| | |
|---|---|
| **Maturity:** | The earlier of one (1) year following the Deemed Issuance Date or the acceleration of the loans upon the occurrence of an event of default. |
| **Interest:** | One-month SOFR plus 3% per annum, paid on a quarterly basis. |
| **Repayments and Prepayment:** | The Company may prepay all or any portion of the Revolving Loan Facility at its option without premium or fees. <br><br> Mandatory prepayments consistent with the Wells Fargo Facility. <br><br> Mandatory repayment at maturity. |
| **Commitment Fee:** | 3% of the unused daily commitment amount, commencing on the date of the Confirmation Order. |
| **Arrangement Fee:** | $500,000 |
| **General Terms** | |
| **Security:** | Pledge of the totality of the (i) capital stock, (ii) equity interests, and (iii) assets and properties of the Borrower and the Guarantors, subject to customary exclusions (including exclusions related to governmental authorizations that are not obtained prior to the Confirmation Order) to the extent that such collateral is not of the type for which CPUC authorization or consent would be required, consistent with the Wells Fargo Facility.  Additionally, the Borrower and its Subsidiaries will agree to a negative pledge for all assets and properties for which CPUC authorization or consent is required for a lender to receive a pledge of such property, consistent with the Wells Fargo Facility. |
| **Representations, Warranties, Covenants and Events of Default:** | Consistent with the Wells Fargo Facility; *provided that* (a) the Term Loan Facility and Revolving Loan Facility will not have financial maintenance covenants (*i.e.*, §§6.13 and 6.14 of the Wells Fargo Facility) and (b) the Company will be permitted to consummate the CO2 Joint Venture (as defined below). |
| **Amendments, Waivers and Consents:** | Generally, amendments to and waivers and consents under (a) the Term Loan Facility will require the approval of Lenders holding 66.67% or more of the outstanding Term Loan Facility obligations, (b) the Revolving Loan Facility will require the approval of Lenders holding 66.67% or more of the funded and unfunded Revolving Loan Facility obligations and commitments, and (c) both the Term Loan Facility and Revolving Loan Facility will require the approval of Lenders holding 66.67% or more of the outstanding Term Loan Facility obligations and funded and unfunded Revolving Loan Facility obligations and commitments (**"*Required Lenders*"**), except for |

4

| | matters that require a higher level of Lender approval consistent with the Wells Fargo Facility or as set forth below. |
|---|---|
| | Notwithstanding the foregoing, except as permitted by the negative covenants consistent with the Wells Fargo Facility, (a) the distribution or transfer of any material operating assets of the Borrower or any of its direct or indirect subsidiaries or joint ventures (whether or not wholly-owned) (the "***Borrower Group***"), or the distribution or transfer of any capital stock or equity interests of any member of the Borrower Group that owns material operating assets (each, an "***Asset/Equity Transfer***"), (b) the incurrence of indebtedness or liens senior to the Term Loan Facility and the Revolving Loan Facility, and (c) certain other amendments, waivers and consents as set forth in the definitive documentation will require the approval of Lenders holding 75% of the outstanding Term Loan Facility obligations and funded and unfunded Revolving Loan Facility obligations and commitments. |
| | The Borrower and its Subsidiaries may consummate the transactions contemplated in the *CO2 Letter Agreement* (the "***CO2 Joint Venture***"); provided that (i) the Borrower pays down the Term Loan Facility by the CO2 Paydown Amount in connection therewith and (ii) the Borrower is not required to make and does not make any cash investments in the CO2 Joint Venture in excess of (A) the cash proceeds from any issuance of equity interests of the Borrower designated for use in connection with the CO2 Joint Venture <u>plus</u> (B) a cumulative builder basket as will be set forth in the Credit Agreement. Any material variations from the terms of the CO2 Letter Agreement will require the consent of the Required Lenders. |
| **Expenses:** | The Company will pay all reasonable and documented out-of-pocket costs and expenses of the Lenders associated with the preparation, execution, delivery, and administration of the Term Loan Facility and the Revolving Loan Facility. |
| **Governing Law:** | New York |

5

## <u>Exhibit B</u>

## Corporate Governance Term Sheet

**RESTRUCTURING OF CORENERGY INFRASTRUCTURE TRUST INC.**
**SUMMARY OF PRINCIPAL TERMS OF GOVERNANCE AND RELATED RIGHTS**

**FEBRUARY 25, 2024**

The following is a description of certain proposed terms for the corporate governance of reorganized CorEnergy Infrastructure Trust, Inc. (as reorganized pursuant to the Plan (as defined below), "CORR"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in that certain Restructuring Support Agreement (the "Restructuring Support Agreement") entered into by CORR and the Ad Hoc Noteholders Group (the "AHNG").

| Board of Directors: | The board of directors of CORR (the "Board") shall initially be comprised of five (5) directors (each a "Director").  At all times, the Board shall be compromised as follows:<br><br>• One (1) Director shall be the CEO of CORR.<br><br>• One (1) Director shall be designated by Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. (the "Keyframe Director").<br><br>• Two (2) Directors shall be independent directors unaffiliated with the AHNG or CORR or its Subsidiaries, who initially shall be designated by at least a two-thirds vote[1] of the AHNG, and thereafter designated upon two-thirds vote of holders of the outstanding common stock of CORR (the "Common Stock") (each an "Independent Director").  Following the death, resignation or removal of an independent director, a new independent director who is not affiliated with or employed by any member of the AHNG or CORR shall be nominated by the same vote.<br><br>• One (1) Director shall be initially designated by the holders of a majority of the AHNG, excluding Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P.; and thereafter shall be appointed by holders of the majority of the outstanding Common Stock of CORR, excluding Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P.; provided that if Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. no longer possesses the right to designate a director, it shall be permitted to vote on such Director (the "Minority Director").<br><br>The identity of the initial Directors shall be set forth in the Plan Supplement.<br><br>All actions of the Board will require the approval by a vote or the |

---

[1] All votes of the AHNG contained herein shall be based upon the amount of Senior Notes held by such member of the AHNG.

| | written consent of a majority of all of the Directors. |
|---|---|
| | A Director may only be removed by a vote of the shareholders of CORR ("Shareholders") holding two-thirds of the Common Stock for cause. In addition, the Keyframe Director may be removed by those Shareholders appointing such Keyframe Director at any time, with or without cause. The Minority Director may be removed by a vote of two-thirds of the Common Stock of those shareholders eligible to vote in connection with the Minority Director. Directors shall serve one-year terms commensurate with Maryland legal requirements. |
| | From time to time, the Board may appoint non-voting observers, including one which may be designated by John Grier. Mr. Grier's option to appoint a non-voting observer shall terminate when Mr. Grier no longer holds equity in CORR. |
| | Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. will be entitled to their director designation rights so long as they holds 20% or more of the Common Stock. |
| | The Shareholders shall enter into a securityholders agreement (the "Securityholders Agreement") which will require each Shareholder to vote its shares of Common Stock in support of each of the nominees described above and otherwise comply with the terms of this term sheet. The Securityholders Agreement shall terminate when the members of the AHNG no longer hold, collectively, at least twenty five percent (25%) of the Common Stock. Upon such termination and thereafter, the two independent directors and the Minority Director shall be elected by a majority vote of the holders of shares of Common Stock. |
| **Dividends** | All dividends shall be paid pro rata to the holders of Common Stock. |
| **Board Approvals:** | Neither CORR nor any subsidiaries of CORR (collectively, the "Subsidiaries") shall take any of the following actions without the prior vote or consent of a majority of the Board: |
| | • hiring or termination the CEO, the CFO or any other members of senior management of CORR, or approving the compensation arrangements of the CEO, CFO or any other member of senior management of CORR; |
| | • any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities, partnership interests or membership interests of any kind of CORR or any Subsidiary[2] (other than those issued solely to |

---

[2]   "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or

| | CORR and its Subsidiaries); |
|---|---|
| | • any redemption or repurchase of any Common Stock; |
| | • any acquisition by CORR or any Subsidiary of the stock or assets of any person, or the acquisition of any business, properties, assets or persons or any dispositions of a material amount of assets of CORR and its Subsidiaries (on a consolidated basis); |
| | • any voluntary election by CORR or any Subsidiary to liquidate or dissolve or to commence bankruptcy or insolvency proceedings or the adoption of a plan with respect to the foregoing; and |
| | • the commencement of an IPO by CORR or any Subsidiary. |
| **Shareholder Approvals:** | Neither CORR nor any Subsidiaries shall take any of the following actions without the prior vote or consent of Shareholders holding at least two-thirds of the outstanding Common Stock: |
| | • any Change of Control, *provided, however*, that a Change of Control to a party affiliated with any Shareholder shall require the separate vote or consent of the non-conflicted Shareholders holding at least a majority of the outstanding Common Stock of CORR held by all non-conflicted Shareholders. |
| | • any voluntary election by CORR to liquidate or dissolve or the adoption of a plan with respect to the foregoing, if such liquidation or dissolution is unrelated to the insolvency of CORR. |
| | • Any increase or decrease in the size of the Board. |
| | • Any transaction between CORR or any of its Subsidiaries, on the one hand, and any affiliate of CORR or any of its Subsidiaries (other than CORR and its Subsidiaries), on the other hand, except transactions with portfolio companies of affiliates that are done on arms'-length basis and on terms no less favorable to CORR or its applicable Subsidiary than are available to other third parties;, *provided, however*, that a transaction with a party affiliated with any Shareholder shall require the separate vote or consent of the non-conflicted Shareholders holding at least a majority of the outstanding Common Stock of CORR held by all non-conflicted Shareholders. |
| | • Any amendment of the governing documents of CORR or the |

indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.

3

| | Securityholders Agreement; *provided, however,* that (i) any amendment that disproportionately and adversely affects any Shareholder in any material respect shall also require the consent of such Shareholder, and (ii) if such amendment would alter a provision requiring more than majority approval, such amendment shall be consented to by the same percentage of Shareholders as required by the provision to be amended.<br><br>• Any increase in the number of equity interests to be issued by CORR.<br><br>• Any redemption or repurchase of any Common Stock. |
|---|---|
| **Additional Shareholder Approval Rights:** | Upon approval of a majority in Note holdings of the AHNG, additional shareholder approval rights may be provided in connection with any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities, partnership interests or membership interests of any kind of CORR or any Subsidiary (other than those issued solely to CORR and its Subsidiaries). |
| **Information and Access Rights:** | CORR and the Subsidiaries will provide to each Specified Shareholder: (i) annual consolidated financial statements of the operations of CORR and the Subsidiaries after the end of each fiscal year (audited, if available); (ii) unaudited consolidated quarterly and year-to-date financial statements of the operations of CORR and the Subsidiaries after the end of each fiscal quarter; and (iii) monthly reports of the consolidated operations of CORR and the Subsidiaries, to the extent available and provided to the Board.  A Specified Shareholder may share such information with a potential purchaser of its interest upon entry into a confidentiality agreement reasonably acceptable to CORR.<br><br>Each Shareholder (or group of affiliated Shareholders) that holds at least 5% of the outstanding shares of Common Stock or any Shareholder that qualifies as a "qualified institutional buyer" (as such term is defined in connection with Rule 144A of the Securities Act) shall be a "Specified Shareholder." |
| **General Restrictions on Transfers:** | The Certificate of Incorporation of CORR will include customary transfer restrictions related to Section 382 of the Internal Revenue Code and CORR's status as a domestically controlled REIT.<br><br>Additionally, except as set forth under "Drag-Along Rights" below or for transfers by a Shareholder to its affiliates, no Shareholder may transfer any shares of Common Stock without the prior consent of the Board (i) to a competitor of CORR and its Subsidiaries or (ii) if, as a result of such transfer, CORR or any Subsidiary would be required to file reports under the Exchange Act, if it or its Subsidiaries are not otherwise subject to such requirements, or register as an investment company or investment adviser. |

| | |
|---|---|
| **Tag-Along Rights:** | Subject to "General Restrictions on Transfer" above, prior to a Shareholder (or group of Shareholders acting in concert) transferring any shares of Common Stock, each Shareholder must provide written notice to each other Shareholder and CORR setting forth the terms of such proposed transfer that exceeds two-thirds of the shares of Common Stock of CORR. Each Shareholder may elect to sell up to their *pro rata* portion of the shares of Common Stock being transferred. |
| **Drag-Along Rights:** | If Shareholders holding two-thirds of the outstanding Common Stock elect to consummate a Change of Control on an arms' length basis with an unaffiliated third party, each Shareholder will be required to: vote in favor of and not oppose such Change of Control, waive any appraisal rights in connection with the Change of Control, sell its *pro rata* portion of the number of shares of Common Stock being sold in such transaction to the prospective third party purchaser on the same terms as the triggering Shareholders (if structured as a sale of share), and otherwise enter into customary agreements in connection therewith and support and comply with customary requests with respect to the Change of Control.<br><br>A "Change of Control" shall be deemed to have occurred if any of the following occurs with respect to CORR: (i) the direct or indirect sale or exchange in a single or series of related transactions by the Shareholders of more than fifty percent (50%) of the Common Stock (excluding any sale or exchange of a Shareholder to an affiliate of such Shareholder for the purpose of such Shareholder's internal reallocation of such interest); (ii) a merger or consolidation in which CORR is a party, other than any merger or consolidation solely amongst CORR and its subsidiaries or parent (if any) or any merger or consolidation following which holders of at least fifty percent (50%) of the Common Stock own at least fifty percent (50%) of the voting equity securities of the surviving entity; or (iii) the sale, exchange, or transfer of all or substantially all of the assets of CORR and its Subsidiaries (on a consolidated basis, including through the sale or other disposition of equity securities of one or more Subsidiaries) to any unaffiliated third party. |
| **No Fees** | None of the Shareholders or their Affiliates shall be paid management or similar fees, and no Director shall be paid a fee for their service on the Board, unless such Director is an independent director. |
| **Strategic Review:** | On or by a date that is 18 months following the Effective Date of CORR's Bankruptcy Plan, as will be set forth by the Bankruptcy Court, the Board will commence a strategic review of CORR. The results of the strategic review shall be non-binding, and the implementation of any recommended actions following the strategic review shall meet the voting thresholds as established herein. |
| **Preemptive Rights:** | Each Shareholder shall have a *pro rata* preemptive right to acquire equity securities issued by CORR or any Subsidiary (including any partially owned Subsidiary) and debt securities issued by CORR or any Subsidiary (including any partially owned Subsidiary) to any Shareholder or its affiliates, subject to customary exceptions, such as |

5

| | |
|---|---|
| | issuances (i) pursuant to the exchange, conversion or exercise terms of other equity securities, (ii) to employees, directors or consultants pursuant to CORR's or such Subsidiary's incentive plans, (iii) as consideration for any acquisition, business combination or joint venture, (iv) in an IPO, (v) in connection with any pro rata stock split, dividend or similar distribution, (vi) which take the form of "equity kickers" to third party lenders in arms' length debt financing transactions, or (vii) to CORR or any wholly-owned Subsidiary of CORR.  If any Shareholders do not exercise their preemptive rights in full, each Shareholder that does so exercise their preemptive rights in full will have a right to subscribe for all or a portion of the unelected shares.  Each Shareholder shall have the right to assign its preemptive rights to any associate or affiliate of such Shareholder, including any investment fund under common management.  For the avoidance of doubt, to the extent that equity or debt interests are offered to any one Shareholder or its affiliates, such rights shall apply to that certain joint venture or similar arrangement pursuant to which CORR would contribute to an entity of which CORR or any wholly-owned Subsidiary of CORR holds an interest in (a) the northernmost 235 miles of the KLM pipeline. |
| **Registration Rights:** | Following an IPO, each Shareholder will have customary piggy-back registration rights. |
| **Amendment of the Governing Documents:** | The governing documents and the Securityholders Agreement may only be amended with the prior written approval of (i) shareholders holding not less than two-thirds of the outstanding shares, and (ii) the Board; provided, however, that (i) any amendment that disproportionately and adversely affects any Shareholder in any material respect shall also require the consent of such Shareholder, and (ii) if such amendment would alter a provision requiring more than majority approval, such amendment shall be consented to by the same percentage of Shareholders as required by the provision to be amended. |
| **Governing Law** | Maryland |

US.362342050.05

## <u>Exhibit B</u>

**Restructuring Support
Agreement**

**EXECUTION VERSION**

---

**THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR A SOLICITATION TO TENDER OR EXCHANGE ANY OF THE COMPANY CLAIMS. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. EACH NOTEHOLDER'S VOTE ON THE PLAN SHALL NOT BE SOLICITED UNTIL THE NOTEHOLDERS HAVE RECEIVED THE DISCLOSURE STATEMENT AND RELATED BALLOT(S). NOTHING CONTAINED IN THIS AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS ARE SUBJECT IN THEIR ENTIRETY TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTS AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

---

### CORENERGY INFRASTRUCTURE TRUST, INC.
### RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of February 25, 2024, is entered into by and among:

     i. CorEnergy Infrastructure Trust, Inc. ("CorEnergy" or the "Company"), a corporation duly organized under the laws of the State of Maryland, having its corporate headquarters at 1100 Walnut, Suite 3350, Kansas City, MO 64106; and

    ii. The undersigned Ad Hoc Noteholder Group (as defined below), holding, in the aggregate, at least 66.7% in principal amount of all outstanding Senior Notes (as defined below) that have executed and delivered counterpart signature pages to

1

**EXECUTION VERSION**

this Agreement or a Joinder to counsel to the Company and to counsel to the Ad Hoc Noteholder Group.

This Agreement collectively refers to the Company and the Ad Hoc Noteholder Group (and to any subsequent Person that becomes a party by executing a Joinder (as such term is defined below) hereto in accordance with the terms hereof) as the "Parties" and, each individually, as a "Party."

## RECITALS

**WHEREAS**, reference is made to the 5.875% Convertible Senior Notes due 2025 (the "Senior Notes") issued by the Company;

**WHEREAS**, the Ad Hoc Noteholder Group (defined below) are the holders of certain of the Senior Notes;

**WHEREAS**, the Parties have engaged in arm's-length, good-faith negotiations regarding a comprehensive restructuring of the existing debt, equity, and other obligations of the Company on the terms and conditions set forth in this Agreement and as specified in the Plan attached as **Exhibit A** hereto (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, the "Plan" and, such transactions as described in this Agreement and the Plan, the "Restructuring Transactions");

**WHEREAS**, the Restructuring Transactions shall be implemented through, among other things, a voluntary bankruptcy case to be commenced by the Company under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court", such case, the "Chapter 11 Case") to be filed on or by February 25, 2024;

**WHEREAS**, the Parties consent to (as applicable) and have agreed to consummate and support the Restructuring Transactions, on the terms set forth in this Agreement and the Plan attached hereto, setting forth the terms and conditions of the Restructuring Transactions;

**WHEREAS**, the Parties have agreed to refrain from taking certain actions so as to preserve value in a potential restructuring and to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Ad Hoc Noteholder Group have committed, as set forth in the Plan, to convert their Senior Notes to a combination of cash, new equity and debt in the Company.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

**EXECUTION VERSION**

## <u>AGREEMENT</u>

**Section 1**        **<u>Definitions; Rules of Construction.</u>**

    1.1        <u>Definitions</u>.

"<u>Ad Hoc Noteholder Group</u>" means that certain ad hoc group including certain Noteholders listed on the signature pages to this Agreement or a Joinder delivered to counsel to the Company and to counsel to the Ad Hoc Noteholder Group.

"<u>Ad Hoc Noteholder Group Professionals</u>" means Faegre Drinker, Biddle & Reath, LLP ("<u>FDBR</u>"); Perella Weinberg Partners, Spencer Fane, LLP and any other professionals or professional firms retained by the Ad Hoc Noteholder Group to assist with Restructuring Transactions.

"<u>Affiliate</u>" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

"<u>Agent</u>" means any administrative agent, collateral agent, indenture trustee or similar Entity, including any successors thereto, as applicable.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof, and includes, for the avoidance of doubt, all exhibits, annexes and schedules hereto and thereto.

"<u>Agreement Effective Date</u>" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"<u>Alternative Proposal</u>" means any plan of reorganization or liquidation, transaction, inquiry, proposal, bid, term sheet, offer, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, winding-up, liquidation, sale of all or substantially all assets, share debt issuance, tender offer, recapitalization, share or debt exchange, business combination, joint venture, partnership, or similar transaction involving the Company, other than the Restructuring Transactions.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals hereof.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereof.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Case.

"<u>Business Day</u>" means any day other than Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of Missouri or the state of New York.

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals hereof.

3

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Commercially Reasonable Best Efforts" means, with respect to a given object, the efforts that a reasonable person in the position of the promisor would use to achieve the goal in light of its capabilities and the standards in the applicable industry or commercial environment; provided, however, that for the avoidance of doubt, this definition is qualified in all respects by Section 6.3(a) of the Agreement, and this definition shall not be read to require the Company to take any actions in violation of its statutory duties as a board or duties as a debtor-in-possession under the Bankruptcy Code.

"Company" has the meaning set forth in the preamble hereof.

"Company Claims" means any Claim against the Company, including the Senior Notes.

"Company Claims/Interests" means, collectively, the Company Interests or Company Claims, including the Senior Notes.

"Company Interests" means any existing Interest in the Company.

"Company Professionals" means Husch Blackwell LLP, Miller Buckfire & Co, LLC, Teneo Capital LLC, and any other professionals or professional firms retained by the Company to assist with Restructuring Transactions.

"Company Termination Event" has the meaning set forth in Section 8.2 hereof.

"Confidentiality Agreement" means an executed confidentiality agreement entered into in connection with or relating to the proposed Restructuring Transactions, including (a) with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information and (b) any confidentiality agreement executed by any Noteholder or Noteholder Professional in connection with or relating to the Restructuring Transactions.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"Definitive Documents" means the documents set forth in Section 3.1 hereof.

"Determination Notice" has the meaning set forth in Section 6.3 hereof.

"Disclosure Statement" means the related disclosure statement with respect to the Plan, including any exhibits, appendices, supplements, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan.

"Disclosure Statement Approval Order" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

"Disclosure Statement Motion" means the motion to approve (conditionally or on a final basis) the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by Sections 1125 and 1126(b) of the Bankruptcy Code.

4

**EXECUTION VERSION**

"Entity" shall have the meaning set forth in Section 101(15) of the Bankruptcy Code.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"First Day Pleadings" has the meaning set forth in Section 3.1 hereof.

"Governance Documents" means such organizational and governance documents as may be necessary to deliver voting control of the Company to the Noteholders.

"Governmental Entity" means any national, international, regional, federal, state, provincial, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"Grier Members" means John D. Grier and M. Bridget Grier, individually, and John D. Grier, as Trustee of the Bridget Grier Spousal Support Trust dated December 18, 2012; Robert G. Lewis, as Trustee of the Hugh David Grier Trust dated October 15, 2012; and Robert G. Lewis, as Trustee of the Samuel Joseph Grier Trust dated October 15, 2012.

"Interest" means, collectively, the shares (or any class thereof) of common stock, preferred stock, and any other equity, ownership, or profits interests of the Company, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, or other equity, ownership, or profits interests of the Company (in each case whether or not arising under or in connection with any employment agreement) and claims under Section 510(b) of the Bankruptcy Code.

"Joinder" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit B**.

"Law" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"Milestones" has the meaning set forth in Section 4 hereof.

"Noteholder" means any party holding a Senior Note.

"Outside Date" has the meaning set forth in Section 4 hereof.

"Parties" has the meaning set forth in the preamble hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal Entity or association.

5

"Petition Date" means the date on which the Company commences a Chapter 11 Case through the filing of a voluntary petition with the Bankruptcy Court in accordance with this Agreement and the Definitive Documents.

"Plan" means a chapter 11 plan of reorganization of the Company attached hereto.

"Plan Effective Date" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and on which the Restructuring Transactions become effective or are consummated.

"Plan Supplement" means a supplemental appendix to the Plan containing, among other things, substantially final forms of (a) certain of the Definitive Documents, (b) to the extent known, information required to be disclosed in accordance with Section 1129(a)(5) of the Bankruptcy Code, and (c) if applicable, a schedule of rejected contracts; provided, that, through the Plan Effective Date, the Company shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan, this Agreement, and the consent of the Requisite Consenting Ad Hoc Noteholder Group.

"Requisite Consenting Ad Hoc Noteholder Group" means, as of the date of determination, consenting members of the Ad Hoc Noteholder Group holding in the aggregate over 66.67% in aggregate outstanding principal amount of the Senior Notes held or controlled by the members of the Ad Hoc Noteholder Group.

"Restructuring Fees and Expenses" means all reasonable and documented fees, costs and expenses of each of the Company Professionals and the Ad Hoc Noteholder Group Professionals, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, consistent with any engagement letters (or similar documents with the same effect and purpose), if any, entered into with the Company.  With respect to FDBR, this shall include all fees and expenses incurred on or after October 1, 2023.

"Restructuring Support Period" means the period commencing on the Agreement Effective Date as set forth in Section 2 hereof  (or, in the case of any party that becomes a party hereto after the Agreement Effective Date, the date as of which such party executes and delivers a Joinder to counsel for the Company and counsel to the Ad Hoc Noteholder Group) and ending on the earlier of (a) the date on which this Agreement is terminated with respect to that Party in accordance with Section 8, and (b) the Plan Effective Date.

"Restructuring Transactions" has the meaning set forth in the recitals hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Note" has the meaning set forth in the recitals hereof. Company has issued and outstanding $118,050,000 of unsecured convertible senior notes bearing interest at a rate of 5.875%.

"Solicitation Materials" means all materials provided in connection with the solicitation of acceptances of votes on the Plan pursuant to Sections 1125 and 1126 of the Bankruptcy Code together with the Disclosure Statement, Disclosure Statement Approval Order, and any cure notices to be sent to counterparties to executory contracts or unexpired leases in connection with the assumption, or assumption and assignment, of such contracts or leases, which shall be in accordance with this Agreement and the Definitive Documents.

"Termination Date" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 8 hereof.

"Termination Event" means an Ad Hoc Noteholder Termination Event or a Company Termination Event, as applicable.

"Transfer" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

1.2     Rules of Construction.

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender;

(b)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified or replaced from time to time in accordance with the terms of this Agreement; provided, however, that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the Execution Date, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Execution Date;

(c)     each reference in this Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import shall mean and be a reference to this Agreement, including, for the avoidance of doubt, the Plan and all exhibits thereto;

(d)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws;

(g)     the use of "include" or "including" is without limitation, whether stated or not;

(h)      the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein; and

(i)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement.

**Section 2      Agreement Effective Date.** This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Central Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied (or waived, as the case may be) in accordance with this Agreement:

(a)      the Company shall have executed and delivered counterpart signature pages of this Agreement;

(b)      the Ad Hoc Noteholder Group that collectively represent or hold, in the aggregate, at least sixty six and two-thirds percent (66.67%) of the aggregate outstanding principal amount of the outstanding Senior Notes shall have executed and delivered counterpart signature pages of this Agreement;

(c)      John D. Grier, individually and on behalf of certain Grier Members, and Robert G. Lewis, on behalf of certain Grier Members, shall have executed the joinder and consent in identical terms of the form attached hereto as **Exhibit C**; and

(d)      the Company shall have paid all accrued and unpaid Restructuring Fees and Expenses as of the Agreement Effective Date for which an invoice has been received by the Company on or before 12:00 p.m., prevailing Central Time, on the date that is one (1) Business Day prior to the Agreement Effective Date; and counsel to the Company shall have given notice (in accordance with Section 13.9) to counsel to the Ad Hoc Noteholder Group and the other parties hereto that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3      Definitive Documents.**

3.1      The "Definitive Documents" governing, related to, otherwise entered into in connection with, or utilized to implement or effect the Restructuring Transactions shall consist of this Agreement and all other agreements, deeds, filings, notifications, letters, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including, but not limited to:

(a)      this Agreement;

(b)      the Solicitation Materials;

(c)      the Disclosure Statement;

(d)      the Disclosure Statement Motion;

8

**EXECUTION VERSION**

(e)    the Plan;

(f)    the Confirmation Order;

(g)    the Plan Supplement and any document included in the Plan Supplement;

(h)    the Governance Documents;

(i)    documents evidencing any new debt as provided under the Plan;

(j)    those motions and proposed court orders that the Company files on or after the Petition Date (as defined below) to have heard on an expedited basis at the "first day hearing" (the "First Day Pleadings");

(k)    all regulatory filings necessary to implement the Restructuring Transactions;

(l)    such other definitive documentation as is necessary or desirable to consummate the Restructuring Transactions, including any related notes, certificates, agreements, documents, and instruments (as applicable); and

(m)    any amendments, modifications, and supplements to any of the above Definitive Documents.

3.2    <u>Consent Rights Regarding Definitive Documents</u>. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion, as applicable. Upon completion, the Definitive Documents and every other document, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall (unless otherwise expressly provided for in this Agreement) contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the applicable terms of the Plan) and otherwise be acceptable to the Company and the Requisite Consenting Ad Hoc Noteholder Group; <u>provided</u>, <u>that</u> (a) the Disclosure Statement and any Solicitation Materials, (b) the Disclosure Statement Order and the Disclosure Statement Motion, (c) the First Day Pleadings; and (d) any documents in the Plan Supplement that are not enumerated herein, in each case, need only be consistent with the terms of this Agreement and otherwise be reasonably acceptable to the Company and the Requisite Consenting Ad Hoc Noteholder Group.

**Section 4    <u>Milestones</u>.** The Company shall comply with, and implement the Restructuring Transactions in accordance, with the following milestones (the "<u>Milestones</u>") unless extended or waived, as the case may be, in writing jointly by the Company and the Requisite Consenting Ad Hoc Noteholder Group pursuant to the terms hereof (which extension or waiver may be an email by and between the counsel to the Company and counsel to the Ad Hoc Noteholder Group):

(a)    By 11:59 p.m. (prevailing Central Time) on February 25, 2024, the Petition Date shall have occurred;

(b)  No later than one day after the Petition Date, the Company shall file the First Day Pleadings, motion to assume this Agreement, Plan, Disclosure Statement, Disclosure Statement Motion, and Solicitation Materials;

(c)  No later than 60 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving, on a conditional or final basis, the Disclosure Statement and Solicitation Materials;

(d)  No later than 105 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (the "Confirmation Date");

(e)  No later than 30 calendar days after the Confirmation Date (the "Outside Date"), the Plan Effective Date shall have occurred.

For the avoidance of doubt, any Milestone that falls on a day that is not a Business Day, shall be extended to the following Business Day, with exception to those Milestones contained in Sections 4(a) and 4(b) in the foregoing.

**Section 5**      **Commitments of the Ad Hoc Noteholder Group.**

5.1   <u>Affirmative Commitments</u>.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Ad Hoc Noteholder Group agrees, in respect of all its members, including any party that executes a Joinder, to:

(a)  negotiate in good faith and use Commercially Reasonable Best Efforts to execute, deliver and implement the Definitive Documents to which it is required to be a party;

(b)  support and cooperate with the Company to take Commercially Reasonable Best Efforts necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case, if and when solicited to do so, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(c)  give any required notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions if requested by the Company to do so, provided that no member of the Ad Hoc Noteholder Group shall be required hereunder to provide any Person (including but not limited to the Agents) with any indemnities or similar undertakings in connection with such notice, order, instruction, or direction or to incur any fees or expenses in connection therewith;

(d)  support the Restructuring Transactions within the timeframes outlined herein and in the Definitive Documents; and

(e)  to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

**EXECUTION VERSION**

5.2    Negative Commitments. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each member of the Ad Hoc Noteholder Group severally, and not jointly or jointly and severally, agrees in respect of all its Company Claims not to, directly or indirectly:

(a)    propose, file, support, vote for, or solicit an Alternative Proposal;

(b)    seek to amend or modify or file a pleading seeking authority to amend or modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Plan;

(c)    object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions;

(d)    take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of, the Restructuring Transactions described in this Agreement or the Plan;

(e)    exercise any right or remedy, or direct any other person, including any Agent (as applicable) to exercise any right or remedy, for the enforcement, collection, or recovery of any of its Company Claims, other than to enforce this Agreement or any Definitive Documents or as otherwise permitted under this Agreement;

(f)    file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Plan, or any Definitive Document; or

(g)    object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under Section 362 of the Bankruptcy Code; provided, however, that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document, and provided, further, that nothing in this Agreement shall limit the right of any Party to object to or otherwise challenge any professional fee applications filed in the Chapter 11 Case.

5.3    Commitments Regarding the Chapter 11 Case. During the Restructuring Support Period, each member of the Ad Hoc Noteholder Group that is entitled to vote to accept or reject the Plan pursuant to its terms agrees, severally and not jointly or jointly and severally, that it shall, subject to receipt by such member of the Disclosure Statement and the Solicitation Materials:

(a)    vote, consistent with the Solicitation Materials, each of its Company Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of votes with respect to the Plan;

(b)    use Commercially Reasonable Best Efforts to support confirmation of the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be

11

**EXECUTION VERSION**

applicable and not direct and/or instruct any of the Agents to take any actions inconsistent with this Agreement or the Plan;

(c)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) designating that it does not opt out of the releases; and

(d)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a) and (b) above; provided, however, that nothing in this Agreement shall prevent any Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Party.

5.4    Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any member of the Ad Hoc Noteholder Group, or any acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a)    be construed to prohibit any member of the Ad Hoc Noteholder Group from asserting or enforcing rights in any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case, in each case; provided, however, that so long as, while this Agreement is operative and has not been terminated, such appearance and the positions advocated are not inconsistent with this Agreement and (ii) either (A) are not for the purpose of hindering, delaying or preventing consummation of the Plan, or the Restructuring Transactions or (B) do not otherwise prevent the consummation of the Plan or the achievement of the Milestones;

(b)    impair or waive any rights of any member of the Ad Hoc Noteholder Group under any applicable credit agreement, indenture, other loan document, or any other contract, stipulation, or applicable law, and nothing herein shall constitute a waiver or amendment of any provision thereof; provided, however, that the exercise of such rights (i) is not inconsistent with the terms of this Agreement and (ii) either (A) are not for the purpose of hindering, delaying, or preventing consummation of the Plan or the Restructuring Transactions or (B) do not otherwise prevent the consummation of the Plan or the achievement of the Milestones;

(c)    be construed to impair or limit any rights of any member of the Ad Hoc Noteholder Group to acquire Senior Notes or to acquire or Transfer a Company Claim that does not arise from or relate to the Senior Notes and each member of the Ad Hoc Noteholder Group agrees that if it acquires additional Senior Notes, then such Senior Notes shall be subject to this Agreement and following such acquisition, the member shall notify Company's Counsel of the acquisition.

(d)    be construed to impair or limit any rights of any member of the Ad Hoc Noteholder Group to consult with other members of the Ad Hoc Noteholder Group or any other party in interest in the Chapter 11 Case subject to applicable confidentiality obligations (if any);

EXECUTION VERSION

(e)      be construed to impair or limit any rights of any member of the Ad Hoc Noteholder Group to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents;

(f)      be construed to impair or waive the rights of any member of the Ad Hoc Noteholder Group to assert or raise any objection not prohibited under this Agreement or any Definitive Document in connection with the Restructuring Transaction;

(g)      require any member of the Ad Hoc Noteholder Group to incur, assume, or become liable for any financial or other liability or obligation other than as expressly described in this Agreement or in any of the Definitive Documents;

(h)      prevent any member of the Ad Hoc Noteholder Group from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its claims against or interests in the Company Party or any lien securing any such claims or interests (including the filing of proofs of claim);

(i)      be construed to prohibit any member of the Ad Hoc Noteholder Group from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(j)      prohibit any member of the Ad Hoc Noteholder Group from taking any action that is not inconsistent with this Agreement.

**Section 6      Commitments of the Company.**

6.1      Affirmative Commitments of the Company.  For the duration of the Restructuring Support Period, the Company shall:

(a)      to use Commercially Reasonable Best Efforts to cooperate with the Ad Hoc Noteholder Group to take actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement;

(b)      negotiate in good faith and use Commercially Reasonable Best Efforts to execute, deliver and implement the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions;

(c)      obtain any and all required governmental, regulatory, licensing, Bankruptcy Court, or other approvals (including any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions;

(d)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, support and take Commercially Reasonable Best Efforts to address any such impediment;

(e)      notify counsel to the Ad Hoc Noteholder Group promptly upon becoming aware of: (i) a Termination Event or event that it knows will, or reasonably expects is likely, to

13

**EXECUTION VERSION**

give rise to a Termination Event, (ii) any matter or circumstance which it knows, or reasonably expects is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) receipt of written notice of any proceeding (including any insolvency proceeding) commenced against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; (iv) a breach of this Agreement (including a breach by the Company); (v) any representation or warranty made by the Company under this Agreement which is incorrect or untrue; and (vi) any notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions;

(f)     cause the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Case, posted on the Company's website, or otherwise made publicly available;

(g)     provide counsel to the Ad Hoc Noteholder Group the advance opportunity, absent exigent circumstances, at least two (2) calendar days in advance of when the Company intends to file such documents (and if not reasonably practicable, then as soon as reasonably practicable prior to filing), to review draft copies of the Definitive Documents, and, without limiting any consent rights set forth in this Agreement, consider in good faith any comments provided by such counsel to Ad Hoc Noteholder Group with respect to the form and substance of any such proposed filing;

(h)     comply with the Milestones, unless extended or waived, as the case may be, in accordance with the terms hereof;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by any person seeking the entry of an order (i) directing the appointment of an unsecured creditors committee, an equity committee, an examiner or a trustee, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Case;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(k)     oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) or approval of any of the Definitive Documents;

(l)     operate in the ordinary course of business and in accordance with past practices and this Agreement, taking into account the Restructuring Transactions and using Commercially Reasonable Best Efforts to preserve intact the Company's business organization and relationships with third parties (including, without limitation, vendors, suppliers, distributors, customers, governmental and regulatory authorities and employees);

(m)    from the Agreement Effective Date through and including the Plan Effective Date, pay within ten (10) calendar days in full and in cash all Restructuring Fees and Expenses when properly incurred and invoiced in accordance with the relevant engagement letters, if any, and continue to timely pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters of the Ad Hoc Noteholder Group Professionals (and not terminate such engagement letters or seek to reject them in the Chapter 11 Case); and, without further order of, or applicable to, the Bankruptcy Court; provided, that, (x) all accrued and unpaid Restructuring Fees and Expenses as of the Plan Effective Date including any reasonable estimate of such Restructuring Fees and Expenses shall be paid by the Company on the Plan Effective Date; and (y) in the event a Termination Date (as defined herein) occurs with respect to the Company, the Company shall remain obligated to pay all Restructuring Fees and Expenses accrued and unpaid as of and up to such Termination Date;

(n)    submit, or cause to be submitted (including if submitted directly by John D. Grier, individually and on behalf of certain Grier Members), and use Commercially Reasonable Best Efforts (either the Company and/or John D. Grier, individually and on behalf of certain Grier Members, as the case may be) to pursue an application with the California Public Utilities Commission for change of control of the Crimson Pipeline, L.P. (PLC-26) and San Pablo Bay Pipeline Company, L.L.C (PLC-29) from John D. Grier to CorEnergy; and

(o)    use Commercially Reasonable Best Efforts to maintain its good standing under the Laws of the state or other jurisdiction in which it is incorporated or organized.

6.2    <u>Negative Commitments of the Company</u>. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company (except with the prior written consent of the Requisite Consenting Ad Hoc Noteholder Group) shall not, directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with the acceptance, implementation or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent with, or is intended to frustrate, materially prejudice or impede approval, implementation and consummation of, the Restructuring Transactions described in this Agreement or the Plan, *provided*, however that if necessary to protect the net operating losses as determined for U.S. federal income tax purposes, the Company may take action seeking a court order to restrict trading of the Senior Notes; so long as such restriction applies equally to the holders of the Senior Notes and to other holders of claims and interests against the Company that would be converted to common equity in the Reorganized Company pursuant to the Plan

(c)    except to the extent permitted herein, seek, solicit, support, encourage, propose, assist, consent to, vote for, enter into, or participate in any discussions, agreements, understandings, or other arrangements with any Person regarding any Alternative Proposal;

(d)    other than as required by this Agreement, the Plan or the Plan Supplement, amend or propose to amend its current governance documents;

(e)      amend or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all respects;

(f)      file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Plan, or any Definitive Documents, except to the extent such filing is expressly permitted by Section 6 herein;

(g)      incur any material indebtedness outside the ordinary course of business, including seeking bankruptcy court approval to incur indebtedness without the express written consent of the Requisite Consenting Ad Hoc Noteholder Group.

6.3    Additional Provisions Regarding the Company's Commitments.

(a)      Notwithstanding anything to the contrary in this Agreement, and subject to Section 8.2(c), nothing in this Agreement shall require the Company or its board to take or refrain from taking any action pursuant to this Agreement (including terminating this Agreement pursuant to Section 8.2(c) hereof), to the extent the board determines in good faith, based on the advice of external counsel (including counsel to the Company), that taking, or refraining from taking, such action, as applicable, would be inconsistent with its fiduciary obligations or applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement. The Company shall promptly notify counsel to the Ad Hoc Noteholder Group of any such determination (and in any event, no later than one (1) Business Day following such determination (the "Determination Notice").

(b)      Notwithstanding anything to the contrary in this Agreement, the Company and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) provide access to non-public information concerning the Company to any Entity that provides an unsolicited Alternative Restructuring Proposal and executes and delivers a customary confidentiality or nondisclosure agreement with the Company, (b) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Proposals if the board of the Company determines in good faith, upon advice of outside counsel, that failure to take such action would be inconsistent with the fiduciary duties of the board under applicable Law, and (c) enter into or continue discussions or negotiations with any official committee and/or the United States Trustee regarding the Restructuring Transactions or any unsolicited Alternative Proposal. The Company shall (i) provide to counsel to the Ad Hoc Noteholder Group, on a professional eyes only basis, (1) a copy of any written Alternative Proposal (and notice and a description of any oral Alternative Proposal), if not barred under any applicable confidentiality agreement between the Company and the submitting party or such submitting party otherwise consents or (2) a summary of the material terms thereof, if the Company is bound by a confidentiality agreement with, or other known contractual or legal obligation of confidentiality to, the submitting party that would prohibit the Company from providing counsel to the Ad Hoc Noteholder Group with a copy of any oral or written Alternative Proposal, in each case within one (1) Business Day of the Company or their advisors receipt of such Alternative Proposal, and (ii) promptly provide such information to counsel to the Ad Hoc Noteholder Group regarding such discussions or any actions or inaction pursuant to this Section 6.3(b) (including copies of

16

any materials provided to, or provided by, the Company with respect to the applicable Alternative Proposal) as necessary to keep counsel to the Ad Hoc Noteholder Group contemporaneously informed as to the status and substance of the foregoing.

(c)     Nothing in this Agreement shall: (a) impair or waive the rights of the Company to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent the Company from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 7      Mutual Representations, Warranties and Covenants.**

7.1     Each of the Parties, severally and not jointly nor jointly and severally, represents, warrants and covenants to each other Party that the following statements are true, correct, and complete as of the date hereof (or, if later, the date that such Party (or if such Party is a Transferee, such Transferee) first became or becomes a Party):

(a)     this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, or in the Bankruptcy Code (if applicable) or as may be required for disclosure by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable Laws, no material consent or approval of, or any registration or filing with, or notice to any other Person is required for it to carry out the Restructuring Transactions contemplated by, and perform its obligations under, this Agreement;

(c)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its obligations under, this Agreement; and

(d)     the entry into, and performance by it of, this Agreement and the Restructuring Transactions contemplated by this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents.

**Section 8      Termination Events.**

8.1     Ad Hoc Noteholder Group Termination Events. This Agreement may be terminated as to the Ad Hoc Noteholder Group upon the delivery to the Company and the other Parties of a written notice from the Requisite Consenting Ad Hoc Noteholder Group in accordance with Section 13.9 hereof upon the occurrence and continuation of any of the following events (each, a "Ad Hoc Noteholder Group Termination Event"):

**EXECUTION VERSION**

(a)    the Company's failure to meet, satisfy or achieve a Milestone (unless such Milestone has been waived or extended in a manner consistent with this Agreement); provided, however, that the right to terminate this Agreement under this Section 8.1(a) on account of a failure by the Company to meet, satisfy or achieve a Milestone may not be asserted by the Ad Hoc Noteholder Group if the Company's failure to comply with such Milestone is caused by, or results from, the breach by the Ad Hoc Noteholder Group (or one of its members) of its covenants, agreements or obligations under this Agreement;

(b)    the breach in any material respect by the Company of any of the representations, warranties, or covenants of the Company set forth in this Agreement that remains uncured (if susceptible to cure) for five (5) calendar days after the Requisite Consenting Ad Hoc Noteholder Group transmits a written notice in accordance with Section 13.9 hereof identifying any such breach;

(c)    subject to Section 6.3 hereof, the Company takes any action to propose or support an Alternative Proposal or announces its intention to pursue an Alternative Proposal, which proposal, support or announcement has not been withdrawn after two (2) Business Days' written notice from the Ad Hoc Noteholder Group;

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling or order that would be immediately or within a ten (10) Business Days period from such issuance, expected to prevent the consummation of or materially alter the Restructuring Transactions; provided, that, this termination right may not be exercised by the Ad Hoc Noteholder Group in contravention of any obligation set out in this Agreement;

(e)    the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof (without the consent of the Requisite Consenting Ad Hoc Noteholder Group), and such order remains in effect for five (5) Business Days after entry of such order; provided, however, that if the denial of confirmation of the Plan (i) is due to a technical infirmity that does not require re-solicitation of the Plan and Disclosure Statement to cure such infirmity and (ii) does not impact the economic recovery, rights of or terms provided to the members of the Ad Hoc Noteholder Group under the Plan, the Ad Hoc Noteholder Group and the Company shall use Commercially Reasonable Best Efforts to cure the technical infirmity causing the basis for the denial and, if the Requisite Consenting Ad Hoc Noteholder Group has agreed to such cure (evidenced in writing, which may be by email) within five (5) Business Days of such denial, then no Party may terminate this Agreement pursuant to this Section 8.1(e); provided, further, that nothing contained in this Section 8.1(e) shall be deemed to modify or extend any applicable Milestones;

(f)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order (without the prior written consent of the Requisite Consenting Ad Hoc Noteholder Group), (i) dismissing the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (iii) appointing, in the Chapter 11 Case, a trustee or examiner with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code; provided, that, an examiner appointed solely to review fees and expenses of professionals retained in the Chapter 11 Case shall not constitute a

Termination Event under <u>Section 10</u> hereof; (iv) terminating the Company's exclusivity under Bankruptcy Code Section 1121;  or (v) rejecting this Agreement, which order is not reversed, stayed, or vacated within three (3) Business Days after the Requisite Consenting Ad Hoc Noteholder Group provides written notice to the other Parties that such order is materially inconsistent with this Agreement;

(g)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any material asset of the Company and such order materially and adversely affects the Company's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(h)     without the consent of the Requisite Consenting Ad Hoc Noteholder Group, the Company (i) proposes or supports an Alternative Proposal pursuant to a pleading filed in the Bankruptcy Court; (ii) publicly announces its intention not to pursue the Restructuring Transactions, (iii) takes any action in furtherance of its intention not to pursue or support the Restructuring Transactions, or (iii) files, publicly announces, or executes a definitive written agreement with respect to an Alternative Proposal;

(i)     the Company withdraws the Plan or files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement and such withdrawal, motion, or pleading has not been revoked or withdrawn within three (3) Business Days of receipt by the Company of written notice from the Requisite Consenting Ad Hoc Noteholder Group that such withdrawal, motion or pleading is inconsistent with this Agreement;

(j)     upon the delivery of a Determination Notice by the Company, or upon a failure to provide a Determination Notice when required, the Company provides notice to the other Parties hereto that it is exercising its rights pursuant to Section 6.3, without application of any grace period to cure in the event that the Company fails to timely deliver such notice contained herein;

(k)     the Company loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to Section 1121 of the Bankruptcy Code;

(l)     failure of the Company to pay the Restructuring Fees and Expenses, as and when required; or

(m)     the Company fails to maintain its good standing under the Laws of any state or other jurisdiction in which it is incorporated or organized except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Case.

8.2     <u>Company Termination Events</u>. The Company may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with <u>Section 13.9</u> upon the occurrence of any of the following events (each a "<u>Company Termination Event</u>"):

(a)     if the Requisite Consenting Ad Hoc Noteholder Group gives notice of termination of this Agreement pursuant to this <u>Section 8</u>;

19

(b)    the breach in any material respect of any representations, warranties, or covenants by any of the Ad Hoc Noteholder Group that remains uncured for a period of ten (10) calendar days after the receipt by the Ad Hoc Noteholder Group of written notice of such breach;

(c)    pursuant to Section 6.3 hereof, the board of directors of the Company (which for the avoidance of doubt, expressly excludes the Ad Hoc Noteholder Group for purposes of this Section 8.2(c)) determines in good faith, after consulting with external counsel (including counsel to the Company), (i) that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Proposal;

(d)    the Bankruptcy Court enters an order denying confirmation of the Plan, and such order remains in effect for five (5) Business Days after entry of such order; provided, however, that if the denial of confirmation of the Plan (i) is due to a technical infirmity that does not require re-solicitation of the Plan and Disclosure Statement to cure such infirmity and (ii) does not impact the economic recovery, rights of or terms provided to the Ad Hoc Noteholder Group under the Plan, the Ad Hoc Noteholder Group and the Company shall use Commercially Reasonable Best Efforts to cure the technical infirmity causing the basis for the denial and, if the Requisite Consenting Ad Hoc Noteholder Group has agreed to such cure (evidenced in writing, which may be by email) within five (5) Business Days of such denial, then no Party may terminate this Agreement pursuant to this Section 8.2(d)); provided, further, that nothing contained in this Section 8.2(d)  shall be deemed to modify or extend any applicable Milestones;

(e)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) would be expected to prevent the consummation of or materially alter the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after the Company transmits a written notice in accordance with Section 13.9 identifying any such issuance; provided, that, this termination right may not be exercised by the Company if the Company sought or requested such ruling in contravention of any obligation set out in this Agreement;

(f)    the Ad Hoc Noteholder Group files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of receipt by the Ad Hoc Noteholder Group of written notice from the Company that such motion or pleading is inconsistent with this Agreement; or

(g)    the Ad Hoc Noteholder Group files or supports any Alternative Proposal, modification, motion, or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such Alternative Proposal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the filing or supporting party receives written notice from the Company that such Alternative Proposal, modification, motion, or pleading is inconsistent with this Agreement or the Plan, and (ii) entry of an order of the Bankruptcy Court approving such Alternative Proposal, modification, motion, or pleading.

8.3    <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement between the Requisite Consenting Ad Hoc Noteholder Group and the Company.

8.4    <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the earlier of (a) the Plan Effective Date and (b) the Outside Date, except if otherwise agreed by the Parties (including the Requisite Consenting Ad Hoc Noteholder Group), in writing, that despite of the events described in this <u>Section 8.4(a)</u> and <u>(b)</u>, this Agreement should be deemed valid.

8.5    <u>Effect of Termination</u>. After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, tenders, waivers, forbearances, ballots and votes delivered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the Company or the Ad Hoc Noteholder Group from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of the Company or the ability of the Company to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Ad Hoc Noteholder Group and its members, and (b) any right of the Ad Hoc Noteholder Group and its members, or the ability of the Ad Hoc Noteholder Group and its members, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Company. No purported termination of this Agreement shall be effective under this <u>Section 8.5</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 8.2(c)</u> Nothing in this <u>Section 8.5</u> shall restrict the Company's right to terminate this Agreement in accordance with <u>Section 8.2(c)</u>. For the avoidance of doubt, each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement or to making any arguments about the propriety of the termination, to the extent the Bankruptcy Court determines that such relief is required.

**Section 9    <u>Ownership of Notes</u>.** Each member of the Ad Hoc Noteholder Group, severally and not jointly nor jointly and severally, represents and warrants that, as of the date such members of the Ad Hoc Noteholder Group executes and delivers this Agreement or a Joinder, as applicable:

(a)      it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Senior Notes or is the nominee, investment manager, or advisor for beneficial holders of the Senior Notes reflected in, and it is not the beneficial or record owner of any Senior Notes other than those reflected in, such Noteholder's signature page to this Agreement or Joinder, as applicable;

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning such Senior Notes;

(c)      other than pursuant to this Agreement, such Senior Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, transfer, or encumbrance of any kind, that would adversely affect in any way such Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and Transfer all of its Company Claims referable to it as contemplated by this Agreement subject to applicable Law; and

(e)      (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the members of the Ad Hoc Noteholder Group in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10      <u>Transfer of Company Claims / Interests</u>.**

10.1      During the Restructuring Support Period, no member of the Ad Hoc Noteholder Group shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests, including the Senior Notes, to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either: (i) the transferee executes and delivers to counsel to the Company, at or before the time of the proposed Transfer, a joinder to this Agreement in a form acceptable to the Company; or (ii) the transferee is a member of the Ad Hoc Noteholder Group and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company at or before the time of the proposed Transfer (in each case of (i) and (ii), a "***Permitted Transferee***").

10.2      Upon compliance with the requirements of <u>Section 10.1</u>, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of <u>Section 10.1</u> shall be void *ab initio*.

10.3      This Agreement shall in no way be construed to preclude members of the Ad Hoc Noteholder Group from acquiring additional Company Claims/Interests; <u>provided</u>, <u>however</u>, that (a) such additional Company Claims/Interests shall automatically and immediately upon

acquisition by a member of the Ad Hoc Noteholder Group be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company or counsel to the Ad Hoc Noteholder Group) and (b) such Noteholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company within five (5) Business Days of such acquisition.

10.4    This Section 10 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Noteholder to Transfer any of its Company Claims/Interests, unless otherwise agreed to by the Company.   For the avoidance of doubt, any cleansing obligations in any Confidentiality Agreements shall continue to apply.

10.5    Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfers set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon such claim or interest being released from the custody of such bank or broker-dealer previously holding custody of such lien or encumbrance.

10.6    Notwithstanding anything to the contrary in this Agreement, any member of the Ad Hoc Noteholder Group may Transfer any of its Company Claims/Interests to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Permitted Transferee; *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims or Interests to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 10.6, (iii) subject to Section 10.1, such Qualified Marketmaker must subsequently Transfer the right, title or interest to such Claims or Interest within five (5) Business Days of its acquisition to a transferee described in the foregoing clause (i) that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor of such Qualified Marketmaker or sign a Qualified Marketmaker Joinder (as defined below) on or before the Qualified Marketmaker Joinder Date (as defined below), and (iv) the Transfer documentation between such member of the Ad Hoc Noteholder Group and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a member of the Ad Hoc Noteholder Group is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims or Interests that it acquires that are not Claims subject to this Agreement by virtue of such Qualified Marketmaker's execution of this Agreement (*i.e.*, received by such Qualified Marketmaker from a holder that is not a member of the Ad Hoc Noteholder Group) without such Transfer being subject to this Section 10.6.

10.6.1   If at the time of a proposed Transfer of any Claims or Interests to a Qualified Marketmaker, such Claims or Interests: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims or Interests in accordance with Section 10.6, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Plan and/or the Restructuring and such Qualified Marketmaker does not Transfer such Claims or Interests to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified**

**Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a consenting creditor with respect to such Claims or Interests in accordance with the terms hereof (such signed Joinder, the "**Qualified Marketmaker Joinder**"); *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a member of the Ad Hoc Noteholder Group with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.  For these purposes, "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers claims and interests held by members of the Ad Hoc Noteholder Group (including debt securities or other debt), or enter with customers into long and/or short positions in Claims or Interests held by the Ad Hoc Noteholder Group (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims or Interests (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

**Section 11    Amendments and Waivers.**

11.1    This Agreement (including as to the required content of any Definitive Document) may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.

11.2    This Agreement may not be modified, amended, or supplemented, or a condition or requirement of this Agreement may not be waived (hereinafter, collectively an "Amendment or Waiver"), except in a writing signed by (a) the Company, (b) Requisite Consenting Ad Hoc Noteholder Group, and (c) to the extent any such Amendment or Waiver, including to any exhibit hereto, would materially and adversely affect any member of the Ad Hoc Noteholder Group, that member  An Amendment or Waiver shall be deemed to materially and adversely affect such member of the Ad Hoc Noteholder Group only if (a) it materially and adversely modifies the treatment of any such member of the Ad Hoc Noteholder Group under the Plan or in connection with this Agreement (including, for the avoidance of doubt, by providing unequal treatment to the members of the Ad Hoc Noteholder Group), or (b) modifies the release of any such member of the Ad Hoc Noteholder Group under the Plan.  The Company shall be permitted to conclusively rely on the representation of counsel of the Ad Hoc Noteholder Group that the Ad Hoc Noteholder Group has received the required consents with respect to an Amendment or Waiver.  In addition, and expressly subject to the foregoing sentence, subject to the Company's consent rights set forth in Section 3.2 hereof the language or provisions in the Disclosure Statement, the Plan, the Confirmation Order, and the Governance Documents shall be acceptable to Requisite Consenting Ad Hoc Noteholder Group.  Without the consent of each member of the Ad Hoc Noteholder Group, (a) the definition of "Requisite Consenting Ad Hoc Noteholder Group" and any defined terms used therein, and (b) any other provision hereof specifying the number or percentage of members of the Ad Hoc Noteholder Group required to amend, waive, or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, shall not be modified.

11.3    The Ad Hoc Noteholder Group and the Company hereby acknowledge and agree that, notwithstanding Section 11.2 above, in the event the proposed Amended or Waiver causes the Confirmation Order and/or the Effective Date to be delayed and/or extended for more than eighteen (18) months counted as of the date hereof, an unanimous approval of the Ad Hoc Noteholder Group shall be required.

11.4    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

11.5    Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to this Section 11, or otherwise, including a written approval by the Company and the Requisite Consenting Ad Hoc Noteholder Group, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

11.6    Any proposed Amendment or Waiver that does not comply with this Section 11 shall be ineffective and void *ab initio*.

**Section 12      Miscellaneous.** Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities, including to tender or exchange any securities, or solicitation of votes for the acceptance of a plan of reorganization for purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws, provisions of the Bankruptcy Code, and/or other applicable law.  The votes of the holders of claims and interests, if applicable, against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Plan, the Disclosure Statement, and related ballots, and other required solicitation materials. In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**Section 13      Entire Agreement**. This Agreement, and the attached exhibits, annexes, and schedules, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement and Parties in entering into this Agreement, are not relying on any other representation or warranties other than as set forth in this Agreement; provided, however, that any Confidentiality Agreement executed by any party shall survive this Agreement and shall continue to be in full force and effect in accordance with their terms.

13.1    <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. Subject to the foregoing, in the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.2    <u>Survival of Agreement</u>. Notwithstanding (i) the Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement, the agreements and obligations of the Parties in <u>Sections 6.1(f)</u>, <u>6.1(m)</u>, <u>8.2</u>, <u>12</u>, <u>13</u> (other than <u>13.4</u>, <u>13.13</u>, <u>13.17</u>, and <u>13.18</u>), and any defined terms used in any of the forgoing Sections shall survive such termination and shall continue in full force and effect with respect to all Parties in accordance with the terms hereof survive such termination and shall continue in full force and effect in accordance with the terms hereof. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company, and in contemplation of the Chapter 11 Case, and (a) the exercise of the rights granted in this Agreement (including giving of notice of termination) shall not be a violation of the automatic stay provisions of Section 362 of the Bankruptcy Code and (b) the Company hereby waives its right to assert a contrary position in the Chapter 11 Case, if any, with respect to the foregoing.

13.3    <u>No Waiver of Participation and Preservation of Rights</u>. If the transactions contemplated herein are not consummated or following the occurrence of the termination of this Agreement with respect to all Parties, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

13.4    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by email in portable document format (.pdf).

13.5    <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the members of the Ad Hoc Noteholder Group under this Agreement shall be several, not joint nor joint and several. No member of the Ad Hoc Noteholder Group shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other members of the Ad Hoc Noteholder Group. It is understood and agreed that no members of the Ad Hoc Noteholder Group have any fiduciary duty, any duty of trust or confidence in any kind or form, or any other duties or responsibilities with any of the other Noteholder or any other creditor, stakeholder, party in interest or other party or Entity, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any member of the Ad Hoc Noteholder Group may trade in any Company Claims without the consent of the Company or any other member of the Ad Hoc Noteholder Group, subject to applicable securities laws and <u>Section 10</u> of this Agreement; <u>provided</u>, <u>however</u>, that no member of the Ad Hoc Noteholder Group shall have any

26

**EXECUTION VERSION**

responsibility for any such trading to any other entity by virtue of this Agreement. For the avoidance of doubt, the members of the Ad Hoc Noteholder Group are not insiders of the Company or its subsidiaries.

13.6 <u>No Recourse</u>. This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement). All causes of action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein). No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any Party (including any person negotiating or executing this Agreement on behalf of a Party), nor any past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party) (any such Person, a "<u>No Recourse Party</u>"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

13.7 <u>Specific Performance; Remedies Cumulative</u>. It is understood and agreed by the Parties that, without limiting any other remedies available at law or equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, without the necessity of proving the inadequacy of money damages as a remedy. Each of the Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

13.8 <u>JURY TRIAL, GOVERNING LAW AND DISPUTE RESOLUTION</u>.

(a) THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY STATE COURT LOCATED IN

THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY.

(b)     Notwithstanding any of the foregoing, if the Chapter 11 Case is commenced, nothing in this Section shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Agreement.

13.9    Notice. All notices, requests, documents delivered, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered by email to the Parties at the below addresses, or e-mail addresses.

If to the Company:

CorEnergy Infrastructure Trust, Inc.
Dan Schulte: dschulte@corenergy.reit
Chris Reitz: creitz@corenergy.reit

With a copy to:

Husch Blackwell
John Cruciani: john.cruciani@huschblackwell.com
Mark Benedict: mark.benedict@huschblackwell.com


If to the Ad Hoc Noteholder Group:

Faegre Drinker Biddle & Reath LLP
James H. Millar: james.millar@faegredrinker.com
Laura Appleby: laura.appleby@faegredrinker.com


13.10    Third-Party Beneficiaries; Successors and Assigns. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective permitted successors and permitted assigns, as applicable, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.11   <u>Conflicts Between the Plan and this Agreement</u>. In the event of any conflict among the terms and provisions in the Plan and this Agreement, the terms and provisions of the Plan shall control. Nothing contained in this <u>Section 13.11</u> shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Plan as set forth in <u>Section 11</u> herein.

13.12   <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

13.13   <u>Good-Faith Cooperation; Further Assurances</u>. The Parties shall cooperate with each other in good faith in respect of matters concerning the implementation and consummation of the Restructuring Transactions. Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise Commercially Reasonable Best Efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; <u>provided</u>, <u>however</u>, that this <u>Section 13.13</u> shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in <u>Section 3.2</u>).

13.14   <u>Severability</u>. If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only as broad as enforceable.

13.15   <u>Damages</u>. Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect or consequential damages or damages for lost profits.

13.16   <u>Disclosure; Publicity</u>. The Company shall deliver drafts to Faegre Drinker Biddle & Reath LLP, Attn: James H. Millar and Laura Appleby as counsel to the Ad Hoc Noteholder Group of any press releases that constitute disclosure of the existence of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each, a "<u>Public Disclosure</u>") at least two (2) Business Days before making any such disclosure (if practicable, and if two (2) Business Days before is not practicable, then as soon as practicable), and the Ad Hoc Noteholder Group Professionals shall be authorized to share such Public Disclosure with their respective clients. Any such disclosure shall be acceptable to the Ad Hoc Noteholder Group. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and the Ad Hoc Noteholder Group, no Party or its advisors will disclose to any person other than to the Company's advisors, the principal amount or percentage of any Company Claims/Interests, or any other securities of the Company held by any member

of the Ad Hoc Noteholder Group without such Noteholder's prior written consent; provided, that, (i) if such disclosure is required by law, subpoena, or other legal process or regulation, to the extent permitted by applicable law, the disclosing Party will afford the relevant Noteholder an opportunity to review and comment in advance of such disclosure and will take Commercially Reasonable Best Efforts to limit such disclosure and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims held by all the members of the Ad Hoc Noteholder Group collectively. Notwithstanding the provisions in this Section 13.16, if consented to in writing by a Noteholder, any Party hereto may disclose such Noteholder's individual holdings.

13.17 <u>Professional Fees & Expenses</u>. The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Group.

13.18 <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company and the Ad Hoc Noteholder Group, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.19 <u>Qualification on Noteholder Representations</u>. The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Noteholder that is a separately managed account of an investment manager are being made only with respect to the Company Claims/Interests managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Noteholder that are not held through accounts managed by such investment manager.

13.20 <u>Independent Due Diligence and Decision Making</u>. Each member of the Ad Hoc Noteholder Group hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company.

13.21 <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.22 <u>Several, Not Joint and Several, Obligations</u>. Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the members of the Ad Hoc Noteholder Group under this Agreement are, in all respects, several and not joint nor joint and several.

**EXECUTION VERSION**

**[Signature Pages to Follow]**

**Company's Signature Page to the Restructuring Support Agreement**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first written above.

**CORENERGY INFRASTRUCTURE TRUST, INC.**

**By:** _____

**Name:**  David J. Schulte

**Title:**  Chief Executive Officer and Chairman of the Board of CorEnergy Infrastructure Trust, Inc.

**[Signature pages of the Ad Hoc Noteholder Group are omitted and on file with the Company]**

**Exhibit A**

**<u>Plan</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No. 24-40236-can11 |
| | ) | |
| CORENERGY INFRASTRUCTURE TRUST, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## PLAN OF REORGANIZATION OF
## CORENERGY INFRASTRUCTURE TRUST, INC.
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**HUSCH BLACKWELL LLP**
Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone      (816) 983-8000
Facsimile      (816) 983-8080
Email:      mark.benedict@huschblackwell.com
      john.cruciani@huschblackwell.com

*Proposed Counsel for Debtor and Debtor in Possession*

---

[1] The Debtor's address is 1100 Walnut, Ste. 3350 Kansas City, MO 64106.  The last four digits of the Debtor's taxpayer identification number are 1375.

i

# Table of Contents

Article I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ...................................................................... 4

   1.01     Defined Terms ............................................................................................ 4

   1.02     Rules of Interpretation ............................................................................ 16

   1.03     Computation of Time ............................................................................... 17

   1.04     Governing Law ........................................................................................ 17

   1.05     Reference to Monetary Figures ............................................................... 17

   1.06     Reference to the Debtor or the Reorganized Debtor ............................... 17

   1.07     Controlling Document .............................................................................. 17

   1.08     Consent Rights ......................................................................................... 18

Article II ADMINISTRATIVE AND PRIORITY CLAIMS ......................................... 18

   2.01     Administrative and Priority Claims ........................................................ 18

   2.02     Professional Fee Claims .......................................................................... 19

   2.03     Restructuring Fees and Expenses ............................................................ 20

   2.04     Priority Tax Claims ................................................................................. 20

   2.05     Statutory Fees .......................................................................................... 20

Article III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........................................................................................................................ 21

   3.01     Classification of Claims and Interests .................................................... 21

   3.02     Treatment of Classes of Claims and Interests ........................................ 21

   3.03     Special Provisions Governing Unimpaired Claims ................................ 26

   3.04     Controversy Concerning Impairment ..................................................... 26

   3.05     Elimination of Vacant Classes ............................................................... 26

   3.06     Voting Classes; Presumed Acceptance by Non-Voting Classes ............. 27

   3.07     Acceptance by Impaired Classes ............................................................ 27

   3.08     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code 27

Article IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN ...................................... 27

   4.01     General Settlement of Claims and Interests ............................................ 27

   4.02     Restructuring Transactions ...................................................................... 28

   4.03     Corporate Action ..................................................................................... 28

   4.04     Takeback Debt ......................................................................................... 29

   4.05     The Revolving Credit Facility ................................................................ 30

HB: 4866-7395-7801.1

4.06     Management Incentive Plan ................................................................. 30

4.07     Employee Obligations ......................................................................... 30

4.08     Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock................................................................................................ 31

4.09     Exemption from Registration Requirements ....................................... 31

4.10     Subordination...................................................................................... 32

4.11     Vesting of Assets in the Reorganized Debtor...................................... 32

4.12     Cancellation of Instruments, Certificates, and Other Documents ............................. 32

4.13     Sources for Plan Distributions ............................................................ 33

4.14     Corporate Existence............................................................................ 33

4.15     New Governance Documents .............................................................. 33

4.16     Indemnification Provisions in Organizational Documents.......................................... 34

4.17     Effectuating Documents; Further Transactions.................................... 34

4.18     Management of the Reorganized Debtor .............................................. 35

4.19     Section 1146(a) Exemption ................................................................ 35

4.20     Preservation of Causes of Action ........................................................ 35

Article V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 36

5.01     Assumption and Rejection of Executory Contracts and Unexpired Leases ............... 36

5.02     Cure and Defaults for Assumed Executory Contracts and Unexpired Leases ........... 37

5.03     Rejection Damages Claims.................................................................. 38

5.04     Insurance Policies ............................................................................... 39

5.05     Contracts and Leases After the Petition Date ...................................... 39

5.06     Reservation of Rights .......................................................................... 40

5.07     Nonoccurrence of Effective Date ........................................................ 40

Article VI PROVISIONS GOVERNING DISTRIBUTIONS.................................................... 40

6.01     Distributions on Account of Claims or Interests Allowed as of Effective Date.......... 40

6.02     Special Rules for Distributions to Holders of Disputed Claims ................................. 41

6.03     Delivery of Distributions ..................................................................... 42

6.04     Claims Paid or Payable by Third Parties ............................................. 44

6.05     No Postpetition or Default Interest on Claims...................................... 45

6.06     Setoffs ................................................................................................ 45

6.07     Allocation Between Principal and Accrued Interest.............................. 46

6.08     Delivery of New Common Stock ......................................................... 46

Article VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS .................................................................................. 46

HB: 4866-7395-7801.1

7.01 Allowance of Claims ................................................................................ 46

7.02 Objections to Claims ............................................................................... 47

7.03 Estimation of Claims ............................................................................... 47

7.04 No Distribution Pending Allowance ........................................................ 47

7.05 Distribution After Allowance .................................................................. 47

7.06 No Interest .............................................................................................. 48

7.07 Adjustment to Claims Without Objection ............................................... 48

7.08 Disallowance of Claims ........................................................................... 48

Article VIII EFFECT OF CONFIRMATION OF THE PLAN ................................... 49

8.01 Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies ........................................................... 49

8.02 Release by the Debtor .............................................................................. 50

8.03 Releases by Holders of Claims and Interests ........................................... 51

8.04 Exculpation ............................................................................................. 53

8.05 Injunction ............................................................................................... 54

8.06 Protection Against Discriminatory Treatment .......................................... 56

8.07 Release of Liens ...................................................................................... 56

8.08 Reimbursement of Contribution .............................................................. 57

8.09 Recoupment ............................................................................................ 57

Article IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................... 57

9.01 Conditions Precedent to the Effective Date .............................................. 57

9.02 Waiver of Conditions Precedent .............................................................. 58

9.03 Effect of Non-Occurrence of Conditions to Consummation ...................... 59

9.04 Substantial Consummation ...................................................................... 59

Article X MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ............ 59

10.01 Modification of Plan ............................................................................... 59

10.02 Effect of Confirmation on Modifications ................................................. 59

10.03 Revocation or Withdrawal of Plan .......................................................... 59

Article XI RETENTION OF JURISDICTION ........................................................... 60

Article XII MISCELLANEOUS PROVISIONS ......................................................... 61

12.01 Immediate Binding Effect ....................................................................... 61

12.02 Additional Documents ............................................................................ 62

12.03 Reservation of Rights ............................................................................. 62

12.04 Successor and Assigns ............................................................................ 62

12.05 Service of Documents ............................................................................. 62

iv

12.06    Term of Injunction or Stays ........................................................................ 63

12.07    Entire Agreement ........................................................................................ 63

12.08    Plan Supplement ......................................................................................... 64

12.09    Non-Severability ......................................................................................... 64

12.10    Votes Solicited in Good Faith ..................................................................... 64

12.11    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment... 64

12.12    Closing of Chapter 11 Case ........................................................................ 65

12.13    Waiver or Estoppel ..................................................................................... 65

HB: 4866-7395-7801.1

**<u>Exhibits</u>**

Exhibit A  - Exit Facility Term Sheet

Exhibit B – Corporate Governance Term Sheet

## **Introduction**

CorEnergy Infrastructure Trust, Inc., as debtor and debtor-in-possession in the above-captioned Chapter 11 Case, proposes this Plan (as defined below) pursuant to Section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims (as defined below) against, and Interests (as defined below) in, the Debtor. The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. Reference is made to the accompanying Disclosure Statement (as defined below) for a discussion of the Debtor's history, businesses, properties, operations, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated herein, and certain other related matters.

The Plan contemplates certain transactions and differing treatment for different Classes of Claims and Interests, including, without limitation, the following treatment of these Holders of Claims and Interests (described in greater detail in Article III herein and in the Disclosure Statement):

(a)  Secured Claims: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(b)  Other Priority Claims: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.

(c)  Grier Member Claims: Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claim constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

1

Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

> With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); and

> With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan; *provided, however,* that for the avoidance of doubt the Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units.

> Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.

(d)   <u>General Unsecured Claims</u>: In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, Payment in full in Cash on account of such Claim either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(e)   <u>Senior Notes</u>: Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture (including those costs and expenses to which the indenture trustee pursuant to the Bond Indenture is contractually entitled). The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims

to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:

> Its Pro Rata share of the Senior Note Payment;

> Its Pro Rata share of the Takeback Debt Principal Amount; and

> Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and

> Its Pro Rata share of the Excess Effective Date Cash, if any.

(f)  <u>Preferred Stock</u>: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Preferred Stock, each Holder of a Preferred Stock shall receive either:

> If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan and; *provided*, *however*, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or

> If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on Exhibit D to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.

HB: 4866-7395-7801.1

If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5. For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.

(g)     Common Stock: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Common Stock will be cancelled.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.**

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

1.01   **Defined Terms**

1.      "*Ad Hoc Noteholder Group*" means that certain ad hoc group comprising certain Senior Noteholders listed on the signature pages to the Restructuring Support Agreement, and any other future holders (if any) of Senior Notes that becomes bound to that Restructuring Support Agreement by means of a signature of that certain Joinder provided therein; ***provided***, ***however***, that whenever the reference refers to the consent rights of or with respect to the Ad Hoc Noteholder Group, it shall mean the consent of the percent or members of the Ad Hoc Noteholder Group as required by the Restructuring Support Agreement.

2.      "*Administrative Claim*" means a Claim incurred by the Debtor on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Case entitled to priority under Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate and operating the Debtor's businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estate pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code.

3.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code), which shall be 30 days after the Effective Date.

4.      "*Affiliate*" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

4

5.      "*Allowed*" means, with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed by the Claim Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Claims Bar Date, if any, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtor as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved, or Final Order that has been entered, by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interest shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including Sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to Section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtor or Reorganized Debtor, as applicable.

6.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

7.      "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

8.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

9.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Western District of Missouri and, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Western District of Missouri.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case and the general, local, and chambers rules of the Bankruptcy Court.

11.     "*Bond Indenture*" means that certain Indenture, dated August 12, 2019, between the Company and U.S. Bank National Association, as Trustee for the Senior Notes.

12. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday in New York, as defined in Bankruptcy Rule 9006(a).

13. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, money market funds and other cash equivalents.

14. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, contribution, and franchises of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to Sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Section 558 of the Bankruptcy Code.

15. "*Certain Crimson Employee Claims*" means any and all Claims by Larry Alexander, Valerie Jackson, and Nester Taura against CorEnergy, including but not limited to the Claims asserted in the letter dated October 23, 2023 from Brook Barnes related to equity awards.

16. "*Certificate*" means any instrument evidencing a Claim or an Interest.

17. "*Chapter 11 Case*" means the case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

18. "*Claim*" means any claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor.

19. "*Claims Bar Date*" means the applicable deadline set by the Bankruptcy Court pursuant to the Plan, Claims Bar Date order, or other Final Order for filing Proofs of Claim in this Chapter 11 Case.

20. "*Claim Objection Deadline*" means the deadline for objecting to a Claim asserted against the Debtor, which shall be with respect to all Claims (other than Administrative Claims and Professional Fee Claims), the later of (a) the first Business Day that is at least 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtor or the Reorganized Debtor, as applicable, or by an Order of the Bankruptcy Court for objecting to such Claims.

21. "*Class*" means a category of Holders of Claims or Interests classified as set forth in <u>Article III</u> hereof pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

HB: 4866-7395-7801.1

22.     "*Class A-1 Crimson Units*" means the Class A-1 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

23.     "*Class A-2 Crimson Units*" means the Class A-2 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

24.     "*Class A-3 Crimson Units*" means the Class A-3 Units (as such term is defined in the Crimson LLC Agreement) issued by Crimson in accordance with the Crimson LLC Agreement.

25.     "*Combined Hearing*" means the hearing(s) before the Bankruptcy Court under Section 1128 of the Bankruptcy Code to consider confirmation of the Plan and final approval of the Disclosure Statement pursuant to Sections 1125 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

26.     "*Common Stock*" means the common stock of CorEnergy.

27.     "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Case.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement on a final basis, subject to the consent rights set forth in <u>Article 1.8</u> hereof.

30.     "*Consummation*" means the occurrence of the Effective Date.

31.     "*Creditors' Professionals*" means (a) Faegre Drinker Biddle & Reath LLP and Spencer Fane LLP as counsel to the Ad Hoc Noteholder Group and (b) Perella Weinberg Partners LP, as financial advisor to the Ad Hoc Noteholder Group, and (c) such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by the Ad Hoc Noteholder Group or any Statutory Committee.

32.     "*Crimson*" means Crimson Midstream Holdings, LLC, a Delaware limited liability company.

33.     "*Crimson LLC Agreement*" means that certain *Revised Third Amended and Restated Limited Liability Company Agreement* dated as of June 30, 2021, by and among the Debtor, Crimson, and the Grier Members.

34.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by the Debtor under Section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to Section 365(b)(2) of the Bankruptcy Code.

7

35.    "*D&O Liability Insurance Policy*" means all unexpired directors', managers', and officers' liability insurance policy (including any "tail policy" and all agreements, documents, or instruments related thereto) that have been issued or provide coverage to current and former directors, managers, officers, and employees of the Debtor.

36.    "*Debtor*" or "*CorEnergy*" means CorEnergy Infrastructure Trust, Inc.

37.    "*Debtor Release*" means the releases set forth in Article 8.02 of the Plan.

38.    "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

39.    "*Disclosure Statement*" means the Disclosure Statement for the Plan of Reorganization of CorEnergy Infrastructure Trust, Inc. Pursuant to Chapter 11 of the Bankruptcy Code, as the same may be amended, modified, or supplemented from time to time, including all exhibits, schedules, appendices, supplements, and related documents, and in each case, subject to the consent rights set forth in the Restructuring Support Agreement.

40.    "*Disputed*" means, with respect to a Claim or Interest, any Claim or Interest that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under Sections 502, 503, or 1111 of the Bankruptcy Code; (b) is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or Proof of Claim has been filed; (c) is otherwise disputed by either the Debtor or the Reorganized Debtor in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order; or (d) the Debtor or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order. If the Debtor disputes only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtor does not dispute, and Disputed as to the balance of such Claim.

41.    "*Distribution Agent*" means, as applicable, the Reorganized Debtor or any other Entity the Reorganized Debtor selects to make or to facilitate distributions in accordance with the Plan.

42.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtor or the Reorganized Debtor consistent with this Plan, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

43.    "*Distribution Record Date*" means the Effective Date of the Plan or such other time as agreed upon between the Debtor and the Ad Hoc Noteholder Group. For the avoidance of doubt, no distribution record date shall apply to the holders of public Securities, including the existing Preferred Stock, the Holders of which shall receive a distribution in accordance with Article III of this Plan.

44.    "*DTC*" means Depository Trust Company.

45.      "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article 9.01 of the Plan have been (a) satisfied or (b) waived in accordance with Article 9.02 of the Plan, and on which the Restructuring Transactions become effective or are consummated.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

46.      "*Effective Date Cash*" means the amount of Cash of the Debtor and its Subsidiaries on the Effective Date as set forth in the Plan Supplement.

47.      "*Employment Agreements*" means the employment agreements entered into between CorEnergy and its employees.

48.      "*Entity*" means an entity as defined in Section 101(15) of the Bankruptcy Code.

49.      "*Estate*" means the estate of the Debtor created under Section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

50.      "*Estate's Professionals*" means (a) Husch Blackwell LLP and Stinson LLP, as counsel to the Debtor; (b) Stifel, Nicolaus & Co, Inc.[2], Teneo Capital LLC, and KPMG LLP as financial advisors; and (c) Ernst & Young LLP, as accountant to the Debtor; and (d) such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by the Debtor.

51.      "*Excess Effective Date Cash*" means the amount equal to the positive difference, if any, between Effective Date Cash less $12 million, not to exceed $8.5 million.

52.      "*Exchange Act*" means the Securities Exchange Act of 1934, as amended

53.      "*Exculpated Party*" means each of the following, solely in its capacity as such: (a) the Debtor; (b) the Ad Hoc Noteholder Group and its members, (c) any Statutory Committee and its members; and the (d) Professionals; and (e) each Related Party of each Entity in clause (a) through (d).

54.      "*Executory Contract*" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

55.      "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

56.      "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing in the Chapter 11 Case with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent.

---

[2]Stifel, Nicolaus & Co, Inc., is the primary investment banking and broker-deal subsidiary of Stifel Financaili Corp, which uses the trade name "Miller Buckfire for its restructuring-focused investment bankruptcy practice.  References to "Miller Buckfire" are to the legal entity Stifel, Nicholaus & Co., Inc.

57.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

58.    "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided*, *that*, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

59.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Senior Note Claim, or a Section 510(b) Claim against the Debtor.

60.    "*Governmental Unit*" has the meaning set forth in Section 101(27) of the Bankruptcy Code.

61.    "*Grier Members*" means John D. Grier and M. Bridget Grier, individually, and John D. Grier, as Trustee of the Bridget Grier Spousal Support Trust dated December 18, 2012; Robert G. Lewis, as Trustee of the Hugh David Grier Trust dated October 15, 2012; and Robert G. Lewis, as Trustee of the Samuel Joseph Grier Trust dated October 15, 2012.

62.    "*Grier Member Claims*" means any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement.

63.    "*Holder*" means an Entity holding a Claim against or an Interest in the Debtor; for the avoidance of doubt when the term "*Holder*" is used with respect to an Interest in Debtor, it shall mean the record holder and not any potential beneficial holders.

64.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

65.    "*Indemnification Provision*" means the Debtor's existing and future indemnification obligations pursuant to the Debtor's bylaws, operating agreement, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of the Debtor to indemnify, defend, reimburse, or limit the liability of, or to advances fees and expenses to, any of the Debtor's current directors, officers, equity holders, managers, members, employees, accountants, investment bankers,

attorneys, other professionals, and professionals of the Debtor, and such current directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such. For the avoidance of doubt, "current" refers to covered Entities that serve as of the Petition Date, regardless of whether such Entities cease serving in such capacities thereafter.

66. "*Interest*" means any equity security as such term is defined in Section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible (***provided***, ***however***, that for the avoidance of doubt, this definition does not include the Senior Notes), exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

67. "*Lien*" means a lien as defined in Section 101(37) of the Bankruptcy Code.

68. "*Management Incentive Plan*" or "*MIP*" means the CorEnergy Infrastructure Trust, Inc. 2024 Omnibus Incentive Plan, to be set forth in the Plan Supplement, for certain participating employees of the Reorganized Debtor and its Affiliates, to be established and implemented in accordance with Article 4.06 of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be allowed and distributed.

69. "*MIP Pool*" has the meaning set forth in Article 4.06 hereof.

70. "*New Board*" means the new board of directors that will replace the board of directors at CorEnergy as of the Effective Date and the identities of such directors or managers, as applicable, shall be set forth in the Plan Supplement to the extent known as of the Plan Supplement Filing Date, and a process for selection of any remaining directors or managers shall be disclosed no later than the commencement of the Combined Hearing; ***provided***, ***however***, that the identities of any such remaining directors or managers shall be disclosed no later than the Effective Date.

71. "*New Common Stock*" means Common Stock in the Reorganized Debtor.

72. "*New Governance Documents*" means any document that may be included with the Plan Supplement with respect to the governance of the Reorganized Debtor following the consummation of the Restructuring Transactions, and any certificate of formation, charter, certificate or article of incorporation, bylaws, operating agreements, limited liability company agreements or other applicable organization documents or charter documents and other shareholder documents, in each case, in accordance with the Restructuring Support Agreement.

73. "*Notice and Claims Agent*" means Stretto, Inc., the noticing, claims, and solicitation agent retained by the Debtor in the Chapter 11 Case.

74.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code.

75.     "*Person*" means a person as defined in Section 101(41) of the Bankruptcy Code.

76.     "*Petition Date*" means the date on which the Debtor filed its voluntary petition for relief commencing its Chapter 11 Case.

77.     "*Plan*" means this chapter 11 plan, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement and all appendices, exhibits, schedules and supplements thereto), as it may be amended, modified, or supplemented from time to time in accordance with the terms hereof, the Confirmation Order and the Restructuring Support Agreement, and in each case, subject to the consent rights set forth in Article 1.08 hereof.

78.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed no later than the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the Restructuring Support Agreement, including, but not limited to the following documents: the Takeback Debt Documents, the Revolving Credit Facility Documents, the MIP, the New Governance Documents, the Shareholder Agreement, the identification of the New Board, to the extent known as of the Plan Supplement Filing Date, the identification of the Effective Date Cash, the Schedule of Rejected Executory Contracts and Unexpired Leases.  The Plan Supplement shall be in accordance with the Restructuring Support Agreement.  Through the Effective Date, the Debtor shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of (a) the Plan, (b) the Restructuring Support Agreement, and (c) the Confirmation Order, and consistent with the terms and conditions provided for in the the Restructuring Support Agreement.

79.     "*Plan Supplement Filing Date*" means the date that is four (4) days before the Voting Deadline.

80.     "*Preferred Stock*" means the 7.375% Series A Cumulative Redeemable Preferred Stock of CorEnergy.

81.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

82.     "*Pro Rata*" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that respective Class.

83.     "*Professional Fee Claim*" means all Administrative Claims for the compensation of Retained Professionals and the reimbursement of expenses incurred by such Retained Professionals through and including the Confirmation Date under Sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

84.    "*Professionals*" means the Creditors' Professionals and the Estate's Professional.

85.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

86.    "*Reinstate,*" "*Reinstated,*" or "*Reinstatement*" means, leaving a Claim Unimpaired under the Plan.

87.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or special committee member or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees and, solely with respect to the Debtor, the former directors, managers, officers of its Affiliates.

88.    "*Released Party*" means collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Ad Hoc Noteholder Group and its members; (d) the Trustee; and (e) each Related Party of each Entity in clause (a) through (d); ***provided, however***, that notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

89.    "*Releasing Party*" means each of the following, solely in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Affiliates; (d) the Estate; (e) the Ad Hoc Noteholder Group; (f) the Professionals; (g) all Holders of Claims or Interests; (h) each Related Party of each Entity in clause (a) through (g).

90.    "*Reorganized Debtor*" means the Debtor as reorganized pursuant to and under the Plan, or any successor thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date in accordance with the Restructuring Transactions.

91.    "*Restructuring Fees and Expenses*" means all reasonable and documented fees, costs and expenses of each of the Creditors' Professionals, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing, including, but not limited to fees and expenses incurred in connection with the Chapter 11 Case, and, to the extent applicable, consistent with any engagement letters entered into with the Company.

92.    "*Restructuring Support Agreement*" means that certain binding Restructuring Support Agreement dated as of February 25, 2024, and all exhibits, schedules and attachments thereto, by and among the Debtor and the Ad Hoc Noteholder Group and any subsequent Entity

13

that becomes a party thereto pursuant to the terms thereof, attached as **Exhibit B** to the Disclosure Statement.

93.      "*Restructuring Transactions*" has the meaning set forth in Article 4.02 of the Plan.

94.      "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with Sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to (i) Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention, or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

95.      "*Revolving Credit Facility*" means the revolving loan with a maximum borrowing amount of $10 million made by certain Holders (identified in the Revolving Credit Facility Documents) of the Senior Notes to CorEnergy on the terms and conditions set forth in the term sheet attached hereto as **Exhibit A**.  The Revolving Credit Facility shall be senior following the occurrence of one or more events of default, as more fully set forth in the governing documents thereto to the Takeback Debt (as defined below) and may be included as a part of the Takeback Debt Documents.

96.      "*Revolving Credit Facility Documents*" means all agreements, documents, and instruments delivered or to be entered into in connection with the Revolving Credit Facility.

97.      "*Revolving Credit Facility Loans*" means loans issued under the Revolving Credit Facility.

98.      "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means a schedule (including any amendments or modifications thereto) that will be Filed as part of the Plan Supplement and will include a list of all Executory Contracts and Unexpired Leases that the Debtor will reject pursuant to the Plan, as amended by the Debtor from time to time in accordance with the Plan, if any, subject to the consent rights set forth in Article 1.08 hereof.

99.      "*SEC*" means the United States Securities and Exchange Commission.

100.     "*Section 510(b) Claim*" means any Claim against the Debtor: (a) arising from the rescission of a purchase or sale of a Security of the Debtor or an affiliate of the Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution Allowed under Section 502 of the Bankruptcy Code on account of such a Claim; or (d) otherwise subordinated pursuant to Section 510(b) of the Bankruptcy Code.

101.     "*Secured*" means any Claim to the extent (a) secured by a lien on property in which the Debtor has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to Section 553 of the Bankruptcy Code, to the extent of the value of the interest of the Holder of such Claim in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) and any other applicable provision of the Bankruptcy Code or (b) allowed, pursuant to the Plan or a Final Order of the Bankruptcy Court, as a secured Claim.

102. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

103. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

104. "*Security*" has the meaning set forth in Section 101(49)of the Bankruptcy Code.

105. "*Senior Note Payment*" means $23.6 million minus (ii) the negative difference, if any between the Effective Date Cash less $12 million.

106. "*Senior Notes*" means the 5.875% Convertible Senior Notes due 2025 issued by CorEnergy pursuant to the Bond Indenture.

107. "*Senior Noteholder*" means the Holder of one or more Senior Notes.

108. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

109. "*Shareholder Agreement*" means the agreement among certain Holders of New Common Stock consistent with the terms and conditions set forth in the term sheet attached hereto as **Exhibit B**.

110. "*Solicitation Materials*" means all documents, ballots, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to Sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

111. "*Statutory Committee*" means any official committee of unsecured creditors, equity holders, or otherwise appointed in the Chapter 11 Case by the U.S. Trustee.

112. "*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies. For the purposes of this definition, Crimson and its subsidiaries are subsidiaries of the Debtor.

113. "*Takeback Debt*" means a loan made by the Holders of the Senior Notes to CorEnergy on the Effective Date on the terms and conditions set forth in the term sheet attached hereto as **Exhibit A**.

114. "*Takeback Debt Principal Amount*" means the term loan facility, which comprises the exchange of the Senior Notes for: (a) an amount equal to $45 million; ***provided***, ***however***, that if the amount of the Senior Note Payment is less than 20% of the Senior Notes Claim, then the Takeback Debt Principal Amount shall be increased by the difference between 20% of the Senior Notes Claim less the Senior Note Payment.

115.    "*Takeback Debt Debt Documents*" means, collectively, the loan agreement by and among the Reorganized Debtor and the lender parties thereto and all other agreements, documents, and instruments delivered or entered into in connection therewith.

116.    "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

117.    "*Third-Party Release*" means the releases set forth in Article 8.03 hereof.

118.    "*Trustee*" means U.S. Bank Trust Company, National Association, in its capacity as successor indenture trustee under the Bond Indenture.

119.    "*U.S. Trustee*" means the Office of the United States Trustee for Region 13.

120.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's or Reorganized Debtor's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

121.    "*Unexpired Lease*" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

122.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not impaired within the meaning of Section 1124 of the Bankruptcy Code.

123.    "*Voting Deadline*" means the date and time by which the Notice and Claims Agent must actually receive the Ballots, as set forth on the Ballots.

1.02    **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise

16

defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to statutes, regulations, orders, rules of court and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (k) any immaterial effectuating provisions may be interpreted by the Debtor or the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (l) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

## 1.03    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## 1.04    Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles; *provided* that corporate governance matters relating to the Debtor shall be governed by the laws of the state of incorporation of the Debtor or Reorganized Debtor, as applicable.

## 1.05    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## 1.06    Reference to the Debtor or the Reorganized Debtor

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

## 1.07    Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, or any other Definitive Document, the terms of the applicable document included in the Plan Supplement or other Definitive Document shall control.  In the event of an inconsistency between the Plan, any document included in the Plan Supplement, or other

HB: 4866-7395-7801.1

Definitive Document, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control, unless provided otherwise.

1.08    **Consent Rights**

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement to the extent set forth in the Restructuring Support Agreement (without enhancement or expansion thereof) with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, the Disclosure Statement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article 1.01 hereof) and fully enforceable as if stated in full herein. In case of a conflict between the consent rights of the applicable parties that are set forth in the Restructuring Support Agreement and those parties' consent rights that are set forth in the Plan or the Plan Supplement, unless otherwise set forth in this Plan, the consent rights in the Restructuring Support Agreement shall control. Any and all consent rights referenced in the Plan or the Restructuring Support Agreement, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

2.01    **Administrative and Priority Claims**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

(a)    **Administrative Claims**

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(b)     **Administrative Claims Bar Date**

All requests for payment of an Administrative Claim (other than Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court or Notice and Claims Agent, as applicable, and served on the Debtor and the Ad Hoc Noteholder Group no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Reorganized Debtor may also choose to object to any Administrative Claim no later than 90 days after the Administrative Claims Bar Date, except as otherwise ordered by the Court, subject to extensions by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor, as applicable, or agreement in writing of the parties. Unless the Debtor or the Reorganized Debtor object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

2.02   **Professional Fee Claims**

(a)     **Final Fee Applications**

All final requests for Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) calendar days after the Effective Date. After notice and the opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid in Cash in full. For the avoidance of doubt, the Restructuring Fees and Expenses shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with Article 2.03 hereof, the Restructuring Support Agreement, and the Plan, as applicable.

(b)     **Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided in the Plan or the Confirmation Order, from on and after the Confirmation Date, the Reorganized Debtor shall pay in Cash the reasonable and documented legal fees and expenses incurred by the Debtor or the Reorganized Debtor in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Confirmation Date, any requirement that Retained Professionals comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)        **Substantial Contribution Compensation and Expenses**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to Sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtor or Reorganized Debtor, as applicable, the Ad Hoc Noteholder Group, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

## 2.03    Restructuring Fees and Expenses

The reasonable Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Case on the dates on which such amounts would be required to be paid under the Restructuring Support Agreement) without the requirement to file a fee application with the Bankruptcy Court, without the need for time detail, and without any requirement for review or approval by the Bankruptcy Court. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtor at least two (2) Business Days before the anticipated Effective Date; *provided*, *that*, such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Fees and Expenses.

## 2.04    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Reorganized Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## 2.05    Statutory Fees

All fees due and payable pursuant to Section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor in full on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to file post-confirmation quarterly reports and pay quarterly fees to the U.S. Trustee until the earliest date upon which the Chapter 11 Case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.01    **Classification of Claims and Interests**

The Plan is being proposed by the Debtor within the meaning of Section 1121 of the Bankruptcy Code. Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with Section 1122 of the Bankruptcy Code. In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described in <u>Article II</u>.

A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. Any Class that does not contain any Allowed Claims or Allowed Interests with respect to the Debtor will be treated in accordance with <u>Article 3.05</u> below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class:

**Summary of Classification and Treatment of Claims and Interests**

| Class | Description | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 4 | Grier Member Claims | Impaired | Yes |
| 5 | Senior Notes | Impaired | Yes |
| 6 | Preferred Stock | Impaired | Yes |
| 7 | Common Stock | Impaired | No (deemed to reject) |

3.02    **Treatment of Classes of Claims and Interests**

Except to the extent that the Debtor and a Holder of an Allowed Claim or Interest agrees to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange

21

for, such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(a)    **Class 1: Secured Claims**

(i)    *Classification*: Class 1 consists of Secured Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(iii)    *Impairment and Voting*: Class 1 is Unimpaired. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(b)    **Class 2: Other Priority Claims**

(i)    *Classification*: Class 2 consists of Other Priority Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, each Holder thereof shall receive, at the election of the Debtor or Reorganized Debtor, as applicable, payment in full in Cash or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code, either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Other Priority Claim.

(iii)    *Impairment and Voting*: Class 2 is Unimpaired. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(c)    **Class 3: General Unsecured Claims**

(i)    *Classification*: Class 3 consists of General Unsecured Claims.

(ii)    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtor or

Reorganized Debtor, as applicable, Payment in full in Cash on account of such Allowed General Unsecured Claim either (a) on the Effective Date or (b) on the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(iii)   *Impairment and Voting*: Class 3 is Unimpaired. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

(d)   **Class 4: Grier Member Claims**

(i)   *Classification*: Class 4 consists of the Grier Member Claims.

(ii)   *Allowance*: Each Grier Member Claim shall be deemed Allowed in the amount of $1.00 for purposes of voting and confirmation, representing any Claim of the Grier Members against the Debtor, including but not limited to any Claims or rights arising under the Crimson LLC Agreement. The Grier Member Claims constitutes legal, valid, and binding obligation of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Grier Member Claims exists. No portion of the Grier Member Claims is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii)   *Treatment*: Because the equity units of the Grier Members in Crimson (the Class A-1 Crimson Units, the Class A-2 Crimson Units, and the Class A-3 Crimson Units) track the dividend and liquidation rights of the Preferred Stock and the Common Stock, the Grier Member Claims will be treated as follows:

a)   With respect to the Class A-1 Crimson Units, the Grier Members' right to exchange their Class A-1 Crimson Units with Preferred Stock will be substituted with the Grier Member's right to exchange their Class A-1 Crimson Units with 2.79% of the New Common Stock, subject to dilution by the Management Incentive Plan and any tracking dividend or liquidation distribution rights that tracked to the Preferred Stock shall be exchanged for tracking to the 2.79% of the New Common Stock; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 7.59 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Preferred

HB: 4866-7395-7801.1

Stock shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); and

b) With respect to the Class A-2 and Class A-3 Crimson Units, the Grier Member's right to exchange their Class A-2 and A-3 Crimson Units with Common Stock will be cancelled because the Common Stock is being cancelled pursuant to Article 4.12 of the Plan. The Class A-2 and A-3 Crimson Units shall not be cancelled, but the Grier Members shall no longer receive any tracking dividend or liquidation distribution on account of the Class A-2 and A-3 Crimson Units and shall not be entitled to exchange the Class A-2 and Class A-3 Crimson Units into New Common Stock.

c) Notwithstanding any provision of the Plan to the contrary, the Crimson LLC Agreement shall be assumed as of the Effective Date.

(iv) *Impairment and Voting*: Class 4 is Impaired. Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. Pursuant to the Restructuring Support Agreement, the Grier Members have agreed to support the Plan, subject to the fiduciaries duty of John Grier, as a member of the Board of Directors of the Debtor, to withdraw his support for the Plan in certain circumstances.

(e) **Class 5: Senior Notes**

(i) *Classification*: Class 5 consists of Senior Notes.

(ii) *Allowance*: Senior Notes shall be deemed Allowed in the aggregate amount of $118,242,651, representing the principal amount outstanding under the Bond Indenture, accrued and unpaid interest, and make whole premiums, plus all other accrued and unpaid fees and other expenses payable under the Bond Indenture. The Senior Notes constitute legal, valid, and binding obligations of the Debtor, and no offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Notes exist. No portion of the Senior Notes is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.

(iii) *Treatment*: Each Senior Noteholder (inclusive of accrued and unpaid interest, accrued and unpaid fees and other expenses payable under the Notes), on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for their respective Senior Note, shall receive:

a)    Its Pro Rata share of the Senior Note Payment;

b)    Its Pro Rata share of the Takeback Debt Principal Amount;

c)    Its Pro Rata share of 88.96% of New Common Stock, subject to dilution by the Management Incentive Plan; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall decrease based on a ratio of 30.0 basis points to every $1 million in Excess Effective Date Cash; and

d)    Its Pro Rata share of the Excess Effective Date Cash, if any.

(iv)    *Impairment and Voting*: Class 5 is Impaired.  Holders of Senior Notes in Class 5 are entitled to vote to accept or reject the Plan.  If Class 5 votes to reject the Plan, the Plan will be cancelled.  Pursuant to the Restructuring Support Agreement, Holders of 90% of the principal amount of the Senior Notes have committed to support the Plan.

(f)    **Class 6: Preferred Stock**

(i)    *Classification*: Class 6 consists of Preferred Stock.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such share of Preferred Stock, each Holder of a Preferred Stock shall receive either:

a)    If Class 6 votes in favor of the Plan, such Holder's Pro Rata share of 8.25% of New Common Stock, subject to dilution by the Management Incentive Plan; ***provided***, ***however***, that if the Senior Notes receive Excess Effective Date Cash, then the percentage shall increase based on a ratio of 22.41 basis points to every $1 million in Excess Effective Date Cash (for the avoidance of doubt the incremental increase to the percentage described herein when combined with the incremental increase to the holders of Grier Member Claims shall total in the aggregate 30 basis points for every $1 million in Excess Effective Date Cash); or

b)    If Class 6 rejects the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Preferred Stock, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Preferred Stock will be cancelled.

c)    If Class 6 rejects the Plan, then the percentage of New Common Stock that would have been allocated to Preferred Stock will be split pro rata between Class 4 and Class 5. For the avoidance of doubt, with respect to Class 4, this allocation will only serve to increase the percentage allocation in the Class 4 treatment, it will not result in the issuance of any New Common Stock except to the extent provided in the Crimson LLC Agreement.

(iii)    *Impairment and Voting*: Class 6 is Impaired.  Holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.

(g)    **Class 7: Common Stock**

(i)    *Classification*: Class 7 consists of Common Stock and, pursuant to § 510(b) of the Bankruptcy Code, the Certain Crimson Employee Claims.

(ii)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Common Stock or Allowed Crimson Employee Claims, each Holder thereof shall receive Cash in the amount its Pro Rata share of the liquidation value of the Debtor as set forth on **Exhibit D** to the Disclosure Statement, which amount is estimated to be $0.00 and the Common Stock shall be cancelled.

(iii)    *Impairment and Voting*: Class 7 is Impaired. Holders of Interests in Class 7 are conclusively presumed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

3.03    <u>**Special Provisions Governing Unimpaired Claims**</u>

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Claim.

3.04    <u>**Controversy Concerning Impairment**</u>

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

3.05    <u>**Elimination of Vacant Classes**</u>

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing, shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

3.06    **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

3.07    **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

An Impaired Class of Interests shall have accepted the Plan if, not counting the vote of any Holder designated under Section 1126(e) of the Bankruptcy Code or any insider under Section 101(31) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Interests actually voting in the Class have voted to accept the Plan.

3.08    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class.  The Debtor shall seek Confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the Plan in accordance with Article X hereof (subject to the terms of the Restructuring Support Agreement) to the extent that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired, Impaired or otherwise to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan at any time before the Confirmation Date.

### ARTICLE IV
### PROVISIONS FOR IMPLEMENTATION OF THE PLAN

4.01    **General Settlement of Claims and Interests**

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and Confirmation Order, upon the Effective Date, the provisions of the Plan and Confirmation Order shall constitute an integrated and global good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan relating to the contractual, legal, and subordination rights of Holders with respect to such Allowed Claims and Interests or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's integrated and global approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and is within the range

of reasonableness.  Subject to this <u>Article IV</u>, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

## 4.02   **Restructuring Transactions**

On or about the Effective Date, the Debtor and/or the Reorganized Debtor, as the case may be, shall take all actions necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary and/or appropriate to effectuate the Restructuring Support Agreement and the Plan (collectively, the "<u>Restructuring Transactions</u>"), including, but not limited to: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, contribution, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree, including the documents comprising the Plan Supplement; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable law; (d) such other transactions that are required to effectuate the Restructuring Transactions in a tax efficient manner for the Debtor, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law and that are consistent with the Plan and the Restructuring Support Agreement.

The Confirmation Order shall and shall be deemed to, pursuant to Sections 363 and 1123 of the Bankruptcy Code, authorize the Restructuring Transactions, which shall and shall be deemed to occur in the sequence set forth therein.

The Confirmation Order shall and shall be deemed to, pursuant to both Sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions consistent with the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

## 4.03   **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (a) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (b) the appointment of the New Board; (c) the adoption and/or filing of any other amended organizational documents required to implement the Restructuring Transactions; (d) the issuance and distribution, or other transfer, of the New Common Stock as provided herein; (e) the implementation of the Restructuring Transactions; (f) the Debtor's entry into, delivery, and performance of the Takeback Debt Documents and Revolving Credit Facility Documents; and (g) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan

(whether proposed to occur before, on, or after the Effective Date). All matters provided for in the Plan involving corporate action required by the Debtor, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security Holders, directors, managers, authorized persons, or officers of the Debtor. On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions consistent with the Plan and the Restructuring Support Agreement) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article 4.03 shall be effective notwithstanding any requirements under non-bankruptcy law.

4.04   **Takeback Debt**

On the Effective Date, the Reorganized Debtor shall issue the Takeback Debt in the amount of the Takeback Debt Principal Amount (in which, subject to the occurrence of the Effective Date, interest shall accrue as of April 4, 2024, regardless of the day on which the Takeback Debt becomes fully operative) to the Holders of the Senior Notes consistent with the terms attached hereto as **Exhibit A**, as may be supplemented through a Plan Supplement. For the avoidance of doubt, if the Effective Date does not occur, no interest shall be due under the Takeback Debt.

All terms of the Takeback Debt, including without limitation, covenants and governance, shall be reasonably acceptable to the Debtor and the Ad Hoc Noteholder Group and otherwise consistent with the Restructuring Support Agreement. Any terms of the Takeback Debt may be modified subject to the consent of the Debtor and the Ad Hoc Noteholder Group.

On the Effective Date, the Debtor shall execute and deliver the Takeback Debt Documents and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Takeback Debt Documents shall constitute legal, valid, and binding obligations of the Debtor and shall be enforceable in accordance with their respective terms. The terms and conditions of the Takeback Debt Documents shall bind the Debtor and each other Entity that enters into such Takeback Debt Documents. Any Entity's acceptance of Takeback Debt shall be deemed as its agreement to the terms of the Takeback Debt Documents, as amended, amended and restated, supplemented, or otherwise modified from time to time following the Effective Date in accordance with their terms.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Takeback Debt and the Takeback Debt Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to issue the Takeback Debt and such other documents as may be required to effectuate the treatment afforded by the Takeback Debt.

4.05    **The Revolving Credit Facility**

On the Effective Date, the Reorganized Debtor shall enter into the Revolving Credit Facility Documents with the holders of the Senior Notes who are subject to the terms of the Restructuring Support Agreement at the discretion of such eligible holders. Confirmation of the Plan shall be deemed approval of the Revolving Credit Facility and authorization for the Debtor and Reorganized Debtor, as applicable, to take any and all actions necessary or appropriate to consummate the Revolving Credit Facility, including executing and delivering the Revolving Credit Facility Documents without any further notice to or order of the Bankruptcy Court.

The proceeds of the Revolving Credit Facility will be used exclusively for emergency purposes only, in accordance with the Revolving Credit Facility Documents.

4.06    **Management Incentive Plan**

On the Effective Date, the Reorganized Debtor shall enter into the Management Incentive Plan. All grants under the Management Incentive Plan shall ratably dilute all New Common Stock issued pursuant to the Plan.

The Management Incentive Plan will reserve exclusively for participants a pool of stock-based awards in the Reorganized Debtor in the form of (a) warrants for 5.0% of New Common Stock and (b) 5.0% of the New Common Stock, both determined on a fully diluted and fully distributed basis (the "MIP Pool"), which shall be reserved for distribution in accordance with the Management Incentive Plan.

On the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to current management.  No later 90 days following the Effective Date, the Reorganized Debtor shall allocate 25.0% of the MIP Pool to management employees of the Reorganized Debtor as determined at the discretion of the New Board.  The remaining 50.0% of the MIP Pool shall be allocated to management employees at the discretion of the New Board.

Confirmation of the Plan shall be deemed, without further notice to or order of the Bankruptcy Court, approval of the Management Incentive Plan and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtor to enter into and execute the Management Incentive Plan and such other documents as may be required to effectuate the treatment afforded by the Management Incentive Plan.

4.07    **Employee Obligations**

CorEnergy is a party to Employment Agreements with all eleven (11) of its employees. The employees covered by the Employment Agreements provide accounting, finance, legal and leadership roles.  Pursuant to the Plan, the Reorganized Debtor will assume all eleven of the Employment Agreements.

4.08    **Deregistration of Existing Common Stock and Preferred Stock and Issuance of New Common Stock**

Prior to or as soon as reasonably practicable following the Effective Date, in accordance with all applicable federal and state rules and regulations, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Debtor or the Reorganized Debtor, as applicable, intend to take steps to de-register the existing Common Stock and Preferred Stock and to terminate and/or suspend its reporting obligations under the Exchange Act, including filing a Form 15 with the SEC to deregister its existing Common Stock and Preferred Stock.

The Confirmation Order shall authorize the issuance of New Common Stock in one or more issuances without the need for any further corporate action, and the Debtor or Reorganized Debtor, as applicable, is authorized to take any action necessary or appropriate in furtherance thereof.  On or about the Effective Date or as soon as reasonably practicable thereafter, applicable Holders of Senior Notes and Preferred Stock shall receive shares of New Common Stock pursuant to Articles 3.02(e) and (f).

All of the shares of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessed.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and the terms and conditions of the instruments evidencing or relating to such distribution or issuance.

The Reorganized Debtor does not intend to obtain a stock exchange listing for the New Common Stock, and the Reorganized Debtor does not intend to be subject to any reporting requirements promulgated by the SEC following the de-registration actions described above. The Reorganized Debtor intends to apply for the New Common Stock to be quoted on the OTC market and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with applicable OTC rules.

4.09    **Exemption from Registration Requirements**

The offering, issuance, and distribution of the New Common Stock pursuant to the Plan (other than Securities issuable under the Management Incentive Plan) will be exempt from the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on Section 1145 of the Bankruptcy Code.  Pursuant to Section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the United States without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the New Governance Documents.

All Persons shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion whether the New Common Stock or other Securities issued under or otherwise acquired pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services. Notwithstanding

31

anything to the contrary in the Plan or otherwise, no Person (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether such New Common Stock or other Securities are validly issued, fully paid and non-assessable, exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

4.10   **Subordination**

The allowance, classification, and treatment of satisfying all Claims and Interests proposed under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, Sections 510(b) or 510(c) of the Bankruptcy Code, or otherwise. Except as provided in the Plan, on the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims and Allowed Interests will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; *provided*, *that*, any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder, or the Plan is revoked or withdrawn.

4.11   **Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property in the Debtor's Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.12   **Cancellation of Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, the New Common Stock, the Plan Supplement, or any agreement instrument, or other document entered into in connection with our pursuant to the Plan or the Restructuring Transactions, the obligations of the Debtor under the Bond Indenture, and any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtor giving rise to any Claim or Interest shall be cancelled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; *provided*, *that*, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest shall continue in effect solely for (a) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided

herein, and (b) permit the Trustee to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees, and expenses (i) due to the Trustee, or (ii) incurred by the Trustee in making such distributions, to the extent not otherwise satisfied by the Debtor. Except as provided in this Plan, on the Effective Date, the Trustee and its respective agents, successors and assigns shall be automatically and fully discharged of all duties and obligations associated with the Bond Indenture; *provided, further*, that the preceding *proviso* shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan. The commitments and obligations of the lenders or Holders under the Bond Indenture to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or any successors or assigns under the Bond Indenture, to the extent there were any remaining commitments or obligations, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, only such matters that, by their express terms, survive the termination of the Bond Indenture shall survive the occurrence of the Effective Date, including the rights of the Trustee, as applicable, to expense reimbursement, indemnification, and similar amounts.

### 4.13    Sources for Plan Distributions

The Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations. The Reorganized Debtor will pay or cause to be paid the Cash payments to be made pursuant to the Plan.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the Reorganized Debtor deems appropriate.

### 4.14    Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including, but not limited to the Restructuring Transactions), on the Effective Date, the Debtor shall continue to exist after the Effective Date as a separate corporation with all the powers of a corporation pursuant to applicable Law, except to the extent such formation documents are amended and restated, converted or otherwise modified by the Plan, the Plan Supplement, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

### 4.15    New Governance Documents

On the Effective Date, or as soon thereafter as is reasonably practicable, the New Governance Documents, consistent with the terms attached hereto as **Exhibit B**, as may be supplemented through a Plan Supplement, shall be adopted and amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the New Governance Documents, and the Restructuring Support Agreement, as applicable, and the

HB: 4866-7395-7801.1

Bankruptcy Code.  To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtor will file its Agreement or applicable New Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of formation in accordance with the applicable laws thereof.  The New Governance Documents shall, among other things: (a) authorize the issuance of the New Common Stock and (b) pursuant to and only to the extent required by Section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  Subject to this Article 4.15 of the Plan, the Reorganized Debtor may amend and restate its formation and constituent documents as permitted by applicable law and the terms of the New Governance Documents, the Restructuring Support Agreement, and the Plan.

Certain Holders of the New Common Stock may enter into and be subject to the terms of a shareholder agreement (the "Shareholder Agreement"), which may restrict such Holder of New Common Stock for the purposes of preserving net operating losses.  It is the intent that any restrictions on trading in any Shareholder Agreement will not apply to small holders holding less than 5% of the New Common Stock who are not qualified institutional buyers as defined in Rule 144A of the Securities Act. The Reorganized Debtor intends to apply for the New Common Stock to be quoted in the OTC markets and to make available to stockholders financial and other information concerning the Reorganized Debtor in accordance with OTC rules.

## 4.16    Indemnification Provisions in Organizational Documents

As of the Effective Date and consistent with applicable law, the Reorganized Debtor's formation documents shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor or Reorganized Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) at least to the same extent as set forth in the Indemnification Provisions, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. The Reorganized Debtor shall not amend and/or restate its organizational documents after the Effective Date to terminate or materially adversely affect (a) any Indemnification Provision or (b) the rights of such directors, officers, equity Holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtor, and such current directors', officers', and managers' respective Affiliates (each of the foregoing solely in their capacity as such) referred to in the immediately preceding sentence.  For the avoidance of doubt, as used in this Article 4.16, "current" refers to covered Entities that serve as of the Petition Date, regardless of whether such Entities cease serving in such capacities thereafter.

## 4.17    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers, manager, and members of the board of managers (or other governing body) thereof, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the

Restructuring Transactions, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

4.18   **Management of the Reorganized Debtor**

On the Effective Date, the board of directors at CorEnergy shall be replaced with the New Board. The New Board shall initially include five (5) members appointed by the new equity holders, on arrangements to be agreed to by, and in the sole discretion of, the Ad Hoc Noteholder Group and as set forth in the Shareholder Agreement.

Provisions regarding the removal, appointment, and replacement of members of the New Board will be set forth in the New Governance Documents or Shareholder Agreement.

4.19   **Section 1146(a) Exemption**

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Takeback Debt or the Revolving Credit Facility, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax, or other similar tax or governmental assessment.  All appropriate state or local governmental officials, agents, or filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

4.20   **Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the

Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action, including Avoidance Actions, against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to commence, pursue, and prosecute any and all Causes of Action against any Entity, including Avoidance Actions, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article 4.20 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article 4.20 that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 5.01    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, including without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts or leases to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges,

36

immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtor or Reorganized Debtor, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 5.02   Cure and Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtor or the Reorganized Debtor, as applicable, shall pay undisputed Cure Claims, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter as dictated by the Debtor's ordinary course of business, for Executory Contracts and Unexpired Leases assumed as of the Effective Date or (b) the assumption effective date, if different than the Effective Date. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor of the Cure Claim; *provided*, *that* nothing herein shall prevent the Reorganized Debtor from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtor also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Claim payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided*, *that*, the Reorganized Debtor may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity.

At least fourteen (14) days prior to the Combined Hearing, the Debtor shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Claim amounts to be sent to applicable third parties (with such Cure Claim being $0.00 if no amount is listed in the notice), which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment on any grounds or related amount of the Cure Claim must be Filed, served, and actually received by the Debtor no later than the date

specified in the notice (which specified date shall be at least fourteen (14) days following service of the notice). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption will be deemed to have assented to such assumption or assumption and assignment and any objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, Order, or approval of the Bankruptcy Court. The Debtor or Reorganized Debtor, as applicable, reserves the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or Reorganized Debtor, as applicable, shall have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date. In the event of a timely Filed objection regarding (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption or the cure payments required by Section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article 5.02, in the amount and at the time dictated by the Debtor's ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article 5.02, in the amount and at the time dictated by the Debtor ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

5.03 **Rejection Damages Claims**

In the event that the rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is Filed with the Notices and Claims Agent and served upon counsel for the Debtor,

the Reorganized Debtor, and counsel for the Ad Hoc Noteholder Group no later than fifteen (15) days after the date of entry of a Final Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III</u> hereof.

5.04  **<u>Insurance Policies</u>**

To the extent the Debtor is a party thereto or a named insured, any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to Section 365 of the Bankruptcy Code.

To the extent applicable, the Debtor or the Reorganized Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect as of the Petition Date. Any current and former directors, officers, managers, and employees of the Debtor who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date subject to the terms of such policy. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor shall retain the ability to supplement (but not reduce) such D&O Liability Insurance Policy as the Debtor or Reorganized Debtor may deem necessary.

The Debtor shall continue to satisfy any applicable insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtor's insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, with respect to any policies where the Debtor is a named insured or a counterparty: (a) the Debtor shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtor.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of all such insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

5.05  **<u>Contracts and Leases After the Petition Date</u>**

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed under Section 365 of the Bankruptcy Code, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business.

HB: 4866-7395-7801.1

Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

5.06    **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or the Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

5.07    **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

6.01    **Distributions on Account of Claims or Interests Allowed as of Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, which shall be the same day as the Effective Date, the distribution agent (the "Distribution Agent") shall make initial distributions under the Plan on account of Claims or Interests Allowed on or before the Effective Date or as soon as reasonably practical thereafter; ***provided***, ***however***, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article 2.04 hereof. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

The Debtor and the Reorganized Debtor, as applicable, shall take such reasonable actions as may be required to cause the distributions to Holders of the Preferred Stock in accordance with and as contemplated under the Plan. Notwithstanding anything in the Plan to the contrary, to the extent a holder of Preferred Stock holds such interests through DTC, distributions attributable to such Holders shall be effectuated through the facilities of DTC, to the extent practicable. The distributions to Holders of Preferred Stock shall be deemed issued on the Effective Date regardless of when the distribution actually occurs.

(a)    **Powers of Distribution Agent**

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof, ***provided***, ***however***, that such Distribution Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Senior Noteholders may be made to or at the direction of the Trustee, who may act as Distribution Agent (or direct the Distribution Agent) for distributions to Senior Noteholders, in accordance with the Plan and the Bond Indenture.  As applicable, the Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with customary practices of DTC.

(b)    **Expenses Incurred On or After the Effective Date**

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of such Distribution Agent without the need for any approvals, authorizations, actions, or consents, except as otherwise ordered by the Bankruptcy Court.  The Distribution Agent shall submit invoices to the Debtor or the Reorganized Debtor, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtor or the Reorganized Debtor, as applicable, shall pay those amounts that either deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor or the Reorganized Debtor, as applicable, deem to be unreasonable.  In the event that the Debtor or the Reorganized Debtor, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Reorganized Debtor, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtor or the Reorganized Debtor, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

6.02  **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

6.03   **Delivery of Distributions**

    (a)    **Record Date for Distributions**

As of the Distribution Record Date, the various transfer registers for each Class of Claims or Interests entitled to distributions under the Plan as maintained by the Debtor or its respective agents shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Debtor's publicly traded Preferred Stock or Common Stock, the distributions to which will be conducted in accordance with the DTC's standard procedures and customary practices.

    (b)    **Distribution Process**

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims or Interests at the address for each such Holder as indicated on the applicable register or in the Debtor's records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *that*, the manner of such distributions shall be determined at the discretion of the Reorganized Debtor.

    (c)    **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Distribution Agent shall comply with all applicable withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each Holder of an Allowed Claim or Interest or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Notwithstanding any provision in the Plan, any document included in the Plan Supplement, or any other Definitive Document to the contrary, the Reorganized Debtor and the Distribution Agent shall have the right, but not the obligation, to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (a) withholding distributions pending receipt of information necessary to facilitate such distributions and (b) in the case of a non-Cash distribution that is subject to withholding, withhold an appropriate portion of such property and either liquidate such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Any amounts withheld or reallocated pursuant to this Article 6.03(c) shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Reorganized Debtor and the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, IRS Form W-9 or, if the payee is a foreign Person, an applicable IRS Form W-8, or any other forms or documents reasonably requested by the Reorganized Debtor or the Distribution Agent to reduce or eliminate any withholding required by Governmental Unit.  If such request is made by the Reorganized Debtor or the Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, and the Holder fails to comply within ninety (90) days after not less than two (2) requests have been made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor as applicable, and any Claim or Interest in respect of such distribution shall be forever barred from assertion against any Debtor, the Reorganized Debtor and their respective property.

(d)     **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

(e)     **Fractional, Undeliverable, and Unclaimed Distributions**

(i)     *Fractional Distributions:* No fractional New Common Stock shall be distributed. Whenever any distribution of fractional units of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding down of such fraction to the nearest unit of New Common Stock. Any Cash distributions shall reflect a rounding down of such Cash to the nearest penny. No consideration shall be provided in lieu of fractional shares or Cash amounts that are rounded down. None of the Reorganized Debtor or the Distribution Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock. DTC shall be considered a single holder for distribution purposes.

(ii)     *Undeliverable Distributions:* If any distribution to a Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder within thirty (30) days of receipt of the Holder's then current address or other necessary information. Undeliverable distributions shall remain in the possession of the Reorganized Debtor as applicable, for one (1) year after the Effective Date at which time such distribution reverts to the Reorganized Debtor as applicable, or is cancelled pursuant to Article 6.03(e)(iv) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)     *Failure to Present Checks:* Checks issued by the Reorganized Debtor (or its Distribution Agent) on account of Allowed Claims shall be null and void if

43

not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days of the Effective Date shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtor or its property.

Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment laws, all such distributions shall revert to the Reorganized Debtor. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

(iv)     *Reversion:* Any distribution under the Plan that is an Unclaimed Distribution for a period of one (1) year after the Effective Date shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock shall be deemed cancelled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

(f)     **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or Interest that has been cancelled shall be deemed to have surrendered such certificate or interest to the Debtor or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such certificate or instrument shall be cancelled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding the foregoing paragraph, this Article 6.03(f) shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

6.04    **Claims Paid or Payable by Third Parties**

(a)     **Claims Paid by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim

receives a payment on account of such Claim from a party that is not the Debtor or the Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

(b)      **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.05   **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, and notwithstanding any documents that govern the Debtor's prepetition funded indebtedness to the contrary, (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (i) interest accruing on or after the Petition Date on any such Claim; or (ii) interest at the contract default rate, as applicable.

6.06   **Setoffs**

Except as otherwise expressly provided for herein and with respect to the Allowed Claim of the holders of the Senior Notes and/or the Trustee, the Reorganized Debtor, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor, as applicable, may hold against the Holder

45

of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); ***provided***, ***however***, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

6.07   **Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein or as otherwise required by law (as reasonably determined by the Reorganized Debtor), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof as determined for federal income tax purposes) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

6.08   **Delivery of New Common Stock**

On the Effective Date, the Reorganized Debtor is authorized to issue or cause to be issued and shall issue the New Common Stock for distribution in accordance with the terms of the Plan without the need for any further board, shareholder or other corporate action. All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Each holder of New Common Stock shall be deemed, without further notice or action, to have agreed to be bound by the New Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms.  The New Governance Documents shall be binding on all Entities receiving New Common Stock (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the New Governance Document. Notwithstanding the foregoing, the Reorganized Debtor, may condition the distribution of any New Common Stock issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtor or the Reorganized Debtor, as applicable, counter-signatures to one or more New Governance Documents.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND**
**DISPUTED CLAIMS AND INTERESTS**

7.01   **Allowance of Claims**

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it

becomes a Final Order), in the Chapter 11 Case allowing such Claim.  The Debtor or Reorganized Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

7.02    **Objections to Claims**

Except as otherwise specifically provided in this Plan or the Confirmation Order, the Debtor, and after the Effective Date, the Reorganized Debtor, shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (c) administer and adjust the Debtor's Claims register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest, including the Causes of Action retained pursuant to Article 4.20 of the Plan.  A motion to extend the Claims Objection Deadline shall automatically extend the deadline until the Court enters an order on such motion.

7.03    **Estimation of Claims**

Before or after the Effective Date, the Debtor or Reorganized Debtor, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

7.04    **No Distribution Pending Allowance**

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.05    **Distribution After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of

the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

7.06   **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.07   **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims register, to the extent applicable) by the Reorganized Debtor without having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, Order, or approval of the Bankruptcy Court.

7.08   **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtor under Sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order. All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the Reorganized Debtor elects to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed to by the Debtor or the Reorganized Debtor, as applicable, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such Claims may not**

HB: 4866-7395-7801.1

receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

## ARTICLE VIII
## EFFECT OF CONFIRMATION OF THE PLAN

8.01  **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies**

Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including the Takeback Debt and the Revolving Credit Facility): (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims and Interests after the Effective Date by the Reorganized Debtor, and Causes of Action against the Debtor of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtor prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities against, liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, its successors and assigns, and its assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not: (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of

49

Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and its Estate and Causes of Action against other Entities.

8.02    **Release by the Debtor**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE REORGANIZED DEBTOR, AND ITS ESTATE FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, OR ITS ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, THE DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE

DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, OR (C) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR THE DEBTOR'S ESTATE ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

8.03 <u>Releases by Holders of Claims and Interests</u>

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED THE DEBTOR, REORGANIZED DEBTOR, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN

51

SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST- EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, THE TAKEBACK DEBT OR THE REVOLVING CREDIT FACLIITY, ANY DEFINITIVE DOCUMENT EXECUTED IN CONNECTION WITH THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, (B) SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN, (C) OBLIGATIONS UNDER THE BOND INDENTURE, THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION THEREOF, INCLUDING THE RIGHTS OF THE TRUSTEE TO EXPENSE REIMBURSEMENT, INDEMNIFICATION AND SIMILAR AMOUNTS, OR (IV) CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE

**AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

8.04 **Exculpation**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE DEBTOR (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTOR AND THE OWNERSHIP THEREOF, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTOR), ANY INTERCOMPANY TRANSACTIONS, THE BOND INDENTURE, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF

**SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, AND OTHER DOCUMENTS, INSTRUMENTS AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

8.05    **Injunction**

    **UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AND AFFILIATES, AND EACH OF THEIR SUCCESSORS AND ASSIGNS, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM OR INTEREST THAT IS EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.**

    **EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE 8.02</u> OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE 8.03</u> OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE 8.04</u> OF THE PLAN, OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE REORGANIZED DEBTOR, THE RELEASED PARTIES, AND/OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST**

HB: 4866-7395-7801.1

ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS DISCHARGED, RELEASED, EXCULPATED, SETTLED AND/OR TREATED, ENTITLED TO A DISTRIBUTION, OR CANCELLED PURSUANT TO THE PLAN.

NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE PREPETITON DOCUMENTS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASE, THE FILING OF THE CHAPTER 11 CASE, THE TAKEBACK DEBT, THE REVOLVING CREDIT FACILITY, ANY DOCUMENTS RELATED TO THE TAKEBACK DEBT, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF ANY DEBT (INCLUDING THE TAKEBACK DEBT AND THE REVOLVING CREDIT FACILITY) AND/OR SECURITIES (INCLUDING THE NEW COMMON STOCK OR EQUITY OF CORENERGY ISSUED IN CONNECTION THEREWITH) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST

**THE DEBTOR, REORGANIZED DEBTOR, OR ANY SUCH EXCULPATED PARTY OR RELEASED PARTY.**

**THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSES OF ACTION.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN, THE CONFIRMATION ORDER OR UNDER ANY OTHER DEFINITIVE DOCUMENT OR OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN, THE CONFIRMATION ORDER OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR INCLUDED IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND THE CONFIRMATION ORDER. THE INJUNCTION IN THE PLAN SHALL EXTEND TO ANY SUCCESSORS AND ASSIGNS OF THE DEBTOR AND THE REORGANIZED DEBTOR AND ITS RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

8.06    **Protection Against Discriminatory Treatment**

In accordance with Section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which the Reorganized Debtor has been or is associated, solely because the Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case, but before the Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

8.07    **Release of Liens**

Except as otherwise specifically provided in the Plan, the Takeback Debt, the Revolving Credit Facility (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest related to the Takeback Debt and/or the Revolving Credit Facility), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor, the Trustee or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtor or the Reorganized Debtor, the Trustee shall execute and deliver all documents reasonably requested by the Debtor,

56

Reorganized Debtor or administrative agent(s) for the Takeback Debt and/or the Revolving Credit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtor and its designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

## 8.08    **Reimbursement of Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## 8.09    **Recoupment**

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## 9.01    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article 9.02 of the Plan:

(a)      The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

(b)      The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated and all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Restructuring Support Agreement by the Debtor or the Ad Hoc Noteholder Group for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Case and the related automatic stay;

(c)      The Grier Members' consent to the Restructuring Support Agreement shall remain in full force and effect;

(d)      The Plan, any other Definitive Documents, and all documents contained in the Plan Supplement, including any exhibits, schedules, annexes, amendments, modifications, or supplements thereto shall have been executed and/or filed with the Bankruptcy Court and shall be consistent in all respects with the Restructuring Support Agreement;

HB: 4866-7395-7801.1

(e)     No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring Transactions, the Restructuring Support Agreement or any of the Definitive Documents contemplated thereby;

(f)     The conditions precedent to the effectiveness of the Takeback Debt, if any, (as determined in any Takeback Debt documentation) shall have been satisfied or duly waived in writing and any documents or instruments related to the Takeback Debt shall have closed or will close simultaneously with the effectiveness of the Plan;

(g)     The conditions precedent to the effectiveness of the Revolving Credit Facility, if any, (as determined in the Revolving Credit Facility Documents) shall have been satisfied or duly waived in writing and any documents or instruments related to the Revolving Credit Facility shall have closed or will close simultaneously with the effectiveness of the Plan;

(h)     The Debtor shall have obtained any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Plan and the Restructuring Transactions;

(i)     The Debtor shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement;

(j)     All conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Governance Documents shall have been waived or satisfied in accordance with the terms thereof;

(k)     To the extent required under applicable non-bankruptcy law, any amendments to the Debtor's governance and organizational documents, shall have been duly filed with the applicable authorities in the relevant jurisdictions; and

(l)     All Restructuring Fees and Expenses for which an invoice has been received by the Debtor on or before two (2) Business Days before the expected Effective Date and professional fees and expenses of Retained Professionals approved by the Bankruptcy Court shall have been paid in full.

## 9.02    **Waiver of Conditions Precedent**

The Debtor (with the express consent of the Ad Hoc Noteholder Group pursuant to the same percentages as required in the Restructuring Support Agreement, in writing), may waive any of the conditions to the Effective Date set forth in <u>Article 9.01</u> of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time (subject to the consent of the Ad Hoc Noteholder Group).

HB: 4866-7395-7801.1

9.03     **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, or if, prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then (except as provided in any such Final Order): (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

9.04     **Substantial Consummation**

"*Substantial Consummation*" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X
MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN**

10.01     **Modification of Plan**

Effective as of the date hereof: (a) the Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtor (subject to the terms of the Restructuring Support Agreement and the consents required therein) or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.   Notwithstanding anything to the contrary herein, the Debtor or the Reorganized Debtor, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Restructuring Support Agreement.

10.02     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute (a) approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to Section 1127(a) of the Bankruptcy Code; and (b) a finding that such modifications to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

10.03     **Revocation or Withdrawal of Plan**

The Debtor reserves the right (subject to the terms of the Restructuring Support Agreement and the consents required therein) to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if Confirmation

HB: 4866-7395-7801.1

or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) the Restructuring Support Agreement will be null and void in all respects; (c) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (d) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against the Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to Section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Case and (b) the Plan, the Confirmation Order, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

HB: 4866-7395-7801.1

7.      enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article 6.03 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to Section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Case;

15.     enforce all orders previously entered by the Bankruptcy Court; and

16.     hear any other matter not inconsistent with the Bankruptcy Code;

17.     *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to the Takeback Debt, Revolving Credit Facility, and the New Governance Documents.  The Takeback Debt, Revolving Credit Facility, and the New Governance Documents shall be governed by the respective jurisdictional provisions therein.

### ARTICLE XII
### MISCELLANEOUS PROVISIONS

#### 12.01  **Immediate Binding Effect**

Subject to Article 9.01 hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan

Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

## 12.02    **Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan Reservation of Rights.

## 12.03    **Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

## 12.04    **Successor and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 12.05    **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be served on:

| Debtor | Counsel to the Debtor |
| --- | --- |

62

| CorEnergy Infrastructure Trust, Inc.<br>Attn: Chris Reitz<br>1100 Walnut St., Kansas City, MO 64106<br>E-mail: creitz@corenergy.reit | Husch Blackwell LLP<br>4801 Main Street, Suite 1000<br>Kansas City, MO 64112-2551<br>Attn:<br>Mark T. Benedict and<br>John J. Cruciani<br><br>Email:<br>mark.benedict@huschblackwell.com<br>john.cruciani@huschblackwell.com |
|---|---|
| **Office of United States Trustee** | **Counsel to the Ad Hoc Noteholder Group** |
| Office of United States Trustee for Region 13 | Faegre Drinker Biddle & Reath LLP<br>1177 Avenue of the Americas, 41st Floor<br>New York, New York 10036, USA<br>Attn:<br>James H. Millar and<br>Laura E. Appleby<br><br>Email:<br>james.millar@faegredrinker.com<br>laura.appleby@faegredrinker.com |

After the Effective Date, the Reorganized Debtor has authority to send a notice to Entities informing them that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

12.06   **Term of Injunction or Stays**

Unless otherwise provided herein, in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.07   **Entire Agreement**

Except as otherwise indicated or as set forth in the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

HB: 4866-7395-7801.1

12.08   **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date, consistent with the Restructuring Support Agreement. After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Notice and Claims Agent's website at https://cases.stretto.com/corenergy or the Bankruptcy Court's website at www.mow.uscourts.gov/bankruptcy.

12.09   **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

12.10   **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with Section 1125(g) of the Bankruptcy Code, and pursuant to Section 1125(e) of the Bankruptcy Code, the Debtor, and its respective Affiliates, agents, representatives, members, principals, shareholders, officers, trustees, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

12.11   **Dissolution of Statutory Committees and Cessation of Fee and Expense Payment**

On the Effective Date, any Statutory Committee appointed in the Chapter 11 Case shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case, except with respect to final fee applications of the Retained Professionals and any consent or consultation rights of the Statutory Committee that remain applicable after the Effective Date. The Reorganized Debtor shall not be responsible for paying any fees or expenses incurred by the members or Retained Professionals of

64

any Statutory Committee or any other statutory committee appointed in the Chapter 11 Case after the Effective Date except with respect to any consent or consultation rights of any Statutory Committee that remain applicable after the Effective Date.

## 12.12   **Closing of Chapter 11 Case**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## 12.13   **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers.

Dated: February 25, 2024.          **CORENERGY INFRASTRUCTURE TRUST, INC.**

By: _/s/ Mark T. Benedict_
Mark T. Benedict, Esq.
John J. Cruciani, Esq.
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone     (816) 983-8000
Facsimile     (816) 983-8080
Email:        Mark.Benedict@huschblackwell.com
              John.Cruciani@huschblackwell.com

Proposed Counsel for Debtor and Debtor in Possession

HB: 4866-7395-7801.1

**<u>Exhibit A</u>**

**Exit Facility Term Sheet**

HB: 4866-7395-7801.1

## CORENERGY INFRASTRUCTURE TRUST, INC.

### Exit Facility Term Sheet

This term sheet (this "***Term Sheet***") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed term and revolving credit loans described below, to be entered into in connection with the voluntary case commenced by CorEnergy Infrastructure Trust, Inc. (the "***Company***") under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware pursuant to a "prepackaged" chapter 11 plan of reorganization (the "***Restructuring Transaction***"). This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to the Lenders (as hereinafter defined) as well as the satisfactory completion of reasonable due diligence.

This Term Sheet and any associated documents that may be provided in furtherance of negotiations between the parties are provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

| Parties | |
|---|---|
| **Borrower:** | The Company, CorEnergy Infrastructure Trust, Inc. |
| **Guarantors:** | All present and future, direct and indirect subsidiaries of the Borrower or Crimson Midstream Holdings, LLC, other than (a) any subsidiary for which a guaranty would require CPUC authorization or consent and such authorization or consent has not been obtained (as of the date hereof, Crimson California Pipeline, L.P. and San Pablo Bay Pipeline Company, LLC) and (b) any subsidiary identified as dormant that will be liquidated and dissolved, or merged into another subsidiary, within a reasonable period after closing.<br><br>A structure chart is attached hereto as Exhibit A. |
| **Lenders:** | Term Loan Facility Lenders: holders of Senior Notes (defined below)<br><br>Revolving Loan Facility Lenders: holders of Senior Notes that have agreed to make revolving loans under the Revolving Credit Facility. |

| Administrative Agent: | UMB Bank N.A. |
|---|---|
| **Summary of Exit Facility** | |
| **Term Loan Facility:** | Exchange of the Company's 5.875% Convertible Senior Notes due 2025 ("***Senior Notes***") for:<br><br>(a)  $45,000,000 of term loan notes under the Term Loan Credit Agreement;<br><br>(b)  cash in accordance with the terms of the Restructuring Transaction; and<br><br>(c)  equity of the Company in accordance with the terms of the Restructuring Transaction. |
| **Revolving Loan Facility:** | Commitment for up to $10,000,000 of new money revolving loans under the Revolving Loan Credit Agreement. |
| **Priority:** | The Revolving Loan Facility and all guaranties and security interests in connection therewith will be (i) senior to the Term Loan Facility and the guaranties and security interests in connection therewith (together with any subsequent refinancings thereof in an aggregate principal amount not to exceed $10,000,000 at any time outstanding, and whether with the same or different lenders) and (ii) junior to certain existing intercompany debt. Absent an event of default, all scheduled payments of principal and interest will be applied to the Revolving Loan Facility and the Term Loan Facility in accordance with their terms. All unscheduled prepayments and, after an event of default, all scheduled payments of principal and interest will be applied first to outstanding obligations under the Revolving Loan Facility and thereafter to outstanding obligations under the Term Loan Facility.<br><br>The Term Loan Facility and all guaranties and security interests in connection therewith will be senior to all other indebtedness and obligations of the Company and its subsidiaries, consistent with the Amended and Restated Credit Agreement, dated as of February 4, 2021 (as amended), among Crimson Midstream Operating, LLC and the other Borrowers party thereto, the Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank, National Association (the "***Wells Fargo Facility***"), except that it will be junior to certain existing intercompany debt. |

US.362261085.08

| Term Loan Facility | |
|---|---|
| **Maturity:** | The earlier of five (5) years from the deemed issuance date of April 4, 2024 (the "***Deemed Issuance Date***") or the acceleration of the loans upon the occurrence of an event of default. |
| **Interest:** | 12% per annum commencing on the Deemed Issuance Date. |
| | Interest will PIK until the Confirmation Order. |
| | After the Confirmation Order, interest will be paid quarterly; *provided that* the Company may PIK interest at its option until the first anniversary of the Confirmation Order. |
| **Repayments and Prepayment:** | Amortization of $1,000,000 per quarter in arrears, commencing with the first full calendar quarter after the first anniversary of the Confirmation Order. |
| | The Company may prepay all or any portion of the Term Loan Facility on or after the first anniversary of the Confirmation Order. |
| | Mandatory prepayment of not less than $9 million (the "***CO2 Paydown Amount***") in connection with the CO2 Joint Venture (as defined below). |
| | Other mandatory prepayments consistent with the Wells Fargo Facility. |
| | All prepayments will be subject to a prepayment premium equal to: |
| | • Prior to the second anniversary of the Effective Date, a 3.00% premium of the aggregate principal amount repaid; <br> • From the second anniversary through the third anniversary, a 2.00% premium of the aggregate principal amount repaid; and <br> • From the third anniversary through the fourth anniversary, 1.00%. |
| Revolving Credit Facility | |
| **Use of Proceeds:** | To remedy emergencies and disasters with respect to regulated assets as required by laws and regulations. In no event shall the proceeds of any Revolving Advances be used to purchase or carry margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board). |
| **Conditions to Borrowing:** | Consistent with the Wells Fargo Facility. |

US.362261085.08

| | |
|---|---|
| **Maturity:** | The earlier of one (1) year following the Deemed Issuance Date or the acceleration of the loans upon the occurrence of an event of default. |
| **Interest:** | One-month SOFR plus 3% per annum, paid on a quarterly basis. |
| **Repayments and Prepayment:** | The Company may prepay all or any portion of the Revolving Loan Facility at its option without premium or fees.<br><br>Mandatory prepayments consistent with the Wells Fargo Facility.<br><br>Mandatory repayment at maturity. |
| **Commitment Fee:** | 3% of the unused daily commitment amount, commencing on the date of the Confirmation Order. |
| **Arrangement Fee:** | $500,000 |
| **General Terms** | |
| **Security:** | Pledge of the totality of the (i) capital stock, (ii) equity interests, and (iii) assets and properties of the Borrower and the Guarantors, subject to customary exclusions (including exclusions related to governmental authorizations that are not obtained prior to the Confirmation Order) to the extent that such collateral is not of the type for which CPUC authorization or consent would be required, consistent with the Wells Fargo Facility.  Additionally, the Borrower and its Subsidiaries will agree to a negative pledge for all assets and properties for which CPUC authorization or consent is required for a lender to receive a pledge of such property, consistent with the Wells Fargo Facility. |
| **Representations, Warranties, Covenants and Events of Default:** | Consistent with the Wells Fargo Facility; *provided that* (a) the Term Loan Facility and Revolving Loan Facility will not have financial maintenance covenants (*i.e.*, §§6.13 and 6.14 of the Wells Fargo Facility) and (b) the Company will be permitted to consummate the CO2 Joint Venture (as defined below). |
| **Amendments, Waivers and Consents:** | Generally, amendments to and waivers and consents under (a) the Term Loan Facility will require the approval of Lenders holding 66.67% or more of the outstanding Term Loan Facility obligations, (b) the Revolving Loan Facility will require the approval of Lenders holding 66.67% or more of the funded and unfunded Revolving Loan Facility obligations and commitments, and (c) both the Term Loan Facility and Revolving Loan Facility will require the approval of Lenders holding 66.67% or more of the outstanding Term Loan Facility obligations and funded and unfunded Revolving Loan Facility obligations and commitments (**"*Required Lenders*"**), except for |

4

|  | matters that require a higher level of Lender approval consistent with the Wells Fargo Facility or as set forth below. |
|--|--|
|  | Notwithstanding the foregoing, except as permitted by the negative covenants consistent with the Wells Fargo Facility, (a) the distribution or transfer of any material operating assets of the Borrower or any of its direct or indirect subsidiaries or joint ventures (whether or not wholly-owned) (the "***Borrower Group***"), or the distribution or transfer of any capital stock or equity interests of any member of the Borrower Group that owns material operating assets (each, an "***Asset/Equity Transfer***"), (b) the incurrence of indebtedness or liens senior to the Term Loan Facility and the Revolving Loan Facility, and (c) certain other amendments, waivers and consents as set forth in the definitive documentation will require the approval of Lenders holding 75% of the outstanding Term Loan Facility obligations and funded and unfunded Revolving Loan Facility obligations and commitments. |
|  | The Borrower and its Subsidiaries may consummate the transactions contemplated in the *CO2 Letter Agreement* (the "***CO2 Joint Venture***"); provided that (i) the Borrower pays down the Term Loan Facility by the CO2 Paydown Amount in connection therewith and (ii) the Borrower is not required to make and does not make any cash investments in the CO2 Joint Venture in excess of (A) the cash proceeds from any issuance of equity interests of the Borrower designated for use in connection with the CO2 Joint Venture <u>plus</u> (B) a cumulative builder basket as will be set forth in the Credit Agreement. Any material variations from the terms of the CO2 Letter Agreement will require the consent of the Required Lenders. |
| **Expenses:** | The Company will pay all reasonable and documented out-of-pocket costs and expenses of the Lenders associated with the preparation, execution, delivery, and administration of the Term Loan Facility and the Revolving Loan Facility. |
| **Governing Law:** | New York |

5

**Exhibit B**

**Corporate Governance Term Sheet**

HB: 4866-7395-7801.1

**RESTRUCTURING OF CORENERGY INFRASTRUCTURE TRUST INC.**
**SUMMARY OF PRINCIPAL TERMS OF GOVERNANCE AND RELATED RIGHTS**

**FEBRUARY 25, 2024**

The following is a description of certain proposed terms for the corporate governance of reorganized CorEnergy Infrastructure Trust, Inc. (as reorganized pursuant to the Plan (as defined below), "CORR"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in that certain Restructuring Support Agreement (the "Restructuring Support Agreement") entered into by CORR and the Ad Hoc Noteholders Group (the "AHNG").

| | |
|---|---|
| **Board of Directors:** | The board of directors of CORR (the "Board") shall initially be comprised of five (5) directors (each a "Director"). At all times, the Board shall be compromised as follows:<br><br>   •   One (1) Director shall be the CEO of CORR.<br><br>   •   One (1) Director shall be designated by Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. (the "Keyframe Director").<br><br>   •   Two (2) Directors shall be independent directors unaffiliated with the AHNG or CORR or its Subsidiaries, who initially shall be designated by at least a two-thirds vote[1] of the AHNG, and thereafter designated upon two-thirds vote of holders of the outstanding common stock of CORR (the "Common Stock") (each an "Independent Director"). Following the death, resignation or removal of an independent director, a new independent director who is not affiliated with or employed by any member of the AHNG or CORR shall be nominated by the same vote.<br><br>   •   One (1) Director shall be initially designated by the holders of a majority of the AHNG, excluding Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P.; and thereafter shall be appointed by holders of the majority of the outstanding Common Stock of CORR, excluding Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P.; provided that if Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. no longer possesses the right to designate a director, it shall be permitted to vote on such Director (the "Minority Director").<br><br>The identity of the initial Directors shall be set forth in the Plan Supplement.<br><br>All actions of the Board will require the approval by a vote or the |

---

[1]   All votes of the AHNG contained herein shall be based upon the amount of Senior Notes held by such member of the AHNG.

| | written consent of a majority of all of the Directors. |
|---|---|
| | A Director may only be removed by a vote of the shareholders of CORR ("Shareholders") holding two-thirds of the Common Stock for cause. In addition, the Keyframe Director may be removed by those Shareholders appointing such Keyframe Director at any time, with or without cause. The Minority Director may be removed by a vote of two-thirds of the Common Stock of those shareholders eligible to vote in connection with the Minority Director. Directors shall serve one-year terms commensurate with Maryland legal requirements.<br><br>From time to time, the Board may appoint non-voting observers, including one which may be designated by John Grier. Mr. Grier's option to appoint a non-voting observer shall terminate when Mr. Grier no longer holds equity in CORR.<br><br>Keyframe Capital Partners, L.P. and Cyrus Capital Partners, L.P. will be entitled to their director designation rights so long as they holds 20% or more of the Common Stock.<br><br>The Shareholders shall enter into a securityholders agreement (the "Securityholders Agreement") which will require each Shareholder to vote its shares of Common Stock in support of each of the nominees described above and otherwise comply with the terms of this term sheet. The Securityholders Agreement shall terminate when the members of the AHNG no longer hold, collectively, at least twenty five percent (25%) of the Common Stock. Upon such termination and thereafter, the two independent directors and the Minority Director shall be elected by a majority vote of the holders of shares of Common Stock. |
| **Dividends** | All dividends shall be paid pro rata to the holders of Common Stock. |
| **Board Approvals:** | Neither CORR nor any subsidiaries of CORR (collectively, the "Subsidiaries") shall take any of the following actions without the prior vote or consent of a majority of the Board:<br><br>• hiring or termination the CEO, the CFO or any other members of senior management of CORR, or approving the compensation arrangements of the CEO, CFO or any other member of senior management of CORR;<br><br>• any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities, partnership interests or membership interests of any kind of CORR or any Subsidiary[2] (other than those issued solely to |

---

[2]    "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or

| | CORR and its Subsidiaries); |
|---|---|
| | • any redemption or repurchase of any Common Stock; |
| | • any acquisition by CORR or any Subsidiary of the stock or assets of any person, or the acquisition of any business, properties, assets or persons or any dispositions of a material amount of assets of CORR and its Subsidiaries (on a consolidated basis); |
| | • any voluntary election by CORR or any Subsidiary to liquidate or dissolve or to commence bankruptcy or insolvency proceedings or the adoption of a plan with respect to the foregoing; and |
| | • the commencement of an IPO by CORR or any Subsidiary. |
| **Shareholder Approvals:** | Neither CORR nor any Subsidiaries shall take any of the following actions without the prior vote or consent of Shareholders holding at least two-thirds of the outstanding Common Stock: |
| | • any Change of Control, *provided, however*, that a Change of Control to a party affiliated with any Shareholder shall require the separate vote or consent of the non-conflicted Shareholders holding at least a majority of the outstanding Common Stock of CORR held by all non-conflicted Shareholders. |
| | • any voluntary election by CORR to liquidate or dissolve or the adoption of a plan with respect to the foregoing, if such liquidation or dissolution is unrelated to the insolvency of CORR. |
| | • Any increase or decrease in the size of the Board. |
| | • Any transaction between CORR or any of its Subsidiaries, on the one hand, and any affiliate of CORR or any of its Subsidiaries (other than CORR and its Subsidiaries), on the other hand, except transactions with portfolio companies of affiliates that are done on arms'-length basis and on terms no less favorable to CORR or its applicable Subsidiary than are available to other third parties;, *provided, however*, that a transaction with a party affiliated with any Shareholder shall require the separate vote or consent of the non-conflicted Shareholders holding at least a majority of the outstanding Common Stock of CORR held by all non-conflicted Shareholders. |
| | • Any amendment of the governing documents of CORR or the |

---

indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.

3

|  | Securityholders Agreement; *provided, however,* that (i) any amendment that disproportionately and adversely affects any Shareholder in any material respect shall also require the consent of such Shareholder, and (ii) if such amendment would alter a provision requiring more than majority approval, such amendment shall be consented to by the same percentage of Shareholders as required by the provision to be amended.<br><br>• Any increase in the number of equity interests to be issued by CORR.<br><br>• Any redemption or repurchase of any Common Stock. |
|---|---|
| **Additional Shareholder Approval Rights:** | Upon approval of a majority in Note holdings of the AHNG, additional shareholder approval rights may be provided in connection with any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities, partnership interests or membership interests of any kind of CORR or any Subsidiary (other than those issued solely to CORR and its Subsidiaries). |
| **Information and Access Rights:** | CORR and the Subsidiaries will provide to each Specified Shareholder: (i) annual consolidated financial statements of the operations of CORR and the Subsidiaries after the end of each fiscal year (audited, if available); (ii) unaudited consolidated quarterly and year-to-date financial statements of the operations of CORR and the Subsidiaries after the end of each fiscal quarter; and (iii) monthly reports of the consolidated operations of CORR and the Subsidiaries, to the extent available and provided to the Board.  A Specified Shareholder may share such information with a potential purchaser of its interest upon entry into a confidentiality agreement reasonably acceptable to CORR.<br><br>Each Shareholder (or group of affiliated Shareholders) that holds at least 5% of the outstanding shares of Common Stock or any Shareholder that qualifies as a "qualified institutional buyer" (as such term is defined in connection with Rule 144A of the Securities Act) shall be a "Specified Shareholder." |
| **General Restrictions on Transfers:** | The Certificate of Incorporation of CORR will include customary transfer restrictions related to Section 382 of the Internal Revenue Code and CORR's status as a domestically controlled REIT.<br><br>Additionally, except as set forth under "Drag-Along Rights" below or for transfers by a Shareholder to its affiliates, no Shareholder may transfer any shares of Common Stock without the prior consent of the Board (i) to a competitor of CORR and its Subsidiaries or (ii) if, as a result of such transfer, CORR or any Subsidiary would be required to file reports under the Exchange Act, if it or its Subsidiaries are not otherwise subject to such requirements, or register as an investment company or investment adviser. |

4

| Tag-Along Rights: | Subject to "General Restrictions on Transfer" above, prior to a Shareholder (or group of Shareholders acting in concert) transferring any shares of Common Stock, each Shareholder must provide written notice to each other Shareholder and CORR setting forth the terms of such proposed transfer that exceeds two-thirds of the shares of Common Stock of CORR. Each Shareholder may elect to sell up to their *pro rata* portion of the shares of Common Stock being transferred. |
|---|---|
| Drag-Along Rights: | If Shareholders holding two-thirds of the outstanding Common Stock elect to consummate a Change of Control on an arms' length basis with an unaffiliated third party, each Shareholder will be required to: vote in favor of and not oppose such Change of Control, waive any appraisal rights in connection with the Change of Control, sell its *pro rata* portion of the number of shares of Common Stock being sold in such transaction to the prospective third party purchaser on the same terms as the triggering Shareholders (if structured as a sale of share), and otherwise enter into customary agreements in connection therewith and support and comply with customary requests with respect to the Change of Control.<br><br>A "Change of Control" shall be deemed to have occurred if any of the following occurs with respect to CORR: (i) the direct or indirect sale or exchange in a single or series of related transactions by the Shareholders of more than fifty percent (50%) of the Common Stock (excluding any sale or exchange of a Shareholder to an affiliate of such Shareholder for the purpose of such Shareholder's internal reallocation of such interest); (ii) a merger or consolidation in which CORR is a party, other than any merger or consolidation solely amongst CORR and its subsidiaries or parent (if any) or any merger or consolidation following which holders of at least fifty percent (50%) of the Common Stock own at least fifty percent (50%) of the voting equity securities of the surviving entity; or (iii) the sale, exchange, or transfer of all or substantially all of the assets of CORR and its Subsidiaries (on a consolidated basis, including through the sale or other disposition of equity securities of one or more Subsidiaries) to any unaffiliated third party. |
| No Fees | None of the Shareholders or their Affiliates shall be paid management or similar fees, and no Director shall be paid a fee for their service on the Board, unless such Director is an independent director. |
| Strategic Review: | On or by a date that is 18 months following the Effective Date of CORR's Bankruptcy Plan, as will be set forth by the Bankruptcy Court, the Board will commence a strategic review of CORR. The results of the strategic review shall be non-binding, and the implementation of any recommended actions following the strategic review shall meet the voting thresholds as established herein. |
| Preemptive Rights: | Each Shareholder shall have a *pro rata* preemptive right to acquire equity securities issued by CORR or any Subsidiary (including any partially owned Subsidiary) and debt securities issued by CORR or any Subsidiary (including any partially owned Subsidiary) to any Shareholder or its affiliates, subject to customary exceptions, such as |

5

US.362342050.05

| | issuances (i) pursuant to the exchange, conversion or exercise terms of other equity securities, (ii) to employees, directors or consultants pursuant to CORR's or such Subsidiary's incentive plans, (iii) as consideration for any acquisition, business combination or joint venture, (iv) in an IPO, (v) in connection with any pro rata stock split, dividend or similar distribution, (vi) which take the form of "equity kickers" to third party lenders in arms' length debt financing transactions, or (vii) to CORR or any wholly-owned Subsidiary of CORR.  If any Shareholders do not exercise their preemptive rights in full, each Shareholder that does so exercise their preemptive rights in full will have a right to subscribe for all or a portion of the unelected shares.  Each Shareholder shall have the right to assign its preemptive rights to any associate or affiliate of such Shareholder, including any investment fund under common management.  For the avoidance of doubt, to the extent that equity or debt interests are offered to any one Shareholder or its affiliates, such rights shall apply to that certain joint venture or similar arrangement pursuant to which CORR would contribute to an entity of which CORR or any wholly-owned Subsidiary of CORR holds an interest in (a) the northernmost 235 miles of the KLM pipeline. |
|---|---|
| **Registration Rights:** | Following an IPO, each Shareholder will have customary piggy-back registration rights. |
| **Amendment of the Governing Documents:** | The governing documents and the Securityholders Agreement may only be amended with the prior written approval of (i) shareholders holding not less than two-thirds of the outstanding shares, and (ii) the Board; <u>provided</u>, <u>however</u>, that (i) any amendment that disproportionately and adversely affects any Shareholder in any material respect shall also require the consent of such Shareholder, and (ii) if such amendment would alter a provision requiring more than majority approval, such amendment shall be consented to by the same percentage of Shareholders as required by the provision to be amended. |
| **Governing Law** | Maryland |

US.362342050.05

**Exhibit B**

**Form of Joinder**

The undersigned ("Joinder Party") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of February 25, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Agreement"),[1] by and among the Company Parties and the Consenting Lenders party thereto. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

(a) Agreement to be Bound. The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as Annex I (as the same has been or may hereafter be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof). The Joinder Party shall hereafter be deemed to be a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held by such Joinder Party.

(b) Representations and Warranties.  The Joinder Party hereby makes the representations and warranties of the Parties and Ad Hoc Noteholder Group set forth in the Agreement to each other Party.

(c) Notice.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "Joinder") to the counsel to the Parties identified in Section 13.9 of the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

**Exhibit C**

**Joinder of Grier Members**

John D. Grier, individually and on behalf of certain Grier Members, and Robert G. Lewis, on behalf of certain Grier Members, hereby acknowledge that they have read and understand the Restructuring Support Agreement, dated as of February 25, 2024 (the "Agreement"),[2] by and among CorEnergy Infrastructure Trust, Inc. and the Ad Hoc Noteholder Group, and hereby agree as follows:

(a) John D. Grier acknowledges and accepts his obligations as a director and officer of the Company to cause the Company to perform consistent with the Agreement and the Plan and to implement the Restructuring Transactions;

(b) The Grier Members agree to accept the treatment of any claims and/or interests that they may assert against the Company or an Affiliate of the Company as set forth in the Plan, and to cause any Affiliate that they control that may assert a Claim against and/or interest in the Company to accept the same;

(c) The Grier Members agree to perform consistent with this Agreement and the Plan and to implement the Restructuring Transactions, and to cause any Affiliate of the Company that they control to perform consistent with this Agreement and the Plan and to implement the Restructuring Transactions;

(d) John D. Grier agrees to submit or cause to be submitted and use Commercially Reasonable Best Efforts to pursue an application with the California Public Utilities Commission for change of control of the Crimson Pipeline, L.P. (PLC-26) and San Pablo Bay Pipeline Company, L.L.C (PLC-29) from John D. Grier to CorEnergy; and

(e) John D. Grier agrees to operate and/or manage, as the case may be, any of the Company's Affiliates in the ordinary course of business.

Notwithstanding anything to the contrary herein or in the Agreement, and subject to Section 8.2(c) of the Agreement, nothing herein or in the Agreement shall require the Grier Members to take or refrain from taking any action pursuant to this Joinder or the Agreement (including terminating the Agreement pursuant to Section 8.2(c) of the Agreement), to the extent they determine in good faith, based on the advice of external counsel (including counsel to the Company), that taking, or refraining from taking, such action, as applicable, would be inconsistent with their fiduciary obligations or applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Joinder or the Agreement. The Grier Members shall promptly cause counsel for the Company to

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

and such Amendment or Waiver (i) materially and adversely affects any Grier Member's treatment under the Plan, (ii) modifies the release of the Grier Member, or (iii) relates to Section 6.1(n) of the Agreement, such Amendment or Waiver shall not be effective as to the Grier Members except to the extent the Grier Members consent in writing to such Amendment or Waiver.

Date Executed:  February 23, 2024

_____

Name: John D. Grier, personally, as proxy for M. Bridget Grier, and as Trustee of the Bridget Grier Spousal Support Trust dated December 18, 2012
Address:  370 17th Street, Suite #3100, Denver, CO 80202
E-mail address(es):  jgrier@crimsonml.com

Date Executed:

_____

Name: Robert G. Lewis, as Trustee of the Hugh David Grier Trust dated October 15, 2012 and the Samuel Joseph Grier Trust dated October 15, 2012
Address:      2401 East 2nd Avenue, Suite 500
              Denver, Colorado 80206
Email:        RLewis@lewisringelman.com

and such Amendment or Waiver (i) materially and adversely affects any Grier Member's treatment under the Plan, (ii) modifies the release of the Grier Member, or (iii) relates to Section 6.1(n) of the Agreement, such Amendment or Waiver shall not be effective as to the Grier Members except to the extent the Grier Members consent in writing to such Amendment or Waiver.

Date Executed:

_____

Name: John D. Grier, personally, as proxy for M. Bridget Grier, and as Trustee of the Bridget Grier Spousal Support Trust dated December 18, 2012
Address: 370 17th Street, Suite #3100, Denver, CO 80202
E-mail address(es): jgrier@crimsonml.com

Date Executed: February 23, 2024

_____

Name: Robert G. Lewis, as Trustee of the Hugh David Grier Trust dated October 15, 2012 and the Samuel Joseph Grier Trust dated October 15, 2012
Address:        2401 East 2nd Avenue, Suite 500
                Denver, Colorado 80206
Email:          RLewis@lewisringelman.com

## Exhibit C

**Historical Financial
Information**

### INDEX TO FINANCIAL STATEMENTS

|  |  | Page No. |
|---|---|---|
| Report of Independent Registered Public Accounting Firm (Ernst & Young, LLP, Kansas City, Missouri, PCAOB ID: 00042) | | F-2 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | | F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2022, 2021, and 2020 | | F-5 |
| Consolidated Statements of Equity for the years ended December 31, 2022, 2021, and 2020 | | F-6 |
| Consolidated Statements of Cash Flow for the years ended December 31, 2022, 2021, and 2020 | | F-7 |
| Notes to Consolidated Financial Statements | | F-9 |
| | 1. Introduction and Basis of Presentation | F-9 |
| | 2. Significant Accounting Policies | F-11 |
| | 3. Acquisitions | F-16 |
| | 4. Transportation and Distribution Revenue | F-19 |
| | 5. Leased Properties and Leases | F-21 |
| | 6. Financing Notes Receivable | F-24 |
| | 7. Income Taxes | F-25 |
| | 8. Property and Equipment | F-26 |
| | 9. Goodwill | F-26 |
| | 10. Concentrations | F-27 |
| | 11. Management Agreement | F-28 |
| | 12. Commitments and Contingencies | F-29 |
| | 13. Fair Value | F-29 |
| | 14. Debt | F-30 |
| | 15. Asset Retirement Obligation | F-34 |
| | 16. Stockholders' Equity | F-34 |
| | 17. Earnings Per Share | F-38 |
| | 18. Variable Interest Entity | F-40 |
| | 19. Related Party Transactions | F-41 |
| | 20. Restatement of Prior Period | F-42 |
| | 21. Quarterly Financial Data (Unaudited) | F-50 |
| | 22. Subsequent Events | F-97 |

F-1

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of CorEnergy Infrastructure Trust, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of CorEnergy Infrastructure Trust, Inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

**Restatement of 2021 Financial Statements**

As discussed in Note 20 to the consolidated financial statements, the 2021 consolidated financial statements have been restated to correct misstatements.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

F-2

Table of Contents   Index to Financial Statements   Glossary of Defined Terms

**Impairment of long-lived assets**

*Description of the Matter*

As discussed in Note 2 to the consolidated financial statements, the Company performs a periodic assessment of property and equipment to identify events or changes in circumstances, or triggering events, which indicate the carrying value of the asset group may not be recoverable. Triggering events include sustained declines in customer volumes and increased operating costs. The carrying value of property and equipment as of December 31, 2022 was $440.1 million.

Auditing management's evaluation of impairment of long-lived assets was complex as sustained declines in customers shipment volumes or increased operating costs could significantly affect the future cash flows of the asset group, and the evaluation of these items required a higher degree of auditor judgment. Significant assumptions used in the Company's undiscounted cash flow forecasts included estimates of future volumes shipped, tariff rates, operating expense and capital expenditures.

*How We Addressed the Matter in Our Audit*

Our procedures to test management's assessment included, among others, evaluating the Company's triggering event identification and assessment of recoverability of the asset groups through testing the significant assumptions used to develop the undiscounted cash flows including the completeness and accuracy of the underlying data. For example, we compared the significant assumptions against historical operational and financial results and the approved internal financial forecasts. We assessed the Company's forecasted customer volumes by comparing against customers' historical volumes and industry data. We selected a sample of revenue transactions throughout the year and compared those transactions to the underlying revenue agreements including tariff rates. We also performed a sensitivity analysis of the significant assumptions to evaluate the impact from changes to the assumptions on the Company's conclusions.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2006.
Kansas City, Missouri
March 29, 2023

F-3

Table of Contents          Index to Financial Statements          Glossary of Defined Terms



**CorEnergy Infrastructure Trust, Inc.**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
|  |  | (As Restated) |
| **Assets** |  |  |
| Property and equipment, net of accumulated depreciation of $52,908,191 and $37,022,035, respectively (Crimson VIE*, net of depreciation: $340,205,058 and $338,452,392, respectively) | $ 440,148,967 | $ 441,430,193 |
| Leased property, net of accumulated depreciation of $299,463 and $258,207, respectively | 1,226,565 | 1,267,821 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 and $600,000, respectively | 858,079 | 1,036,660 |
| Cash and cash equivalents (Crimson VIE: $1,874,319 and $2,825,902, respectively) | 17,830,482 | 11,540,576 |
| Accounts and other receivables (Crimson VIE: $10,343,769 and $11,291,749, respectively) | 14,164,525 | 15,367,389 |
| Due from affiliated companies (Crimson VIE: $167,743 and $676,825, respectively) | 167,743 | 676,825 |
| Deferred costs, net of accumulated amortization of $726,619 and $345,775, respectively | 415,727 | 796,572 |
| Inventory (Crimson VIE: $5,804,776 and $3,839,865, respectively) | 5,950,051 | 3,953,523 |
| Prepaid expenses and other assets (Crimson VIE: $3,414,372 and $5,004,566, respectively) | 9,478,146 | 9,075,043 |
| Operating right-of-use assets (Crimson VIE: $4,452,210 and $5,647,631, respectively) | 4,722,361 | 6,075,939 |
| Deferred tax asset, net | — | 206,285 |
| Goodwill | — | 16,210,020 |
| **Total Assets** | $ 494,962,646 | $ 507,636,846 |
| **Liabilities and Equity** |  |  |
| Secured credit facilities, net of debt issuance costs of $665,547 and $1,275,244, respectively | $ 100,334,453 | $ 99,724,756 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $1,726,470 and $2,384,170, respectively | 116,323,530 | 115,665,830 |
| Accounts payable and other accrued liabilities (Crimson VIE: $16,889,980 and $10,699,806, respectively) | 26,316,216 | 16,080,162 |
| Income tax payable (Crimson VIE: $85,437) | 174,849 | — |
| Due to affiliated companies (Crimson VIE: $209,750 and $648,316, respectively) | 209,750 | 648,316 |
| Operating lease liability (Crimson VIE: $4,454,196 and $5,647,036, respectively) | 4,696,410 | 6,046,657 |
| Deferred tax liability, net | 1,292,300 | — |
| Unearned revenue (Crimson VIE: $203,725 and $199,405, respectively) | 5,948,621 | 5,839,602 |
| **Total Liabilities** | $ 255,296,129 | $ 244,005,323 |
| Commitments and Contingencies (Note 12) |  |  |
| **Equity** |  |  |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 51,810 issued and outstanding at December 31, 2022 and December 31, 2021 | $ 129,525,675 | $ 129,525,675 |
| Common stock, non-convertible, $0.001 par value; 15,253,958 and 14,893,184 shares issued and outstanding at December 31, 2022 and December 31, 2021, respectively (100,000,000 shares authorized) | 15,254 | 14,893 |
| Class B Common Stock, $0.001 par value; 683,761 shares issued and outstanding at December 31, 2022 and December 31, 2021 (11,896,100 shares authorized) | 684 | 684 |
| Additional paid-in capital | 327,016,573 | 338,302,735 |
| Retained deficit | (333,785,097) | (321,028,580) |
| **Total CorEnergy Equity** | 122,773,089 | 146,815,407 |
| Non-controlling interest | 116,893,428 | 116,816,116 |
| **Total Equity** | 239,666,517 | 263,631,523 |
| **Total Liabilities and Equity** | $ 494,962,646 | $ 507,636,846 |

*Variable Interest Entity (VIE) (Note 18)

See accompanying Notes to Consolidated Financial Statements.

F-4

Table of Contents          Index to Financial Statements          Glossary of Defined Terms



**CorEnergy Infrastructure Trust, Inc.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | | (As Restated) | |
| **Revenue** | | | |
| Transportation and distribution | $ 122,008,768 | $ 116,536,612 | $ 19,972,351 |
| Pipeline loss allowance subsequent sales | 10,753,732 | 8,606,850 | — |
| Lease | 210,800 | 1,246,090 | 21,351,123 |
| Deferred rent receivable write-off | — | — | (30,105,820) |
| Other | 674,307 | 1,744,244 | 120,417 |
| Total Revenue | 133,647,607 | 128,133,796 | 11,338,071 |
| **Expenses** | | | |
| Transportation and distribution | 63,825,083 | 58,146,006 | 6,059,707 |
| Pipeline loss allowance subsequent sales cost of revenue | 9,370,802 | 8,194,040 | — |
| General and administrative | 22,367,912 | 26,641,161 | 12,231,922 |
| Depreciation, amortization and ARO accretion | 16,076,326 | 14,801,676 | 13,654,429 |
| Loss on impairment of goodwill | 16,210,020 | | |
| Loss on impairment of leased property | — | — | 140,268,379 |
| Loss on impairment and disposal of leased property | — | 5,811,779 | 146,537,547 |
| Loss on termination of lease | — | 165,644 | 458,297 |
| Total Expenses | 127,850,143 | 113,760,306 | 319,210,281 |
| **Operating Income (Loss)** | $ 5,797,464 | $ 14,373,490 | $ (307,872,210) |
| **Other Income (Expense)** | | | |
| Other income | $ 283,217 | $ 769,682 | $ 471,449 |
| Interest expense | (13,928,439) | (12,742,157) | (10,301,644) |
| Gain (loss) on extinguishment of debt | — | (861,814) | 11,549,968 |
| Total Other Income (Expense) | (13,645,222) | (12,834,289) | 1,719,773 |
| **Income (Loss) before income taxes** | (7,847,758) | 1,539,201 | (306,152,437) |
| **Taxes** | | | |
| Current tax expense (benefit) | 173,327 | (1,531) | (395,843) |
| Deferred tax expense | 1,498,584 | 4,076,290 | 310,985 |
| Income tax expense (benefit), net | 1,671,911 | 4,074,759 | (84,858) |
| **Net Loss** | $ (9,519,669) | $ (2,535,558) | $ (306,067,579) |
| Less: Net Income attributable to non-controlling interest | 3,236,848 | 2,866,467 | |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (12,756,517) | $ (5,402,025) | $ (306,067,579) |
| Preferred dividend requirements | 9,552,519 | 9,395,604 | 9,189,809 |
| **Net Loss attributable to Common Stockholders** | $ (22,309,036) | $ (14,797,629) | $ (315,257,388) |
| | | | |
| **Common Stock** | | | |
| Basic weighted average shares outstanding | 15,050,266 | 14,246,526 | 13,650,718 |
| Basic net loss per share | $ (1.41) | $ (1.01) | $ (23.09) |
| | | | |
| Diluted weighted average shares outstanding | 15,515,223 | 14,246,526 | 13,650,718 |
| Diluted net loss per share | $ (1.44) | $ (1.01) | $ (23.09) |
| | | | |
| **Class B Common Stock** | | | |
| Basic and diluted weighted average shares outstanding | 683,761 | 335,324 | N/A |
| Basic and diluted net loss per share | $ (1.61) | $ (1.21) | N/A |
| | | | |
| Dividends declared per Common share | $ 0.200 | $ 0.200 | $ 0.900 |

See accompanying Notes to Consolidated Financial Statements.

F-5



**CorEnergy Infrastructure Trust, Inc.**
**CONSOLIDATED STATEMENTS OF EQUITY**

| | Common Stock | | Class B Common Stock | | Preferred Stock | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Amount | | | | |
| Balance at December 31, 2019 | 13,638,916 | $ 13,639 | — | $ — | $ 125,493,175 | $ 360,844,497 | $ (9,611,872) | $ — | $ 476,739,439 |
| Net loss | — | — | — | — | — | — | (306,067,579) | — | (306,067,579) |
| Series A preferred stock dividends | — | — | — | — | — | (9,242,797) | — | — | (9,242,797) |
| Preferred stock repurchases[1] | — | — | — | — | (222,825) | 7,932 | 52,896 | — | (161,997) |
| Common Stock dividends | — | — | — | — | — | (12,286,368) | — | — | (12,286,368) |
| Common Stock issued upon exchange of convertible notes | 12,605 | 13 | — | — | — | 419,116 | — | — | 419,129 |
| Balance at December 31, 2020 | 13,651,521 | $ 13,652 | — | $ — | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | — | — | (5,402,025) | 2,866,467 | (2,535,558) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 116,816,115 | 116,816,115 |
| Series A preferred stock dividends | — | — | — | — | — | (9,395,604) | — | — | (9,395,604) |
| Common Stock dividends | — | — | — | — | — | (2,850,026) | — | — | (2,850,026) |
| Reinvestment of dividends paid to common stockholders | 84,418 | 84 | — | — | — | 410,496 | — | — | 410,580 |
| Common stock issued under director's compensation plan | 3,399 | 3 | — | — | — | 22,497 | — | — | 22,500 |
| Crimson distribution on Class A-1 Units | — | — | — | — | — | — | — | (2,256,113) | (2,256,113) |
| Crimson Class A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (610,353) | (610,353) |
| Series A preferred stock issued due to Internalization transaction | — | — | — | — | 4,255,325 | (10,213) | — | — | 4,245,112 |
| Common Stock issued due to Internalization transaction | 1,153,846 | 1,154 | — | — | — | 7,094,999 | — | — | 7,096,153 |
| Class B Common Stock issued due to Internalization transaction | — | — | 683,761 | 684 | — | 3,288,206 | — | — | 3,288,890 |
| Balance at December 31, 2021 (As Restated) | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 129,525,675 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |
| Net income (loss) | — | — | — | — | — | — | (12,756,517) | 3,236,848 | (9,519,669) |
| Series A preferred stock dividends | — | — | — | — | — | (9,552,519) | — | — | (9,552,519) |
| Common stock dividends | — | — | — | — | — | (3,004,579) | — | — | (3,004,579) |
| Reinvestment of dividends paid to common stockholders | 279,957 | 280 | — | — | — | 803,643 | — | — | 803,923 |
| Common Stock, accrued dividend equivalent | — | — | — | — | — | (67,431) | — | — | (67,431) |
| Crimson dividends on Class A-1 units | — | — | — | — | — | — | — | (3,236,848) | (3,236,848) |
| Stock-based compensation | 80,817 | 81 | — | — | — | 534,724 | — | 77,312 | 612,117 |
| Balance at December 31, 2022 | 15,253,958 | $ 15,254 | 683,761 | $ 684 | $ 129,525,675 | $ 327,016,573 | $ (333,785,097) | $ 116,893,428 | $ 239,666,517 |

See accompanying Notes to Consolidated Financial Statements.

F-6

Table of Contents          Index to Financial Statements          Glossary of Defined Terms



**CorEnergy Infrastructure Trust, Inc.**
**CONSOLIDATED STATEMENTS OF CASH FLOW**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| | | (As Restated) | |
| **Operating Activities** | | | |
| Net loss | $ (9,519,669) | $ (2,535,558) | $ (306,067,579) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Deferred income tax | 1,498,584 | 4,076,290 | 310,985 |
| Depreciation, amortization and ARO accretion | 16,076,326 | 14,801,676 | 13,654,429 |
| Amortization of debt issuance costs | 1,648,242 | 1,604,881 | 1,270,035 |
| Loss on impairment of goodwill | 16,210,020 | — | — |
| Loss on impairment of leased property | — | — | 140,268,379 |
| Loss on impairment and disposal of leased property | — | 5,811,779 | 146,537,547 |
| Loss on termination of lease | — | 165,644 | 458,297 |
| Deferred rent receivable write-off, noncash | — | — | 30,105,820 |
| (Gain) loss on extinguishment of debt | — | 861,814 | (11,549,968) |
| Gain on sale of equipment | (39,678) | (16,508) | (13,683) |
| Stock-based compensation | 612,117 | 22,500 | — |
| Changes in assets and liabilities: | | | |
| Deferred rent receivables | — | — | (247,718) |
| Accounts and other receivables | (786,145) | 1,121,365 | 467,257 |
| Financing note accrued interest receivable | — | (8,780) | (18,069) |
| Inventory | (1,996,528) | (2,183,946) | — |
| Prepaid expenses and other assets | (6,314,654) | (4,840,831) | (1,424,332) |
| Due from affiliated companies, net | 70,516 | (28,509) | — |
| Management fee payable | — | (971,626) | (698,324) |
| Accounts payable and other accrued liabilities | 12,133,378 | (562,870) | (1,903,936) |
| Income tax payable | 174,849 | — | — |
| Unearned revenue | 109,019 | (601,126) | (766,070) |
| Other changes, net | 3,331 | $ 156 | — |
| Net cash provided by operating activities | $ 29,879,708 | $ 16,716,351 | $ 10,383,070 |
| **Investing Activities** | | | |
| Acquisition of Crimson Midstream Holdings, net of cash acquired | — | (69,002,052) | — |
| Acquisition of Corridor InfraTrust Management, net of cash acquired | — | 952,487 | — |
| Purchases of property and equipment, net | (13,893,812) | (20,228,454) | (2,186,155) |
| Proceeds from reimbursable projects | 2,523,196 | 3,131,391 | — |
| Proceeds from sale of property and equipment | 55,075 | 97,210 | 15,000 |
| Proceeds from insurance recovery | — | 60,153 | — |
| Principal payment on financing note receivable | 178,581 | 155,008 | 43,333 |
| Decrease in financing note receivable | — | 26,849 | — |
| Net cash used in investing activities | $ (11,136,960) | $ (84,807,408) | $ (2,127,822) |
| **Financing Activities** | | | |
| Debt financing costs | — | (2,735,922) | — |
| Cash paid for maturity of convertible notes | — | — | (1,676,000) |
| Cash paid for repurchase of convertible notes | — | — | (1,316,250) |
| Cash paid for settlement of Pinedale Secured Credit Facility | — | — | (3,074,572) |
| Repurchases of Series A preferred stock | — | — | (161,997) |
| Dividends paid on Series A preferred stock | (9,552,519) | (9,395,604) | (9,242,797) |
| Dividends paid on Common Stock | (2,200,656) | (2,439,446) | (12,286,368) |
| Distributions to non-controlling interest | (3,236,848) | (2,256,113) | — |
| Advances on revolving line of credit | 14,000,000 | 24,000,000 | — |

F-7

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Payments on revolving line of credit | (6,000,000) | (22,000,000) | — |
| Principal payments on secured credit facility | (8,000,000) | (6,000,000) | (1,764,000) |
| Proceeds from financing arrangement | 5,814,435 | 3,882,392 | |
| Payments on financing arrangement | (3,277,254) | (3,020,581) | — |
| Net cash used in financing activities | $ (12,452,842) | $ (19,965,274) | $ (29,521,984) |
| Net change in cash and cash equivalents | $ 6,289,906 | $ (88,056,331) | $ (21,266,736) |
| Cash and cash equivalents at beginning of year | 11,540,576 | 99,596,907 | 120,863,643 |
| Cash and cash equivalents at end of year | $ 17,830,482 | $ 11,540,576 | $ 99,596,907 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 11,343,702 | $ 11,224,582 | $ 9,272,409 |
| Income tax refunds | 12,055 | 635,730 | 466,236 |
| | | | |
| **Non-Cash Investing Activities** | | | |
| Proceeds from sale of leased property provided directly to secured lender | $ — | $ — | $ 18,000,000 |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | 2,099,287 | 113,847 | 591,421 |
| In-kind consideration for the Grans Isle Gathering System provided as partial consideration for the Crimson Midstream Holdings acquisition | — | 48,873,169 | — |
| Crimson credit facility assumed and refinanced in connection with the Crimson Midstream Holdings acquisition | — | 105,000,000 | — |
| Equity consideration attributable to non-controlling interest holder in connection with the Crimson Midstream Holdings acquisition | — | 116,205,762 | — |
| Series A preferred stock issued due to Internalization transaction | — | 4,245,112 | — |
| Common stock issued due to Internalization transaction | — | 7,096,153 | — |
| Class B Common Stock issued due to Internalization transaction | — | 3,288,890 | — |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Proceeds from sale of leased property used in settlement of Pinedale Secured Credit Facility | $ — | $ — | $ (18,000,000) |
| Reinvestment of dividends paid to common stockholders | 803,923 | 410,580 | |
| Common Stock issued upon exchange and conversion of convertible notes | — | — | 419,129 |
| Crimson Class A-2 Units dividends payment in-kind | — | 610,353 | |
| Dividend equivalents accrued on RSUs | 67,431 | — | — |
| Assets acquired under financing arrangement | 3,672,910 | 1,617,825 | — |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents    Index to Financial Statements    Glossary of Defined Terms



<div align="center">

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2022**

</div>

**1. INTRODUCTION AND BASIS OF PRESENTATION**

**Introduction**

CorEnergy Infrastructure Trust, Inc. (referred to as "CorEnergy" or "the Company"), was organized as a Maryland corporation and commenced operations on December 8, 2005. The Company's common stock, par value $0.001 per share ("Common Stock") is listed on the New York Stock Exchange ("NYSE") under the symbol "CORR" and its depositary shares representing the Company's 7.375% Series A Cumulative Redeemable Preferred Stock, par value $0.001 per share (Series A Preferred Stock") is listed on the NYSE under the symbol "CORR PrA". The Company's Class B Common Stock, par value $0.001 per share ("Class B Common Stock"), is not listed on an exchange.

The Company owns and operates critical energy midstream infrastructure connecting the upstream and downstream sectors within the industry. The Company currently generates revenue from the transportation, via pipeline systems, of crude oil and natural gas for its customers in California and Missouri, respectively. The pipelines are located in areas where it would be difficult to replicate rights-of-way or transport natural gas or crude oil via non-pipeline alternatives, resulting in the Company's assets providing utility-like criticality in the midstream supply chain for its customers. Prior to 2021, the Company focused primarily on entering into long-term triple-net participating leases with energy companies. Over the last 24 months, the Company's asset portfolio has undergone significant changes. The Company divested all of its leased assets, including the Grand Isle Gathering System ("GIGS") and Pinedale Liquids Gathering System ("Pinedale LGS"), which are described in these notes to consolidated financial statements.

CorEnergy's Private Letter Rulings ("PLRs") enable the Company to invest in a broader set of revenue contracts within its real estate investment trust ("REIT") structure, including the opportunity to not only own, but also operate infrastructure assets. CorEnergy considers its investments in these energy infrastructure assets to be a single reportable business segment and reports them accordingly in its consolidated financial statements.

The principal executive office of the Company is located at 1100 Walnut, Suite 3350, Kansas City, Missouri 64106.

**Basis of Presentation and Consolidation**

The accompanying consolidated financial statements include CorEnergy accounts and the accounts of its wholly owned subsidiaries and variable interest entities ("VIE's") for which CorEnergy is the primary beneficiary. The consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") set forth in the Accounting Standards Codification ("ASC"), as published by the Financial Accounting Standards Board ("FASB"), and with the Securities and Exchange Commission ("SEC") instructions to Form 10-K and Article 10 of Regulation S-X. The accompanying consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair presentation of the Company's financial position, results of operations and cash flows for the periods presented. There were no adjustments that, in the opinion of management, were not of a normal and recurring nature. All intercompany transactions and balances have been eliminated in consolidation, and the Company's net earnings have been reduced by the portion of net earnings attributable to non-controlling interests, when applicable. Prior reporting period amounts have been recast to conform with the current presentation. In preparing the consolidated financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the balance sheet and revenues and expenses for the period. Actual results could differ significantly from those estimates.

The Company consolidates a VIE when it is the primary beneficiary, which is the party that has both (i) the power to direct the activities that most significantly impact the VIE's economic performance and (ii) through its interests in the VIE, the obligation to absorb losses or the right to receive benefits from the VIE that could potentially be significant to the VIE. In order to determine whether it has a variable interest in a VIE, the Company performs a qualitative analysis of the entity's design, primary decision makers, key agreements governing the VIE, voting interests and significant activities impacting the VIE's economic performance. The Company continually monitors VIEs to determine if any events have occurred that could cause the primary beneficiary to change.

In February 2021, the Company acquired a 49.50% voting interest in Crimson Midstream Holdings, LLC ("Crimson"), which is a legal entity that meets the VIE criteria. As a result of its consolidation analysis more fully described in Note 18 ("Variable Interest Entity"), the Company determined it is the primary beneficiary of Crimson due to its related-party relationship with Crimson's

<div align="center">

F-9

</div>

50.50% voting interest holder. Therefore, beginning February 1, 2021 (the effective date of the acquisition), Crimson is consolidated in the Company's consolidated financial statements and the non-controlling interest is presented as a component of equity. Net income from Crimson is allocated to the non-controlling interest based on Crimson's contractual rights to earnings and distributions associated with the Crimson Class A-1, A-2 and A-3 Units. Refer to Note 16 ("Stockholders' Equity") for further discussion of the non-controlling interest in Crimson. The consolidated financial statements also include the accounts of any limited partnerships where the Company represents the general partner and, based on all facts and circumstances, controls such limited partnerships, unless the limited partner has substantive participating rights or substantive kick-out rights. Refer to Note 18 ("Variable Interest Entity"), for further discussion of the Company's consolidated VIEs.

The FASB issued Accounting Standards Update ("ASU") 2015-02 *Consolidations (Topic 810) - Amendments to the Consolidation Analysis* ("ASU 2015-02"), which amended previous consolidation guidance and introduced a separate consolidation analysis specific to limited partnerships and other similar entities. Under this analysis, limited partnerships and other similar entities are considered a VIE unless the limited partners hold substantive kick-out rights or participating rights. Management determined that Crimson, Pinedale Corridor, LP, ("Pinedale LP") and Grand Isle Corridor LP are VIEs under the amended guidance because the limited partners of both partnerships lack both substantive kick-out rights and participating rights. As such, management evaluated the qualitative criteria under FASB ASC Topic 810 in conjunction with ASU 2015-02 to make a determination whether these partnerships should be consolidated in the Company's financial statements. ASC Topic 810-10 requires the primary beneficiary of a VIE's activities to consolidate the VIE. The primary beneficiary is identified as the enterprise that has (i) the power to direct the activities of the VIE that most significantly impact the entity's economic performance and (ii) the obligation to absorb losses of the entity that could potentially be significant to the VIE or the right to receive benefits from the entity that could potentially be significant to the VIE. The standard requires an ongoing analysis to determine whether the variable interest gives rise to a controlling financial interest in the VIE. Based on the general partners' roles and rights under the partnership agreements and its exposure to losses and benefits of each of the partnerships through its significant limited partner interests, management determined that CorEnergy is the primary beneficiary of Crimson, Pinedale LP, and Grand Isle Corridor LP. Based upon this evaluation, and the Company's 100% ownership interest in Pinedale LP, and Grand Isle Corridor LP, the consolidated financial statements presented include full consolidation with respect to these partnerships.

Crimson is managed by a board of managers (the "Crimson Board"), which is made up of four managers of which the Company and the Grier Members (as defined below) are each represented by two managers. The Crimson Board is responsible for governing the significant activities that impact Crimson's economic performance, including a number of activities that are managed by an approved budget requiring super-majority approval or joint approval. In assessing the primary beneficiary, the Company determined that power is shared; however, the Company and the Grier Members as a related-party group have characteristics of a primary beneficiary. The Company performed the "most closely associated" test and determined that CorEnergy is the entity in the related-party group most closely associated with the VIE. In performing this assessment, the Company considered, among other factors, that (i) its influence over the tax structure of Crimson so its operations could be included in the Company's REIT structure under its PLR, which allows fees received for the usage of storage and pipeline capacity to qualify as rents from real property; (ii) the activities of the Company are substantially similar in nature to the activities of Crimson because the Company owns existing transportation and distribution assets in MoGas Pipeline LLC ("MoGas") and Omega Pipeline Company, LLC ("Omega"); (iii) Crimson's assets represent a substantial portion of the Company's total assets; and (iv) the Grier Members' interest in Crimson in Class A-1, Class A-2, and Class A-3 Units of Crimson will earn distributions if the CorEnergy Board of Directors declares a common or preferred dividend for Series A Preferred, and Class B Common Stock. Therefore, CorEnergy was determined as the primary beneficiary of Crimson and, therefore, the consolidated the Crimson VIE. The Grier Members' ownership interest in Crimson is reflected as a non-controlling interest in the consolidated financial statements.

**Restatement of Prior Period**

As discussed in Note 20 ("Restatement Of Prior Period"), on March 3, 2023, the Audit Committee of the Board of Directors of the Company concluded, after discussion with the Company's management, that the Company's consolidated audited financial statements as of and for the fiscal year ended December 31, 2021 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") and the Company's consolidated unaudited financial statements as of and for the periods ended March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022 (collectively, the "Non-Reliance Periods") included in the Company's Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods, should no longer be relied upon.

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

## 2. SIGNIFICANT ACCOUNTING POLICIES

A. *Use of Estimates* – The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amount of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

B. *Leased Property and Leases* – In February of 2016, the FASB issued ASU 2016-02, *Leases* ("ASU 2016-02" or "ASC 842"), which amends the existing accounting standards for lease accounting and requires lessees to recognize most leases on their balance sheets and making targeted changes to lessor accounting.

Beginning in 2019, for the underlying asset class related to single-use office space, the Company accounts for each separate lease component and non-lease component as a single lease component. For the underlying lessor asset class related to pipelines residing on military bases, the Company accounts for each separate lease component and non-lease component as a single lease component if the non-lease components otherwise are accounted for in accordance with the revenue standard, and both the following criteria are met: (i) the timing and pattern of revenue recognition are the same for the non-lease component(s) and the related lease component and (ii) the lease component will be classified as an operating lease. The Company carried forward the accounting treatment for land easements under existing agreements, which are currently accounted for within property, plant and equipment. Land easements are reassessed under ASC 842 when such agreements are modified.

The Company's current leased properties are classified as operating leases and are recorded as leased property, net of accumulated depreciation, in the Consolidated Balance Sheets. Initial direct costs incurred in connection with the creation and execution of a lease prior to January 1, 2019 are capitalized and amortized over the lease term. Subsequent to January 1, 2019, initial direct costs under ASC 842 are incremental costs of a lease that would not have been incurred if the lease had not been obtained and may include commissions or payments made to an existing tenant as an incentive to terminate its lease. Base rent related to the Company's leased property is recognized on a straight-line basis over the term of the lease when collectability is probable. Participating rent is recognized when it is earned, based on the achievement of specified performance criteria. Base and participating rent are recorded as lease revenue in the Consolidated Statements of Operations. Rental payments received in advance are classified as unearned revenue and included as a liability within the Consolidated Balance Sheets. Unearned revenue is amortized ratably over the lease period as revenue recognition criteria are met. Rental payments received in arrears are accrued and classified as deferred rent receivable and included in assets within the Consolidated Balance Sheets.

Under the Company's previously held triple-net leases, the tenant was required to pay property taxes and insurance directly to the applicable third-party providers. Consistent with guidance in ASC 842, the Company will present the cost and the lessee's direct payment to the third-party under the triple-net leases on a net basis in the Consolidated Statements of Operations.

C . *Property and Equipment* – Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful life of the asset. Expenditures for repairs and maintenance are charged to operations as incurred, and improvements, which maintain the existing operating capacity of assets or extend their useful lives, are capitalized and depreciated over the remaining estimated useful life of the asset. The Company initially records long-lived assets at their purchase price plus any direct acquisition costs, unless the transaction is accounted for as a business combination, in which case the acquisition costs are expensed as incurred. If the transaction is accounted for as a business combination, the Company allocates the purchase price to the acquired tangible and intangible assets and liabilities based on their estimated fair values.

D. *Long-Lived Asset Impairment* – The Company's long-lived assets consist primarily of oil and natural gas pipelines that have been obtained through asset acquisitions and a business combination. Management continually monitors its business, the business environment and performance of its operations to determine if an event has occurred that indicates that the carrying value of a long-lived asset group may be impaired. When a triggering event occurs, which is a determination that involves judgment, management utilizes cash flow projections to assess its ability to recover the carrying value of the asset group based on the long-lived assets' ability to generate future cash flows on an undiscounted basis over the remaining useful life of the primary asset. This differs from the evaluation of goodwill, for which the recoverability assessment utilizes fair value estimates that include discounted cash flows in the estimation process and accordingly any goodwill impairment recognized may not be indicative of a similar impairment of the related underlying long-lived assets.

Management's projected cash flows of long-lived assets are primarily based on contractual cash flows that extend many years into the future. If those cash flow projections indicate that the long-lived asset's carrying value is not recoverable, management records an impairment charge for the excess of carrying value of the asset over its fair value. The estimate of fair value considers a number of factors, including the potential value that would be received if the asset were sold, discount rates and projected cash flows. Due to the imprecise nature of these projections and assumptions, actual results can differ from management's estimates.

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

For the year ended December 31, 2021, the Company recognized a loss on impairment and disposal for the GIGS asset of $5.8 million, as more fully described in Note 5 ("Leased Properties And Leases"). For the year ended December 31, 2020, the Company recognized a loss on impairment for the GIGS asset of $140.3 million and a loss on impairment and disposal of the Pinedale LGS of $146.5 million, respectively, as more fully described in Note 5 ("Leased Properties And Leases"). There was no impairment of long-lived assets recorded during the year ended December 31, 2022.

E. *Financing Notes Receivable* – Financing notes receivable are presented at face value plus accrued interest receivable and deferred loan origination costs and net of related direct loan origination income. Each quarter, the Company reviews its financing notes receivable to determine if the balances are realizable based on factors affecting the collectability of those balances. Factors may include credit quality, timeliness of required periodic payments, past due status and management discussions with obligors. The Company evaluates the collectability of both interest and principal of each of its loans to determine if an allowance is needed. An allowance will be recorded when based on current information and events, the Company determines it is probable that it will be unable to collect all amounts due according to the existing contractual terms. If the Company determines an allowance is necessary, the amount deemed uncollectible is expensed in the period of determination. An insignificant delay or shortfall in the amount of payments does not necessarily result in the recording of an allowance. Generally, when interest and/or principal payments on a loan become past due, or if the Company does not otherwise expect the borrower to be able to service its debt and other obligations, the Company will place the loan on non-accrual status and will typically cease recognizing financing revenue on that loan until all principal and interest have been brought current. Interest income recognition is resumed if and when the previously reserved-for financing notes become contractually current and performance has been demonstrated. Payments received subsequent to the recording of an allowance will be recorded as a reduction to principal. During the years ended December 31, 2022, and 2021, the Company did not record provisions for loan loss. The Company's financing notes receivable are discussed more fully in Note 6 ("Financing Notes Receivable").

F. *Fair Value Measurements* – FASB ASC 820, *Fair Value Measurements and Disclosure* ("ASC 820"), defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. Various inputs are used in determining the fair value of the Company's assets and liabilities. These inputs are summarized in the three broad levels listed below:

- Level 1 - quoted prices in active markets for identical investments

- Level 2 - other significant observable inputs (including quoted prices for similar investments, market corroborated inputs, etc.)

- Level 3 - significant unobservable inputs (including the Company's own assumptions in determining the fair value of investments)

See Note 13 ("Fair Value") for further discussion of the Company's fair value measurements.

G. *Cash and Cash Equivalents* – The Company maintains cash balances at financial institutions in amounts that regularly exceed FDIC-insured limits. The Company's cash equivalents are comprised of short-term, liquid money market instruments.

H. *Accounts and other receivables* – Accounts receivable are presented at face value net of an allowance for doubtful accounts within accounts and other receivables on the balance sheet. Accounts are considered past due based on the terms of sale with the customers. The Company reviews accounts for collectability based on an analysis of specific outstanding receivables, current economic conditions and past collection experience. For the years ended December 31, 2022 and 2021, the Company determined that an allowance for doubtful accounts was not necessary.

I. *Deferred rent receivables* – Lease receivables are determined according to the terms of the lease agreements entered into by the Company and its lessees. Lease receivables primarily represent timing differences between straight-line revenue recognition and contractual lease receipts. Beginning April 1, 2020, lease payments by the Company's GIGS tenant lapsed due to conditions related to the COVID-19 pandemic and energy markets, which resulted in the write-off of the deferred rent receivable of $30.1 million for the year ended December 31, 2020. Refer to Note 5 ("Leased Properties And Leases") for further details.

J. *Goodwill* – Goodwill represents the excess of the amount paid for the Corridor InfraTrust Management, Inc. ("Corridor") and MoGas business over the fair value of the net identifiable assets acquired. To comply with ASC 350, *Intangibles - Goodwill and Other* ("ASC 350"), the Company performs an impairment test for goodwill annually, or more frequently in the event that a triggering event has occurred. December 31st is the Company's annual testing date associated with its goodwill.

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment*, which simplifies how an entity is required to test goodwill for impairment by eliminating step two from the goodwill impairment test. ASU 2017-04, *Simplifying the Test for Goodwill Impairment* became effective for all public entities on January 1, 2017.

Table of Contents Index to Financial Statements Glossary of Defined Terms

In accordance with ASC 350, a company may elect to perform a qualitative assessment to determine whether the quantitative impairment test is required. If the company elects to perform a qualitative assessment, the quantitative impairment test is required only if the conclusion is that it is more likely than not that the reporting unit's fair value is less than its carrying amount. If a company bypasses the qualitative assessment, the quantitative goodwill impairment test should be followed in Step 1.

Step 1 compares the fair value of the reporting unit to its carrying value to identify and measure any potential impairment. The reporting unit fair value is based upon consideration of various valuation methodologies. Declines in volumes or rates from those forecasted, or other changes in assumptions, may result in a change in management's estimate and result in an impairment.

K. *Debt Discount and Debt Issuance Costs* – Costs incurred for the issuance of new debt are capitalized and amortized into interest expense over the debt term. Issuance costs related to long-term debt are recorded as a direct deduction from the carrying amount of that debt liability, net of accumulated amortization. Issuance costs related to line-of-credit arrangements however, are presented as an asset instead of a direct deduction from the carrying amount of the debt. In accordance with ASC 470, *Debt* ("ASC 470"), the Company recorded its 5.875% Convertible Senior Notes due 2025 ("5.875% Convertible Notes") at the aggregate principal amount, less discount. The Company is amortizing the debt discount over the life of the 5.875% Convertible Notes as additional non-cash interest expense utilizing the effective interest method.Refer to Note 14 ("Debt") for additional information.

L. *Asset Retirement Obligations* – The Company follows ASC 410-20, *Asset Retirement Obligations ("ARO")*, which requires that an asset retirement obligation ("ARO") associated with the retirement of a long-lived asset be recognized as a liability in the period in which it is incurred and becomes determinable, with an offsetting increase in the carrying amount of the associated asset. The Company recognized an existing ARO in conjunction with the acquisition of the GIGS in June of 2015.

The Company measures changes in the ARO liability due to passage of time by applying an interest method of allocation to the amount of the liability at the beginning of the period. The increase in the carrying amount of the liability is recognized as an expense classified as an operating item in the Consolidated Statements of Operations, hereinafter referred to as ARO accretion expense. The Company periodically reassesses the timing and amount of cash flows anticipated associated with the ARO and adjusts the fair value of the liability accordingly under the guidance in ASC 410-20.

The fair value of the obligation at the acquisition date was capitalized as part of the carrying amount of the related long-lived assets and is being depreciated over the asset's remaining useful life. The useful lives of most pipeline gathering systems are primarily derived from available supply resources and ultimate consumption of those resources by end users. Adjustments to the ARO resulting from reassessments of the timing and amount of cash flows will result in changes to the retirement costs capitalized as part of the carrying amount of the asset.

Upon decommissioning of the ARO or a portion thereof, the Company reduces the fair value of the liability and recognizes a (gain) loss on settlement of ARO as an operating item in the Consolidated Statements of Operations for the difference between the liability and actual decommissioning costs incurred.

On February 4, 2021, the Company disposed of the ARO upon providing the GIGS asset as partial consideration for the Crimson Transaction. Refer to Note 5 ("Leased Properties And Leases") for further details.

Refer to Note 15 ("Asset Retirement Obligation") for additional information.

M. *Revenue Recognition* – In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers* ("ASU 2014-09" or "ASC 606"), which became effective for all public entities on January 1, 2018. ASC 606 supersedes previously existing revenue recognition standards with a single model unless those contracts are within the scope of other standards (e.g. leases). The model requires an entity to recognize as revenue the amount of consideration to which it expects to be entitled for the transfer of promised goods or services to customers.

Specific recognition policies for the Company's revenue items are as follows:

- *Transportation and distribution revenue* – The Company's contracts related to transportation and distribution revenue are primarily comprised of a mix of oil and natural gas supply, transportation and distribution performance obligations, as well as limited performance obligations related to system maintenance and improvement. Transportation revenues are recognized by Crimson and MoGas and distribution revenues are recognized by Omega and Omega Gas Marketing, LLC.

  ◦ Under the Company's oil and natural gas supply, transportation and distribution performance obligations, the customer simultaneously receives and consumes the benefit of the services as the commodities are delivered. Therefore, the transaction price is allocated proportionally over the series of identical performance obligations with each contract. The transaction price is calculated based on (i) index price, plus a contractual markup in the

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

case of natural gas supply agreements (considered variable due to fluctuations in the index), (ii) Federal Energy Regulatory Commission ("FERC") regulated rates or negotiated rates in the case of transportation agreements and (iii) contracted amounts (with annual CPI escalators) in the case of the Company's distribution agreement. Based on the nature of the agreements, revenue for all but one of the Company's oil and natural gas supply, transportation and distribution performance obligations is recognized on a right to invoice basis as the performance obligations are met, which represents what the Company expects to receive in consideration and is representative of value delivered to the customer. The Company has a contract with one customer, Spire, Inc. ("Spire"), that has fixed pricing which varies over the contract term. For this specific contract, the transaction price has been allocated ratably over the contractual performance obligation beginning in 2018 with the adoption of ASC 606. All invoicing is done in the month following service, with payment typically due a month from invoice date.

- *Pipeline loss allowance* - The Company's crude oil transportation revenue includes amounts earned for pipeline loss allowance ("PLA"). PLA revenue, recorded within transportation revenue, represents the estimated realizable value of the earned loss allowance volumes received by the Company as applicable under the tariff or contract. As is common in the pipeline transportation industry, as crude oil is transported, the Company earns a small percentage of the crude oil volume transported to offset any measurement uncertainty or actual volumes lost in transit. The Company will settle the PLA with its shippers either in-kind or in cash. PLA received by the Company typically exceeds actual pipeline losses in transit and typically results in a benefit to the Company. For PLA volumes received in-kind, the Company records these in inventory.

  ◦ When PLA is paid in-kind, the barrels are valued at current market price less standard deductions, recorded as inventory and recognized as non-cash consideration revenue, concurrent with related transportation services. PLA paid in cash is treated in the same way as in-kind, but no inventory is created. In accordance with ASC 606, when control of the PLA volumes has been transferred to the purchaser, the Company records this as revenue at the contractual sales price within PLA revenue and PLA cost of revenues.

  ◦ Under a contract with the Department of Defense ("DOD"), gas sales and cost of gas sales are presented on a net basis in the transportation and distribution revenue line. The Company continues to present the gas sales and cost of gas sales on a net basis upon adoption of ASC 606.

- *Pipeline loss allowance subsequent sales and cost of revenue* - PLA volumes received in-kind by the Company that are initially recorded in inventory and subsequently sold are recorded in pipeline loss allowance subsequent sales at the market price less standard deductions for which they are contractually sold. At the time of the sale, the cost of the PLA volumes sold are expensed in pipeline loss allowance subsequent sales cost of revenue based on the carrying value of those volumes, which is valued using an average costing method at the lower of cost or net realizable value.

- *Financing revenue* – Historically, financing notes receivable have been considered a core product offering and therefore the related income is presented as a component of operating income. For increasing rate loans, base interest income is recorded ratably over the life of the loan, using the effective interest rate. The net amount of deferred loan origination income and costs are amortized on a straight-line basis over the life of the loan and reported as an adjustment to yield in financing revenue. Participating financing revenues are recorded when specific performance criteria have been met.

- *Lease revenue* – Refer to Note 5 ("Leased Properties And Leases") for the Company's lease revenue recognition policy.

N. *Transportation and distribution expense* – Included here are Crimson's cost of operating and maintaining the crude oil pipelines, MoGas' costs of operating and maintaining the natural gas transmission line, and Omega's costs of operating and maintaining the natural gas distribution system. These costs are incurred both internally and externally. The internal costs relate to system control, pipeline operations, maintenance, insurance and taxes. Other internal costs include payroll for employees associated with gas control, field employees and management. The external costs consist of professional services such as audit and accounting, legal and regulatory and engineering.

Under the Company's contract with the DOD, amounts paid by Omega for gas and propane are netted against sales and are presented in the transportation and distribution revenue line. See paragraph (M) above.

O. *Other Income Recognition* – Specific policies for the Company's other income items are as follows:

- *Net distributions and other income* – Includes interest income earned on the Company's money market instruments and distributions and dividends from historical investments. Distributions and dividends from investments were recorded on their ex-dates and were reflected as other income within the accompanying Consolidated Statements of Operations. Distributions received from the Company's investments were generally characterized as ordinary income, capital gains and distributions received from investment securities. The portion characterized as return of capital was paid by the

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

Company's investees from their cash flow from operations. The Company recorded investment income, capital gains and distributions received from investment securities made at the time such distributions were received. Such estimates were based on information available from each company and other industry sources. These estimates may have subsequently been revised based on information received from the entities after their tax reporting periods were concluded, as the actual character of these distributions was not known until after the fiscal year end of the Company.

•   *Net realized and unrealized gain (loss) from investments* – Securities transactions were accounted for on the date the securities were purchased or sold. Realized gains and losses were reported on an identified cost basis. The Company recorded investment income and return of capital based on estimates made at the time such distributions were received. Such estimates were based on information available from the portfolio company and other industry sources. These estimates may have subsequently been revised based on information received from the portfolio company after their tax reporting periods were concluded, as the actual character of these distributions were not known until after the Company's fiscal year end.

P. *Asset Acquisition Expenses* – Costs incurred in connection with the research of real property acquisitions not accounted for as business combinations are expensed until it is determined that the acquisition of the real property is probable. Upon such determination, costs incurred in connection with the acquisition of the property are capitalized as described in paragraph (C) above. Deferred costs related to an acquisition that the Company has determined, based on management's judgment, not to pursue are expensed in the period in which such determination is made. Costs incurred in connection with a business combination are expensed as incurred.

Q. *Offering Costs* – Offering costs related to the issuance of common or preferred stock are charged to additional paid-in capital when the stock is issued.

R. *Stock-based Compensation* - The fair value of share-based payments is estimated using the quoted market price of the Company's common stock and pricing models as of the date of grant as further discussed in Note 16 ("Stockholder's Equity"). The resulting cost is recognized on a straight-line basis over the period during which an employee is required to provide service in exchange for the awards, usually the vesting period. Forfeitures are accounted for in the period in which they occur. In addition to service-based awards, the Company grants fully vested Common Stock to the Board of Directors and certain members of the executive team.

S. *Earnings (Loss) Per Share* – Subsequent to the issuance of our Class B Common Stock in July of 2021, the Company applies the two-class method for calculating and presenting earnings (loss) per common share. The two-class method is an earnings allocation formula that determines earnings per share for each class of common stock according to dividends declared or accumulated and participation rights in undistributed earnings and losses of all participating securities. Under this method:

    i.   Income or loss from continuing operations ("net income") is reduced by the amount of dividends declared in the current period for each class of stock and by the contractual amount of dividends that must be accumulated for the current period.

    ii.  The remaining earnings or loss ("undistributed earnings or loss") are allocated to the participating securities to the extent each security may share in earnings as if all the earnings or losses for the period had been distributed.

    iii. The total distributed and undistributed earnings and losses are allocated to each participating security which is then divided by the number of weighted average outstanding shares of the participating security to which the earnings are allocated to determine the earnings or loss per share for the participating security.

    iv.  Basic and diluted net income or loss per share data are presented for each class of common stock.

In applying the two-class method, the Company determined undistributed earnings and losses should be allocated equally on a pro rata basis between the Common Stock and the Class B Common Stock due to the contractual participation rights of the Class B Common Stock which participate pari-passu with Common Stock in regard to undistributed earnings and losses.

T. *Federal and State Income Taxation* – The Company is treated as a REIT for federal income tax purposes. Because certain of its assets may not produce REIT-qualifying income or be treated as interests in real property, those assets are held in wholly owned taxable REIT subsidiaries ("TRSs") in order to limit the potential that such assets and income could prevent the Company from qualifying as a REIT.

As a REIT, the Company holds and operates certain of its assets through one or more wholly owned TRSs. The Company's use of TRSs enables it to continue to engage in certain businesses while complying with REIT qualification requirements and also allows it to retain income generated by these businesses for reinvestment without the requirement of distributing those earnings.

F-15

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

In the future, the Company may elect to reorganize and transfer certain assets or operations from its TRSs to the Company or other subsidiaries, including qualified REIT subsidiaries.

The Company's other investments were limited partnerships or limited liability companies which were treated as partnerships for federal and state income tax purposes. As a limited partner, the Company reported its allocable share of taxable income in computing its own taxable income. To the extent held by a TRS, the TRS's tax expense or benefit was included in the Consolidated Statements of Operations based on the component of income or gains and losses to which such expense or benefit related. Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is recognized if, based on the weight of available evidence, it is more likely than not that some portion or all of the deferred income tax asset will not be realized. It is expected that for the year ended December 31, 2022, and future periods, any deferred tax liability or asset generated will be related entirely to the assets and activities of the Company's TRSs.

If the Company ceased to qualify as a REIT, the Company, as a C corporation, would be obligated to pay federal and state income tax on its taxable income.

U . *Recent Accounting Pronouncements* – In June of 2016, the FASB issued ASU 2016-13, *Financial Instruments - Credit Losses* ("ASU 2016-13"), which introduces an approach based on expected losses to estimate credit losses on certain types of financial instruments. The new model, referred to as the current expected credit losses ("CECL model"), will apply to financial assets subject to credit losses and measured at amortized cost, and certain off-balance sheet credit exposures. ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. In November of 2019, the FASB issued ASU 2019-10, *Financial Instruments - Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842) Effective Dates* , which deferred the effective dates of these standards for certain entities. Based on the guidance for smaller reporting companies, the effective date of ASU 2016-13 is deferred for the Company until fiscal year 2023, and the Company has elected to defer adoption of this standard.

Although the Company has elected to defer adoption of ASU 2016-13, it will continue to evaluate the potential impact of the standard on its consolidated financial statements. As part of its ongoing assessment work, the Company has formed an implementation team, completed training on the CECL model and has begun developing policies, processes and internal controls.

In March of 2020, the FASB issued ASU 2020-04, *"Reference Rate Reform (Topic 848)"* ("ASU 2020-04"). In response to concerns about structural risks of interbank offered rates including the risk of cessation of the London Interbank Offered Rate ("LIBOR"), regulators in several jurisdictions around the world have undertaken reference rate reform initiatives to identify alternative reference rates that are more observable and less susceptible to manipulation. The provisions of ASU 2020-04 are elective and apply to all entities, subject to meeting certain criteria, that have debt or derivative contracts, among other contracts, that reference LIBOR or another reference rate expected to be discontinued because of reference rate reform. ASU 2020-04, among other things, provides optional expedients and exceptions for a limited period of time for applying GAAP to these contracts if certain criteria are met to ease the potential burden in accounting for or recognizing the effects of reference rate reform on financial reporting. ASU 2020-04 is effective for all entities as of March 12, 2020 through December 31, 2022. In September 2022, certain Company parties entered into a First Amendment to Crimson's Amended and Restated Credit Agreement, to replace LIBOR with the Secured Overnight Financing Rate ("SOFR"). The Company adopted this amendment in September 2022 with the First Amendment to Crimson's Amended and Restated Credit Agreement. The amendment did not have a material impact on the Company's consolidated financial statements.

**3. ACQUISITIONS**

On February 4, 2021 (effective February 1, 2021), the Company completed the acquisition of an interest in Crimson (which includes a 49.50% voting interest and all of the Class B-1 Units of Crimson which encompasses the right to receive 100.0% of the economic benefit of Crimson's business, after satisfying the priority rights of (i) the Class A-1 Units to receive distributions on each unit equal to the dividends on a share of the Company's Series A Preferred Stock and (ii) the Class A-2 and A-3 Units to receive distributions on each unit equal to dividends on a share of the Company's Class B Common Stock (the "Crimson Transaction") for total consideration with a fair value of $343.8 million after giving effect to the initial working capital adjustments. The Company has the right to acquire the remaining 50.50% voting interest, subject to approval by the California Public Utility Commission ("CPUC"). After giving effect to initial working capital adjustments, the consideration consisted of a combination of cash on hand of $74.6 million, commitments to issue new common and preferred equity valued at $115.3 million, contribution to the sellers of the GIGS asset with a fair value of $48.9 million and $105.0 million in new term loan and revolver borrowings, all as detailed further below. The consideration was subject to a final working capital adjustment. Crimson is a CPUC-regulated crude oil pipeline owner and operator, and its assets include four critical infrastructure pipeline systems spanning approximately 2,000 miles (including approximately 1,100 active miles) across northern, central and southern California, connecting California crude production to in-state refineries.

F-16

Table of Contents Index to Financial Statements Glossary of Defined Terms

To effect the Crimson Transaction, on February 4, 2021, the Company entered into and consummated a Membership Interest Purchase Agreement (the "MIPA") with CGI Crimson Holdings, L.L.C. ("Carlyle"), Crimson, and John D. Grier and certain affiliated trusts of Grier (the "Grier Members"). Pursuant to the terms of the MIPA, the Company acquired all of the economic interests of Crimson owned by Carlyle for consideration consisting of approximately $66.0 million in cash (net of initial working capital adjustments) and the transfer to Carlyle of the Company's interest in GIGS (as further described in Note 5 ("Leased Properties And Leases")). Crimson Midstream Operating LLC ("Crimson Midstream Operating"), a subsidiary of Crimson, and Corridor MoGas, Inc. ("Corridor MoGas"), a subsidiary of the Company, also entered into a $105.0 million Amended and Restated Credit Agreement with Wells Fargo (as further described below and in Note 14 ("Debt")).

Simultaneously, Crimson, the Company, and the Grier Members entered into the Third Amended and Restated Limited Liability Company Agreement ("Third LLC Agreement") of Crimson. Pursuant to the terms of the Third LLC Agreement, the Grier Members' outstanding membership interests in Crimson were exchanged for 1,613,202 Class A-1 Units of Crimson, 2,436,000 Class A-2 Units of Crimson and 2,450,142 Class A-3 Units of Crimson, which, as described in Note 16 ("Stockholders' Equity"), may eventually be exchangeable for shares of the Company's common and preferred stock. The Company received 10,000 Class B-1 Units, which represent the Company's economic interest in Crimson. The Class A-1 Units issued were subject to a final working capital adjustment. Additionally, 495,000 Class C-1 Units (representing 49.50% of the voting interests under the Third LLC Agreement) were issued to the Company in exchange for the former Class C Units acquired from Carlyle and 505,000 Class C-1 Units (representing 50.50% of the voting interests under the Third LLC Agreement) were issued to the Grier Members, in exchange for the Class C Units held by the Grier Members prior to the Crimson Transaction.

In June 2021, a working capital adjustment was made for the Crimson Transaction, which resulted in an increase in the assets acquired of $1.8 million. As a result the Company issued an additional 37,043 Class A-1 Units to the Grier Members for their 50.50% ownership interest and paid an additional $908 thousand in cash for the ownership interest the Company purchased. The newly issued units resulted in an increase in the aggregate value of non-controlling interest of $883 thousand and increased the Grier Members' total Class A-1 Units to 1,650,245.

The acquisition was treated as a business combination in accordance with ASC 805, *Business Combinations*, which requires allocation of the purchase price to the estimated fair values of assets and liabilities acquired in the transaction. The allocation of purchase price was based on management's judgment after evaluating several factors, including a valuation assessment. The following is a summary of the final allocation of the purchase price:

| Crimson Midstream Holdings, LLC | | |
|---|---|---|
| **Assets Acquired** | | |
| Cash and cash equivalents | $ | 6,554,921 |
| Accounts and other receivables | | 11,394,441 |
| Inventory | | 1,681,637 |
| Prepaid expenses and other assets | | 6,144,932 |
| Property and equipment[1] | | 333,715,139 |
| Operating right-of-use asset | | 6,268,077 |
| Total assets acquired: | $ | 365,759,147 |
| **Liabilities Assumed** | | |
| Accounts payable and other accrued liabilities[1] | $ | 13,540,164 |
| Operating lease liability | | 6,268,077 |
| Unearned revenue | | 315,000 |
| Total liabilities assumed: | $ | 20,123,241 |
| **Fair Value of Net Assets Acquired:** | $ | 345,635,906 |
| | | |
| Non-controlling interest at fair value[2][3] | $ | 116,205,762 |

(1) Amounts recorded for property and equipment include land, buildings, lease assets, leasehold improvements, furniture, fixtures and equipment. During the three months ended June 30, 2021, the Company recorded a $1.8 million working capital adjustments primarily related to the valuation of land. During the three months ended December 31, 2021, the Company recorded measurement period adjustments relating to (i) rights-of-way and pipelines, which resulted in $734 thousand additional depreciation for the year ended December 31, 2021 and (ii) accrued office lease in the amount of $250 thousand, which is netted against the $1.8 million working capital adjustment.

(2) Includes a non-controlling interest for Grier Members' equity consideration in the Crimson Class A-1, Class A-2, and Class A-3 Units (including the 37,043 newly issued Class A-1 Units) with a total fair value of $116.2 million. Refer to "Fair Value of Non-controlling Interest" below and Note 16 ("Stockholders' Equity") for further details.

(3) In addition to the newly issued Class A-1 Units, CorEnergy also paid $908 thousand in cash as a contribution to Crimson Midstream Holdings, LLC.

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

**Fair Value of Assets and Liabilities Acquired**

The fair value of property and equipment was determined from an external valuation performed by an unrelated third-party specialist based on the cost methodology. The preliminary fair value measurement of tangible assets is based on significant inputs not observable in the market and thus represent Level 3 measurements within the fair value measurement hierarchy. The significant unobservable input used includes a discount rate based on an estimated weighted average cost of capital of a theoretical market participant. The Company utilized a weighted average discount rate of 14.0% when deriving the fair value of the property and equipment acquired. The weighted average discount rate reflects management's best estimate of inputs a market participant would utilize. In addition, the Company utilized revenue, cost and growth projections in its discounted cash flows to value the assets and liabilities acquired as well as relevant third-party valuation data for the pipeline right of ways. The carrying value of cash and cash equivalents, accounts and other receivables, prepaid expenses and other assets, and accounts payable and other accrued liabilities, approximate fair value due to their short term, highly liquid nature. Inventory was valued based on average crude oil inventory prices, less an applicable discount to sell, at the acquisition date.

**Fair Value of Non-controlling Interest**

The fair value of the non-controlling interest for each of the Crimson Class A-1, Class A-2 and Class A-3 Units was determined from an external valuation performed by an unrelated third-party specialist. As described in Note 16 ("Stockholders' Equity"), the holders of the Crimson A-1, Class A-2 and Class A-3 Units have the right to receive any distributions that the Company's Board of Directors determines would be payable as if they held (initially) the shares of Series C Preferred Stock, Series B Preferred Stock and Class B Common Stock, respectively, with all distributions on Class A-1 Units becoming tied to the Company's Series A Preferred Stock as of June 30, 2021 and distributions on the Class A-2 Units becoming tied to the Class B Common Stock as of July 7, 2021, as further described in Note 16 ("Stockholders' Equity"). To determine the fair value of the units on February 1, 2021, the third-party valuation specialists developed a Monte Carlo model to simulate a distribution of future prices underlying the CorEnergy securities associated with the Crimson Class A-1, Class A-2, and Class A-3 Units. The fair value measurement is based on observable inputs related to the Company's Common Stock and Series A Preferred Stock, including stock price, historical volatility and dividend yield. The fair value measurement is also based on significant inputs not observable in the market and thus represent Level 3 measurements. The significant unobservable inputs include a discount rate of 11.88% for the Class A-1 Units and 11.75% for the Class A-3 Units. The valuation for the Class A-2 Units assumed stockholder approval would be received to exchange the Class A-2 Units to Class B Common Stock instead of Series B Preferred Stock. Therefore, the valuation mirrors the assumptions utilized for the Class A-3 Units.

During the year ended December 31, 2021, the Company incurred transaction costs and financing costs at closing of approximately $2.0 million and $2.8 million, respectively. The Company also incurred due diligence costs and other financing costs of $783 thousand and $235 thousand, respectively for year ended December 31, 2021. Total transaction, due diligence and financing costs, including $1.5 million incurred for the year ended December 31, 2020, for the Crimson Transaction were $7.3 million. Transaction and due diligence costs are recorded in general and administrative expenses in the Consolidated Statements of Operation. Financing costs were capitalized as deferred debt issuance costs in the Consolidated Balance Sheet. For the period from February 1, 2021 (effective date of the acquisition) to December 31, 2021, revenues for Crimson were $106.3 million and net income was $17.8 million.

**Pro Forma Results of Operations (Unaudited)**

The following selected comparative unaudited pro forma revenue information for the year ended December 31, 2021, assumes that the Crimson acquisition occurred at the beginning of 2021, and reflects the full results for the period presented. The pro forma results have been prepared for comparative purposes only and do not purport to indicate the results of operations which would actually have occurred had the combination been in effect on the dates indicated, or which may occur in the future. These amounts have been calculated after applying the Company's accounting policies. The Company has excluded pro forma information related to net earnings (loss) as it is impracticable to provide the information because Crimson was part of a larger entity that was separated via a common control transfer at the closing of the Crimson Transaction. As a result, quarterly financial information has not been carved-out for the Crimson entities acquired in prior quarterly periods.

|          | Pro Forma Year Ended |
|          | December 31, 2021 |
|----------|----------------------|
| Revenues | $          136,921,819 |

**Corridor InfraTrust Management, LLC**

On July 6, 2021, the Company consummated the internalization (the "Internalization") of the Company's management company, Corridor, pursuant to the previously announced Contribution Agreement, dated as of February 4, 2021 (the Contribution

F-18

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

Agreement"), by and among the Company and the contributors a party thereto (the Contributors"). Pursuant to the Contribution Agreement and following approval by the Company's stockholders, the Company, acquired Corridor, which owns the assets used by Corridor to perform management functions previously provided to the Company under the Management Agreement. Upon closing of the Internalization, the Company became an internally managed REIT. Prior to the Internalization, the Company and Corridor were parties to that certain Management Agreement, dated May 8, 2015 (as amended the "Management Agreement"), and that certain Administrative Agreement, dated December 1, 2011 (as amended, the "Administrative Agreement"). As an internally managed company, the Company no longer pays Corridor any fees or expense reimbursements arising from the Management Agreement but rather incurs Corridor's direct employee compensation and office-related expenses.

The Internalization was consummated for a purchase price of approximately $14.6 million, payable in equity. Pursuant to the Contribution Agreement, the Company issued to the Contributors, based on each Contributor's percentage ownership in Corridor, an aggregate of: (i) 1,153,846 shares of Common Stock, (ii) 683,761 shares of Class B Common Stock, and (iii) 170,213 depositary shares of Series A Preferred Stock (collectively with the Common Stock and Class B Common Stock, the "Internalization Consideration"). At closing, the Management Agreement and Administrative Agreement were both effectively terminated.

The acquisition was treated as a business combination in accordance with ASC 805, *Business Combinations*, which requires allocation of the purchase price to the estimated fair values of assets and liabilities acquired in the transaction. The allocation of purchase price was based on management's judgment after evaluating several factors, including a valuation assessment. The following is a summary of the final allocation of the purchase price:

**Corridor InfraTrust Management, LLC**

| | | |
|---|---|---:|
| **Assets Acquired** | | |
| Cash and cash equivalents | $ | 952,487 |
| Accounts and other receivables | | 344,633 |
| Prepaid expenses and other assets | | 14,184 |
| Property and equipment | | 87,101 |
| Operating right-of-use asset | | 453,396 |
| Goodwill | | 14,491,152 |
| Total assets acquired: | $ | 16,342,953 |
| **Liabilities Assumed** | | |
| Accounts payable and other accrued liabilities | $ | 1,259,402 |
| Operating lease liability | | 453,396 |
| Total liabilities assumed: | $ | 1,712,798 |
| **Fair Value of Net Assets Acquired:** | $ | 14,630,155 |

**Fair Value of Assets and Liabilities Acquired**

The carrying value of cash and cash equivalents, accounts and other receivables, prepaid expenses and other assets, and accounts payable and other accrued liabilities, approximate fair value due to their short term, highly liquid nature.

**4. TRANSPORTATION AND DISTRIBUTION REVENUE**

The Company's contracts related to transportation and distribution revenue are primarily comprised of a mix of crude oil, natural gas supply, and natural gas transportation and distribution performance obligations, as well as limited performance obligations related to system maintenance and improvement. Refer to Note 2 ("Significant Accounting Policies") for additional details on the Company's revenue recognition policies under ASC 606.

*Crude Oil and Natural Gas Transportation and Distribution*

Under the Company's (i) crude oil and natural gas transportation, (ii) natural gas supply, and (iii) natural gas distribution performance obligations, the customer simultaneously receives and consumes the benefit of the services as the commodity is delivered. Therefore, the transaction price is allocated proportionally over the series of identical performance obligations with each contract, and the Company satisfies performance obligations over time as midstream transportation and distribution services are performed. The transaction price is calculated based on (i) index price, plus a contractual markup in the case of natural gas supply agreements (considered variable due to fluctuations in the index), (ii) CPUC and FERC regulated rates or negotiated rates in the case of transportation agreements and (iii) contracted amounts (with annual CPI escalators) in the case of the Company's distribution agreement.

Table of Contents    Index to Financial Statements    Glossary of Defined Terms

The Company's crude oil transportation revenue also includes amounts earned for pipeline loss allowance ("PLA"). PLA revenue, recorded within transportation revenue, represents the estimated realizable value of the earned loss allowance volumes received by the Company as applicable under the tariff or contract. As is common in the pipeline transportation industry, as crude oil is transported, the Company earns a small percentage of the crude oil volume transported to offset any measurement uncertainty or actual volumes lost in transit. The Company will settle the PLA with its shippers either in-kind or in cash. PLA received by the Company typically exceeds actual pipeline losses in transit and typically results in a benefit to the Company.

When PLA is paid in-kind, the barrels are valued at current market price less standard deductions, recorded as inventory and recognized as non-cash consideration revenue, concurrent with related transportation services. PLA paid in cash is treated in the same way as in-kind, but no inventory is created. In accordance with ASC 606, when control of the PLA volumes has been transferred to the purchaser, the Company records this non-cash consideration as revenue at the contractual sales price within PLA revenue and PLA cost of revenues.

Based on the nature of the agreements, revenue for all but one of the Company's natural gas supply, transportation and distribution performance obligations is recognized on a right to invoice basis as the performance obligations are met, which represents what the Company expects to receive in consideration and is representative of value delivered to the customer.

*System Maintenance & Improvement*

System maintenance and improvement contracts are specific and tailored to the customer's needs, have no alternative use and have an enforceable right to payment as the services are provided. Revenue is recognized on an input method, based on the actual cost of service as a measure of the performance obligation satisfaction. Differences between amounts invoiced and revenue recognized under the input method are reflected as an asset or liability on the Consolidated Balance Sheets. The costs of system improvement projects are recognized as a financing arrangement in accordance with guidance in the ASC 842 lease standard while the margin is recognized in accordance with the ASC 606 revenue standard as discussed above.

The table below summarizes the Company's contract liability balance related to its transportation and distribution revenue contracts as of December 31, 2022 and 2021:

|  | Contract Liability[1] | |
|---|---|---|
|  | December 31, 2022 | December 31, 2021 |
| Beginning Balance January 1 | $ 5,339,364 | $ 6,104,979 |
| Unrecognized Performance Obligations | 1,175,824 | 199,405 |
| Recognized Performance Obligations | (587,315) | (965,020) |
| Ending Balance December 31 | $ 5,927,873 | $ 5,339,364 |

(1) The contract liability balance is included in unearned revenue in the Consolidated Balance Sheets.

The Company's contract asset balances were immaterial as of both December 31, 2022 and 2021. The Company also recognized deferred contract costs related to incremental costs to obtain a transportation performance obligation contract, which are amortized on a straight-line basis over the remaining term of the contract. As of December 31, 2022, the remaining unamortized deferred contract costs balance was $756 thousand. The contract asset and deferred contract costs balances are included in prepaid expenses and other assets in the Consolidated Balance Sheets.

The following is a breakout of the Company's transportation and distribution revenue for the years ended December 31, 2022, 2021 and 2020:

|  | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2022 | | 2021 | | 2020 | |
| Crude oil transportation revenue | $ 100,351,627 | 82.2 % | $ 94,935,160 | 81.5 % | $ — | — % |
| Natural gas transportation contracts | 15,415,891 | 12.6 % | 15,222,145 | 13.1 % | 12,840,795 | 64.3 % |
| Natural gas distribution contracts | 4,899,750 | 4.0 % | 4,785,548 | 4.1 % | 4,782,284 | 23.9 % |
| Other | 1,341,500 | 1.2 % | 1,593,759 | 1.3 % | 2,349,272 | 11.8 % |
| Total | $ 122,008,768 | 100.0 % | $ 116,536,612 | 100.0 % | $ 19,972,351 | 100.0 % |

Table of Contents    Index to Financial Statements    Glossary of Defined Terms

**5. LEASED PROPERTIES AND LEASES**

Prior to 2021, the Company primarily acquired midstream and downstream assets in the U.S. energy sector such as pipelines, storage terminals, and gas and electric distribution systems, and, historically, leased many of these assets to operators under triple-net leases. The Company's leased property was classified as an operating lease and was recorded as leased property in the Consolidated Balance Sheets. Base rent related to the Company's leased property was recognized on a straight-line basis over the term of the lease when collectability was probable. Participating rent was recognized when it was earned, based on the achievement of specified performance criteria. Base and participating rent were recorded as lease revenue in the Consolidated Statements of Operations. The Company regularly evaluated the collectability of any deferred rent receivable on a lease-by-lease basis. The evaluation primarily included assessment of the financial condition and credit quality of the Company's tenants, changes in tenants' payment history and current economic factors. When the collectability of the deferred rent receivable or future lease payments were no longer probable, the Company recognized a write-off of the deferred rent receivable as a reduction of revenue in the Consolidated Statements of Operations.

The Company divested the last of its material leased assets, including (i) GIGS on February 4, 2021 as described further below and (ii) the Pinedale LGS on June 30, 2020 in a sale to its tenant, Ultra Wyoming, LLC ("Ultra Wyoming") pursuant to the terms of the sale agreement approved by the U.S. Bankruptcy Court overseeing the bankruptcy proceedings of Ultra Wyoming and its parent company, Ultra Petroleum Corp ("UPL").

**Sale and Impairment of the Grand Isle Gathering System**

During 2020, the nonpayment of rent by the tenant of the GIGS (the "EGC Tenant") along with the significant decline in the global oil market triggered indicators of impairment for the GIGS asset. As a result, the Company recognized a $140.3 million loss on impairment of leased property related to the GIGS asset in the Consolidated Statements of Operations for the year ended December 31, 2020. The Company also previously recognized deferred rent receivable for the lease agreement for the Grand Isle Gathering Lease (the Grand Isle Lease Agreement"), which primarily represented timing differences between the straight-line revenue recognition and contractual lease receipts over the lease term. Given the EGC Tenant's nonpayment of rent and the Company's expectations surrounding the collectability of the contractual lease payments under the lease, the Company recognized a non-cash write-off of the deferred rent receivable of $30.1 million. The non-cash write-off was recognized as a reduction of revenue in the Consolidated Statements of Operations for the year ended December 31, 2020.

As discussed in Note 3 ("Acquisitions"), on February 4, 2021, the GIGS asset was used as partial consideration for the acquisition of the Company's interest in Crimson resulting in its disposal, along with the ARO (collectively, the "GIGS Disposal Group"), which was assumed by the sellers. Upon meeting the held-for-sale criteria in mid-January 2021, the Company ceased recording depreciation on the GIGS asset. The GIGS asset had a carrying value of $63.5 million and the ARO had a carrying value of $8.8 million, or a net carrying value of $54.7 million for the GIGS Disposal Group. The GIGS asset had a fair value of approximately $48.9 million at the time of disposal, which was determined by a discounted cash flow model and utilized the forecast of a market participant and its expected operation of the asset. The fair value measurement is also based on significant inputs not observable in the market and thus represent Level 3 measurements. The significant unobservable inputs include a discount rate of 11.75%. The contribution of the GIGS Disposal Group resulted in a loss on impairment and disposal of leased property of $5.8 million in the Consolidated Statements of Operations in the first quarter of 2021.

**Termination of the Grand Isle Lease Agreement**

As described in Note 12 ("Commitments And Contingencies"), in connection with the GIGS disposition, the Company and Grand Isle Corridor entered into a Settlement and Mutual Release Agreement (the "Settlement Agreement") with the EGC Tenant and related parties related to the previously reported litigation between them and terminated the Grand Isle Lease Agreement. The termination of the Grand Isle Lease Agreement resulted in the write-off of deferred lease costs of $166 thousand, which is recorded as a loss on termination of lease in the Consolidated Statements of Operations for the year ended December 31, 2021.

**Sale and Impairment of the Pinedale Liquids Gathering System**

On April 14, 2020, UPL, the parent and guarantor of the lease obligations of the tenant and operator of the Company's Pinedale LGS, announced that its significant indebtedness and extremely challenging current market conditions raised a substantial doubt about its ability to continue as a going concern. The going concern qualification in UPL's financial statements filed in its 2019 Annual Report on Form 10-K resulted in defaults under UPL's credit and term loan agreement. UPL also disclosed that it elected not to make interest payments on certain outstanding indebtedness, triggering a 30-day grace period. If such interest payments were not made by the end of the grace period, an event of default would occur, potentially causing its outstanding indebtedness to become immediately due and payable. UPL further disclosed that if it was unable to obtain sufficient additional capital to repay the outstanding indebtedness and sufficient liquidity to meet its operating needs, it may be necessary for UPL to seek protection from creditors under Chapter 11 of the U.S. Bankruptcy Code.

F-21

On May 14, 2020, UPL filed a voluntary petition to reorganize under Chapter 11 of the U.S. Bankruptcy Code. The filing included Ultra Wyoming, the operator of the Pinedale LGS and tenant under the lease agreement for Pinedale LGS (the "Pinedale Lease Agreement") with the Company's indirect wholly owned subsidiary Pinedale Corridor, LP ("Pinedale LP"). The bankruptcy filing of both the guarantor, UPL, and the tenant constituted defaults under the terms of the Pinedale Lease Agreement. The bankruptcy filing imposed a stay of CorEnergy's ability to exercise remedies for the foregoing defaults. Ultra Wyoming also filed a motion to reject the Pinedale Lease Agreement, with a request that such motion be effective June 30, 2020. Pending the effective date of the rejection, Section 365 of the Bankruptcy Code generally requires Ultra Wyoming to comply on a timely basis with the provisions of the Pinedale Lease Agreement, including the payment provisions. Accordingly, the Company received the rent payments due on the first day of April, May and June 2020.

Pinedale LP, along with the Prudential Insurance Company of America ("Prudential"), the lender under the Amended Pinedale Term Credit Facility discussed in Note 14 ("Debt"), commenced discussions with UPL, which resulted in UPL presenting an initial offer to purchase the Pinedale LGS. The Amended Pinedale Term Credit Facility was secured by the Pinedale LGS and was not secured by any assets of CorEnergy or its other subsidiaries.

On June 5, 2020, Pinedale LP filed a motion with the U.S. Bankruptcy Court objecting to Ultra Wyoming's motion to reject the Pinedale Lease Agreement while continuing its negotiations with UPL. Pinedale LP and the Company agreed in principle to terms with Ultra Wyoming to sell the Pinedale LGS for $18.0 million cash as set forth in a non-binding term sheet that was filed with the U.S. Bankruptcy Court in UPL's Chapter 11 case along with a motion for approval of the transaction on June 22, 2020. A copy of the draft definitive purchase and sale agreement was also filed with the motion.

On June 26, 2020, the U.S. Bankruptcy Court in UPL's Chapter 11 case approved the sale of the Pinedale LGS. Following such approval, on June 29, 2020, Pinedale LP entered into the purchase and sale agreement (the "Sale Agreement") with Ultra Wyoming. On June 30, 2020, Pinedale LP closed on the sale of the Pinedale LGS to its tenant, Ultra Wyoming, for total cash consideration of $18.0 million, and the Pinedale Lease Agreement was terminated. The sale was completed pursuant to the terms of the Sale Agreement previously approved by the bankruptcy court as discussed above. In connection with the closing of the sale, the Company and Pinedale LP entered into a mutual release of all claims related to the Pinedale LGS and the Pinedale Lease Agreement with UPL and Ultra Wyoming, including a release by Pinedale LP of all claims against UPL and Ultra Wyoming arising from the rejection or termination of the Pinedale Lease Agreement.

In conjunction with the sale of the Pinedale LGS described above, Pinedale LP and the Company entered into a compromise and release agreement (the "Release Agreement") with Prudential related to the Amended Pinedale Term Credit Facility, which had an outstanding balance of approximately $32.0 million, net of $132 thousand of deferred debt issuance costs. Pursuant to the Release Agreement, the $18.0 million sale proceeds from the Sale Agreement were provided by Ultra Wyoming directly to Prudential. The Company also provided the remaining cash available at Pinedale LP of approximately $3.3 million (including $198 thousand for accrued interest) to Prudential in exchange for (i) the release of all liens on the Pinedale LGS and the other assets of Pinedale LP, (ii) the termination of the Company's pledge of equity interests of the general partner of Pinedale LP, (iii) the termination and satisfaction in full of the obligations of Pinedale LP under the Amended Pinedale Term Credit Facility and (iv) a general release of any other obligations of Pinedale LP and/or the Company and their respective directors, officers, employees or agents pertaining to the Amended Pinedale Term Credit Facility.

During the negotiation and closing of the sale of the Pinedale LGS to Ultra Wyoming, the Company determined that impairment indicators existed because the value to be received from the sale was less than the carrying value of the asset of $164.5 million. As a result of these indicators and the sale of the Pinedale LGS, the Company recognized a loss on impairment and disposal of leased property in the Consolidated Statement of Operations of approximately $146.5 million for the year ended December 31, 2020. Further, the sale of the Pinedale LGS resulted in the termination of the Pinedale Lease Agreement, and the Company recognized a loss on termination of lease of approximately $458 thousand for the year ended December 31, 2020. These losses were partially offset by the settlement of the Amended Pinedale Term Credit Facility with Prudential (as discussed above and in Note 14 ("Debt"), which resulted in a gain on extinguishment of debt of $11.0 million for year ended December 31, 2020.

**LESSOR - LEASED PROPERTIES**

Beginning in 2019, the Company concluded that Omega's long-term contract with the DOD to provide natural gas distribution to Fort Leonard Wood through the Omega Pipeline System meets the definition of a lease under ASC 842. Omega is the lessor in the contract and the lease is classified as an operating lease. The Company noted the non-lease component is the predominant component in the lease, and the timing and pattern of transfer of the lease component and the associated non-lease component are the same. As discussed in Note 2 ("Significant Accounting Policies"), the Company elected not to separate lease and related non-lease components if the non-lease components otherwise would be accounted for in accordance with the revenue standard under ASC 606; therefore, the Company continues to account for the DOD contract under the revenue standard.

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

In the second quarter of 2019, the Company started a system improvement project on Omega's pipeline distribution system, which is considered a "built to suit" transaction under ASC 842. The system improvement project is a separate lease component and the DOD is deemed to control the system improvement due to certain contract provisions. As a result, the Company accounted for the costs of the system improvement as a financing arrangement, which is included in accounts and other receivables in the Consolidated Balance Sheets. The margin the Company earned on the system improvement project is a non-lease component accounted for under the revenue standard. Refer to Note 2 ("Significant Accounting Policies") for further details.

**LESSEE - LEASED PROPERTIES**

The Company's operating subsidiaries currently lease land, corporate office space, single-use office space and equipment. During the year ended December 31, 2021, the Company acquired additional right-of-use assets and lease liabilities in connection with the Crimson Transaction and the Internalization, and the Company signed a new lease for the Denver corporate office. Crimson entered into a new corporate office lease which will commence upon possession of the property, which is anticipated during the first-half of 2023. No lease payments are due for the first year. No right-of-use asset or operating lease liability has been recorded as of December 31, 2022. The Company's leases are classified as operating leases and are presented as operating right-of-use assets and operating lease liability on the Consolidated Balance Sheet. The Company recognizes lease expense in the Consolidated Statements of Operations on a straight-line basis over the remaining lease term. The Company noted the following information regarding its operating leases for the years ended December 31, 2022 and 2021:

| | For the Year Ended | |
| --- | --- | --- |
| | December 31, 2022 | December 31, 2021 |
| Lease cost: | | |
| Operating lease cost | $ 1,786,402 | $ 1,462,136 |
| Short term lease cost | — | 229,166 |
| Total lease cost | $ 1,786,402 | $ 1,691,302 |

The following table reflects the weighted average lease term and discount rate for leases in which the Company is a lessee:

| | December 31, 2022 | December 31, 2021 |
| --- | --- | --- |
| Weighted-average remaining lease term - operating leases (in years) | 11.0 | 10.0 |
| Weighted-average discount rate - operating leases | 7.45 % | 7.04 % |

F-23

The following table represents cash flow and supplemental information for leases in which the Company is a lessee:

| | For the Year Ended | |
| --- | --- | --- |
| | December 31, 2022 | December 31, 2021 |
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows used on operating leases | $ 1,783,822 | $ 1,691,894 |
| | | |
| Supplemental disclosure of noncash leasing activities: | | |
| Right-of-use assets obtained in exchange for new operating lease liabilities[1] | 66,385 | 372,380 |

(1) Includes lease extension.

The following table reflects the undiscounted cash flows for future minimum lease payments under non-cancellable operating leases reconciled to the Company's lease liabilities on our Consolidated Balance Sheet as of December 31, 2022:

| For the Years Ending December 31, | Operating Leases |
| --- | --- |
| 2023 | 1,215,193 |
| 2024 | 475,209 |
| 2025 | 419,068 |
| 2026 | 464,849 |
| 2027 | 464,849 |
| Thereafter | 3,972,700 |
| Total | 7,011,868 |
| Less: Present Value Discount | 2,315,458 |
| Operating Lease Liabilities | $ 4,696,410 |

## 6. FINANCING NOTES RECEIVABLE

Financing notes receivable are presented at face value plus accrued interest receivable and deferred loan origination costs, and net of related direct loan origination income. Each quarter, the Company reviews its financing notes receivable to determine if the balances are realizable based on factors affecting the collectability of those balances. Factors may include credit quality, timeliness of required periodic payments, past due status, and management discussions with obligors. The Company evaluates the collectability of both interest and principal of each of its loans to determine if an allowance is needed. An allowance will be recorded when, based on current information and events, the Company determines it is probable that it will be unable to collect all amounts due according to the existing contractual terms.

### Four Wood Corridor Financing Notes Receivable

On August 10, 2021, the terms of the financing notes between Four Wood Corridor, LLC, a subsidiary of the Company, and Compass SWD, LLC (the "Compass REIT Loan") were amended (i) to extend the maturity date from November 30, 2024 to July 31, 2026 and (ii) to reduce payments to $24 thousand per month through the maturity date beginning as of August 31, 2021. Additionally, the amended Compass REIT Loan will continue to accrue interest at an annual rate of 12.0%. As of December 31, 2022 and December 31, 2021, the Compass REIT Loan was recorded, net of allowance at $858 thousand and $1.0 million, respectively.

On May 22, 2020, the terms of the Compass REIT Loan were amended (i) to extend the maturity date from June 30, 2021 to November 30, 2024 and (ii) to reduce payments to interest only through December 31, 2020. Additionally, the amended Compass REIT Loan will continue to accrue interest at an annual rate of 8.5% through May 31, 2021. Subsequent to May 31, 2021, interest will accrue at an annual rate of 12.0%. Monthly principal payments of approximately $11 thousand resumed on January 1, 2021 and increase annually beginning on June 30, 2021 through the maturity date.

F-24

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

## 7. INCOME TAXES

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amount of assets and liabilities for financial reporting and tax purposes. Components of the Company's deferred tax assets and liabilities as of December 31, 2022 and 2021, are as follows:

**Deferred Tax Assets and Liabilities**

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Deferred Tax Assets:** | | |
| Deferred contract revenue | $ 1,230,985 | $ 1,333,510 |
| Net operating loss carryforwards | 7,027,439 | 6,929,821 |
| Capital loss carryforward | 92,418 | 92,418 |
| Other | 338 | 366 |
| Sub-total | $ 8,351,180 | $ 8,356,115 |
| Valuation allowance | (5,168,148) | (3,891,342) |
| Sub-total | $ 3,183,032 | $ 4,464,773 |
| **Deferred Tax Liabilities:** | | |
| Cost recovery of fixed assets | $ (4,386,744) | $ (4,187,621) |
| Other | (88,588) | (70,867) |
| Sub-total | $ (4,475,332) | $ (4,258,488) |
| **Total net deferred tax (liability) asset** | $ (1,292,300) | $ 206,285 |

The total deferred tax assets and liabilities presented above relate to the Company's TRSs. The Company recognizes the tax benefits of uncertain tax positions only when the position is "more likely than not" to be sustained upon examination by the tax authorities based on the technical merits of the tax position. The Company's policy is to record interest and penalties on uncertain tax positions as part of tax expense. As of December 31, 2022 and 2021, the Company had no uncertain positions. Tax years subsequent to the year ended December 31, 2018, remain open to examination by federal and state tax authorities.

As of December 31, 2022 and 2021, the TRSs had cumulative net operating loss carryforwards ("NOL") of $29.2 million and $28.7 million, respectively. Net operating losses of $26.4 million generated during the years ended December 31, 2022, 2021, 2020, 2019, and 2018 may be carried forward indefinitely, subject to limitation. Net operating losses generated for years prior to December 31, 2018 may be carried forward for 20 years. If not utilized, the net operating loss will expire as follows: $328 thousand, $176 thousand, $328 thousand, and $1.9 million in the years ending December 31, 2034, 2035, 2036 and 2037, respectively. The Company also has a capital loss carryforward of $440 thousand as of December 31, 2022 and 2021, respectively, which if not utilized, will expire as of December 31, 2024.

Management assessed the available evidence and determined that it is more likely than not that the capital loss carryforward will not be utilized prior to expiration. Due to the uncertainty of realizing this deferred tax asset, a valuation allowance of $92 thousand was recorded equal to the amount of the tax benefit of this carryforward at December 31, 2022 and 2021. Additionally, the Company determined that certain of the federal and state net operating losses would not be utilized prior to their expiration. Due to the uncertainty of realizing these deferred tax assets, a valuation allowance of $5.2 million was recorded as of December 31, 2022 and $3.8 million as of December 31, 2021. In the future, if the Company concludes, based on existence of sufficient evidence, that it should realize more or less of the deferred tax assets, the valuation allowance will be adjusted accordingly in the period such conclusion is made.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The CARES Act, among other things, permitted NOL carryovers and carrybacks to offset 100.0% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allowed NOLs originating in 2018, 2019 and 2020 to be carried back to each of the five preceding taxable years to generate a refund of previously paid income taxes. Certain of the Company's TRSs have NOLs totaling approximately $1.2 million were eligible for carryback under the CARES Act. The benefit of these carrybacks has been recorded as an increase to income taxes receivable and a reduction to deferred tax assets. Certain NOLs which were initially measured at the current corporate income tax rate of 21.0% are being carried back to offset taxable income that was taxed at a pre-Tax Cuts and Jobs Act of 2017 rate of 34%. The benefit received from the rate differential is reflected in the income tax provision for the year ended December 31, 2020.

Total income tax expense (benefit) differs from the amount computed by applying the federal statutory income tax rate of 21% for the years ended December 31, 2022, 2021 and 2020, to income or loss from operations and other income and expense for the years presented, as follows:

F-25

**Income Tax Expense (Benefit)**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | | As Restated | |
| | 2022 | 2021 | 2020 |
| Application of statutory income tax rate | $ (2,327,764) | $ (278,726) | $ (64,292,012) |
| State income taxes, net of federal tax benefit | 68,320 | 681,342 | 35,371 |
| Income of Real Estate Investment Trust not subject to tax | 2,664,761 | 532,952 | 64,331,160 |
| Increase in valuation allowance | 1,276,806 | 3,159,313 | — |
| Other | (10,212) | (20,122) | (159,377) |
| **Total income tax expense (benefit)** | $ 1,671,911 | $ 4,074,759 | $ (84,858) |

Total income taxes are computed by applying the federal statutory rate of 21% plus a blended state income tax rate.

For the years ended December 31, 2022, 2021 and 2020, all of the income tax expense (benefit) presented above relates to the assets and activities held in the Company's TRSs. The components of income tax expense (benefit) include the following for the periods presented:

**Components of Income Tax Expense (Benefit)**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **Current tax expense (benefit)** | | | |
| Federal | $ 141,544 | $ (7,154) | $ (420,074) |
| State (net of federal tax benefit) | 31,783 | 5,623 | 24,231 |
| Total current tax expense (benefit) | $ 173,327 | $ (1,531) | $ (395,843) |
| **Deferred tax expense** | | | |
| Federal | $ 947,036 | $ 3,400,571 | $ 299,845 |
| State (net of federal tax benefit) | 551,548 | 675,719 | 11,140 |
| Total deferred tax expense | $ 1,498,584 | $ 4,076,290 | $ 310,985 |
| **Total income tax expense (benefit), net** | $ 1,671,911 | $ 4,074,759 | $ (84,858) |

The Company elected, effective for the 2013 tax year, to be treated as a REIT for federal income tax purposes. The Company's REIT election, assuming continued compliance with the applicable tests, will continue in effect for subsequent tax years. The Company satisfied the annual income test and the quarterly asset tests necessary for us to qualify to be taxed as a REIT for 2022, 2021 and 2020.

## 8. PROPERTY AND EQUIPMENT

Property and equipment consist of the following:

**Property and Equipment**

| | December 31, 2022 | December 31, 2021 |
| --- | --- | --- |
| Land | $ 24,989,784 | $ 24,989,784 |
| Crude oil pipelines | 185,047,366 | 180,663,146 |
| Natural gas pipeline | 105,322,987 | 104,847,405 |
| Right-of-way agreements | 87,206,374 | 85,451,574 |
| Pipeline related facilities | 42,647,865 | 39,995,865 |
| Tanks | 33,092,825 | 30,679,194 |
| Construction work in progress | 10,495,266 | 8,581,560 |
| Vehicles and trailers and other equipment | 2,684,993 | 1,840,609 |
| Office equipment and computers | 1,569,698 | 1,403,090 |
| **Gross property and equipment** | $ 493,057,158 | $ 478,452,227 |
| Less: accumulated depreciation | (52,908,191) | (37,022,034) |
| **Net property and equipment** | $ 440,148,967 | $ 441,430,193 |

Depreciation expense was $16.0 million, $14.7 million, and $3.4 million for the years ended December 31, 2022, 2021 and 2020, respectively.

## 9. GOODWILL

Goodwill represents the excess of the purchase price over the fair value of net identifiable assets on acquisition of a business. The carrying value of goodwill is not amortized, rather, it is assessed for impairment annually, or more frequently if events or circumstances arise that suggest the carrying value of goodwill may be impaired. The Company performs its annual impairment test of the carrying value of goodwill on December 31 of each year.

Triggering events that potentially warrant an interim goodwill impairment test include, among other factors, declines in historical or projected revenue, operating income or cash flows, and sustained declines in the Company's stock price or market capitalization, considered both in absolute terms and relative to peers.

Based on sustained declines in the trading price of our common stock and other securities with an established trading market, we performed a Step 1 interim quantitative goodwill impairment test as of September 30, 2022, primarily using a market approach to determine the fair value of our reporting units. This assessment involved determining the fair value of our reporting units and comparing those values to the carrying value of each corresponding reporting unit. The carrying values of the reporting units exceeded their fair value and the goodwill impairment was measured at the amount by which the reporting unit's carrying value exceeded its fair value, limited to a maximum of the goodwill recorded at each reporting unit. Fair value of our reporting units were primarily estimated using earnings multiples techniques as well as a reconciliation of our consolidated market capitalization to the fair value of all reporting units. The determination of fair value using the earnings multiples technique requires significant assumptions to be made in relation to the appropriateness of earnings multipliers for reporting units and other qualitative factors associated with our reporting units and business activities. As a result of this testing, we recorded a goodwill impairment charge of $16.2 million during the year ended December 31, 2022, which was included as a discrete line item on the Consolidated Statement of Operations. The $16.2 million goodwill impairment charge was comprised of $14.5 million associated with the Corridor reporting unit and $1.7 million associated with the MoGas reporting unit. As of December 31, 2022, there was no remaining goodwill recorded and therefore no additional goodwill subject to future risk of additional impairment.

As of December 31, 2021, the gross carrying value and net carrying value of the goodwill was $6.2 million.

As of December 31, 2022, the gross carrying value and the net carrying value of the goodwill was $0 following the $16.2 million impairment charge recorded during the year ended December 31, 2022.

The change in the net book value of goodwill for the years ended December 31, 2022 and 2021, was as follows:

|  | 2022 | 2021 |
|---|---|---|
| As of January 1, | $ 16,210,020 | $ 1,718,868 |
| Corridor Infrastructure Trust Acquisition | — | 14,491,152 |
| Loss on impairment | (16,210,020) | — |
| As of December 31, | $ — | $ 16,210,020 |

## 10. CONCENTRATIONS

The Company has customer concentrations through several major customers that have contracted transportation revenues. Concentrations consist of the following:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
|  | Percent of Revenues | Percent of Revenues | Percent of Revenues[1] |
| Phillips 66 | 11 % | 12 % | NA |
| Shell Trading US Company | 14 % | 17 % | NA |
| Chevron Products Company | 18 % | 20 % | NA |
| PBF Holding Company | 15 % | 13 % | NA |
| Valero | 7 % | 5 % | NA |
| Spire | 6 % | 6 % | 16 % |
| Ameren Energy | 4 % | 4 % | 11 % |
| Department of Defense | 4 % | 4 % | 15 % |

(1) The 2020 percent is calculated using consolidated revenues excluding the deferred rent receivable write-off recorded on GIGS for the year ended December 31, 2021.

Table of Contents Index to Financial Statements Glossary of Defined Terms

**11. MANAGEMENT AGREEMENT**

On February 4, 2021, the Company entered into a Contribution Agreement with the Contributors and Corridor, the Company's former external manager. Consummation of the transaction contemplated in the Contribution Agreement resulted in the Internalization of Corridor, which was approved by stockholders on June 29, 2021.

On June 29, 2021, the CorEnergy stockholders approved the Internalization. The Internalization transaction was completed on July 6, 2021. Pursuant to the Contribution Agreement, the Company issued to the Contributors, based on each Contributor's percentage ownership in Corridor, the Internalization Consideration.

As a result of the Internalization transaction, the Company now (i) owns all material assets of Corridor used in the conduct of the business, and (ii) is managed by officers and employees who previously worked for Corridor, and have become employees of the Company. Both the Management Agreement and the Administrative Agreement are no longer in effect upon the closing of the Internalization transaction. Additional information on the Internalization Transaction can be found in our Current Report on Form 8-K filed with the SEC on July 12, 2021.

Contemporaneously with the execution of the Contribution Agreement, the Company and Corridor entered into the First Amendment (the "First Amendment") to the Management Agreement that had the effect, beginning February 1, 2021, of (i) eliminating the management fee, (ii) providing a one-time, $1.0 million advance to Corridor to fund bonus payments to its employees in connection with the Internalization and (iii) providing payments to Corridor for actual employee compensation and office related expenses. Further, the First Amendment provided that, beginning April 1, 2021, the Company paid Corridor additional cash fees equivalent to the aggregate amount of all distributions that would accrue, if declared, on and after such date with respect to the securities to be issued as the Internalization Consideration pursuant to the Contribution Agreement (an amount, assuming payment on a cash basis equal to approximately $172 thousand per quarter). This agreement was in effect until the closing of the Internalization on July 6, 2021. The Company paid $53 thousand for declared dividends under this agreement.

Prior to Internalization, the terms of the Management Agreement provided for a quarterly management fee to be paid to Corridor equal to .25% (1.0% annualized) of the value of the Company's Managed Assets as of the end of each quarter. "Managed Assets" means the total assets of the Company (including any securities receivables, other personal property or real property purchased with or attributable to any borrowed funds) minus (A) the initial invested value of all non-controlling interests, (B) the value of any hedged derivative assets, (C) any prepaid expenses and (D) all of the accrued liabilities other than (1) deferred taxes and (2) debt entered into for the purpose of leverage. For purposes of the definition of Managed Assets, the Company's securities portfolio will be valued at then current market value. For purposes of the definition of Managed Assets, other personal property and real property assets will include real and other personal property owned and the assets of the Company invested, directly or indirectly, in equity interests in or loans secured by real estate or personal property (including acquisition related costs and acquisition costs that may be allocated to intangibles or are unallocated), valued at the aggregate historical cost, before reserves for depreciation, amortization, impairment charges or bad debts or other similar noncash reserves. In light of previous provisions for loan losses on certain of the Company's energy infrastructure financing investments, Corridor voluntarily recommended, and the Company agreed, that effective on and after the Company's March 31, 2016 balance sheet date, solely for the purpose of computing the value of the Company's Managed Assets in calculating the quarterly management fee under the terms of the Management Agreement, that portion of the Management Fee attributable to such loans shall be based on the estimated net realizable value of the loans, which shall not exceed the amount invested in the loans as of the end of the quarter for which the Management Fee is to be calculated.

The Management Agreement also provided for payment of a quarterly incentive fee of 10.0% of the increase in distributions paid over a distribution threshold equal to $0.625 per share per quarter, and require that at least half of any incentive fees paid be reinvested in the Company's Common Stock. The foregoing description of the terms of the Management Agreement is qualified in its entirety by reference to the full terms of such agreement, which is incorporated by reference as an exhibit to this Report.

Fees incurred under the Management Agreement for the year ended December 31, 2022, 2021 and 2020 were $0, $322 thousand, and $5.1 million, respectively. The Management Agreement effectively terminated upon the signing of the Contribution Agreement on February 4, 2021. Thereafter, the Company paid the fees all related to reimbursement of Corridor employee compensation and office-related expenses under the First Amendment. For the year ended December 31, 2021, the fees incurred include $1.0 million related to a transaction bonus outlined in the Contribution Agreement and $1.6 million for reimbursement of Corridor employee compensation and office related expenses under the First Amendment. The Company also reimbursed Corridor for approximately $50 thousand in legal fees incurred in connection with the Internalization and paid investment advisors $1.9 million in connection with the execution of the Contribution Agreement. Fees incurred are reported in the General and Administrative line item on the Consolidated Statements of Operations.

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

The Company paid Corridor, as the Company's Administrator pursuant to an Administrative Agreement, an administrative fee equal to an annual rate of 0.04% of the value of the Company's Managed Assets, with a minimum annual fee of $30 thousand. Fees incurred under the Administrative Agreement for the years ended December 31, 2022, 2021 and 2020 were $0, $13 thousand, and $203 thousand, respectively, and are reported in the General and Administrative line item on the Consolidated Statements of Operations. The Administrative Agreement was effectively terminated upon the closing of the Internalization Transaction on July 6, 2021.

## 12. COMMITMENTS AND CONTINGENCIES

### Crimson Legal Proceedings

In June 2016, Crimson discovered a leak on its Ventura pipeline located in Ventura County, California, at which time Crimson began remediation of the observed release and concurrently took the pipeline out of service. The pipeline was properly repaired and returned to service in June 2016. The remediation efforts are complete, the affected area has been restored, and Crimson has implemented a monitoring program for the area. In November 2018, Crimson was notified by the California State Water Resources Board of a Forthcoming Assessment of Administrative Civil Liability concerning alleged violations of the California Water Code related to this incident. Through pre-enforcement settlement discussion, Crimson and the California State Water Board reached a settlement requiring Crimson to pay a penalty which, in connection with final approval from the State of California, was set at $330 thousand, (including incidental charges) and was paid during the year ended December 31, 2021. Pursuant to such settlement, Crimson also must annually perform certain ongoing monitoring obligations related to the condition of the affected barranca. Additionally, in July 2020 Crimson entered into a Stipulation of Final Judgment related to the same incident with the Ventura County, California Department of Fish and Wildlife, Office of Oil Spill Response, pursuant to which Crimson agreed to pay penalties of $900 thousand plus reimbursement of certain investigative costs. Half of this settlement was paid during 2020 prior to the Crimson Transaction, and the remainder was paid during the three months ended September 30, 2021.

The Company also is subject to various other claims and legal proceedings covering a wide range of matters that arose in the ordinary course of business. In the opinion of management, all such matters are without merit or are of such kind, or involve such amounts, as would not have a material adverse effect on the financial position, results of operations or cash flows of the Company.

### California Bonds Indemnification

The Company maintains certain agreements for indemnity and surety bonds with various California regulatory bodies. The total annual premium paid for the bonds currently outstanding is approximately $115 thousand, recorded in general and administrative expense.

## 13. FAIR VALUE

The following section describes the valuation methodologies used by the Company to estimate fair value of financial instruments for disclosure purposes only, as required under disclosure guidance related to the fair value of financial instruments.

*Cash and Cash Equivalents* — The carrying value of cash, amounts due from banks, federal funds sold and securities purchased under resale agreements approximates fair value.

*Financing Notes Receivable* — The carrying value of financing notes receivable approximates fair value. The financing notes receivable are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Financing notes with carrying values that are not expected to be recovered through future cash flows are written-down to their estimated net realizable value. Estimates of realizable value are determined based on unobservable inputs, including estimates of future cash flow generation and value of collateral underlying the notes. The carrying value of financing notes receivable approximates fair value.

*Inventory* — Inventory primarily consists of crude oil earned as in-kind PLA payments and is valued using an average costing method at the lower of cost or net realizable value.

*Secured Credit Facilities* — The fair value of the Company's long-term variable-rate debt under its secured credit facilities approximates carrying value.

F-29

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

*Unsecured Convertible Senior Notes* — The fair value of the unsecured convertible senior notes is estimated using quoted market prices from either active (Level 1) or generally active (Level 2) markets.

| | | Carrying and Fair Value Amounts | | | |
| --- | --- | --- | --- | --- | --- |
| | Level within Fair Value Hierarchy | December 31, 2022 | | December 31, 2021 | |
| | | Carrying Amount [1] | Fair Value | Carrying Amount [1] | Fair Value |
| **Financial Assets:** | | | | | |
| 5.875% Unsecured convertible senior notes | Level 2 | 116,323,530 | 79,093,500 | 115,665,830 | 111,144,075 |
| (1) The carrying value of debt balances are presented net of unamortized original issuance discount and debt issuance costs. | | | | | |

## 14. DEBT

The following is a summary of debt facilities and balances as of December 31, 2022 and 2021:

| | Total Commitment or Original Principal | Quarterly Principal Payments[2] | Maturity Date | December 31, 2022 | | December 31, 2021 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Amount Outstanding | Interest Rate | Amount Outstanding | Interest Rate |
| Crimson Secured Credit Facility: | | | | | | | |
| Crimson Revolver | $ 50,000,000 | | 5/3/2024 | $ 35,000,000 | 8.41 % | $ 27,000,000 | 4.11 % |
| Crimson Term Loan | 80,000,000 | 2,000,000 | 5/3/2024 | 66,000,000 | 8.22 % | 74,000,000 | 4.10 % |
| Crimson Uncommitted Incremental Credit Facility | 25,000,000 | | 5/3/2024 | — | — % | — | — % |
| 5.875% Unsecured Convertible Senior Notes | 120,000,000 | — | 8/15/2025 | 118,050,000 | 5.875 % | 118,050,000 | 5.875 % |
| **Total Debt** | | | | $ 219,050,000 | | $ 219,050,000 | |
| Less: | | | | | | | |
| Unamortized deferred financing costs on 5.875% Convertible Senior Notes | | | | $ 218,587 | | $ 301,859 | |
| Unamortized discount on 5.875% Convertible Senior Notes | | | | 1,507,883 | | 2,082,311 | |
| Unamortized deferred financing costs on Crimson Term Loan[1] | | | | 665,547 | | 1,275,244 | |
| **Long-term debt, net of deferred financing costs** | | | | $ 216,657,983 | | $ 215,390,586 | |
| **Debt due within one year** | | | | $ 10,000,000 | | $ 8,000,000 | |

(1) Unamortized deferred financing costs related to the Company's revolving credit facility are included in Deferred Costs in the Assets section of the Consolidated Balance Sheets. Refer to the "Deferred Financing Costs" paragraph below.

(2) The required quarterly principal payments will increase from $2.0 million to $3.0 million beginning with the payment due September 30, 2023.

**Crimson Credit Facility**

On February 4, 2021, in connection with the Crimson Transaction, Crimson Midstream Operating and Corridor MoGas, (collectively, the "Borrowers"), together with Crimson, MoGas Debt Holdco LLC, MoGas, CorEnergy Pipeline Company, LLC, United Property Systems, Crimson Pipeline, LLC and Cardinal Pipeline, L.P. (collectively, the "Guarantors") entered into the Crimson Credit Facility with the lenders from time to time party thereto and Wells Fargo Bank, National Association, as administrative agent for other participating lenders. The Crimson Credit Facility provides borrowing capacity of up to $155.0 million, consisting of: a $50.0 million revolving credit facility ("Crimson Revolver"), an $80.0 million term loan ("Crimson Term Loan") and an uncommitted incremental credit facility of $25.0 million. Upon closing of the Crimson Transaction described in Note 3 ("Acquisitions"), the Borrowers drew the $80.0 million Crimson Term Loan and $25.0 million on the Crimson Revolver. Subsequent to the initial closing, on March 25, 2021, Crimson contributed all of its equity interests in Crimson Midstream Services, LLC and Crimson Midstream I Corporation to Crimson Midstream Operating, and, effective as of May 4, 2021, such subsidiaries have become additional Guarantors pursuant to the Amended and Restated Guaranty Agreement and parties to the Amended and Restated Security Agreement and (in the case of Crimson Midstream I Corporation) the Amended and Restated Pledge Agreement. On September 14, 2022, the Borrowers completed the first amendment to the Amended and Restated Credit Agreement, which replaced the use of a LIBOR reference rate with the Secured Overnight Financing Rate ("SOFR"). On March 6, 2023, the Company completed the second amendment to the Amended and Restated Credit Agreement, which extended the maturity of the Crimson Term Loan from its maturity on February 4, 2024 to May 3, 2024 and amended the applicable total leverage ratio in the first two quarters of 2023 from 2.50 to 2.75. Beginning in Q3 2023, the total leverage ratio steps down to 2.50 for the remainder of the term. Additionally, the required quarterly amortization of the term loan was increased from $2.0 million to $3.0 million beginning in the third quarter of 2023.

Table of Contents        Index to Financial Statements        Glossary of Defined Terms

The loans under the Crimson Credit Facility mature on May 3, 2024. The Crimson Term Loan requires quarterly payments of $2.0 million in arrears on the last business day of March, June, September and December, commencing on June 30, 2021 and increasing to $3.0 million per quarter beginning September 30, 2023. Subject to certain conditions, all loans made under the Crimson Credit Facility shall, at the option of the Borrowers, bear interest at either (a) SOFR plus an adjustment based tenor ("Adjusted SOFR") plus a spread of 325 to 450 basis points, or (b) a rate equal to the highest of (i) the prime rate established by the Administrative Agent, (ii) the federal funds rate plus 0.5%, or (iii) the one-month Adjusted SOFR rate plus 1.0%, plus a spread of 225 to 350 basis points. The applicable spread for each interest rate is based on the Total Leverage Ratio (as defined in the Crimson Credit Facility). The effective interest rate for the Crimson Credit Facility was approximately 8.3% as of December 31, 2022.

Outstanding balances under the facility are guaranteed by the Guarantors pursuant to the Amended and Restated Guaranty Agreement and secured by all assets of the Borrowers and Guarantors (including the equity in such parties), other than any assets regulated by the CPUC and other customary excluded assets, pursuant to an Amended and Restated Pledge Agreement and an Amended and Restated Security Agreement.  Pursuant to the second amendment, under certain circumstances, the stock and assets of the Company's Omega Gas Pipeline, LLC and Omega Gas Marketing subsidiaries must be pledged as collateral. Also, under certain circumstances, the proceeds from specified asset sales must be used to repay the term loan and revolving credit facility after which the borrowing availability under the revolving credit facility will be reduced to $30.0 million. Under the terms of the Crimson Credit Facility, as amended, the Borrowers and their restricted subsidiaries will be subject to certain financial covenants commencing with the fiscal quarter ended June 30, 2021 as follows (i): the total leverage ratio shall not be greater than: (a) 3.00 to 1.00 commencing with the fiscal quarter ended June 30, 2021 through and including the fiscal quarter ending December 31, 2021; (b) 2.75 to 1.00 commencing with the fiscal quarter ending March 31, 2022 through and including the fiscal quarter ending June 30, 2023; and (c) 2.50 to 1.00 commencing with the fiscal quarter ending September 30, 2023 and for each fiscal quarter thereafter and (ii) the debt service coverage ratio, shall not be less than 2.00 to 1.00.

Cash distributions to the Company from the Borrowers are subject to certain restrictions, including without limitation, no default or event of default, compliance with financial covenants, minimum undrawn availability and available free cash flow. Pursuant to the second amendment, no distributions may be made from the co-borrowers to their parent until the proceeds of specified asset sales have been used to repay the loans and other financial conditions have been met. The Borrowers and their restricted subsidiaries are also subject to certain additional affirmative and negative covenants customary for credit transactions of this type. The Crimson Credit Facility contains default and cross-default provisions (with applicable customary grace or cure periods) customary for transactions of this type. Upon the occurrence of an event of default, payment of all amounts outstanding under the Crimson Credit Facility may become immediately due and payable at the election of the Required Lenders (as defined in the Crimson Credit Facility).

**Contractual Payments**

The remaining contractual principal payments as of December 31, 2022 are as follows:

| Year | Crimson Term Loan | Crimson Revolver | 5.875% Convertible Notes | Total |
|---|---|---|---|---|
| 2023 | 10,000,000 | — | — | 10,000,000 |
| 2024 | 56,000,000 | 35,000,000 | — | 91,000,000 |
| 2025 | — | — | 118,050,000 | 118,050,000 |
| Total Remaining Contractual Payments | $ 66,000,000 | $ 35,000,000 | $ 118,050,000 | $ 219,050,000 |

Table of Contents Index to Financial Statements Glossary of Defined Terms

*Deferred Financing Costs*

A summary of deferred financing cost amortization expenses for the years ended December 31, 2022, 2021 and 2020 is as follows:

**Deferred Financing Cost Amortization Expense** [1][2]

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Crimson Credit Facility | $ 990,540 | $ 899,304 | $ — |
| CorEnergy Credit Facility | — | 47,879 | 574,541 |
| Amended Pinedale Term Credit Facility | — | — | 26,410 |
| **Total Deferred Debt Cost Amortization** | $ 990,540 | $ 947,183 | $ 600,951 |

(1) Amortization of deferred debt issuance costs is included in interest expense in the Consolidated Statements of Operations.
(2) For the amount of deferred debt costs amortization relating to the 5.875% Convertible Notes included in the Consolidated Statements of Operations, refer to the Convertible Note Interest Expense table below.

CorEnergy Credit Facilities

Prior to the July 28, 2017 credit facility amendment and restatement, previously existing deferred financing costs related to the CorEnergy Credit Facility were approximately $1.8 million, of which approximately $1.6 million continued to be deferred and amortized under the amended and restated facility. Additionally, the Company incurred approximately $1.3 million in new debt issuance costs which were deferred and were being amortized over the term of the new facility. The total deferred financing costs of $2.9 million were being amortized on a straight-line basis over the 5-year term of the amended and restated CorEnergy Credit Facility prior to its termination in February 2021 (as described above). In connection with such termination, the Company wrote-off the remaining deferred debt costs of approximately $862 thousand as a loss on extinguishment of debt in the Consolidated Statement of Operations in the first quarter of 2021.

*Convertible Debt*

5.875% Convertible Notes

On August 12, 2019, the Company completed a private placement offering of $120.0 million aggregate principal amount of 5.875% Convertible Notes to the initial purchasers of such notes for cash in reliance on a registration exemption provided by Section 4(a)(2) of the Securities Act. The initial purchasers then resold the 5.875% Convertible Notes for cash equal to 100% of the aggregate principal amount thereof to qualified institutional buyers, as defined in Rule 144A under the Securities Act, in reliance on a registration exemption provided by Rule 144A. The 5.875% Convertible Notes mature on August 15, 2025 and bear interest at a rate of 5.875% per annum, payable semiannually in arrears on February 15 and August 15 of each year, beginning on February 15, 2020.

The 5.875% Convertible Notes were issued with an initial purchasers' discount of $3.5 million, which is being amortized over the life of the notes. The Company also incurred approximately $508 thousand of deferred debt costs in issuing the 5.875% Convertible Notes, which are also being amortized over the life of the notes.

Holders may convert all or any portion of their 5.875% Convertible Notes into shares of the Company's Common Stock at their option at any time prior to the close of business on the business day immediately preceding the maturity date. The initial conversion rate for the 5.875% Convertible Notes is 20.0 shares of Common Stock per $1,000 principal amount of the 5.875% Convertible Notes, equivalent to an initial conversion price of $50.00 per share of the Company's Common Stock. Such conversion rate will be subject to adjustment in certain events as specified in the Indenture.

Upon the occurrence of a make-whole fundamental change (as defined in the indenture governing the notes, and which includes the failure to maintain the Company's common stock listing on the NYSE or Nasdaq), holders may require the Company to repurchase for cash all or any portion of their 5.875% Convertible Notes at a fundamental change repurchase price equal to 100.0% of the principal amount of the 5.875% Convertible Notes to be repurchased, plus any accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date as prescribed in the Indenture. Following the occurrence of a make- whole fundamental change, or if the Company delivers a notice of redemption (as discussed below), the Company will, in certain circumstances, increase the applicable conversion rate for a holder that elects to convert its notes in connection with such make-whole fundamental change or notice of redemption.

The Company may not redeem the 5.875% Convertible Notes prior to August 15, 2023. On or after August 15, 2023, the Company may redeem for cash all or part of the 5.875% Convertible Notes, at its option, if the last reported sale price of its Common Stock has been at least 125.0% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and

F-32

Table of Contents          Index to Financial Statements                    Glossary of Defined Terms

including, the trading day immediately preceding the date on which the Company provides notice of redemption. The redemption price will equal 100.0% of the principal amount of the 5.875% Convertible Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

The indenture for the 5.875% Convertible Notes specifies events of default, including default by the Company or any of its subsidiaries with respect to any debt agreements under which there may be outstanding, or by which there may be secured or evidenced, any debt in excess of $25.0 million in the aggregate of the Company and/or any such subsidiary, resulting in such indebtedness becoming or being declared due and payable prior to its stated maturity.

The 5.875% Convertible Notes rank equal in right of payment to any other current and future unsecured obligations of the Company and senior in right of payment to any other current and future indebtedness of the Company that is contractually subordinated to the 5.875% Convertible Notes. The 5.875% Convertible Notes are structurally subordinated to all liabilities (including trade payables) of the Company's subsidiaries. The 5.875% Convertible Notes are effectively junior to all of the Company's existing or future secured debt, to the extent of the value of the collateral securing such debt.

On April 29, 2020, the Company repurchased approximately $2.0 million face amount of its 5.875% Convertible Notes for approximately $1.3 million, including $24 thousand of accrued interest. The repurchase resulted in a gain on extinguishment of debt of $576 thousand recorded in the Consolidated Statements of Operations for the year ended December 31, 2020. As of December 31, 2022, the Company has $118.1 million aggregate principal amount of 5.875% Convertible Notes outstanding.

7.00% Convertible Notes

During the first quarter of 2020, certain holders elected to convert $416 thousand of 7.00% Convertible Notes for approximately 12,605 shares of Common Stock. On June 12, 2020, the Company paid $1.7 million in aggregate principal and $59 thousand in accrued interest upon maturity of the 7.00% Convertible Notes to extinguish the remaining debt outstanding.

The following is a summary of the impact of the Company's convertible notes on interest expense for the years ended December 31, 2022, 2021 and 2020:

**Convertible Note Interest Expense**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **5.875% Convertible Notes:** | | | |
| Interest Expense | $ 6,935,438 | $ 6,935,438 | $ 6,972,988 |
| Discount Amortization | 574,428 | 574,428 | 577,539 |
| Deferred Debt Issuance Amortization | 83,272 | 83,272 | 83,723 |
| **Total 5.875% Convertible Notes** | $ 7,593,138 | $ 7,593,138 | $ 7,634,250 |
| | | | |
| **7.00% Convertible Notes:** | | | |
| Interest Expense | $ — | $ — | $ 55,331 |
| Discount Amortization | — | — | 6,682 |
| Deferred Debt Issuance Cost Amortization | — | — | 1,140 |
| **Total 7.00% Convertible Notes** | $ — | $ — | $ 63,153 |
| **Total Convertible Notes** | $ 7,593,138 | $ 7,593,138 | $ 7,697,403 |

Including the impact of the convertible debt discount and related deferred debt issuance costs, the effective interest rate on the 5.875% Convertible Notes is approximately 6.4% for the years ended December 31, 2022, 2021, and 2020.

***Note Payable***

For the years ended December 31, 2022 and 2021, the Company entered into short-term financing agreements in order to fund corporate insurance needs. As of December 31, 2022, the outstanding balance on the note payable was $3.5 million. The note bears interest at 5.7% with monthly payments due until September 2023. As of December 31, 2021, the outstanding balance on the note payable was $863 thousand. The note bore interest at 3.6% with monthly payments made through February 2022.

F-33

**15. ASSET RETIREMENT OBLIGATION**

On February 4, 2021, the Company disposed of the ARO upon providing the GIGS asset as partial consideration for the Crimson Transaction. Refer to Note 5 ("Leased Properties And Leases") for further details.

A component of the consideration exchanged to purchase the GIGS assets in June 2015 was the assumption of the seller's ARO associated with such assets. The ARO represents the estimated costs of decommissioning the GIGS pipelines and onshore oil receiving and separation facilities in Grand Isle, Louisiana at retirement. The Company recognized the ARO at its estimated fair value on the date of acquisition with a corresponding ARO asset capitalized as part of the carrying amount of the related long-lived assets to be depreciated over the assets' remaining useful lives.

The Company's former tenant, EGC Tenant, had an ARO related to the platform which was attached to the GIGS pipelines. If EGC Tenant was unable to fulfill their obligation, the Company would have been required to assume the liability for the related asset removal costs.

In periods subsequent to the initial measurement of an ARO, the Company recognized changes in the liability resulting from (a) the passage of time through accretion expense and (b) revisions to either the timing or the amount of the estimate of undiscounted cash flows based on periodic revaluations. Future expected cash flows were based on subjective estimates and assumptions, which inherently included significant uncertainties which were beyond the Company's control. These assumptions represent Level 3 inputs in the fair value hierarchy. The Company has no assets that are legally restricted for purposes of settling asset retirement obligations.

In 2020, the Company revised its estimates to reflect a decrease in timing of the cash flows due to a change in the useful life of the ARO segments identified during the GIGS asset impairment discussed in Note 5 ("Leased Properties And Leases").

The following table is a reconciliation of the ARO as of December 31, 2022 and 2021:

**Asset Retirement Obligation**

|  | For the Years Ended December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Beginning asset retirement obligation | $  — | $  8,762,579 |
| ARO accretion expense | — | 40,546 |
| ARO disposed | — | (8,803,125) |
| Ending asset retirement obligation | $  — | $  — |

**16. STOCKHOLDERS' EQUITY**

**STOCK-BASED COMPENSATION**

On May 25, 2022, the Stockholders of the Company approved the CorEnergy Infrastructure Trust, Inc. Omnibus Equity Incentive Plan (the "Omnibus Plan") (3,000,000 shares of Common Stock authorized) which will allow the Company to grant equity awards to its employees, non-employee directors, and consultants in its employ or service (or the employ or service of any parent, subsidiary or affiliate). Incentive compensation programs play a pivotal role in the Company's effort to (i) attract and retain key personnel essential to its long-term growth and financial success, and (ii) align long term interests of recipients with the Company's stockholders. Under the Omnibus Plan, awards may be granted in the form of options, restricted stock, restricted stock units ("RSU"s), stock appreciation rights, Common Stock awards, cash-based awards and performance-based awards.

On May 26, 2022, the Company filed a Form S-8 registration statement with the SEC, pursuant to which it registered 3,000,000 shares of Common Stock for issuance under the Omnibus Plan. As of December 31, 2022, the Company has issued 80,817 shares of Common Stock and 674,312 RSUs (net of forfeitures) to directors and certain of the Company's employees, respectively, under the Omnibus Plan resulting in remaining availability of 2,244,871 shares of Common Stock under the plan.

Table of Contents | Index to Financial Statements | Glossary of Defined Terms

**Director Stock-Based Compensation**

During the year ended December 31, 2022, members of the Board of Directors were granted 80,817 fully vested shares of Common Stock at an aggregated weighted average grant date fair value of $2.23 per share.

The Company recognized $180 thousand of expense in general and administrative expense for the year ended December 31, 2022 in connection with these grants.

**Restricted Stock Units**

The Company's Board of Directors approved awards of restricted stock units, to certain of the Company's employees under the Omnibus Plan. The number of awards granted to each employee is derived from the employee's bonus target and a 20-day volume weighted average price (VWAP) of CorEnergy's Common Stock with the number of RSUs fixed as of the grant date. The Company records stock-based compensation expense on a straight-line recognition method over the requisite service period for the entire award. Each RSU represents the right to receive one share of Common Stock at a future date. The RSUs vest over three years, with 1/3 vesting on March 15th each year. These RSUs will be settled within 30 days of vesting, and will accrue dividend equivalents equal to dividends declared on the Company's Common Stock over the vesting period which will be paid to the holder in cash or, at the discretion of the Compensation and Corporate Governance Committee of the Board, in the form of additional shares of Common Stock having a fair market value equal to the amount of such dividend equivalents upon vesting of the units. Forfeitures for the RSU's and dividend equivalents will be accounted for when they occur.

The following table represents the nonvested RSU activity for the year ended December 31, 2022:

| | Restricted Stock Units | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at January 1, 2022 | — | $ — |
| Granted | 682,890 | 2.58 |
| Vested | — | — |
| Forfeited | (8,578) | 2.58 |
| Outstanding at December 31, 2022 | 674,312 | $ 2.58 |
| Expected to vest as of December 31, 2022 | 674,312 | |

As of December 31, 2022, the estimated remaining unrecognized compensation cost related to stock-based compensation arrangements was $1.3 million. The weighted average period over which this remaining compensation expense is expected to be recognized is 2.20 years.

The following table presents the Company's stock-based compensation expense:

| | For the Year Ended | |
|---|---|---|
| | December 31, 2022 | December 31, 2021 |
| General and administrative expense | $ 540,891 | $ — |
| Transportation and distribution expense | 71,226 | — |
| Total | $ 612,117 | $ — |

**PREFERRED STOCK**

The Company's authorized preferred stock consists of 69,367,000 shares with a par value of $0.001 per share. On January 27, 2015, the Company sold, in an underwritten public offering, 2,250,000 depositary shares, each representing 1/100th of a share of Series A Preferred Stock. Pursuant to this offering, the Company issued 22,500 whole shares of Series A Preferred Stock. On April 18, 2017, the Company closed a follow-on underwritten public offering of 2,800,000 depositary shares, each representing 1/100th of a share of 7.375% Series A Preferred Stock, at a price of $25.00 per depositary share. On May 10, 2017, the Company sold an additional 150,000 depositary shares at a public offering price of $25.00 per depositary share in connection with the underwriters' exercise of their over-allotment option to purchase additional shares. Following the offering, the Company had a total of 5,200,000 depositary shares outstanding, or 52,000 whole shares.

The depositary shares pay an annual dividend of $1.84375 per share, equivalent to 7.375% of the $25.00 liquidation preference. The depositary shares may be redeemed on or after January 27, 2020, at the Company's option, in whole or in part, at the $25.00 liquidation preference plus all accrued and unpaid dividends to, but not including, the date of redemption. The depositary shares have no stated maturity, are not subject to any sinking fund or mandatory redemption and are not convertible into any other

F-35

Table of Contents Index to Financial Statements Glossary of Defined Terms

securities of the Company except in connection with certain changes of control. Holders of the depositary shares generally have no voting rights, except for limited voting rights if the Company fails to pay dividends for six or more quarters (whether or not consecutive) and in certain other circumstances. The depositary shares representing the Series A Preferred Stock trade on the NYSE under the ticker "CORRPrA."

The Company's Board of Directors authorized a securities repurchase program for the Company to buy up to the remaining amount of its 7.00% Convertible Notes prior to maturity on June 15, 2020 and up to $5.0 million of its Common Stock and Series A Preferred Stock, which commenced March 21, 2020. Purchases were made through the program until it expired on August 20, 2020. During 2020, the Company repurchased 8,913 depositary shares of Series A Preferred Stock for approximately $162 thousand in cash.

As of December 31, 2022, the Company had a total of 5,181,027 depositary shares outstanding, or approximately 51,810 whole shares, with an aggregate par value of $51.81. See Note 22 ("Subsequent Events"), for further information regarding the declaration and payment of a dividend on the Series A Preferred Stock.

### COMMON STOCK

As of December 31, 2022, the Company had 15,253,958 of common shares issued and outstanding.

### CLASS B COMMON STOCK

On June 29, 2021, the stockholders approved (i) the issuance of Class B Common Stock upon conversion of the Series B Preferred Stock issuable pursuant to the terms of the Crimson Transaction, which will effectively make the Crimson Class A-2 Units exchangeable directly for Class B Common Stock following receipt of CPUC approval, and (ii) the issuance of Class B Common Stock pursuant to the terms of the Internalization. On July 6, 2021, the Company issued 683,761 Class B common shares to the Contributors as partial consideration for the Internalization transaction. The Crimson Class A-3 Units are also exchangeable directly for Class B Common Stock following receipt of CPUC approval.

### NON-CONTROLLING INTEREST

As disclosed in Note 3 ("Acquisitions") as part of the Crimson Transaction, the Company and the Grier Members entered into the Third LLC Agreement of Crimson. Pursuant to the terms of the Third LLC Agreement, the Grier Members and the Company's interests in Crimson are summarized in the table below:

|  | As of December 31, 2022 | |
|---|---|---|
|  | Grier Members | CorEnergy |
|  | (in units, except as noted) | |
| **Economic ownership interests in Crimson Midstream Holdings, LLC** | | |
| Class A-1 Units | 1,650,245 | — |
| Class A-2 Units | 2,460,414 | — |
| Class A-3 Units | 2,450,142 | — |
|  | | |
| Class B-1 Units | — | 10,000 |
|  | | |
| **Voting ownership interests in Crimson Midstream Holdings, LLC** | | |
| Class C-1 Units | 505,000 | 495,000 |
| Voting Interests of Class C-1 Units (%) | 50.50 % | 49.50 % |

In June 2021, the final working capital adjustment was made for the Crimson Transaction, which resulted in an increase in the assets acquired of $1.8 million (as further described above in Note 3 ("Acquisition"). This resulted in 37,043 Class A-1 Units being issued to the Grier Members. The newly issued units resulted in an increase in non-controlling interest of $883 thousand.

After working capital adjustments, the fair value of the Grier Members' noncontrolling interest, which is represented by the Crimson Class A-1, Class A-2, and Class A-3 Units listed above, was $116.2 million as of the acquisition date (as further described in Note 3 ("Acquisitions")) . As described further below, the Class A-1, Class A-2, and Class A-3 Units may eventually be exchanged for shares of the Company's common and preferred stock subject to the approval of the CPUC ("CPUC Approval"). The Crimson Class A-1, Class A-2, and Class A-3 Units held by the Grier Members and the Class B-1 Units held by the Company represent economic interests in Crimson while the Class C-1 Units represent voting interests.

Upon CPUC Approval, the parties will enter into a Fourth Amended and Restated LLC Agreement of Crimson ("Fourth LLC Agreement"), which will, among other things, (i) give the Company voting control of Crimson and its assets, in connection with an anticipated further restructuring of the Company's asset ownership structure and (ii) provide the Grier Members and management members (as defined below) the right to exchange their entire interest in Crimson for securities of the Company as follows:

- Class A-1 Units will become exchangeable for up to 1,755,579, (which includes the addition of 37,043 shares as a result of the working capital adjustment) of the Company's depositary shares, each representing 1/100th of a share of the Company's Series A Preferred Stock (prior to the changes made, effective June 30, 2021, pursuant to the Stock Exchange Agreement described in the Company's Current Report Form 8-K filed July 12, 2021, the Class A-1 Units would have become exchangeable into the Company's 9.0% Series C Preferred Stock);

- Class A-2 units will become exchangeable for up to 8,762,158 additional shares of the non-listed Class B Common Stock of the Company, and

- Class A-3 Units will become exchangeable for up to 2,450,142 shares of the non-listed Class B Common Stock.

Class B Common Stock will eventually be converted into Common Stock on the occurrence of the earlier of the following: (i) the occurrence of the third anniversary of the closing date of the Crimson Transaction or (ii) the satisfaction of certain conditions related to an increase in the relative dividend rate of the Common Stock.

Prior to exchange of the Crimson Class A-1, Class A-2, and Class A-3 Units into corresponding Company securities (and after giving effect to the changes to the Company securities into which the Class A-1 and Class A-2 Units may be exchanged, as described above), the Grier Members only have the right to receive distributions to the extent that the Company's Board of Directors determines dividends would be payable if they held the shares of Series A Preferred (for the Class A-1 Units), Series B Preferred (for the Class A-2 Units prior to July 7, 2021), and Class B Common Stock (for the Class A-2 Units (on and after July 7, 2021) and Class A-3 Units), respectively, regardless of whether the securities are outstanding. If the respective shares of Series A Preferred, Series B Preferred and Class B Common Stock are not outstanding, the Company's Board of Directors must consider that they would be outstanding when declaring dividends on the Common Stock. Following CPUC Approval, the terms of the Fourth LLC Agreement provide that such rights will continue until the Grier Members elect to exchange the Crimson Class A-1, Class A-2, and Class A-3 Units for the related securities of the Company. In addition, after CPUC Approval, certain Crimson Units held by the Grier Members are expected to be transferred to other individuals currently managing Crimson (the "Management Members"). The following table summarizes the distributions payable under the Crimson Class A-1, Class A-2, and Class A-3 Units as if the Grier Members held the respective underlying Company securities. The Crimson Class A-1, Class A-2, and Class A-3 Units are entitled to the distribution regardless of whether the corresponding Company security is outstanding.

| Units | Distribution Rights of CorEnergy Securities | Annual Distribution per Share |
|---|---|---|
| Class A-1 Units | 7.375% Series A Cumulative Redeemable Preferred Stock[1] | $ 1.84 |
| Class A-2 Units | Class B Common Stock[3][4] | Varies[2][3] |
| Class A-3 Units | Class B Common Stock[3][4] | Varies[2][3] |

(1) On June 29, 2021, the Board of the Company authorized management to enter into an agreement to convert the right to receive the Company's 9.00% Series C Preferred Stock into 7.375% Series A Cumulative Redeemable Preferred Stock.

(2) On July 7, 2021, the Company converted the right that holders of Class A-2 Units would have had to exchange such units for shares of the Company's 4.00% Series B Preferred Stock into a right to exchange such units for shares of the Company's Class B Common Stock with the effective date, for dividend purposes, of June 30, 2021.

(3) (A) For the fiscal quarters of the Company ending June 30, 2021, September 30, 2021, December 31, 2021 and March 31, 2022, the Common Stock Base Dividend Per Share shall equal $0.05 per share per quarter; (B) for the fiscal quarters of the Company ending June 30, 2022, September 30, 2022, December 31, 2022 and March 31, 2023, the Common Stock Base Dividend Per Share shall equal $0.055 per share per quarter; and (C) for the fiscal quarters of the Company ending June 30, 2023, September 30, 2023, December 31, 2023 and March 31, 2024, the Common Stock Base Dividend Per Share shall equal $0.06 per share per quarter. The Class B Common Stock dividend is subordinated based on a distribution formula described in footnote (4) below.

(4) For each fiscal quarter ending June 30, 2021 through and including the fiscal quarter ending March 31, 2024, each share of Class B Common Stock will be entitled to receive dividends (the "Class B Common Stock Dividends"), subject to Board approval, equal to the quotient of (i) difference of (A) CAD of the most recently completed quarter and (B) 1.25 multiplied by the Common Stock Base Dividend, divided by (ii) shares of Class B Common Stock issued and outstanding multiplied by 1.25.

During the year ended December 31, 2021, distributions of $2.3 million were paid to the Grier Members for the Class A-1 Units. A paid-in-kind distribution of 24,414 additional Class A-2 Units ($610 thousand) based on distributions that would have been payable on the Series B Preferred Stock. No distributions were paid to the Class A-3 Units as no distributions were declared on the Class B Common Stock.

F-37

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

During the year ended December 31, 2022, distributions in the amount of $3.2 million were paid to the Grier Members for the Class A-1 Units. No distributions were paid for the Class A-2 or Class A-3 Units as no distributions were declared on the Class B Common Stock.

## SHELF REGISTRATION

On October 30, 2018, the Company filed a shelf registration statement with the SEC, pursuant to which it registered 1,000,000 shares of Common Stock for issuance under its dividend reinvestment plan. As of December 31, 2022, the Company has issued 386,379 shares of Common Stock under its dividend reinvestment plan pursuant to the shelf registration, resulting in remaining availability (subject to the current limitation discussed below) of 613,621 shares of Common Stock.

On September 16, 2021, the Company had a resale shelf registration statement declared effective by the SEC, pursuant to which it registered the following securities that were issued in connection with the Internalization for resale by the Contributors: 1,837,607 shares of Common Stock (including both (i)1,153,846 shares of Common Stock issued at the closing of the Internalization transaction and (ii) up to 683,761 additional shares of Common Stock which may be acquired by the Contributors upon the conversion of outstanding shares of our unlisted Class B Common Stock issued at the closing of the Internalization) and 170,213 depositary shares, each representing 1/100th fractional interest of a share of Series A Preferred Stock issued at the closing of the Internalization transaction.

On November 3, 2021, the Company filed a new shelf registration statement, which replaced the previous Shelf Registration Statement, declared effective on November 17, 2021 by the SEC, pursuant to which the Company may publicly offer additional debt or equity securities with an aggregate offering price of up to $600.0 million. As of December 31, 2022, the Company has not issued any securities under this new shelf registration statement, so total availability remains at $600.0 million.

## 17. EARNINGS (LOSS) PER SHARE

Basic and diluted earnings (loss) per share data is computed using the two-class method for the years ended December 31, 2022 and December 31, 2021, based on the weighted-average number of shares of Common Stock and Class B Common Stock outstanding during the periods. The undistributed earnings and losses are allocated between Common Stock and Class B Common Stock as if all earnings and losses had been distributed during the period. Common Stock and Class B Common Stock have equal rights to undistributed earnings and losses. For the year ended December 31, 2020, the two-class method was not applicable as there was only one outstanding class of common stock.

As described in Note 20 ("Restatement Of Prior Period"), the Company previously reported earnings per share for its Common Stock and Class B Common Stock on a combined basis, however, beginning with the quarter ended September 30, 2021 when the Class B Common Stock was first issued, the Company should have reported earnings per share using the two-class method, under which earnings per share for its Common Stock and Class B Common Stock should have been separately calculated and reported, during these periods. Additionally, due to the error in calculating net income allocable to non-controlling interest that is further described in Note 20 ("Restatement Of Prior Period"), the numerator used in calculating earnings per share was incorrect beginning with the quarter ended March 31, 2021.

The following table sets forth the computation of basic net loss and diluted net loss per share under the two-class method for the periods ended December 31, 2022 and December 31, 2021.

### LOSS PER SHARE

|  | For the Years Ended December 31, | |
|---|---|---|
|  | **2022** | **2021** |
|  |  | (As Restated) |
| **Numerator for basic and diluted losses per Common Stock and Class B Common Stock** |  |  |
| Net Loss | $ (9,519,669) | $ (2,535,558) |
| Less: Net Income attributable to non-controlling interest | 3,236,848 | 2,866,467 |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (12,756,517) | $ (5,402,025) |
| Less dividends and distributions: |  |  |
| Preferred dividend requirements | 9,552,519 | 9,395,604 |
| Common Stock dividends | 3,004,579 | 2,850,026 |
| **Total undistributed losses** | $ (25,313,615) | $ (17,647,655) |

| | | | | |
|---|---|---:|---|---:|
| Common Stock undistributed losses - basic | $ | (24,213,549) | $ | (17,241,830) |
| Class B Common Stock undistributed losses - basic | | (1,100,066) | | (405,825) |
| **Total undistributed losses - basic** | $ | (25,313,615) | $ | (17,647,655) |
| | | | | |
| Common Stock undistributed losses - diluted | $ | (25,313,615) | $ | (17,241,830) |
| Class B Common Stock undistributed losses - diluted | | (1,100,066) | | (405,825) |
| **Total undistributed losses - diluted** | $ | (26,413,681) | $ | (17,647,655) |
| | | | | |
| Common Stock dividends | $ | 3,004,579 | $ | 2,850,026 |
| Common Stock undistributed losses - basic | | (24,213,549) | | (17,241,830) |
| **Numerator for basic net loss per Common Stock share:** | $ | (21,208,970) | $ | (14,391,804) |
| | | | | |
| Class B Common Stock dividends | $ | — | $ | — |
| Class B Common Stock undistributed losses - basic | | (1,100,066) | | (405,825) |
| **Numerator for basic net loss per Class B Common Stock share:** | $ | (1,100,066) | $ | (405,825) |
| | | | | |
| Common Stock dividends | $ | 3,004,579 | $ | 2,850,026 |
| Common Stock undistributed losses - diluted | | (25,313,615) | | (17,241,830) |
| **Numerator for diluted net loss per Common Stock share:** | $ | (22,309,036) | $ | (14,391,804) |
| | | | | |
| Class B Common Stock dividends | $ | — | $ | — |
| Class B Common Stock undistributed losses - diluted | | (1,100,066) | | (405,825) |
| **Numerator for diluted net loss per Class B Common Stock share:** | $ | (1,100,066) | $ | (405,825) |
| | | | | |
| **Denominator for basic net loss per Common Stock and Class B Common Stock share:** | | | | |
| Common Stock weighted average shares outstanding - basic | | 15,050,266 | | 14,246,526 |
| Class B Common Stock weighted average shares outstanding - basic | | 683,761 | | 335,324 |
| | | | | |
| **Denominator for diluted net loss per Common Stock and Class B Common Stock share:** | | | | |
| Common Stock weighted average shares outstanding - diluted[1][2] | | 15,515,223 | | 14,246,526 |
| Class B Common Stock weighted average shares outstanding - diluted[3] | | 683,761 | | 335,324 |
| | | | | |
| **Basic net loss per share:** | | | | |
| Common Stock | $ | (1.41) | $ | (1.01) |
| Class B Common Stock | $ | (1.61) | $ | (1.21) |
| | | | | |
| **Diluted net loss per share:** | | | | |
| Common Stock | $ | (1.44) | $ | (1.01) |
| Class B Common Stock | $ | (1.61) | $ | (1.21) |

NOTES TO TABLE

(1) For purposes of the diluted net loss per share computation for Common Stock, all shares of Class B Common Stock are assumed to be converted at a ratio of 1 Class B Common Stock share to .68 Common Stock share; therefore, 100% of undistributed losses is allocated to Common Stock

(2) For the period ended December 31, 2022, 2,361,000 shares of Common Stock are excluded from the computation of diluted net loss per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt. For the period ended December 31, 2021, 2,825,957 shares of Common Stock are excluded from the computation of diluted net loss per share because their effect would be antidilutive. This is comprised of 464,957 shares of converted Class B Common Stock and 2,361,000 shares of converted 5.875% convertible debt.

(3) For purposes of the diluted net loss per share computation for Class B Common Stock, weighted average shares of Class B Common Stock are assumed not converted to Common Stock.

**Loss Per Share For the Year Ended December 31, 2020**

Basic loss per share data is computed based on the weighted-average number of shares of common stock outstanding during the periods. Diluted loss per share data is computed based on the weighted-average number of shares of common stock outstanding, including all potentially issuable shares of common stock. Diluted loss per share for the year ended December 31, 2020 excludes

the impact to income and the number of shares outstanding from the conversion of the 7.00% Convertible Notes and the 5.875% Convertible Notes, as applicable, because such impact is antidilutive. The remaining 7.00% Convertible Notes matured on June 15, 2020.

Under the if converted method, the 5.875% Convertible Notes would result in an additional 2,361,000 common shares outstanding for the year ended December 31, 2020.

## LOSS PER SHARE

| | For the Year Ended December 31, 2020 |
|---|---|
| Net Loss attributable to CorEnergy Stockholders | $ (306,067,579) |
| Less: preferred dividend requirements[1] | 9,189,809 |
| Net Loss attributable to Common Stockholders | $ (315,257,388) |
| Weighted average shares - basic | 13,650,718 |
| Basic loss per share | $ (23.09) |
| | |
| Net Loss attributable to Common Stockholders (from above) | $ (315,257,388) |
| Add: After tax effect of convertible interest | — |
| Loss attributable for dilutive securities | $ (315,257,388) |
| Weighted average shares - diluted | 13,650,718 |
| Diluted loss per share | $ (23.09) |

(1) In connection with the repurchases of Series A Preferred Stock during the year ended December 31, 2020, preferred dividend requirements were reduced by $52,896, representing the discount in the repurchase price paid compared to the carrying amount derecognized.

## 18. VARIABLE INTEREST ENTITY

### Crimson Midstream Holdings

Since February 1, 2021, CorEnergy has held a 49.50% voting interest in Crimson and the Grier Members hold the remaining 50.50% voting interest. Crimson is a VIE because the legal entity is structured with non-substantive voting rights resulting from (i) the disproportionality between the voting interests of its members and certain economics of the distribution waterfall in the Third LLC Agreement and (ii) the *de facto* agent relationship between CorEnergy and Grier, who was appointed to CorEnergy's Board of Directors and Chief Operating Officer upon closing of the Crimson Transaction. As a result of this related-party relationship, substantially all of Crimson's activities either involve or are conducted on behalf of CorEnergy, which has disproportionately few voting rights, including Grier as a *de facto* agent.

Crimson is managed by the Crimson Board, which is made up of four managers of which the Company and the Grier Members are each represented by two managers. The Crimson Board is responsible for governing the significant activities that impact Crimson's economic performance, including a number of activities which are managed by an approved budget that requires super-majority approval or joint approval. In assessing the primary beneficiary, the Company determined that power is shared; however, the Company and the Grier Members as a related-party group, have characteristics of a primary beneficiary. The Company performed the "most closely associated" test and determined that CorEnergy is the entity in the related-party group most closely associated with the VIE. In performing this assessment, the Company considered, among other factors, that (i) its influence over the tax structure of Crimson so its operations could be included in the Company's REIT structure under its PLR, which allows fees received for the usage of storage and pipeline capacity to qualify as rents from real property; (ii) the activities of the Company are substantially similar in nature to the activities of Crimson as the Company owns existing transportation and distribution assets at MoGas and Omega; (iii) Crimson's assets represent a substantial portion of the Company's total assets; and (iv) the Grier Members' interest in Crimson in Class A-1, Class A-2, and Class A-3 Units will earn distributions if the CorEnergy Board of Directors declares a common or preferred dividend for Series A Preferred and Class B Common Stock. Therefore, CorEnergy is the primary beneficiary and consolidates the Crimson VIE, and the Grier Members' equity ownership interest (after the working capital adjustment and paid-in-kind dividends) is reflected as a non-controlling interest in the consolidated financial statements.

The Company noted that Crimson's assets cannot be used to settle CorEnergy's liabilities with the exception of quarterly distributions, if declared by the Crimson Board. The quarterly distributions are used to fund current obligations, projected working capital requirements, debt service payments and dividend payments. As discussed in Note 14 ("Debt"), cash distributions to the Company from the borrowers under the Crimson Credit Facility are subject to certain restrictions, including without limitation, no default or event of default, compliance with financial covenants, minimum undrawn availability and available free cash flow. Further, the Crimson Credit Facility is secured by assets at both Crimson Midstream Operating and Corridor MoGas,

Table of Contents Index to Financial Statements Glossary of Defined Terms

Inc. For the year ended December 31, 2022, the Company received $10.5 million in cash distributions from Crimson, which were in accordance with the terms of the Crimson Credit Facility. For the year ended December 31, 2021, the Company received $10.0 million, in cash distributions from Crimson, which were in accordance with the terms of the Crimson Credit Facility.

The Company's interest in Crimson is significant to its financial position, financial performance and cash flows. A significant decline in Crimson's ability to fund quarterly distributions to the Company could have a significant impact on the Company's financial performance, including its ability to fund the obligations described above.

**Limited Partnerships**

Under the consolidation guidance, limited partnerships and other similar entities are considered VIEs unless the limited partners hold substantive kick-out rights or participating rights. Management determined that Pinedale LP and Grand Isle Corridor LP are VIEs because the limited partners of both partnerships lack both substantive kick-out rights and participating rights. However, based on the general partners' roles and rights as afforded by the partnership agreements and its exposure to losses and benefits of each of the partnerships through its significant limited partner interests, management determined that CorEnergy is the primary beneficiary of both Pinedale LP and Grand Isle Corridor LP. Based upon this evaluation and the Company's 100.0% ownership of the limited partnership interest in both Pinedale LP and Grand Isle Corridor LP, the consolidated financial statements presented include full consolidation with respect to both partnerships.

## 19. RELATED PARTY TRANSACTIONS

As previously disclosed, John D. Grier, a director and Chief Operating Officer of the Company, together with the Grier Members, own the Class A-1, Class A-2, and Class A-3 equity ownership interest in Crimson, which the Company has a right to acquire in the future, pursuant to the terms of the MIPA, following receipt of CPUC approval for a change of control of Crimson's CPUC-regulated assets. The Grier Members also retain equity interests in Crescent Midstream Holdings, LLC ("Crescent Midstream Holdings") which they held prior to the Crimson Transaction, as well as Crescent Louisiana Midstream, LLC ("CLM"), Crimson Renewable Energy, L.P. ("CRE") and Delta Trading, L.P. ("Delta").

As of December 31, 2022, the Company is owed $168 thousand from related parties, including CLM, CRE and Delta, which is included in due from affiliated companies in the Consolidated Balance Sheet. These balances are primarily related to payroll, employee benefits and other services discussed below. The amounts billed to CLM are cash settled and the amounts billed to Crescent Midstream will reduce a prepaid TSA (as defined below) liability on the Company's books until such time as the TSA liability is reduced to zero. As of December 31, 2022, the prepaid TSA liability related to Crescent Midstream was $210 thousand and recorded in due to affiliated companies in the Consolidated Balance Sheets. For the year ended December 31, 2022 and 2021, Crimson billed TSA and Services (as defined below) related costs and benefits to related parties totaling $1.1 million and $9.9 million, respectively.

Total transition services reimbursements for the TSAs discussed below are presented in the Consolidated Statements of Operations as a reduction within transportation and distribution expense and general and administrative expense.

**Transition Services Agreements**

The subsidiaries of Crescent Midstream Holdings, LLC ("Crescent Midstream Holdings") were formerly a part of Crimson prior to the Crimson Transaction and received various business services from Crimson or certain of its subsidiaries. Effective February 4, 2021, Crimson, certain of Crimson's subsidiaries or a combination thereof, entered into several transition services agreements (collectively, the "Transition Services Agreements" or "TSAs") with Crescent Midstream Holdings to facilitate its transition to operating independently. Each of the TSAs are described in more detail below. Also, effective February 4, 2021, Crimson and certain of its subsidiaries entered into an Assignment and Assumption Agreement to assign all of the TSAs to Crimson's direct, wholly owned TRS, Crimson Midstream I Corporation ("Crimson Midstream I"). Crimson and/or certain of its subsidiaries were reimbursed approximately $156 thousand per month for services provided under the TSAs during 2021, for which the billed amount was allocated 50.0% to Crescent Midstream, LLC ("Crescent Midstream"), a wholly owned subsidiary of Crescent Midstream Holdings, and 50.0% to CLM, a 70.0% owned subsidiary of Crescent Midstream. These TSA agreements ended on February 3, 2022 and Crimson entered into a Services Agreement for some of the business services previously provided as described below.

*Employee TSA* - Crimson and Crescent Midstream Holdings entered into a transition services agreement (the "Employee TSA") whereby an indirect, wholly owned subsidiary of Crimson provided payroll, employee benefits and other related employment services to Crescent Midstream Holdings and its subsidiaries. Under the Employee TSA, Crimson's indirect, wholly owned subsidiary made available and assigned to Crescent Midstream Holdings and its subsidiaries certain employees to provide services primarily to Crescent Midstream Holdings and its subsidiaries. While the Employee TSA was in effect, Crescent Midstream

F-41

Table of Contents          Index to Financial Statements                Glossary of Defined Terms

Holdings was responsible for the daily supervision of and assignment of work to the employees providing services to Crescent Midstream Holdings and its subsidiaries. Additionally, Crimson's indirect, wholly owned subsidiary Crimson Midstream Services entered into an Employee Sharing Agreement with Crimson Midstream I to make available all employees performing services under the Employee TSA to Crimson Midstream I. The Employee Sharing Agreement was effective beginning February 1, 2021. The Employee Sharing Agreement together with the Assignment and Assumption Agreement described above, effectively bound Crimson Midstream I to the terms of the Employee TSA in the same manner as Crimson's indirect, wholly owned subsidiary. The Employee TSA and the Employee Sharing Agreement ended on February 3, 2022.

*Control Center TSA -* Crimson Midstream Operating, a wholly owned subsidiary of Crimson, entered into a transition services agreement (the "Control Center TSA") with Crescent Midstream Holdings to provide certain customary control center services and field transition support services necessary to operate a pipeline system. The Control Center TSA was assigned from Crimson Midstream Operating to Crimson Midstream I by the Assignment and Assumption Agreement discussed above. This agreement ended on February 3, 2022.

*Insurance Coverage TSA -* Crimson Midstream Operating and Crescent Midstream Operating, LLC ("Crescent Midstream Operating") (collectively, the "Insurance TSA Parties") entered into a transition services agreement (the "Insurance Coverage TSA") related to the remaining term of coverage on certain insurance policies which were shared by Crimson, certain of its subsidiaries (including Crimson Midstream Operating), Crescent Midstream Operating and certain other entities related to Crescent Midstream Operating (collectively, the "Insureds"). Under the Insurance Coverage TSA, the Insurance TSA Parties agreed to retain and maintain the certain insurance policies, and continue to split the premium payments among the Insureds in line with the historical practices prior to Crescent Midstream Holdings' spin-off from Crimson. By entering into the Insurance Coverage TSA, the Insurance TSA Parties acknowledged that any claims made which result in a loss by one of the Insureds will erode and may exhaust the shared limits and/or aggregates stated in any of the certain insurance policies. Additionally, under the terms of the Insurance Coverage TSA, it was agreed that the Insurance TSA Party which was directly responsible for any incident that results in any loss of coverage under any of the certain shared insurance policies may be primarily financially responsible for such self-insurance and/or covering any increase in costs of the certain insurance policy that occurred as a result of such incident. The Insurance Coverage TSA expired on May 31, 2021, and simultaneously, the Company, Crimson, and certain other subsidiaries of the Company obtained alternative insurance coverage effective through October 31, 2022. As of December 31, 2022, there is no relationship associated with the insurance coverage of the Company and its subsidiaries and Crescent Midstream Operating and its subsidiaries.

**Services Agreement**

Effective February 4, 2022, Crimson Midstream Operating entered into a services agreement (the "Services Agreement") to provide administrative-related services to Crescent Midstream Holdings through February 3, 2023, or upon receipt of Crescent Midstream Holdings' written notice to terminate the Services Agreement prior to February 3, 2023. This agreement was subsequently extended to February 1, 2024. Under the Services Agreement, Crimson and/or certain of its subsidiaries are reimbursed at a fixed fee of approximately $44 thousand per month.

## 20. RESTATEMENT OF PRIOR PERIOD

Beginning with the quarter ended March 31, 2021, the Company previously reported its net income attributable to non-controlling interest and resulting net income attributable to the Company based on an allocation of Crimson's net income using the proportion of ownership interests held by the non-controlling interest to total outstanding ownership interest of Crimson, which was approximately 51%. The Company has determined the relative ownership interest in Crimson was not an appropriate basis for allocating Crimson's earnings to the non-controlling interest as a substantive profit sharing arrangement exists. The Company has determined that it should have allocated the net income from Crimson to the non-controlling interest based on their contractual rights to earnings and distributions associated with the Crimson Class A-1, A-2 and A-3 Units.

Additionally, the Company previously reported earnings per share for its Common Stock and Class B Common Stock on a combined basis, however, beginning with the quarter ended September 30, 2021 when the Class B Common Stock was first issued it should have reported earnings per share using the two-class method, under which earnings per share for its Common Stock and Class B Common Stock should have been separately calculated and reported, during these periods.

As a result of the above items, the Company updated its calculation of Crimson net income allocated to the non-controlling interest and its calculation of earnings per share for its Common Stock and Class B Common Stock and restated its consolidated financial statements as of and for the year ended December 31, 2021 and the consolidated financial statements for each of the interim periods during the years ended December 31, 2022 and 2021. The tables below represent our restated consolidated

F-42

financial statements for the year ended December 31, 2021. Refer to Note 21 ("Quarterly Financial Data (Unaudited)") for such restated information for the relevant interim periods.

In addition to the errors described above, the Company is correcting certain items that were primarily identified during the preparation of its consolidated financial statements for the fiscal year ended December 31, 2022, including: i) correction of cash and cash equivalents and accounts payable and other accrued liabilities in the Consolidated Balance Sheets for outstanding disbursements, ii) reclassification and presentation of gross cash payments made for reimbursable projects and associated payments received that were previously netted in the Consolidated Statement of Cash Flows and iii) reclassification and presentation of activity associated with the Company's proceeds received associated with the third-party financing of insurance and associated payments made on that financing arrangement in the Consolidated Statements of Cash Flows. These previously uncorrected and immaterial adjustments to prior periods are being corrected as a part of the restatement.

**Description of Annual Restatement Tables**

The following tables present the impact of the restatement on our previously reported consolidated statement of operations, balance sheet, statement of equity, and statement of cash flows for the year ended December 31, 2021, for which the values were derived from our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 filed on March 14, 2022. Certain reclassifications between captions on the statement of cash flows are included in the effect of restatement column to conform to current reporting.

Table of Contents          Index to Financial Statements          Glossary of Defined Terms

*As of and for the year ended December 31, 2021*

The effects of the restatement on the consolidated balance sheet as of December 31, 2021 are summarized in the following table:

| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $37,022,035 (Crimson VIE: $338,452,392) | $ 441,430,193 | $ — | $ 441,430,193 |
| Leased property, net of accumulated depreciation of $258,207 | 1,267,821 | — | 1,267,821 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 1,036,660 | — | 1,036,660 |
| Cash and cash equivalents (Crimson VIE: $2,825,902) | 12,496,478 | (955,902) | 11,540,576 |
| Accounts and other receivables (Crimson VIE: $11,291,749) | 15,367,389 | — | 15,367,389 |
| Due from affiliated companies (Crimson VIE: $676,825) | 676,825 | — | 676,825 |
| Deferred costs, net of accumulated amortization of $345,775 | 796,572 | — | 796,572 |
| Inventory (Crimson VIE: $3,839,865 ) | 3,953,523 | — | 3,953,523 |
| Prepaid expenses and other assets (Crimson VIE: $5,004,566) | 9,075,043 | — | 9,075,043 |
| Operating right-of-use assets (Crimson VIE: $5,647,631) | 6,075,939 | — | 6,075,939 |
| Deferred tax asset, net | 206,285 | — | 206,285 |
| Goodwill | 16,210,020 | — | 16,210,020 |
| **Total Assets** | $ 508,592,748 | $ (955,902) | $ 507,636,846 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of debt issuance costs of $1,275,244 | $ 99,724,756 | $ — | $ 99,724,756 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,384,170 | 115,665,830 | — | 115,665,830 |
| Accounts payable and other accrued liabilities (Crimson VIE: $10,699,806 ) | 17,036,064 | (955,902) | 16,080,162 |
| Due to affiliated companies (Crimson VIE: $648,316) | 648,316 | — | 648,316 |
| Operating lease liability (Crimson VIE: $5,647,036) | 6,046,657 | — | 6,046,657 |
| Unearned revenue (Crimson VIE: $199,405) | 5,839,602 | — | 5,839,602 |
| **Total Liabilities** | $ 244,961,225 | $ (955,902) | $ 244,005,323 |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 51,810 issued and outstanding at December 31, 2021 | $ 129,525,675 | $ — | $ 129,525,675 |
| Common stock, non-convertible, $0.001 par value; 14,893,184 shares issued and outstanding at December 31, 2021 (100,000,000 shares authorized) | 14,893 | — | 14,893 |
| Class B Common Stock, $0.001 par value; 683,761 issued and outstanding at December 31, 2021 (11,896,100 shares authorized) | 684 | — | 684 |
| Additional paid-in capital | 338,302,735 | — | 338,302,735 |
| Retained deficit | (327,157,636) | 6,129,056 | (321,028,580) |
| **Total CorEnergy Equity** | 140,686,351 | 6,129,056 | 146,815,407 |
| Non-controlling Interest | 122,945,172 | (6,129,056) | 116,816,116 |
| **Total Equity** | 263,631,523 | — | 263,631,523 |
| **Total Liabilities and Equity** | $ 508,592,748 | $ (955,902) | $ 507,636,846 |

The effects of the restatement on the consolidated statement of operations for the year ended December 31, 2021 are summarized in the following table:

| | For the Year Ended December 31, 2021 | | |
|---|---|---|---|
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution revenue | $ 116,536,612 | $ — | $ 116,536,612 |
| Pipeline loss allowance subsequent sales | 8,606,850 | — | 8,606,850 |
| Lease revenue | 1,246,090 | — | 1,246,090 |
| Other revenue | 1,744,244 | — | 1,744,244 |
| **Total Revenue** | 128,133,796 | — | 128,133,796 |
| **Expenses** | | | |
| Transportation and distribution expenses | 58,146,006 | — | 58,146,006 |
| Pipeline loss allowance subsequent sales cost of revenue | 8,194,040 | — | 8,194,040 |
| General and administrative | 26,641,161 | — | 26,641,161 |
| Depreciation, amortization and ARO accretion expense | 14,801,676 | — | 14,801,676 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| **Total Expenses** | 113,760,306 | — | 113,760,306 |
| **Operating Income** | $ 14,373,490 | $ — | $ 14,373,490 |
| **Other Income (Expense)** | | | |
| Other income | $ 769,682 | $ — | $ 769,682 |
| Interest expense | (12,742,157) | — | (12,742,157) |
| Loss on extinguishment of debt | (861,814) | — | (861,814) |
| **Total Other Income (Expense)** | (12,834,289) | — | (12,834,289) |
| **Income before income taxes** | 1,539,201 | — | 1,539,201 |
| **Taxes** | | | |
| Current tax benefit | (1,531) | — | (1,531) |
| Deferred tax expense | 4,076,290 | — | 4,076,290 |
| **Income tax expense, net** | 4,074,759 | — | 4,074,759 |
| **Net Loss** | $ (2,535,558) | $ — | $ (2,535,558) |
| Less: Net Income attributable to non-controlling interest | 8,995,523 | (6,129,056) | 2,866,467 |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (11,531,081) | 6,129,056 | $ (5,402,025) |
| Preferred dividend requirements | 9,395,604 | — | 9,395,604 |
| **Net Loss attributable to Common Stockholders** | $ (20,926,685) | $ 6,129,056 | $ (14,797,629) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 14,581,850 | (335,324) | 14,246,526 |
| Basic net loss per share | $ (1.44) | $ 0.43 | $ (1.01) |
| | | | |
| Diluted weighted average shares outstanding | 14,581,850 | (335,324) | 14,246,526 |
| Diluted net loss per share | $ (1.44) | $ 0.43 | $ (1.01) |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 335,324 | 335,324 |
| Basic and diluted net loss per share | $ — | $ (1.21) | $ (1.21) |
| Dividends declared per Common share | $ 0.20 | $ — | $ 0.20 |

F-45

The effects of the restatement on the consolidated statement of equity for the year ended December 31, 2021 are summarized in the following table:

| | Common Stock | | Class B Common Stock | | Preferred Stock | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total Equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Amount | | | | Total |
| **As Previously Reported** | | | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | — | $ — | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | — | — | (11,531,081) | 8,995,523 | (2,535,558) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 116,816,115 | 116,816,115 |
| Series A preferred stock dividends | — | — | — | — | — | (9,395,604) | — | — | (9,395,604) |
| Common Stock dividends | — | — | — | — | — | (2,850,026) | — | — | (2,850,026) |
| Reinvestment of dividends paid to common stockholders | 84,418 | 84 | — | — | — | 410,496 | — | — | 410,580 |
| Common stock issued under director's compensation plan | 3,399 | 3 | — | — | — | 22,497 | — | — | 22,500 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (2,256,113) | (2,256,113) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (610,353) | (610,353) |
| Series A preferred stock issued due to internalization transaction | — | — | — | — | 4,255,325 | (10,213) | — | — | 4,245,112 |
| Common Stock issued due to internalization transaction | 1,153,846 | 1,154 | — | — | — | 7,094,999 | — | — | 7,096,153 |
| Class B Common Stock issued due to internalization transaction | — | — | 683,761 | 684 | — | 3,288,206 | — | — | 3,288,890 |
| **Balance at December 31, 2021** | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 129,525,675 | $ 338,302,735 | $ (327,157,636) | $ 122,945,172 | $ 263,631,523 |
| | | | | | | | | | |
| **Restatement Impacts** | | | | | | | | | |
| Net income (loss) | — | $ — | — | $ — | $ — | $ — | $ 6,129,056 | $ (6,129,056) | $ — |
| **Balance at December 31, 2021 (restatement impacts)** | — | $ — | — | $ — | $ — | $ — | $ 6,129,056 | $ (6,129,056) | $ — |
| **As Restated** | | | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | — | $ — | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | — | — | (5,402,025) | 2,866,467 | (2,535,558) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 116,816,115 | 116,816,115 |
| Series A preferred stock dividends | — | — | — | — | — | (9,395,604) | — | — | (9,395,604) |
| Common Stock dividends | — | — | — | — | — | (2,850,026) | — | — | (2,850,026) |
| Reinvestment of dividends paid to common stockholders | 84,418 | 84 | — | — | — | 410,496 | — | — | 410,580 |
| Common stock issued under director's compensation plan | 3,399 | 3 | — | — | — | 22,497 | — | — | 22,500 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (2,256,113) | (2,256,113) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (610,353) | (610,353) |

Table of Contents
Index of Financial Statements
Glossary of Defined Terms

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Series A preferred stock issued due to internalization transaction | — | — | — | — | 4,255,325 | (10,213) | — | — | 4,245,112 |
| Common Stock issued due to internalization transaction | 1,153,846 | 1,154 | — | — | — | 7,094,999 | — | — | 7,096,153 |
| Class B Common Stock issued due to internalization transaction | — | — | 683,761 | 684 | — | 3,288,206 | — | — | 3,288,890 |
| **Balance at December 31, 2021** | 14,893,184 | $ 14,893 | 683,761 | 684 | $ 129,525,675 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |

F-47

The effects of the restatement on the consolidated statement of cash flow for year ended December 31, 2021 are summarized in the following table:

| | For the Year Ended December 31, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Operating Activities** | | | |
| Net loss | $ (2,535,558) | $ — | $ (2,535,558) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Deferred income tax | 4,076,290 | — | 4,076,290 |
| Depreciation, amortization and ARO accretion | 16,406,557 | (1,604,881) | 14,801,676 |
| Amortization of debt issuance costs | — | 1,604,881 | 1,604,881 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Loss on extinguishment of debt | 861,814 | — | 861,814 |
| Gain on sale of equipment | (16,508) | — | (16,508) |
| Stock-based compensation | — | 22,500 | 22,500 |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | (92,089) | 1,213,454 | 1,121,365 |
| Financing note accrued interest receivable | (8,780) | — | (8,780) |
| Inventory | (2,183,946) | — | (2,183,946) |
| Prepaid expenses and other assets | (958,283) | (3,882,548) | (4,840,831) |
| Due from affiliated companies, net | (28,509) | — | (28,509) |
| Management fee payable | (971,626) | — | (971,626) |
| Accounts payable and other accrued liabilities | (2,627,549) | 2,064,679 | (562,870) |
| Unearned revenue | (601,126) | — | (601,126) |
| Other changes, net | — | 156 | 156 |
| Net cash provided by operating activities | $ 17,298,110 | $ (581,759) | $ 16,716,351 |
| **Investing Activities** | | | |
| Acquisition of Crimson Midstream Holdings, net of cash acquired | (69,002,052) | — | (69,002,052) |
| Acquisition of Corridor InfraTrust Management, net of cash acquired | 952,487 | — | 952,487 |
| Purchases of property and equipment, net | (15,883,609) | (4,344,845) | (20,228,454) |
| Proceeds from reimbursable projects | — | 3,131,391 | 3,131,391 |
| Proceeds from sale of property and equipment | 97,210 | — | 97,210 |
| Proceeds from insurance recovery | 60,153 | — | 60,153 |
| Principal payment on financing note receivable | 155,008 | — | 155,008 |
| Decrease in financing note receivable | 26,849 | — | 26,849 |
| Net cash used in investing activities | $ (83,593,954) | $ (1,213,454) | $ (84,807,408) |
| **Financing Activities** | | | |
| Debt financing costs | (2,735,922) | — | (2,735,922) |
| Dividends paid on Series A preferred stock | (9,395,604) | — | (9,395,604) |
| Dividends paid on Common Stock | (2,439,446) | — | (2,439,446) |
| Common Stock issued under the director's compensation plan | 22,500 | (22,500) | — |
| Distributions to non-controlling interest | (2,256,113) | — | (2,256,113) |
| Advances on revolving line of credit | 24,000,000 | — | 24,000,000 |
| Payments on revolving line of credit | (22,000,000) | — | (22,000,000) |
| Principal payments on secured credit facility | (6,000,000) | — | (6,000,000) |
| Proceeds from financing arrangement | — | 3,882,392 | 3,882,392 |
| Payments on financing arrangement | — | (3,020,581) | (3,020,581) |
| Net cash used in financing activities | $ (20,804,585) | $ 839,311 | $ (19,965,274) |
| Net change in cash and cash equivalents | $ (87,100,429) | $ (955,902) | $ (88,056,331) |
| Cash and cash equivalents at beginning of year | 99,596,907 | — | 99,596,907 |
| Cash and cash equivalents at end of year | $ 12,496,478 | $ (955,902) | $ 11,540,576 |

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

| | For the Year Ended December 31, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 11,224,582 | $ — | $ 11,224,582 |
| Income tax refunds | 635,730 | — | 635,730 |
| | | | |
| **Non-Cash Investing Activities** | | | |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | $ 113,847 | $ — | $ 113,847 |
| In-kind consideration for the Grans Isle Gathering System provided as partial consideration for the Crimson Midstream Holdings acquisition | 48,873,169 | — | 48,873,169 |
| Crimson credit facility assumed and refinanced in connection with the Crimson Midstream Holdings acquisition | 105,000,000 | — | 105,000,000 |
| Equity consideration attributable to non-controlling interest holder in connection with the Crimson Midstream Holdings acquisition | 116,205,762 | — | 116,205,762 |
| Series A preferred stock issued due to Internalization transaction | 4,245,112 | — | 4,245,112 |
| Common stock issued due to Internalization transaction | 7,096,153 | — | 7,096,153 |
| Class B Common Stock issued due to Internalization transaction | 3,288,890 | — | 3,288,890 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Crimson Class A-2 Units dividends payment in-kind | $ 610,353 | $ — | $ 610,353 |
| Reinvestment of dividends paid to common stockholders | 410,580 | — | 410,580 |
| Assets acquired under financing arrangement | — | 1,617,825 | 1,617,825 |

F-49

**21. QUARTERLY FINANCIAL DATA** *(Unaudited)*

| | For the Fiscal 2022 Quarters Ended | | | |
| | (As Restated) March 31 | (As Restated) June 30 | (As Restated) September 30 | December 31 |
|---|---|---|---|---|
| Total Revenue | $ 32,872,351 | $ 31,521,436 | $ 32,961,686 | $ 36,292,134 |
| Total Expenses | 25,258,024 | 25,971,341 | 45,014,863 | 31,605,915 |
| Operating Income (Loss) | $ 7,614,327 | $ 5,550,095 | $ (12,053,177) | $ 4,686,219 |
| Net Income (Loss) | $ 4,364,757 | $ 2,170,126 | $ (15,501,704) | $ (552,849) |
| Less: Net Income attributable to non-controlling interest | 809,212 | 809,212 | 809,212 | 809,212 |
| Net Income (Loss) attributable to CorEnergy Infrastructure Trust, Inc. | $ 3,555,545 | $ 1,360,914 | $ (16,310,916) | $ (1,362,061) |
| Preferred dividend requirements | $ 2,388,130 | $ 2,388,130 | $ 2,388,130 | $ 2,388,130 |
| Net Income (loss) attributable to Common Stockholders | $ 1,167,415 | $ (1,027,216) | $ (18,699,046) | $ (3,750,191) |
| | | | | |
| Basic net earnings (loss) per share: | | | | |
| Common Stock | $ 0.08 | $ (0.06) | $ (1.18) | $ (0.23) |
| Class B Common Stock | $ 0.03 | $ (0.11) | $ (1.23) | $ (0.28) |
| | | | | |
| Diluted net earnings (loss) per share: | | | | |
| Common Stock | $ 0.08 | $ (0.07) | $ (1.20) | $ (0.24) |
| Class B Common Stock | $ 0.03 | $ (0.11) | $ (1.23) | $ (0.28) |

| | For the Fiscal 2021 Quarters Ended | | | |
| | (As Restated) March 31 | (As Restated) June 30 | (As Restated) September 30 | (As Restated) December 31 |
|---|---|---|---|---|
| Total Revenue | $ 23,040,498 | $ 32,296,578 | $ 37,028,882 | $ 35,767,838 |
| Total Expenses | 30,003,999 | 26,717,163 | 27,654,395 | 29,384,749 |
| Operating Income (Loss) | $ (6,963,501) | $ 5,579,415 | $ 9,374,487 | $ 6,383,089 |
| Net Income (Loss) | (10,694,263) | 2,427,409 | 5,919,971 | (188,675) |
| Less: Net Income attributable to non-controlling interest | — | 1,010,951 | 1,046,304 | 809,212 |
| Net Income (Loss) attributable to CorEnergy Infrastructure Trust, Inc. | $ (10,694,263) | $ 1,416,458 | $ 4,873,667 | $ (997,887) |
| Preferred dividend requirements | 2,309,672 | 2,309,672 | 2,388,130 | 2,388,130 |
| Net Income (loss) attributable to Common Stockholders | (13,003,935) | (893,214) | 2,485,537 | (3,386,017) |
| | | | | |
| Basic net earnings (loss) per share: | | | | |
| Common Stock | $ (0.95) | $ (0.07) | $ 0.16 | $ (0.21) |
| Class B Common Stock | NA | NA | $ 0.11 | $ (0.26) |
| | | | | |
| Diluted net earnings (loss) per share: | | | | |
| Common Stock | $ (0.95) | $ (0.07) | $ 0.16 | $ (0.22) |
| Class B Common Stock | NA | NA | $ 0.11 | $ (0.26) |

**Description of Quarterly Restatement Tables**

In lieu of filing amended quarterly reports on Form 10-Q, the tables below represent our restated unaudited consolidated financial statements for each of the previously completed quarters during the years ended December 31, 2022 and 2021. The following tables present the impact of the restatement on our previously reported consolidated statements of operations, balance sheets, statements of equity, and statements of cash flows for which the values were derived from our Quarterly Reports on Form 10-Q for the interim periods of 2022 and 2021. Certain reclassifications between captions on the statements of cash flows are included in the effect of restatement columns to conform to current reporting. For further information on the restatement, refer to Note 20 ("Restatement Of Prior Period").

**As of and For the Three Months Ended March 31, 2021**

The effects of the restatement on the consolidated balance sheet as of March 31, 2021 are summarized in the following table:

|  | March 31, 2021 | | |
|  | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $25,260,543 (Crimson VIE: $335,865,029) | $       441,213,095 | $                — | $       441,213,095 |
| Leased property, net of accumulated depreciation of $227,265 | 1,298,763 | — | 1,298,763 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 1,183,950 | — | 1,183,950 |
| Cash and cash equivalents (Crimson VIE: $(547,104)) | 18,839,994 | (1,178,880) | 17,661,114 |
| Accounts and other receivables (Crimson VIE: $10,828,844) | 15,275,036 | — | 15,275,036 |
| Due from affiliated companies (Crimson VIE: $827,264) | 827,264 | — | 827,264 |
| Deferred costs, net of accumulated amortization of $60,142 | 1,082,205 | — | 1,082,205 |
| Inventory (Crimson VIE: $1,690,158) | 1,795,688 | — | 1,795,688 |
| Prepaid expenses and other assets (Crimson VIE: $6,313,679) | 8,424,488 | — | 8,424,488 |
| Operating right-of-use assets (Crimson VIE: $6,097,344) | 6,175,414 | — | 6,175,414 |
| Deferred tax asset, net | 4,308,976 | — | 4,308,976 |
| Goodwill | 1,718,868 | — | 1,718,868 |
| **Total Assets** | $       502,143,741 | $     (1,178,880) | $       500,964,861 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of debt issuance costs of $1,732,515 | $       103,267,485 | $                — | $       103,267,485 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,877,445 | 115,172,555 | — | 115,172,555 |
| Accounts payable and other accrued liabilities (Crimson VIE: $13,046,352) | 17,910,708 | (1,178,880) | 16,731,828 |
| Management fees payable | 608,246 | — | 608,246 |
| Due to affiliated companies (Crimson VIE: $1,637,540) | 2,053,170 | — | 2,053,170 |
| Operating lease liability (Crimson VIE: $5,752,045) | 5,800,866 | — | 5,800,866 |
| Unearned revenue (Crimson VIE $315,000) | 6,294,359 | — | 6,294,359 |
| **Total Liabilities** | $       251,107,389 | $     (1,178,880) | $       249,928,509 |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $125,270,350 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 50,108 issued and outstanding at March 31, 2021 | $       125,270,350 | $                — | $       125,270,350 |
| Common stock, non-convertible, $0.001 par value; 13,651,521 shares issued and outstanding at March 31, 2021 (100,000,000 shares authorized) | 13,652 | — | 13,652 |
| Additional paid-in capital | 336,750,132 | — | 336,750,132 |
| Retained deficit | (327,926,126) | 1,605,308 | (326,320,818) |
| **Total CorEnergy Equity** | 134,108,008 | 1,605,308 | 135,713,316 |
| Non-controlling interest | 116,928,344 | (1,605,308) | 115,323,036 |
| **Total Equity** | 251,036,352 | — | 251,036,352 |
| **Total Liabilities and Equity** | $       502,143,741 | $     (1,178,880) | $       500,964,861 |

e

The effects of the restatement on the consolidated statement of operations for the three months ended March 31, 2021 are summarized in the following table:

| | For the Three Months Ended March 31, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution revenue | $ 21,295,139 | $ — | $ 21,295,139 |
| Pipeline loss allowance subsequent sales | 1,075,722 | — | 1,075,722 |
| Lease revenue | 474,475 | — | 474,475 |
| Other revenue | 195,162 | — | 195,162 |
| Total Revenue | 23,040,498 | — | 23,040,498 |
| **Expenses** | | | — |
| Transportation and distribution expenses | 10,342,597 | — | 10,342,597 |
| Pipeline loss allowance subsequent sales cost of revenue | 948,856 | — | 948,856 |
| General and administrative | 9,836,793 | — | 9,836,793 |
| Depreciation, amortization and ARO accretion expense | 2,898,330 | — | 2,898,330 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Total Expenses | 30,003,999 | — | 30,003,999 |
| **Operating Loss** | $ (6,963,501) | $ — | $ (6,963,501) |
| **Other Income (Expense)** | | | — |
| Other income | $ 63,526 | $ — | $ 63,526 |
| Interest expense | (2,931,007) | — | (2,931,007) |
| Loss on extinguishment of debt | (861,814) | — | (861,814) |
| Total Other Expense | (3,729,295) | — | (3,729,295) |
| **Loss before income taxes** | (10,692,796) | — | (10,692,796) |
| **Taxes** | | | — |
| Current tax expense | 27,867 | — | 27,867 |
| Deferred tax benefit | (26,400) | — | (26,400) |
| Income tax expense, net | 1,467 | — | 1,467 |
| **Net Loss** | $ (10,694,263) | $ — | $ (10,694,263) |
| Less: Net income attributable to non-controlling interest | 1,605,308 | (1,605,308) | — |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (12,299,571) | $ 1,605,308 | $ (10,694,263) |
| Preferred dividend requirements | 2,309,672 | — | 2,309,672 |
| **Net Loss attributable to Common Stockholders** | $ (14,609,243) | $ 1,605,308 | $ (13,003,935) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 13,651,521 | — | 13,651,521 |
| Basic net loss per share | $ (1.07) | $ 0.12 | $ (0.95) |
| | | | |
| Diluted weighted average shares outstanding | 13,651,521 | — | 13,651,521 |
| Diluted net loss per share | $ (1.07) | $ 0.12 | $ (0.95) |
| | | | |
| Dividends declared per Common share | $ 0.050 | $ — | $ 0.050 |

The effects of the restatement on the consolidated statement of equity for the three months ended March 31, 2021 are summarized in the following table:

| | Common Stock | | Preferred Stock | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Amount | | | | |
| **As Previously Reported** | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | (12,299,571) | 1,605,308 | (10,694,263) |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common stock dividends | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 336,750,132 | $ (327,926,126) | $ 116,928,344 | $ 251,036,352 |
| | | | | | | | |
| **Restatement Impact** | | | | | | | |
| Net income (loss) | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| Series A preferred stock dividends | — | — | — | — | — | — | — |
| Common stock dividends | — | — | — | — | — | — | — |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — |
| **Balance at March 31, 2021 (Unaudited)** | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| | | | | | | | |
| **As Restated** | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | — | 149,399,827 |
| Net loss | — | — | — | — | (10,694,263) | — | (10,694,263) |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common stock dividends | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 336,750,132 | $ (326,320,818) | $ 115,323,036 | $ 251,036,352 |

F-53

The effects of the restatement on the consolidated statement of cash flow for the three months ended March 31, 2021 are summarized in the following table:

| | For the Three Months Ended March 31, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Operating Activities** | | | |
| Net loss | $ (10,694,263) | $ — | $ (10,694,263) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | | |
| Deferred income tax | (26,400) | — | (26,400) |
| Depreciation, amortization and ARO accretion | 3,267,034 | (368,704) | 2,898,330 |
| Amortization of debt issuance costs | — | 368,704 | 368,704 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Loss on extinguishment of debt | 861,814 | — | 861,814 |
| Non-cash lease expense | 178,542 | (178,542) | — |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | (344,371) | — | (344,371) |
| Financing note accrued interest receivable | (6,714) | — | (6,714) |
| Inventory | (26,111) | — | (26,111) |
| Prepaid expenses and other assets | (249,081) | — | (249,081) |
| Due to affiliated companies, net | 1,225,906 | — | 1,225,906 |
| Management fee payable | (363,380) | — | (363,380) |
| Accounts payable and other accrued liabilities | (1,611,539) | (1,178,880) | (2,790,419) |
| Operating lease liability | (523,652) | 523,652 | — |
| Unearned revenue | (146,369) | — | (146,369) |
| Other changes, net | — | (345,110) | (345,110) |
| Net cash (used in) provided by operating activities | $ (2,481,161) | $ (1,178,880) | $ (3,660,041) |
| **Investing Activities** | | | |
| Acquisition of Crimson Midstream Holdings, net of cash acquired | (68,094,324) | — | (68,094,324) |
| Purchases of property and equipment, net | (4,625,511) | — | (4,625,511) |
| Proceeds from sale of property and equipment | 79,600 | — | 79,600 |
| Proceeds from insurance recovery | 60,153 | — | 60,153 |
| Principal payment on financing note receivable | 32,500 | — | 32,500 |
| Net cash (used in) provided by investing activities | $ (72,547,582) | $ — | $ (72,547,582) |
| **Financing Activities** | | | |
| Debt financing costs | (2,735,922) | — | (2,735,922) |
| Dividends paid on Series A preferred stock | (2,309,672) | — | (2,309,672) |
| Dividends paid on common stock | (682,576) | — | (682,576) |
| Advances on revolving line of credit | 3,000,000 | — | 3,000,000 |
| Payments on revolving line of credit | (3,000,000) | — | (3,000,000) |
| Net cash used in financing activities | $ (5,728,170) | $ — | $ (5,728,170) |
| Net change in Cash and Cash Equivalents | $ (80,756,913) | $ (1,178,880) | $ (81,935,793) |

Table of Contents Index to Financial Statements Glossary of Defined Terms

| | For the Three Months Ended March 31, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| Cash and Cash Equivalents at beginning of period | 99,596,907 | — | 99,596,907 |
| Cash and Cash Equivalents at end of period | $ 18,839,994 | $ (1,178,880) | $ 17,661,114 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 4,254,050 | $ — | $ 4,254,050 |
| Income taxes paid (net of refunds) | 5,026 | — | 5,026 |
| | | | |
| **Non-Cash Investing Activities** | | | |
| In-kind consideration for the Grand Isle Gathering System provided as partial consideration for the Crimson Midstream Holdings acquisition | $ 48,873,169 | $ — | $ 48,873,169 |
| Crimson Credit Facility assumed and refinanced in connection with the Crimson Midstream Holdings acquisition | 105,000,000 | — | 105,000,000 |
| Equity consideration attributable to non-controlling interest holder in connection with the Crimson Midstream Holdings acquisition | 115,323,036 | — | 115,323,036 |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | 868,190 | — | 868,190 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Change in accounts payable and accrued expenses related to debt financing costs | $ (235,198) | $ — | $ (235,198) |

F-55

**As of and For the Three and Six Months Ended June 30, 2021**

The effects of the restatement on the consolidated balance sheet as of June 30, 2021 are summarized in the following table:

| | June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $28,973,654 (Crimson VIE: $338,930,724) | $ 443,457,382 | $ — | $ 443,457,382 |
| Leased property, net of accumulated depreciation of $237,579 | 1,288,449 | — | 1,288,449 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 1,149,245 | — | 1,149,245 |
| Cash and cash equivalents (Crimson VIE: $2,989,319) | 17,695,458 | (548,236) | 17,147,222 |
| Accounts and other receivables (Crimson VIE: $11,434,113) | 14,389,085 | — | 14,389,085 |
| Due from affiliated companies (Crimson VIE: $1,163,633) | 1,163,633 | — | 1,163,633 |
| Deferred costs, net of accumulated amortization of $155,353 | 986,994 | — | 986,994 |
| Inventory (Crimson VIE: $1,512,398) | 1,625,464 | — | 1,625,464 |
| Prepaid expenses and other assets (Crimson VIE: $4,018,467) | 10,939,625 | — | 10,939,625 |
| Operating right-of-use assets (Crimson VIE: $5,844,591) | 5,914,710 | — | 5,914,710 |
| Deferred tax asset, net | 4,173,754 | — | 4,173,754 |
| Goodwill | 1,718,868 | — | 1,718,868 |
| **Total Assets** | $ 504,502,667 | $ (548,236) | $ 503,954,431 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of debt issuance costs of $1,580,091 | $ 104,419,909 | $ — | $ 104,419,909 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,713,020 | 115,336,979 | — | 115,336,979 |
| Accounts payable and other accrued liabilities (Crimson VIE: $11,454,583) | 20,780,331 | (548,236) | 20,232,095 |
| Management Fees Payable | 304,770 | — | 304,770 |
| Due to affiliated companies (Crimson VIE: $979,603) | 979,603 | — | 979,603 |
| Operating lease liability (Crimson VIE: $5,609,946) | 5,651,002 | — | 5,651,002 |
| Unearned revenue (Crimson VIE $315,000) | 6,147,990 | — | 6,147,990 |
| **Total Liabilities** | $ 253,620,584 | $ (548,236) | $ 253,072,348 |
| | | | |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $125,270,350 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 50,108 issued and outstanding at June 30, 2021 | $ 125,270,350 | $ — | $ 125,270,350 |
| Common stock, non-convertible, $0.001 par value; 13,673,326 shares issued and outstanding at June 30, 2021 (100,000,000 shares authorized) | 13,673 | — | 13,673 |
| Additional paid-in capital | 333,890,657 | — | 333,890,657 |
| Retained deficit | (327,513,586) | 2,609,227 | (324,904,359) |
| **Total CorEnergy Equity** | 131,661,094 | 2,609,227 | 134,270,321 |
| Non-controlling interest | 119,220,989 | (2,609,227) | 116,611,762 |
| **Total Equity** | 250,882,083 | — | 250,882,083 |
| **Total Liabilities and Equity** | $ 504,502,667 | $ (548,236) | $ 503,954,431 |

F-56

Table of Contents    Index to Financial Statements    Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the three months ended June 30, 2021 are summarized in the following table:

| | For the Three Months Ended June 30, 2021 | | |
| | As Reported Previously | Effect of Restatement | As Restated |
|---|---|---|---|
| **Revenue** | | | |
| Transportation and distribution revenue | $ 28,100,343 | $ — | $ 28,100,343 |
| Pipeline loss allowance subsequent sales | 2,915,533 | — | 2,915,533 |
| Lease revenue | 701,525 | — | 701,525 |
| Other revenue | 579,177 | — | 579,177 |
| **Total Revenue** | 32,296,578 | — | 32,296,578 |
| **Expenses** | | | |
| Transportation and distribution expenses | 15,363,410 | — | 15,363,410 |
| Pipeline loss allowance subsequent sales cost of revenue | 2,223,646 | — | 2,223,646 |
| General and administrative | 5,381,654 | — | 5,381,654 |
| Depreciation, amortization and ARO accretion expense | 3,748,453 | — | 3,748,453 |
| **Total Expenses** | 26,717,163 | — | 26,717,163 |
| **Operating Income** | $ 5,579,415 | $ — | $ 5,579,415 |
| **Other Income (Expense)** | | | |
| Other income | $ 299,293 | $ — | $ 299,293 |
| Interest expense | (3,295,703) | — | (3,295,703) |
| **Total Other Expense** | (2,996,410) | — | (2,996,410) |
| **Income before income taxes** | 2,583,005 | — | 2,583,005 |
| **Taxes** | | | |
| Current tax expense | 20,374 | — | 20,374 |
| Deferred tax expense | 135,222 | — | 135,222 |
| **Income tax expense, net** | 155,596 | — | 155,596 |
| **Net Income** | $ 2,427,409 | $ — | $ 2,427,409 |
| Less: Net income (loss) attributable to non-controlling interest | 2,014,870 | (1,003,919) | 1,010,951 |
| **Net Income attributable to CorEnergy Infrastructure Trust, Inc.** | $ 412,539 | $ 1,003,919 | $ 1,416,458 |
| Preferred dividend requirements | 2,309,672 | — | 2,309,672 |
| **Net Income (Loss) attributable to Common Stockholders** | $ (1,897,133) | $ 1,003,919 | $ (893,214) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 13,659,667 | — | 13,659,667 |
| Basic net loss per share | $ (0.14) | $ 0.07 | $ (0.07) |
| | | | |
| Diluted weighted average shares outstanding | 13,659,667 | — | 13,659,667 |
| Diluted net loss per share | $ (0.14) | $ 0.07 | $ (0.07) |
| | | | |
| Dividends declared per Common share | $ 0.050 | — | $ 0.050 |

F-57

Table of Contents          Index to Financial Statements          Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the six months ended June 30, 2021 are summarized in the following table:

| | For the Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution revenue | $ 49,395,482 | $ — | $ 49,395,482 |
| Pipeline loss allowance subsequent sales | 3,991,255 | — | 3,991,255 |
| Lease revenue | 1,176,000 | — | 1,176,000 |
| Other revenue | 774,339 | — | 774,339 |
| Total Revenue | 55,337,076 | — | 55,337,076 |
| **Expenses** | | | |
| Transportation and distribution expenses | 25,706,007 | — | 25,706,007 |
| Pipeline loss allowance subsequent sales cost of revenue | 3,172,502 | — | 3,172,502 |
| General and administrative | 15,218,447 | — | 15,218,447 |
| Depreciation, amortization and ARO accretion expense | 6,646,783 | — | 6,646,783 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Total Expenses | 56,721,162 | — | 56,721,162 |
| **Operating Loss** | $ (1,384,086) | $ — | $ (1,384,086) |
| **Other Income (Expense)** | | | |
| Other income | $ 362,819 | $ — | $ 362,819 |
| Interest expense | (6,226,710) | — | (6,226,710) |
| Loss on extinguishment of debt | (861,814) | — | (861,814) |
| Total Other Expense | (6,725,705) | — | (6,725,705) |
| **Loss before income taxes** | (8,109,791) | — | (8,109,791) |
| **Taxes** | | | |
| Current tax expense | 48,241 | — | 48,241 |
| Deferred tax expense | 108,822 | — | 108,822 |
| Income tax expense, net | 157,063 | — | 157,063 |
| **Net Loss** | $ (8,266,854) | $ — | $ (8,266,854) |
| Less: Net income (loss) attributable to non-controlling interest | 3,620,178 | (2,609,227) | 1,010,951 |
| **Net Income (Loss) attributable to CorEnergy Infrastructure Trust, Inc.** | $ (11,887,032) | $ 2,609,227 | $ (9,277,805) |
| Preferred dividend requirements | 4,619,344 | — | 4,619,344 |
| **Net Income (Loss) attributable to Common Stockholders** | $ (16,506,376) | $ 2,609,227 | $ (13,897,149) |
| | | | |
| **Common Stock** | | | |
| Basic weighted average shares outstanding | 13,655,617 | — | 13,655,617 |
| Basic net loss per share | $ (1.21) | $ 0.19 | $ (1.02) |
| | | | |
| Diluted weighted average shares outstanding | 13,655,617 | — | 13,655,617 |
| Diluted net loss per share | $ (1.21) | $ 0.19 | $ (1.02) |
| | | | |
| Dividends declared per Common share | $ 0.050 | $ — | $ 0.050 |

The effects of the restatement on the consolidated statement of equity for the three and six months ended June 30, 2021 are summarized in the following table:

| | Common Stock | | Preferred Stock | Additional Paid-in | Retained | Non-controlling | |
| | Shares | Amount | Amount | Capital | Deficit | Interest | Total |
|---|---|---|---|---|---|---|---|
| **As Previously Reported** | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | (12,299,571) | 1,605,308 | (10,694,263) |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 336,750,132 | $ (327,926,126) | $ 116,928,344 | $ 251,036,352 |
| Net income | — | — | — | — | 412,539 | 2,014,870 | 2,427,409 |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | (682,576) | — | — | (682,576) |
| Reinvestment of dividends paid to common stockholders | 21,805 | 21 | — | 132,774 | — | — | 132,795 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | (604,951) | (604,951) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | (406,000) | (406,000) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 1,288,726 | 1,288,726 |
| **Balance at June 30, 2021 (Unaudited)** | 13,673,326 | $ 13,673 | $ 125,270,350 | $ 333,890,657 | $ (327,513,587) | $ 119,220,989 | $ 250,882,083 |
| | | | | | | | |
| **Restatement Impact** | | | | | | | |
| Net income (loss) | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| **Balance at March 31, 2021 (Unaudited)** | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| Net income (loss) | — | — | — | — | 1,003,919 | (1,003,919) | — |
| **Balance at June 30, 2021 (Unaudited)** | — | $ — | $ — | $ — | $ 2,609,227 | $ (2,609,227) | $ — |
| | | | | | | | |
| **As Restated** | | | | | | | |
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 339,742,380 | $ (315,626,555) | $ — | $ 149,399,827 |
| Net loss | — | — | — | — | (10,694,263) | — | (10,694,263) |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | $ 125,270,350 | $ 336,750,132 | $ (326,320,818) | $ 115,323,036 | $ 251,036,352 |
| Net income | — | — | — | — | 1,416,458 | 1,010,951 | 2,427,409 |
| Series A preferred stock dividends | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | (682,576) | — | — | (682,576) |

Table of Contents Index of Financial Statements Glossary of Defined Terms

| | | | | | | |
|---|---|---|---|---|---|---|
| Reinvestment of dividends paid to common stockholders | 21,805 | 21 | — | 132,774 | — | — | 132,795 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | (604,951) | (604,951) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | (406,000) | (406,000) |
| Equity attributable to non-controlling interest | — | — | — | — | — | 1,288,726 | 1,288,726 |
| **Balance at June 30, 2021 (Unaudited)** | 13,673,326 | $ 13,673 | $ 125,270,350 | $ 333,890,657 | $ (324,904,359) | $ 116,611,762 | $ 250,882,083 |

F-60

The effects of the restatement on the consolidated statement of cash flow for the six months ended June 30, 2021 are summarized in the following table:

| | For the Six Months Ended June 30, 2021 | | |
| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Operating Activities** | | | |
| Net loss | $ (8,266,854) | $ — | $ (8,266,854) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Deferred income tax | 108,822 | — | 108,822 |
| Depreciation, amortization and ARO accretion | 7,427,544 | (780,761) | 6,646,783 |
| Amortization of debt issuance costs | — | 780,761 | 780,761 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Loss on extinguishment of debt | 861,814 | — | 861,814 |
| Non-cash lease expense | 439,246 | (439,246) | — |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | 541,580 | 122,976 | 664,556 |
| Financing note accrued interest receivable | (9,926) | — | (9,926) |
| Inventory | 144,113 | — | 144,113 |
| Prepaid expenses and other assets | (2,788,545) | (3,882,392) | (6,670,937) |
| Due from affiliated companies, net | (184,030) | — | (184,030) |
| Management fee payable | (666,856) | — | (666,856) |
| Accounts payable and other accrued liabilities | 1,740,265 | (117,333) | 1,622,932 |
| Operating lease liability | (673,516) | 673,516 | — |
| Unearned revenue | (292,738) | — | (292,738) |
| Other changes, net | — | (234,270) | (234,270) |
| Net cash provided by operating activities | $ 4,358,342 | $ (3,876,749) | $ 481,593 |
| **Investing Activities** | | | |
| Acquisition of Crimson Midstream Holdings, net of cash acquired | (69,002,053) | — | (69,002,053) |
| Purchases of property and equipment, net | (9,275,334) | (709,933) | (9,985,267) |
| Proceeds from reimbursable projects | — | 586,957 | 586,957 |
| Proceeds from sale of property and equipment | 79,600 | — | 79,600 |
| Proceeds from insurance recovery | 60,153 | — | 60,153 |
| Principal payment on financing note receivable | 70,417 | — | 70,417 |
| Net cash used in investing activities | $ (78,067,217) | $ (122,976) | $ (78,190,193) |
| **Financing Activities** | | | |
| Debt financing costs | (2,735,922) | — | (2,735,922) |
| Dividends paid on Series A preferred stock | (4,619,344) | — | (4,619,344) |
| Dividends paid on Common Stock | (1,232,357) | — | (1,232,357) |
| Distributions to non-controlling interest | (604,951) | — | (604,951) |
| Advances on revolving line of credit | 8,000,000 | — | 8,000,000 |
| Payments on revolving line of credit | (7,000,000) | — | (7,000,000) |
| Proceeds from financing arrangement | — | 3,882,392 | 3,882,392 |
| Payments on financing arrangement | — | (430,903) | (430,903) |
| Net cash used in financing activities | $ (8,192,574) | $ 3,451,489 | $ (4,741,085) |
| Net change in Cash and Cash Equivalents | $ (81,901,449) | $ (548,236) | $ (82,449,685) |
| Cash and Cash Equivalents at beginning of period | 99,596,907 | — | 99,596,907 |

F-61

Table of Contents          Index to Financial Statements          Glossary of Defined Terms

| | For the Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| Cash and Cash Equivalents at end of period | $ 17,695,458 | $ (548,236) | $ 17,147,222 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 5,750,876 | $ — | $ 5,750,876 |
| Income taxes paid (net of refunds) | (1,286) | — | (1,286) |
| | | | |
| **Non-Cash Investing Activities** | | | |
| In-kind consideration for the Grand Isle Gathering System provided as partial consideration for the Crimson Midstream Holdings acquisition | $ 48,873,169 | $ — | $ 48,873,169 |
| Crimson Credit Facility assumed and refinanced in connection with the Crimson Midstream Holdings acquisition | 105,000,000 | — | 105,000,000 |
| Equity consideration attributable to non-controlling interest holder in connection with the Crimson Midstream Holdings acquisition | 116,205,762 | — | 116,205,762 |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | 386,009 | — | 386,009 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Change in accounts payable and accrued expenses related to debt financing costs | $ 235,198 | $ — | $ 235,198 |
| Crimson A-2 Units dividends payment in kind | 406,000 | — | 406,000 |
| Assets acquired under financing arrangement | — | 3,554,952 | 3,554,952 |

F-62

Table of Contents Index to Financial Statements Glossary of Defined Terms

**As of and For the Three and Nine Months Ended September 30, 2021**

The effects of the restatement on the consolidated balance sheet as of September 30, 2021 are summarized in the following table:

| | September 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $32,592,641 (Crimson VIE: $341,422,699) | $ 445,250,237 | $ — | $ 445,250,237 |
| Leased property, net of accumulated depreciation of $247,893 | 1,278,135 | — | 1,278,135 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 1,078,072 | — | 1,078,072 |
| Cash and cash equivalents (Crimson VIE: $3,717,809) | 15,091,957 | (411,890) | 14,680,067 |
| Accounts and other receivables (Crimson VIE: $11,426,137) | 14,573,047 | — | 14,573,047 |
| Due from affiliated companies (Crimson VIE: $953,806) | 953,806 | — | 953,806 |
| Deferred costs, net of accumulated amortization of $250,564 | 891,783 | — | 891,783 |
| Inventory (Crimson VIE: $3,229,161) | 3,342,111 | — | 3,342,111 |
| Prepaid expenses and other assets (Crimson VIE: $5,159,383) | 10,550,792 | — | 10,550,792 |
| Operating right-of-use assets (Crimson VIE: $5,950,501) | 6,433,505 | — | 6,433,505 |
| Deferred tax asset, net | 4,060,239 | — | 4,060,239 |
| Goodwill | 16,210,020 | — | 16,210,020 |
| **Total Assets** | $ 519,713,704 | $ (411,890) | $ 519,301,814 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of deferred financing costs of $1,427,667 | $ 102,572,333 | $ — | $ 102,572,333 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,548,595 | 115,501,404 | — | 115,501,404 |
| Accounts payable and other accrued liabilities (Crimson VIE: $14,005,086) | 20,901,358 | (411,890) | 20,489,468 |
| Income tax liability | 33,027 | — | 33,027 |
| Due to affiliated companies (Crimson VIE: $765,228) | 765,228 | — | 765,228 |
| Operating lease liability (Crimson VIE: $5,826,885) | 6,281,014 | — | 6,281,014 |
| Unearned revenue (Crimson VIE $315,000) | 6,001,622 | — | 6,001,622 |
| **Total Liabilities** | 252,055,986 | $ (411,890) | $ 251,644,096 |
| | | | |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 51,810 issued and outstanding at September 30, 2021 | $ 129,525,675 | $ — | $ 129,525,675 |
| Common stock, non-convertible, $0.001 par value; 14,866,799 shares issued and outstanding at September 30, 2021 (100,000,000 shares authorized) | 14,866 | — | 14,866 |
| Class B Common Stock, $0.001 par value; 683,761 shares issued and outstanding at September 30, 2021 (11,896,100 shares authorized) | 684 | — | 684 |
| Additional paid-in capital | 341,331,070 | — | 341,331,070 |
| Retained deficit | (324,749,301) | 4,718,608 | (320,030,693) |
| **Total CorEnergy Equity** | 146,122,994 | 4,718,608 | 150,841,602 |
| Non-controlling interest | 121,534,724 | (4,718,608) | 116,816,116 |
| **Total Equity** | 267,657,718 | — | 267,657,718 |
| **Total Liabilities and Equity** | $ 519,713,704 | $ (411,890) | $ 519,301,814 |

Table of Contents    Index to Financial Statements    Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the three months ended September 30, 2021 are summarized in the following table:

| | For the Three Months Ended September 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution revenue | $ 34,286,394 | $ — | $ 34,286,394 |
| Pipeline loss allowance subsequent sales | 2,124,581 | — | 2,124,581 |
| Lease revenue | 32,915 | — | 32,915 |
| Other revenue | 584,992 | — | 584,992 |
| **Total Revenue** | 37,028,882 | — | 37,028,882 |
| **Expenses** | | | |
| Transportation and distribution expenses | 16,089,414 | — | 16,089,414 |
| Pipeline loss allowance subsequent sales cost of revenue | 2,718,038 | — | 2,718,038 |
| General and administrative | 5,156,087 | — | 5,156,087 |
| Depreciation, amortization and ARO accretion expense | 3,690,856 | — | 3,690,856 |
| **Total Expenses** | 27,654,395 | — | 27,654,395 |
| **Operating Income** | $ 9,374,487 | $ — | $ 9,374,487 |
| **Other Income (expense)** | | | |
| Other income | $ 4,040 | $ — | $ 4,040 |
| Interest expense | (3,351,967) | — | (3,351,967) |
| **Total Other Expense** | (3,347,927) | | (3,347,927) |
| **Income before income taxes** | 6,026,560 | — | 6,026,560 |
| **Taxes** | | | |
| Current tax benefit | (6,927) | — | (6,927) |
| Deferred tax expense | 113,516 | — | 113,516 |
| **Income tax expense, net** | 106,589 | | 106,589 |
| **Net Income** | $ 5,919,971 | $ — | $ 5,919,971 |
| Less: Net income attributable to non-controlling interest | 3,155,685 | (2,109,381) | 1,046,304 |
| **Net income attributable to CorEnergy Infrastructure Trust, Inc.** | $ 2,764,286 | $ 2,109,381 | $ 4,873,667 |
| Preferred dividend requirements | 2,388,130 | — | 2,388,130 |
| **Net income attributable to Common Stockholders** | $ 376,156 | $ 2,109,381 | $ 2,485,537 |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 15,426,226 | (646,600) | 14,779,625 |
| Basic net income per share | $ 0.02 | $ 0.14 | $ 0.16 |
| | | | |
| Diluted weighted average shares outstanding | 15,426,226 | 181,644 | 15,244,582 |
| Diluted net income per share | $ 0.02 | $ 0.14 | $ 0.16 |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 646,600 | 646,600 |
| Basic and diluted net income per share | $ — | $ 0.11 | $ 0.11 |
| | | | |
| Dividends declared per Common share | $ 0.050 | $ — | $ 0.050 |

F-64

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the nine months ended September 30, 2021 are summarized in the following table:

| | For the Nine Months Ended September 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution revenue | $ 83,681,876 | $ — | $ 83,681,876 |
| Pipeline loss allowance subsequent sales | 6,115,836 | — | 6,115,836 |
| Lease revenue | 1,208,915 | — | 1,208,915 |
| Other revenue | 1,359,331 | — | 1,359,331 |
| **Total Revenue** | 92,365,958 | — | 92,365,958 |
| **Expenses** | | | |
| Transportation and distribution expenses | 41,795,421 | — | 41,795,421 |
| Pipeline loss allowance subsequent sales cost of revenue | 5,890,540 | — | 5,890,540 |
| General and administrative | 20,374,534 | — | 20,374,534 |
| Depreciation, amortization and ARO accretion expense | 10,337,639 | — | 10,337,639 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| **Total Expenses** | 84,375,557 | — | 84,375,557 |
| **Operating Income** | $ 7,990,401 | $ — | $ 7,990,401 |
| **Other Income (expense)** | | | |
| Other income | $ 366,859 | $ — | $ 366,859 |
| Interest expense | (9,578,677) | — | (9,578,677) |
| Loss on extinguishment of debt | (861,814) | — | (861,814) |
| **Total Other Expense** | (10,073,632) | — | (10,073,632) |
| **Loss before income taxes** | (2,083,231) | — | (2,083,231) |
| **Taxes** | | | |
| Current tax expense | 41,313 | — | 41,313 |
| Deferred tax expense | 222,339 | — | 222,339 |
| **Income tax expense, net** | 263,652 | — | 263,652 |
| **Net Loss** | $ (2,346,883) | $ — | $ (2,346,883) |
| Less: Net income attributable to non-controlling interest | 6,775,863 | (4,718,608) | 2,057,255 |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (9,122,746) | $ 4,718,608 | $ (4,404,138) |
| Preferred dividend requirements | 7,007,474 | — | 7,007,474 |
| **Net Loss attributable to Common Stockholders** | $ (16,130,220) | $ 4,718,608 | $ (11,411,612) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 14,252,305 | (217,902) | 14,034,403 |
| Basic net loss per share | $ (1.13) | $ 0.33 | $ (0.80) |
| | | | |
| Diluted weighted average shares outstanding | 14,252,305 | (217,902) | 14,034,403 |
| Diluted net loss per share | $ (1.13) | $ 0.33 | $ (0.80) |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 217,902 | 217,902 |
| Basic and diluted net loss per share | $ — | $ (0.95) | $ (0.95) |
| | | | |
| Dividends declared per Common share | $ 0.150 | $ — | $ 0.150 |

The effects of the restatement on the consolidated statement of equity for the three and nine months ended September 30, 2021 are summarized in the following table:

| | Common Stock | | Class B Common Stock | | Preferred Stock | Additional Paid-in | Retained | Non-controlling | |
| | Shares | Amount | Shares | Amount | Amount | Capital | Deficit | Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| **As Previously Reported** | | | | | | | | | |
| Balance at December 31, 2020 | 13,651,521 | $ 13,652 | — | $ — | $125,270,350 | $339,742,380 | $(315,626,555) | $ — | $ 149,399,827 |
| Net income (loss) | — | — | — | — | — | — | (12,299,571) | 1,605,308 | (10,694,263) |
| Series A preferred stock dividends | — | — | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | — | $ — | $125,270,350 | $336,750,132 | $(327,926,126) | $ 116,928,344 | $ 251,036,352 |
| Net income | — | — | — | — | — | — | 412,539 | 2,014,870 | 2,427,409 |
| Series A preferred stock dividends | — | — | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | — | — | (682,576) | — | — | (682,576) |
| Reinvestment of dividends paid to common stockholders | 21,805 | 21 | — | — | — | 132,774 | — | — | 132,795 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (604,951) | (604,951) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (406,000) | (406,000) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 1,288,726 | 1,288,726 |
| **Balance at June 30, 2021 (Unaudited)** | 13,673,326 | $ 13,673 | — | $ — | $125,270,350 | $333,890,657 | $(327,513,587) | $ 119,220,989 | $ 250,882,083 |
| Net income | — | — | — | — | — | — | 2,764,286 | 3,155,685 | 5,919,971 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (741,530) | — | — | (741,530) |
| Reinvestment of dividends paid to common stockholders | 36,228 | 36 | — | — | — | 174,583 | — | — | 174,619 |
| Common Stock issued under director's compensation plan | 3,399 | 3 | — | — | — | 22,497 | — | — | 22,500 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (841,950) | (841,950) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (204,353) | (204,353) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 204,353 | 204,353 |
| Series A preferred stock issued due to internalization transaction | — | — | — | — | 4,255,325 | (10,213) | — | — | 4,245,112 |
| Common Stock issued due to internalization transaction | 1,153,846 | 1,154 | — | — | — | 7,094,999 | — | — | 7,096,153 |
| Class B Common Stock issued due to internalization transaction | — | — | 683,761 | 684 | — | 3,288,206 | — | — | 3,288,890 |
| **Balance at September 30, 2021 (Unaudited)** | 14,866,799 | $ 14,866 | 683,761 | $ 684 | $129,525,675 | $341,331,070 | $(324,749,302) | $ 121,534,724 | $ 267,657,718 |

F-66

Table of Contents     Index to Financial Statements     Glossary of Defined Terms

**Restatement Impact**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net income (loss) | — | $ — | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| **Balance at March 31, 2021 (Unaudited)** | — | $ — | — | $ — | $ — | $ — | $ 1,605,308 | $ (1,605,308) | $ — |
| Net income (loss) | — | — | — | — | — | — | 1,003,919 | (1,003,919) | — |
| **Balance at June 30, 2021 (Unaudited)** | — | $ — | — | $ — | $ — | $ — | $ 2,609,227 | $ (2,609,227) | $ — |
| Net income (loss) | — | — | — | — | — | — | 2,109,381 | (2,109,381) | — |
| **Balance at September 30, 2021 (Unaudited)** | — | $ — | — | $ — | $ — | $ — | $ 4,718,608 | $ (4,718,608) | $ — |
| | | | | | | | | | — |

**As Restated**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2020** | 13,651,521 | $ 13,652 | — | $ — | $125,270,350 | $339,742,380 | $(315,626,555) | $ — | $ 149,399,827 |
| Net loss | — | — | — | — | — | — | (10,694,263) | — | (10,694,263) |
| Series A preferred stock dividends | — | — | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | — | — | (682,576) | — | — | (682,576) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 115,323,036 | 115,323,036 |
| **Balance at March 31, 2021 (Unaudited)** | 13,651,521 | $ 13,652 | — | $ — | $125,270,350 | $336,750,132 | $(326,320,818) | $ 115,323,036 | $ 251,036,352 |
| Net income | — | — | — | — | — | — | 1,416,458 | 1,010,951 | 2,427,409 |
| Series A preferred stock dividends | — | — | — | — | — | (2,309,672) | — | — | (2,309,672) |
| Common Stock dividends | — | — | — | — | — | (682,576) | — | — | (682,576) |
| Reinvestment of dividends paid to common stockholders | 21,805 | 21 | — | — | — | 132,774 | — | — | 132,795 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (604,951) | (604,951) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (406,000) | (406,000) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 1,288,726 | 1,288,726 |
| **Balance at June 30, 2021 (Unaudited)** | 13,673,326 | $ 13,673 | — | $ — | $125,270,350 | $333,890,657 | $(324,904,359) | $ 116,611,762 | $ 250,882,083 |
| Net income | — | — | — | — | — | — | 4,873,667 | 1,046,304 | 5,919,971 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (741,530) | — | — | (741,530) |
| Reinvestment of dividends paid to common stockholders | 36,228 | 36 | — | — | — | 174,583 | — | — | 174,619 |
| Common stock issued under director's compensation plan | 3,399 | 3 | — | — | — | 22,497 | — | — | 22,500 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (841,950) | (841,950) |
| Crimson A-2 Units dividends payment in kind | — | — | — | — | — | — | — | (204,353) | (204,353) |
| Equity attributable to non-controlling interest | — | — | — | — | — | — | — | 204,353 | 204,353 |
| Series A preferred stock issued due to internalization transaction | — | — | — | — | 4,255,325 | (10,213) | — | — | 4,245,112 |

F-67

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Common Stock issued due to internalization transaction | 1,153,846 | 1,154 | — | — | — | 7,094,999 | — | — | 7,096,153 |
| Class B Common Stock issued due to internalization transaction | — | — | 683,761 | 684 | — | 3,288,206 | — | — | 3,288,890 |
| **Balance at September 30, 2021 (Unaudited)** | 14,866,799 | $ 14,866 | 683,761 | $ 684 | $ 129,525,675 | $ 341,331,070 | $ (320,030,693) | $ 116,816,116 | $ 267,657,718 |

F-68

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

The effects of the restatement on the consolidated statement of cash flow for the nine months ended September 30, 2021 are summarized in the following table:

| | For the Nine Months Ended September 30, 2021 | | |
| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Operating Activities** | | | |
| Net loss | $ (2,346,883) | $ — | $ (2,346,883) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Deferred income tax | 222,337 | — | 222,337 |
| Depreciation, amortization and ARO accretion | 11,530,460 | (1,192,821) | 10,337,639 |
| Amortization of debt issuance costs | — | 1,192,821 | 1,192,821 |
| Loss on impairment and disposal of leased property | 5,811,779 | — | 5,811,779 |
| Loss on termination of lease | 165,644 | — | 165,644 |
| Loss on extinguishment of debt | 861,814 | — | 861,814 |
| Non-cash lease expense | 373,847 | (373,847) | — |
| Gain on sale of equipment | (16,508) | — | (16,508) |
| Stock-based compensation | — | 22,500 | 22,500 |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | 702,251 | (586,957) | 115,294 |
| Financing note accrued interest receivable | (8,780) | — | (8,780) |
| Inventory | (1,572,534) | — | (1,572,534) |
| Prepaid expenses and other assets | (2,409,857) | (3,882,392) | (6,292,249) |
| Due from affiliated companies, net | (188,578) | — | (188,578) |
| Management fee payable | (971,626) | — | (971,626) |
| Accounts payable and other accrued liabilities | 987,899 | 881,766 | 1,869,665 |
| Income tax liability | 33,027 | — | 33,027 |
| Operating lease liability | (496,900) | 496,900 | — |
| Unearned revenue | (439,106) | — | (439,106) |
| Other changes, net | — | (123,053) | (123,053) |
| Net cash provided by operating activities | $ 12,238,286 | $ (3,565,083) | $ 8,673,203 |
| **Investing Activities** | | | |
| Acquisition of Crimson Midstream Holdings, net of cash acquired | (69,002,053) | — | (69,002,053) |
| Acquisition of Corridor InfraTrust Management, net of cash acquired | 952,487 | — | 952,487 |
| Purchases of property and equipment, net | (15,024,412) | (709,933) | (15,734,345) |
| Proceeds from Reimbursable projects | — | 1,296,890 | 1,296,890 |
| Proceeds from sale of property and equipment | 97,210 | — | 97,210 |
| Proceeds from insurance recovery | 60,153 | — | 60,153 |
| Principal payment on financing note receivable | 113,595 | — | 113,595 |
| Decrease in financing note receivable | 26,849 | — | 26,849 |
| Net cash used in investing activities | $ (82,776,171) | $ 586,957 | $ (82,189,214) |
| **Financing Activities** | | | |
| Debt financing costs | (2,735,922) | — | (2,735,922) |
| Dividends paid on Series A preferred stock | (7,007,474) | — | (7,007,474) |
| Dividends paid on Common Stock | (1,799,268) | — | (1,799,268) |
| Common stock issued under director's compensation plan | 22,500 | (22,500) | — |
| Distributions to non-controlling interest | (1,446,901) | — | (1,446,901) |
| Advances on revolving line of credit | 19,000,000 | — | 19,000,000 |
| Payments on revolving line of credit | (16,000,000) | — | (16,000,000) |

Table of Contents          Index to Financial Statements                    Glossary of Defined Terms

| | For the Nine Months Ended September 30, 2021 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| Principal payments on Crimson secured credit facility | (4,000,000) | — | (4,000,000) |
| Proceeds from financing arrangement | — | 3,882,392 | 3,882,392 |
| Payments on financing arrangement | — | (1,293,656) | (1,293,656) |
| Net cash used in financing activities | $ (13,967,065) | $ 2,566,236 | $ (11,400,829) |
| Net change in Cash and Cash Equivalents | $ (84,504,950) | $ (411,890) | $ (84,916,840) |
| Cash and Cash Equivalents at beginning of period | 99,596,907 | — | 99,596,907 |
| Cash and Cash Equivalents at end of period | $ 15,091,957 | $ (411,890) | $ 14,680,067 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 10,206,280 | — | $ 10,206,280 |
| Income taxes paid (net of refunds) | (635,730) | — | (635,730) |
| | | | |
| **Non-Cash Investing Activities** | | | |
| In-kind consideration for the Grand Isle Gathering System provided as partial consideration for the Crimson Midstream Holdings acquisition | $ 48,873,169 | — | $ 48,873,169 |
| Crimson Credit Facility assumed and refinanced in connection with the Crimson Midstream Holdings acquisition | 105,000,000 | — | 105,000,000 |
| Equity consideration attributable to non-controlling interest holder in connection with the Crimson Midstream Holdings acquisition | 116,205,762 | — | 116,205,762 |
| Series A preferred stock issued due to internalization transaction | 4,245,112 | — | 4,245,112 |
| Common Stock issued due to internalization transaction | 7,096,153 | — | 7,096,153 |
| Class B Common Stock issued due to internalization transaction | 3,288,890 | — | 3,288,890 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Change in accounts payable and accrued expenses related to debt financing costs | $ 235,198 | — | $ 235,198 |
| Crimson A-2 Units dividends payment in kind | 610,353 | — | 610,353 |
| Assets acquired under financing arrangement | — | 2,588,520 | 2,588,520 |

F-70

Table of Contents Index to Financial Statements Glossary of Defined Terms

**As of and For the Three Months Ended March 31, 2022**

The effects of the restatement on the consolidated balance sheet as of March 31, 2022 are summarized in the following table:

| | March 31, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $40,964,057 (Crimson VIE: $336,342,641) | $ 438,593,056 | $ — | $ 438,593,056 |
| Leased property, net of accumulated depreciation of $268,522 | 1,257,505 | — | 1,257,505 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 993,994 | — | 993,994 |
| Cash and cash equivalents (Crimson VIE: $3,264,738) | 13,286,081 | (2,043,957) | 11,242,124 |
| Accounts and other receivables (Crimson VIE: $8,871,936) | 12,954,640 | — | 12,954,640 |
| Due from affiliated companies (Crimson VIE: $169,968) | 169,968 | — | 169,968 |
| Deferred costs, net of accumulated amortization of $440,986 | 701,361 | — | 701,361 |
| Inventory (Crimson VIE: $3,829,532) | 3,968,235 | — | 3,968,235 |
| Prepaid expenses and other assets (Crimson VIE: $5,176,012) | 7,795,241 | — | 7,795,241 |
| Operating right-of-use assets (Crimson VIE: $5,357,343) | 5,730,264 | — | 5,730,264 |
| Deferred tax asset, net | 134,072 | — | 134,072 |
| Goodwill | 16,210,020 | — | 16,210,020 |
| **Total Assets** | $ 501,794,437 | $ (2,043,957) | $ 499,750,480 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of deferred financing costs of $1,122,820 | $ 96,877,181 | $ — | $ 96,877,181 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,219,745 | 115,830,255 | — | 115,830,255 |
| Accounts payable and other accrued liabilities (Crimson VIE: $7,686,258) | 12,986,409 | (2,043,957) | 10,942,452 |
| Income tax liability | 141,226 | — | 141,226 |
| Due to affiliated companies (Crimson VIE: $423,491 ) | 423,491 | — | 423,491 |
| Operating lease liability (Crimson VIE: $5,044,501) | 5,388,922 | — | 5,388,922 |
| Unearned revenue (Crimson VIE $205,790) | 5,885,621 | — | 5,885,621 |
| **Total Liabilities** | $ 237,533,105 | $ (2,043,957) | $ 235,489,148 |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 51,810 issued and outstanding at March 31, 2022 | $ 129,525,675 | — | $ 129,525,675 |
| Common stock, non-convertible, $0.001 par value; 14,960,628 shares issued and outstanding at March 31, 2022 (100,000,000 shares authorized) | 14,960 | — | 14,960 |
| Class B Common Stock, $0.001 par value; 683,761 shares issued and outstanding at March 31, 2022 (11,896,100 shares authorized) | 684 | — | 684 |
| Additional paid-in capital | 335,376,932 | — | 335,376,932 |
| Retained deficit | (324,853,173) | 7,380,138 | (317,473,035) |
| **Total CorEnergy Equity** | 140,065,078 | 7,380,138 | 147,445,216 |
| Non-controlling interest | 124,196,254 | (7,380,138) | 116,816,116 |
| **Total Equity** | 264,261,332 | — | 264,261,332 |
| **Total Liabilities and Equity** | $ 501,794,437 | $ (2,043,957) | $ 499,750,480 |

Table of Contents                        Index to Financial Statements                        Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the three months ended March 31, 2022 are summarized in the following table:

| | For the Three Months Ended March 31, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| Revenue | | | |
| Transportation and distribution | $ 29,761,354 | $ — | $ 29,761,354 |
| Pipeline loss allowance subsequent sales | 2,731,763 | — | 2,731,763 |
| Lease | 34,225 | — | 34,225 |
| Other | 345,009 | — | 345,009 |
| Total Revenue | 32,872,351 | — | 32,872,351 |
| Expenses | | | |
| Transportation and distribution | 13,945,843 | — | 13,945,843 |
| Pipeline loss allowance subsequent sales cost of revenue | 2,192,649 | — | 2,192,649 |
| General and administrative | 5,142,865 | — | 5,142,865 |
| Depreciation, amortization and ARO accretion | 3,976,667 | — | 3,976,667 |
| Total Expenses | 25,258,024 | — | 25,258,024 |
| Operating Income | $ 7,614,327 | $ — | $ 7,614,327 |
| Other Income (expense) | | | |
| Other income | $ 120,542 | $ — | $ 120,542 |
| Interest expense | (3,146,855) | — | (3,146,855) |
| Total Other Expense | (3,026,313) | — | (3,026,313) |
| Income before income taxes | 4,588,014 | — | 4,588,014 |
| Taxes | | | |
| Current tax expense | 151,044 | — | 151,044 |
| Deferred tax expense | 72,213 | — | 72,213 |
| Income tax expense, net | 223,257 | — | 223,257 |
| Net Income | $ 4,364,757 | $ — | $ 4,364,757 |
| Less: Net income attributable to non-controlling interest | 2,060,294 | (1,251,082) | 809,212 |
| Net income attributable to CorEnergy Infrastructure Trust, Inc. | $ 2,304,463 | $ 1,251,082 | $ 3,555,545 |
| Preferred dividend requirements | 2,388,130 | — | 2,388,130 |
| Net income (loss) attributable to Common Stockholders | $ (83,667) | $ 1,251,082 | $ 1,167,415 |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 15,600,926 | (683,761) | 14,917,165 |
| Basic net income (loss) per share | $ (0.01) | $ 0.09 | $ 0.08 |
| | | | |
| Diluted weighted average shares outstanding | 15,600,926 | (218,804) | 15,382,122 |
| Diluted net income (loss) per share | $ (0.01) | $ 0.09 | $ 0.08 |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 683,761 | 683,761 |
| Basic and diluted net income per share | $ — | $ 0.03 | $ 0.03 |
| | | | |
| Dividends declared per Common share | $ 0.050 | | $ 0.050 |

The effects of the restatement on the consolidated statement of equity for the three months ended March 31, 2022 are summarized in the following table:

| | Series A Cumulative Redeemable Preferred Stock | Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | Shares | Amount | Shares | Amount | | | | |
| **As Previously Reported** | | | | | | | | | |
| **Balance at December 31, 2021** | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $    684 | $ 338,302,735 | $ (327,157,636) | $ 122,945,172 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 2,304,463 | 2,060,294 | 4,364,757 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (744,659) | — | — | (744,659) |
| Reinvestment of dividends paid to common stockholders | — | 67,444 | 67 | — | — | 206,986 | — | — | 207,053 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| **Balance at March 31, 2022 (Unaudited)** | $ 129,525,675 | 14,960,628 | $ 14,960 | 683,761 | $    684 | $ 335,376,932 | $ (324,853,173) | $ 124,196,254 | $ 264,261,332 |
| | | | | | | | | | |
| **Restatement Impact** | | | | | | | | | |
| Adjustments to 2021 Net Income | $ — | — | $ — | — | $ — | $ — | $ 6,129,056 | $ (6,129,056) | $ — |
| Net income (loss) | — | — | — | — | — | — | 1,251,082 | (1,251,082) | — |
| **Balance at March 31, 2022 (Unaudited)** | $ — | — | $ — | — | $ — | $ — | $ 7,380,138 | $ (7,380,138) | $ — |
| | | | | | | | | | |
| **As Restated** | | | | | | | | | |
| Balance at December 31, 2021 | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $    684 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 3,555,545 | 809,212 | 4,364,757 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (744,659) | — | — | (744,659) |
| Reinvestment of dividends paid to common stockholders | — | 67,444 | 67 | — | — | 206,986 | — | — | 207,053 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| **Balance at March 31, 2022 (Unaudited)** | $ 129,525,675 | 14,960,628 | $ 14,960 | 683,761 | $    684 | $ 335,376,932 | $ (317,473,035) | $ 116,816,116 | $ 264,261,332 |

F-73

Table of Contents   Index to Financial Statements   Glossary of Defined Terms

The effects of the restatement on the consolidated statement of cash flow for the three months ended March 31, 2022 are summarized in the following table:

| | For the Three Months Ended March 31, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Operating Activities** | | | |
| Net income | $ 4,364,757 | $ — | $ 4,364,757 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Deferred income tax | 72,213 | — | 72,213 |
| Depreciation, amortization and ARO accretion | 4,388,927 | (412,260) | 3,976,667 |
| Amortization of debt issuance costs | — | 412,260 | 412,260 |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | 2,412,748 | (1,391,763) | 1,020,985 |
| Inventory | (14,712) | — | (14,712) |
| Prepaid expenses and other assets | 1,601,150 | (345,675) | 1,255,475 |
| Due from affiliated companies, net | 282,032 | — | 282,032 |
| Accounts payable and other accrued liabilities | (4,056,041) | (218,915) | (4,274,956) |
| Income tax liability | 141,226 | — | 141,226 |
| Operating lease liability | (657,735) | 657,735 | — |
| Unearned revenue | 46,019 | — | 46,019 |
| Other changes, net | — | (312,060) | (312,060) |
| Net cash provided by (used in) operating activities | $ 8,580,584 | $ (1,610,678) | $ 6,969,906 |
| **Investing Activities** | | | |
| Purchases of property and equipment, net | (1,098,698) | (92,666) | (1,191,364) |
| Proceeds from reimbursable projects | — | 1,478,042 | 1,478,042 |
| Principal payment on financing note receivable | 42,666 | — | 42,666 |
| Net cash provided by (used in) investing activities | $ (1,056,032) | $ 1,385,376 | $ 329,344 |
| **Financing Activities** | | | |
| Dividends paid on Series A preferred stock | (2,388,130) | — | (2,388,130) |
| Dividends paid on Common Stock | (744,659) | — | (744,659) |
| Reinvestment of Dividends Paid to Common Stockholders | 207,053 | — | 207,053 |
| Distributions to non-controlling interest | (809,212) | — | (809,212) |
| Advances on revolving line of credit | 2,000,000 | — | 2,000,000 |
| Payments on revolving line of credit | (3,000,000) | — | (3,000,000) |
| Principal payments on Crimson secured credit facility | (2,000,000) | — | (2,000,000) |
| Payments on financing arrangement | — | (862,754) | (862,754) |
| Net cash used in financing activities | $ (6,734,948) | $ (862,754) | $ (7,597,702) |
| Net change in Cash and Cash Equivalents | $ 789,604 | $ (1,088,056) | $ (298,452) |
| Cash and Cash Equivalents at beginning of period | 12,496,478 | (955,902) | 11,540,576 |
| Cash and Cash Equivalents at end of period | $ 13,286,082 | $ (2,043,958) | $ 11,242,124 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 4,500,333 | $ — | $ 4,500,333 |
| Income taxes paid (net of refunds) | (716) | — | (716) |
| | | | |
| **Non-Cash Investing Activities** | | | |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | $ 1,178,271 | $ — | $ 1,178,271 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Assets acquired under financing arrangement | $ — | $ 647,130 | $ 647,130 |

F-74

Table of Contents          Index to Financial Statements          Glossary of Defined Terms

**As of and For the Three and Six Months Ended June 30, 2022**

The effects of the restatement on the consolidated balance sheet as of June 30, 2022 are summarized in the following table:

| | June 30, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $44,870,127 (Crimson VIE*: $335,765,423) | $    437,328,908 | $                    — | $    437,328,908 |
| Leased property, net of accumulated depreciation of $278,838 | 1,247,189 | — | 1,247,189 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 950,034 | — | 950,034 |
| Cash and cash equivalents (Crimson VIE: $1,759,070) | 17,750,255 | (1,418,585) | 16,331,670 |
| Accounts and other receivables (Crimson VIE: $8,577,791) | 12,571,130 | — | 12,571,130 |
| Due from affiliated companies (Crimson VIE: $231,105) | 231,105 | — | 231,105 |
| Deferred costs, net of accumulated amortization of $536,197 | 606,150 | — | 606,150 |
| Inventory (Crimson VIE: $4,387,216) | 4,540,818 | — | 4,540,818 |
| Prepaid expenses and other assets (Crimson VIE: $3,931,105) | 7,240,815 | — | 7,240,815 |
| Operating right-of-use assets (Crimson VIE: $5,057,314) | 5,374,148 | — | 5,374,148 |
| Deferred tax asset, net | 113,625 | — | 113,625 |
| Goodwill | 16,210,020 | — | 16,210,020 |
| **Total Assets** | $    504,164,197 | $    (1,418,585) | $    502,745,612 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of deferred financing costs of $970,395 | $      96,029,605 | $                    — | $      96,029,605 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $2,055,320 | 115,994,680 | — | 115,994,680 |
| Accounts payable and other accrued liabilities (Crimson VIE: $9,854,951) | 17,399,201 | (1,418,585) | 15,980,616 |
| Income tax payable | 305,205 | — | 305,205 |
| Due to affiliated companies (Crimson VIE: $343,105) | 343,105 | — | 343,105 |
| Operating lease liability (Crimson VIE: $4,849,887) | 5,138,409 | — | 5,138,409 |
| Unearned revenue (Crimson VIE $205,790) | 6,120,397 | — | 6,120,397 |
| **Total Liabilities** | $    241,330,602 | $    (1,418,585) | $    239,912,017 |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value), 69,367,000 authorized; 51,810 issued and outstanding at June 30, 2022 | $    129,525,675 | $                    — | $    129,525,675 |
| Common stock, non-convertible, $0.001 par value; 15,060,857 shares issued and outstanding at June 30, 2022 (100,000,000 shares authorized) | 15,060 | — | 15,060 |
| Class B Common Stock, $0.001 par value; 683,761 shares issued and outstanding at June 30, 2022 (11,896,100 shares authorized) | 684 | — | 684 |
| Additional paid-in capital | 332,588,181 | — | 332,588,181 |
| Retained deficit | (323,649,718) | 7,537,597 | (316,112,121) |
| **Total CorEnergy Equity** | 138,479,882 | 7,537,597 | 146,017,479 |
| Non-controlling interest | 124,353,713 | (7,537,597) | 116,816,116 |
| **Total Equity** | 262,833,595 | — | 262,833,595 |
| **Total Liabilities and Equity** | $    504,164,197 | $    (1,418,585) | $    502,745,612 |

F-75

The effects of the restatement on the consolidated statement of operations for the three months ended June 30, 2022 are summarized in the following table:

| | For the Three Months Ended June 30, 2022 | | |
| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Revenue** | | | |
| Transportation and distribution | $ 28,112,834 | $ — | $ 28,112,834 |
| Pipeline loss allowance subsequent sales | 3,074,436 | — | 3,074,436 |
| Lease | 30,825 | — | 30,825 |
| Other | 303,341 | — | 303,341 |
| **Total Revenue** | 31,521,436 | — | 31,521,436 |
| **Expenses** | | | |
| Transportation and distribution | 14,263,677 | — | 14,263,677 |
| Pipeline loss allowance subsequent sales cost of revenue | 2,438,987 | — | 2,438,987 |
| General and administrative | 5,276,363 | — | 5,276,363 |
| Depreciation, amortization and ARO accretion | 3,992,314 | — | 3,992,314 |
| **Total Expenses** | 25,971,341 | — | 25,971,341 |
| **Operating Income** | $ 5,550,095 | $ — | $ 5,550,095 |
| **Other Income (expense)** | | | |
| Other income | $ 136,023 | $ — | $ 136,023 |
| Interest expense | (3,342,906) | — | (3,342,906) |
| **Total Other Expense** | (3,206,883) | — | (3,206,883) |
| **Income before income taxes** | 2,343,212 | — | 2,343,212 |
| **Taxes** | | | |
| Current tax expense | 156,877 | — | 156,877 |
| Deferred tax expense | 16,209 | — | 16,209 |
| **Income tax expense, net** | 173,086 | — | 173,086 |
| **Net Income** | $ 2,170,126 | $ — | $ 2,170,126 |
| Less: Net income attributable to non-controlling interest | 966,671 | (157,459) | 809,212 |
| **Net income attributable to CorEnergy Infrastructure Trust, Inc.** | $ 1,203,455 | $ 157,459 | $ 1,360,914 |
| Preferred dividend requirements | 2,388,130 | — | 2,388,130 |
| **Net Income (loss) attributable to Common Stockholders** | $ (1,184,675) | $ 157,459 | $ (1,027,216) |
| | | | |
| **Common Stock** | | | |
| Basic weighted average shares outstanding | 15,673,703 | (683,761) | 14,989,942 |
| Basic net loss per share | $ (0.08) | $ 0.02 | $ (0.06) |
| | | | |
| Diluted weighted average shares outstanding | 15,673,703 | (218,804) | 15,454,899 |
| Diluted net loss per share | $ (0.08) | $ 0.01 | $ (0.07) |
| | | | |
| **Class B Common Stock** | | | |
| Basic and diluted weighted average shares outstanding | — | 683,761 | 683,761 |
| Basic and diluted net loss per share | $ — | $ (0.11) | $ (0.11) |
| | | | |
| Dividends declared per Common share | $ 0.050 | $ — | $ 0.050 |

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the six months ended June 30, 2022 are summarized in the following table:

|  | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| **Revenue** | | | |
| Transportation and distribution | $ 57,874,188 | $ — | $ 57,874,188 |
| Pipeline loss allowance subsequent sales | 5,806,199 | — | 5,806,199 |
| Lease | 65,050 | — | 65,050 |
| Other | 648,350 | — | 648,350 |
| Total Revenue | 64,393,787 | — | 64,393,787 |
| **Expenses** | | | |
| Transportation and distribution | 28,209,520 | — | 28,209,520 |
| Pipeline loss allowance subsequent sales cost of revenue | 4,631,636 | — | 4,631,636 |
| General and administrative | 10,419,228 | — | 10,419,228 |
| Depreciation, amortization and ARO accretion | 7,968,981 | — | 7,968,981 |
| Total Expenses | 51,229,365 | — | $ 51,229,365 |
| **Operating Income** | $ 13,164,422 | $ — | 13,164,422 |
| **Other Income (expense)** | | | |
| Other income | $ 256,565 | $ — | $ 256,565 |
| Interest expense | (6,489,761) | — | (6,489,761) |
| Total Other Expense | (6,233,196) | — | (6,233,196) |
| **Income before income taxes** | 6,931,226 | — | 6,931,226 |
| **Taxes** | | | |
| Current tax expense | 307,921 | — | 307,921 |
| Deferred tax expense | 88,422 | — | 88,422 |
| Income tax expense, net | 396,343 | — | 396,343 |
| **Net Income** | $ 6,534,883 | $ — | $ 6,534,883 |
| Less: Net income attributable to non-controlling interest | 3,026,965 | (1,408,541) | 1,618,424 |
| **Net income attributable to CorEnergy Infrastructure Trust, Inc.** | $ 3,507,918 | $ 1,408,541 | $ 4,916,459 |
| Preferred dividend requirements | 4,776,260 | — | 4,776,260 |
| **Net Income (loss) attributable to Common Stockholders** | $ (1,268,342) | $ 1,408,541 | $ 140,199 |
| | | | |
| **Common Stock** | | | |
| Basic weighted average shares outstanding | 15,637,515 | (683,761) | 14,953,754 |
| Basic net income (loss) per share | $ (0.08) | $ 0.09 | $ 0.01 |
| | | | |
| Diluted weighted average shares outstanding | 15,637,515 | (177,468) | 15,460,047 |
| Diluted net income (loss) per share | $ (0.08) | $ 0.09 | $ 0.01 |
| | | | |
| **Class B Common Stock** | | | |
| Basic and diluted weighted average shares outstanding | — | 683,761 | 683,761 |
| Basic and diluted net loss per share | — | $ (0.09) | $ (0.09) |
| | | | |
| Dividends declared per Common share | $ 0.100 | $ — | $ 0.100 |

The effects of the restatement on the consolidated statement of equity for the three and six months ended June 30, 2022 are summarized in the following tables:

| | Series A Cumulative Redeemable Preferred Stock | Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | Shares | Amount | Shares | Amount | | | | |
| **As Previously Reported** | | | | | | | | | |
| **Balance at December 31, 2021** | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 338,302,735 | $ (327,157,636) | $ 122,945,172 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 2,304,463 | 2,060,294 | 4,364,757 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common stock dividends | — | — | — | — | — | (744,659) | — | — | (744,659) |
| Reinvestment of dividends paid to common stockholders | — | 67,444 | 67 | — | — | 206,986 | — | — | 207,053 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| **Balance at March 31, 2022 (Unaudited)** | $ 129,525,675 | 14,960,628 | $ 14,960 | 683,761 | $ 684 | $ 335,376,932 | $ (324,853,173) | $ 124,196,254 | $ 264,261,332 |
| Net income | — | — | — | — | — | — | 1,203,455 | 966,671 | 2,170,126 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common stock dividends | — | — | — | — | — | (748,031) | — | — | (748,031) |
| Reinvestment of dividends paid to common stockholders | — | 69,312 | 69 | — | — | 196,082 | — | — | 196,151 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| Stock-based compensation | — | 30,917 | 31 | — | — | 151,328 | — | — | 151,359 |
| **Balance at June 30, 2022 (Unaudited)** | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (323,649,718) | $ 124,353,713 | $ 262,833,595 |
| | | | | | | | | | |
| **Restatement Impact** | | | | | | | | | |
| Adjustments to 2021 Net Income (loss) | $ — | — | $ — | — | $ — | $ — | $ 6,129,056 | $ (6,129,056) | $ — |
| Net income (loss) | — | — | — | — | — | — | 1,251,082 | (1,251,082) | — |
| **Balance at March 31, 2022 (Unaudited)** | $ — | — | $ — | — | $ — | $ — | $ 7,380,138 | $ (7,380,138) | $ — |
| Net income | — | — | — | — | — | — | 157,459 | (157,459) | — |
| **Balance at June 30, 2022 (Unaudited)** | $ — | — | $ — | — | $ — | $ — | $ 7,537,597 | $ (7,537,597) | $ — |
| | | | | | | | | | |
| **As Restated** | | | | | | | | | |
| **Balance at December 31, 2021** | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 3,555,545 | 809,212 | 4,364,757 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common stock dividends | — | — | — | — | — | (744,659) | — | — | (744,659) |
| Reinvestment of dividends paid to common stockholders | — | 67,444 | 67 | — | — | 206,986 | — | — | 207,053 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| **Balance at March 31, 2022 (Unaudited)** | $ 129,525,675 | 14,960,628 | $ 14,960 | 683,761 | $ 684 | $ 335,376,932 | $ (317,473,035) | $ 116,816,116 | $ 264,261,332 |
| Net income | — | — | — | — | — | — | 1,360,914 | 809,212 | 2,170,126 |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common stock dividends | — | — | — | — | — | (748,031) | — | — | (748,031) |

| | Series A Amount | Common Shares | Common Amount | Class B Shares | Class B Amount | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| Reinvestment of dividends paid to common stockholders | — | 69,312 | 69 | — | — | 196,082 | — | | 196,151 |
| Crimson cash distribution on A-1 Units | — | — | — | — | — | — | | (809,212) | (809,212) |
| Stock-based compensation | — | 30,917 | 31 | — | — | 151,328 | — | | 151,359 |
| Balance at June 30, 2022 (Unaudited) | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (316,112,121) | $ 116,816,116 | $ 262,833,595 |

| | Series A Cumulative Redeemable Preferred Stock | Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | Shares | Amount | Shares | Amount | | | | |
| **As Previously Reported** | | | | | | | | | |
| Balance at December 31, 2021 | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 338,302,735 | $ (327,157,636) | $ 122,945,172 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 3,507,918 | 3,026,965 | 6,534,883 |
| Series A preferred stock dividends | — | — | — | — | — | (4,776,260) | — | — | (4,776,260) |
| Common stock dividends | — | — | — | — | — | (1,492,690) | — | — | (1,492,690) |
| Reinvestment of dividends paid to common stockholders | — | 136,756 | 136 | — | — | 403,068 | — | — | 403,204 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (1,618,424) | (1,618,424) |
| Stock-based Compensation | — | 30,917 | 31 | — | — | 151,328 | — | — | 151,359 |
| Balance at June 30, 2022 (Unaudited) | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (323,649,718) | $ 124,353,713 | $ 262,833,595 |
| | | | | | | | | | |
| **Restatement Impact** | | | | | | | | | |
| Adjustments to 2021 Net Income | $ — | — | $ — | — | $ — | $ — | 6,129,056 | (6,129,056) | $ — |
| Net income (loss) | — | — | — | — | — | — | 1,408,541 | (1,408,541) | — |
| Balance at June 30, 2022 (Unaudited) | $ — | — | $ — | — | $ — | $ — | 7,537,597 | (7,537,597) | $ — |
| | | | | | | | | | |
| **As Restated** | | | | | | | | | |
| Balance at December 31, 2021 | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $ 684 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |
| Net income | — | — | — | — | — | — | 4,916,459 | 1,618,424 | 6,534,883 |
| Series A preferred stock dividends | — | — | — | — | — | (4,776,260) | — | — | (4,776,260) |
| Common stock dividends | — | — | — | — | — | (1,492,690) | — | — | (1,492,690) |
| Reinvestment of dividends paid to common stockholders | — | 136,756 | 136 | — | — | 403,068 | — | — | 403,204 |
| Crimson cash dividends on A-1 units | — | — | — | — | — | — | — | (1,618,424) | (1,618,424) |
| Stock-based Compensation | — | 30,917 | 31 | — | — | 151,328 | — | — | 151,359 |
| Balance at June 30, 2022 (Unaudited) | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (316,112,121) | $ 116,816,116 | $ 262,833,595 |

F-79

Table of Contents Index to Financial Statements Glossary of Defined Terms

The effects of the restatement on the consolidated statement of cash flow for the six months ended June 30, 2022 are summarized in the following table:

| | For the Six Months Ended June 30, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Operating Activities** | | | |
| Net income | $ 6,534,883 | $ — | $ 6,534,883 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Deferred income tax | 88,422 | — | 88,422 |
| Depreciation, amortization and ARO accretion | 8,793,101 | (824,120) | 7,968,981 |
| Amortization of debt issuance costs | — | 824,120 | 824,120 |
| Gain on sale of equipment | (22,678) | — | (22,678) |
| Stock-based compensation | 151,359 | — | 151,359 |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | 1,024,635 | — | 1,024,635 |
| Inventory | (587,295) | — | (587,295) |
| Prepaid expenses and other assets | 2,487,362 | (701,791) | 1,785,571 |
| Due from affiliated companies, net | 140,509 | — | 140,509 |
| Accounts payable and other accrued liabilities | 363,137 | 707,953 | 1,071,089 |
| Income tax liability | 305,205 | — | 305,205 |
| Operating lease liability | (908,248) | 908,248 | — |
| Unearned revenue | 280,795 | — | 280,795 |
| Other changes, net | — | (206,457) | (206,457) |
| Net cash provided by operating activities | $ 18,651,187 | $ 707,953 | $ 19,359,139 |
| **Investing Activities** | | | |
| Purchases of property and equipment | (4,141,485) | — | (4,141,485) |
| Proceeds from reimbursable projects | 2,103,544 | — | 2,103,544 |
| Proceeds from sale of property and equipment | 38,075 | — | 38,075 |
| Principal payment on financing note receivable | 86,626 | — | 86,626 |
| Net cash used in investing activities | $ (1,913,240) | $ — | $ (1,913,240) |
| **Financing Activities** | | | |
| Dividends paid on Series A preferred stock | (4,776,260) | — | (4,776,260) |
| Dividends paid on Common Stock | (1,492,690) | — | (1,492,690) |
| Reinvestment of Dividends Paid to Common Stockholders | 403,204 | — | 403,204 |
| Distributions to non-controlling interest | (1,618,424) | — | (1,618,424) |
| Advances on revolving line of credit | 4,000,000 | — | 4,000,000 |
| Payments on revolving line of credit | (4,000,000) | — | (4,000,000) |
| Principal payments on Crimson secured credit facility | (4,000,000) | — | (4,000,000) |
| Payments on financing arrangement | — | (1,170,635) | (1,170,635) |
| Net cash used in financing activities | $ (11,484,170) | $ (1,170,635) | $ (12,654,805) |
| Net change in Cash and Cash Equivalents | $ 5,253,777 | $ (462,682) | $ 4,791,094 |
| Cash and Cash Equivalents at beginning of period | 12,496,478 | (955,902) | 11,540,576 |
| Cash and Cash Equivalents at end of period | $ 17,750,255 | $ (1,418,584) | $ 16,331,670 |
| | | | |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 4,999,845 | $ — | $ 4,999,845 |
| Income taxes paid (net of refunds) | (12,055) | — | (12,055) |
| | | | |
| **Non-Cash Investing Activities** | | | |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | $ 771,180 | $ — | $ 771,180 |
| | | | |
| **Non-Cash Financing Activities** | | | |
| Assets acquired under financing arrangement | $ — | $ 1,226,402 | $ 1,226,402 |

Table of Contents                    Index to Financial Statements                    Glossary of Defined Terms

**As of and For the Three and Nine Months Ended September 30, 2022**

The effects of the restatement on the consolidated balance sheet as of September 30, 2022 are summarized in the following table:

| | September 30, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Assets** | | | |
| Property and equipment, net of accumulated depreciation of $48,864,283 (Crimson VIE*: $337,470,077) | $ 438,249,633 | $ — | $ 438,249,633 |
| Leased property, net of accumulated depreciation of $289,154 | 1,236,873 | — | 1,236,873 |
| Financing notes and related accrued interest receivable, net of reserve of $600,000 | 904,743 | — | 904,743 |
| Cash and cash equivalents (Crimson VIE: $2,009,787) | 21,776,263 | (1,127,621) | 20,648,642 |
| Accounts and other receivables (Crimson VIE: $7,654,757) | 10,609,744 | — | 10,609,744 |
| Due from affiliated companies (Crimson VIE: $94,994) | 94,994 | — | 94,994 |
| Deferred costs, net of accumulated amortization of $631,408 | 510,939 | — | 510,939 |
| Inventory (Crimson VIE: $5,859,262) | 6,004,037 | — | 6,004,037 |
| Prepaid expenses and other assets (Crimson VIE: $3,946,389) | 5,699,079 | — | 5,699,079 |
| Operating right-of-use assets (Crimson VIE: $4,755,606) | 5,082,028 | — | 5,082,028 |
| Deferred tax asset, net | 111,681 | — | 111,681 |
| Goodwill | — | — | — |
| **Total Assets** | $ 490,280,014 | $ (1,127,621) | $ 489,152,393 |
| **Liabilities and Equity** | | | |
| Secured credit facilities, net of deferred financing costs of $817,972 | $ 99,182,028 | $ — | $ 99,182,028 |
| Unsecured convertible senior notes, net of discount and debt issuance costs of $1,890,895 | 116,159,105 | — | 116,159,105 |
| Accounts payable and other accrued liabilities (Crimson VIE: $13,819,708) | 19,596,670 | (1,127,621) | 18,469,049 |
| Income tax payable | 344,630 | — | 344,630 |
| Due to affiliated companies (Crimson VIE: $276,428) | 276,428 | — | 276,428 |
| Operating lease liability (Crimson VIE: $4,653,594) | 4,951,891 | — | 4,951,891 |
| Unearned revenue (Crimson VIE: $205,790) | 5,990,897 | — | 5,990,897 |
| **Total Liabilities** | $ 246,501,649 | $ (1,127,621) | $ 245,374,028 |
| | | | |
| **Equity** | | | |
| Series A Cumulative Redeemable Preferred Stock 7.375%, $129,525,675 liquidation preference ($2,500 per share, $0.001 par value); 69,367,000 authorized; 51,810 issued and outstanding at September 30, 2022 | $ 129,525,675 | $ — | $ 129,525,675 |
| Common stock, non-convertible, $0.001 par value; 15,176,911 shares issued and outstanding at September 30, 2022 (100,000,000 shares authorized) | 15,177 | — | 15,177 |
| Class B Common Stock, $0.001 par value; 683,761 shares issued and outstanding at September 30, 2022 (11,896,100 shares authorized) | 684 | — | 684 |
| Additional paid-in capital | 329,796,049 | — | 329,796,049 |
| Retained deficit | (339,752,470) | 7,329,433 | (332,423,037) |
| **Total CorEnergy Equity** | 119,585,115 | 7,329,433 | 126,914,548 |
| Non-controlling interest | 124,193,250 | (7,329,433) | 116,863,817 |
| **Total Equity** | 243,778,365 | — | 243,778,365 |
| **Total Liabilities and Equity** | $ 490,280,014 | $ (1,127,621) | $ 489,152,393 |

The effects of the restatement on the consolidated statement of operations for the three months ended September 30, 2022 are summarized in the following table:

| | For the Three Months Ended September 30, 2022 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Effect of Restatement | As Restated |
| **Revenue** | | | |
| Transportation and distribution | $ 31,305,546 | $ — | $ 31,305,546 |
| Pipeline loss allowance subsequent sales | 1,477,251 | — | 1,477,251 |
| Lease | 111,725 | — | 111,725 |
| Other | 67,164 | — | 67,164 |
| **Total Revenue** | 32,961,686 | — | 32,961,686 |
| **Expenses** | | | |
| Transportation and distribution | 17,647,673 | — | 17,647,673 |
| Pipeline loss allowance subsequent sales cost of revenue | 1,385,028 | — | 1,385,028 |
| General and administrative | 5,743,342 | — | 5,743,342 |
| Depreciation, amortization and ARO accretion | 4,028,800 | — | 4,028,800 |
| Loss on impairment of goodwill | 16,210,020 | — | 16,210,020 |
| **Total Expenses** | 45,014,863 | — | 45,014,863 |
| **Operating Loss** | $ (12,053,177) | $ — | $ (12,053,177) |
| **Other Income (expense)** | | | |
| Other income | $ 76,050 | $ — | $ 76,050 |
| Interest expense | (3,483,208) | — | (3,483,208) |
| **Total Other Expense** | (3,407,158) | — | (3,407,158) |
| **Loss before income taxes** | (15,460,335) | — | (15,460,335) |
| **Taxes** | | | |
| Current tax expense | 35,187 | — | 35,187 |
| Deferred tax expense | 6,182 | — | 6,182 |
| **Income tax expense, net** | 41,369 | — | 41,369 |
| **Net Loss** | $ (15,501,704) | $ — | $ (15,501,704) |
| Less: Net income attributable to non-controlling interest | 601,048 | 208,164 | 809,212 |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | $ (16,102,752) | $ (208,164) | $ (16,310,916) |
| Preferred dividend requirements | 2,388,130 | — | 2,388,130 |
| **Net Loss attributable to Common Stockholders** | $ (18,490,882) | $ (208,164) | $ (18,699,046) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 15,773,469 | (683,761) | 15,089,708 |
| Basic net loss per share | $ (1.17) | $ (0.01) | $ (1.18) |
| | | | |
| Diluted weighted average shares outstanding | 15,773,469 | (218,804) | 15,554,665 |
| Diluted net loss per share | $ (1.17) | $ (0.03) | $ (1.20) |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 683,761 | 683,761 |
| Basic and diluted net loss per share | $ — | $ (1.23) | $ (1.23) |
| | | | |
| Dividends declared per Common share | $ 0.050 | $ — | $ 0.050 |

Table of Contents          Index to Financial Statements          Glossary of Defined Terms

The effects of the restatement on the consolidated statement of operations for the nine months ended September 30, 2022 are summarized in the following table:

| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| | **For the Nine Months Ended September 30, 2022** | | |
| **Revenue** | | | |
| Transportation and distribution | $ 89,179,734 | $ — | $ 89,179,734 |
| Pipeline loss allowance subsequent sales | 7,283,450 | — | 7,283,450 |
| Lease | 176,775 | — | 176,775 |
| Other | 715,514 | — | 715,514 |
| Total Revenue | 97,355,473 | — | 97,355,473 |
| **Expenses** | | | |
| Transportation and distribution | 45,857,193 | — | 45,857,193 |
| Pipeline loss allowance subsequent sales cost of revenue | 6,016,664 | — | 6,016,664 |
| General and administrative | 16,162,570 | — | 16,162,570 |
| Depreciation, amortization and ARO accretion | 11,997,781 | — | 11,997,781 |
| Loss on impairment of goodwill | 16,210,020 | — | 16,210,020 |
| Total Expenses | 96,244,228 | — | 96,244,228 |
| **Operating Income** | $ 1,111,245 | $ — | $ 1,111,245 |
| **Other Income (expense)** | | | |
| Other income | $ 332,615 | $ — | $ 332,615 |
| Interest expense | (9,972,969) | — | $ (9,972,969) |
| Total Other Expense | (9,640,354) | — | (9,640,354) |
| **Loss before income taxes** | (8,529,109) | — | (8,529,109) |
| **Taxes** | | | |
| Current tax expense | 343,108 | — | 343,108 |
| Deferred tax expense | 94,604 | — | 94,604 |
| Income tax expense, net | 437,712 | — | 437,712 |
| **Net Loss** | $ (8,966,821) | $ — | $ (8,966,821) |
| Less: Net income attributable to non-controlling interest | 3,628,013 | (1,200,377) | 2,427,636 |
| **Net Loss attributable to CorEnergy** | $ (12,594,834) | $ 1,200,377 | $ (11,394,457) |
| Preferred dividend requirements | 7,164,390 | — | 7,164,390 |
| **Net Loss attributable to Common Stockholders** | $ (19,759,224) | $ 1,200,377 | $ (18,558,847) |
| | | | |
| Common Stock | | | |
| Basic weighted average shares outstanding | 15,683,331 | (683,761) | 14,999,570 |
| Basic net loss per share | $ (1.26) | $ 0.08 | $ (1.18) |
| | | | |
| Diluted weighted average shares outstanding | 15,683,331 | (218,804) | 15,464,527 |
| Diluted net loss per share | $ (1.26) | $ 0.06 | $ (1.20) |
| | | | |
| Class B Common Stock | | | |
| Basic and diluted weighted average shares outstanding | — | 683,761 | 683,761 |
| Basic and diluted net loss per share | $ — | $ (1.33) | $ (1.33) |
| | | | |
| Dividends declared per Common share | $ 0.150 | $ — | $ 0.150 |

The effects of the restatement on the consolidated statement of equity for the three and nine months ended September 30, 2022 are summarized in the following tables:

| | Series A Cumulative Redeemable Preferred Stock | Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | Shares | Amount | Shares | Amount | | | | |
| **As Previously Reported** | | | | | | | | | |
| **Balance at June 30, 2022 (Unaudited)** | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (323,649,718) | $ 124,353,713 | $ 262,833,595 |
| Net income (loss) | — | — | — | — | — | — | (16,102,752) | 601,048 | (15,501,704) |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (753,043) | — | — | (753,043) |
| Reinvestment of dividends paid to common stockholders | — | 84,606 | 85 | — | — | 197,895 | — | — | 197,980 |
| Common Stock, accrued dividend equivalent | — | — | — | — | — | (34,145) | — | — | (34,145) |
| Crimson cash distribution on Class A-1 Units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| Stock-based compensation | — | 31,448 | 32 | — | — | 185,291 | — | 47,701 | 233,024 |
| **Balance at September 30, 2022 (Unaudited)** | $ 129,525,675 | 15,176,911 | $ 15,177 | 683,761 | $ 684 | $ 329,796,049 | $ (339,752,470) | $ 124,193,250 | $ 243,778,365 |
| | | | | | | | | | |
| **Restatement Impact** | | | | | | | | | |
| Adjustments to 2021 Net Income (loss) | $ — | — | $ — | — | $ — | $ — | $ 6,129,056 | $ (6,129,056) | $ — |
| Adjustments to Q1 - Q2 2022 Net Income (loss) | — | — | — | — | — | — | 1,408,541 | (1,408,541) | — |
| Net income (loss) | — | — | — | — | — | — | (208,164) | 208,164 | — |
| **Balance at September 30, 2022 (Unaudited)** | $ — | — | $ — | — | $ — | $ — | $ 7,329,433 | $ (7,329,433) | $ — |
| | | | | | | | | | |
| **As Restated** | | | | | | | | | |
| **Balance at June 30, 2022 (Unaudited)** | $ 129,525,675 | 15,060,857 | $ 15,060 | 683,761 | $ 684 | $ 332,588,181 | $ (316,112,121) | $ 116,816,116 | $ 262,833,595 |
| Net income (loss) | — | — | — | — | — | — | (16,310,916) | 809,212 | (15,501,704) |
| Series A preferred stock dividends | — | — | — | — | — | (2,388,130) | — | — | (2,388,130) |
| Common Stock dividends | — | — | — | — | — | (753,043) | — | — | (753,043) |
| Reinvestment of dividends paid to common stockholders | — | 84,606 | 85 | — | — | 197,895 | — | — | 197,980 |
| Common Stock, accrued dividend equivalent | — | — | — | — | — | (34,145) | — | — | (34,145) |
| Crimson cash distribution on Class A-1 Units | — | — | — | — | — | — | — | (809,212) | (809,212) |
| Stock-based compensation | — | 31,448 | 32 | — | — | 185,291 | — | 47,701 | 233,024 |
| **Balance at September 30, 2022 (Unaudited)** | $ 129,525,675 | 15,176,911 | $ 15,177 | 683,761 | $ 684 | $ 329,796,049 | $ (332,423,037) | $ 116,863,817 | $ 243,778,365 |

F-84

| | Series A Cumulative Redeemable Preferred Stock | Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Deficit | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | Shares | Amount | Shares | Amount | | | | |
| **As Previously Reported** | | | | | | | | | |
| **Balance at December 31, 2021** | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $      684 | $ 338,302,735 | $ (327,157,636) | $ 122,945,172 | $ 263,631,523 |
| Net income (loss) | — | — | — | — | — | — | (12,594,834) | 3,628,013 | (8,966,821) |
| Series A preferred stock dividends | — | — | — | — | — | (7,164,390) | — | — | (7,164,390) |
| Common stock dividends | — | — | — | — | — | (2,245,733) | — | — | (2,245,733) |
| Reinvestment of dividends paid to common stockholders | — | 221,362 | 221 | — | — | 600,963 | — | — | 601,184 |
| Common Stock, accrued dividend equivalent | — | — | — | — | — | (34,145) | — | — | (34,145) |
| Crimson cash dividends on Class A-1 units | — | — | — | — | — | — | — | (2,427,636) | (2,427,636) |
| Stock-based Compensation | — | 62,365 | 63 | — | — | 336,619 | — | 47,701 | 384,383 |
| **Balance at September 30, 2022 (Unaudited)** | $ 129,525,675 | 15,176,911 | $ 15,177 | 683,761 | $      684 | $ 329,796,049 | $ (339,752,470) | $ 124,193,250 | $ 243,778,365 |
| | | | | | | | | | |
| **Restatement Impact** | | | | | | | | | |
| Adjustments to 2021 Net Income (loss) | $      — | — | $      — | — | $      — | $      — | $   6,129,056 | $  (6,129,056) | $      — |
| Net income (loss) | | | | | | | 1,200,377 | (1,200,377) | |
| **Balance at September 30, 2022 (Unaudited)** | $      — | — | $      — | — | $      — | $      — | $   7,329,433 | $  (7,329,433) | $      — |
| | | | | | | | | | |
| **As Restated** | | | | | | | | | |
| **Balance at December 31, 2021** | $ 129,525,675 | 14,893,184 | $ 14,893 | 683,761 | $      684 | $ 338,302,735 | $ (321,028,580) | $ 116,816,116 | $ 263,631,523 |
| Net income (loss) | — | — | — | — | — | — | (11,394,457) | 2,427,636 | (8,966,821) |
| Series A preferred stock dividends | — | — | — | — | — | (7,164,390) | — | — | (7,164,390) |
| Common Stock dividends | — | — | — | — | — | (2,245,733) | — | — | (2,245,733) |
| Reinvestment of dividends paid to common stockholders | — | 221,362 | 221 | — | — | 600,963 | — | — | 601,184 |
| Common Stock, accrued dividend equivalent | — | — | — | — | — | (34,145) | — | — | (34,145) |
| Crimson cash distribution on Class A-1 Units | — | — | — | — | — | — | — | (2,427,636) | (2,427,636) |
| Stock-based compensation | — | 62,365 | 63 | — | — | 336,619 | — | 47,701 | 384,383 |
| **Balance at September 30, 2022 (Unaudited)** | $ 129,525,675 | 15,176,911 | $ 15,177 | 683,761 | $      684 | $ 329,796,049 | $ (332,423,037) | $ 116,863,817 | $ 243,778,365 |

F-85

The effects of the restatement on the consolidated statement of cash flow for the nine months ended September 30, 2022 are summarized in the following table:

| | For the Nine Months Ended September 30, 2022 | | |
|---|---|---|---|
| | As Previously Reported | Effect of Restatement | As Restated |
| **Operating Activities** | | | |
| Net loss | $ (8,966,821) | $ — | $ (8,966,821) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Deferred income tax | 94,604 | — | 94,604 |
| Depreciation, amortization and ARO accretion | 11,997,781 | — | 11,997,781 |
| Amortization of debt issuance costs | 1,236,178 | — | 1,236,178 |
| Loss on impairment of goodwill | 16,210,020 | — | 16,210,020 |
| Gain on sale of equipment | (39,678) | — | (39,678) |
| Stock-based compensation | 384,383 | — | 384,383 |
| Changes in assets and liabilities: | | | |
| Accounts and other receivables | 2,715,207 | — | 2,715,207 |
| Inventory | (2,050,514) | — | (2,050,514) |
| Prepaid expenses and other assets | 4,296,890 | (2,514,429) | 1,782,460 |
| Due from affiliated companies, net | 209,943 | — | 209,943 |
| Accounts payable and other accrued liabilities | 1,213,961 | 1,815,664 | 3,029,625 |
| Income tax liability | 344,630 | — | 344,630 |
| Operating lease liability | (1,094,766) | 1,094,766 | — |
| Unearned revenue | 151,295 | — | 151,295 |
| Other changes, net | — | (100,855) | (100,855) |
| Net cash provided by operating activities | $ 26,703,113 | $ 295,146 | $ 26,998,258 |
| **Investing Activities** | | | |
| Purchases of property and equipment | (7,759,603) | — | (7,759,603) |
| Proceeds from reimbursable projects | 2,385,858 | — | 2,385,858 |
| Proceeds from sale of property and equipment | 55,075 | — | 55,075 |
| Principal payment on financing note receivable | 131,917 | — | 131,917 |
| Net cash used in investing activities | $ (5,186,753) | $ — | $ (5,186,753) |
| **Financing Activities** | | | |
| Dividends paid on Series A preferred stock | (7,164,390) | — | (7,164,390) |
| Dividends paid on Common Stock | (1,644,549) | — | (1,644,549) |

F-86

| | As Previously Reported | Effect of Restatement | As Restated |
|---|---|---|---|
| | | For the Nine Months Ended September 30, 2022 | |
| Distributions to non-controlling interest | (2,427,636) | — | (2,427,636) |
| Advances on revolving line of credit | 9,000,000 | — | 9,000,000 |
| Payments on revolving line of credit | (4,000,000) | — | (4,000,000) |
| Principal payments on Crimson secured credit facility | (6,000,000) | — | (6,000,000) |
| Proceeds from financing arrangement | — | 1,520,517 | 1,520,517 |
| Payments on financing arrangement | — | (1,987,382) | (1,987,382) |
| Net cash used in financing activities | $ (12,236,575) | $ (466,865) | $ (12,703,440) |
| Net change in Cash and Cash Equivalents | 9,279,785 | (171,719) | 9,108,065 |
| Cash and Cash Equivalents at beginning of period | 12,496,478 | (955,902) | 11,540,576 |
| Cash and Cash Equivalents at end of period | $ 21,776,263 | $ (1,127,621) | $ 20,648,641 |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Interest paid | $ 8,802,697 | $ — | $ 8,802,697 |
| Income taxes paid (net of refunds) | (12,055) | — | (12,055) |
| **Non-Cash Investing Activities** | | | |
| Purchases of property, plant and equipment in accounts payable and other accrued liabilities | $ 2,249,585 | $ — | $ 2,249,585 |
| **Non-Cash Financing Activities** | | | |
| Reinvestment of Dividends Paid to Common Stockholders | $ 601,184 | $ — | $ 601,184 |
| Dividend equivalents accrued on RSUs | 34,145 | — | 34,145 |
| Assets acquired under financing arrangement | — | 307,312 | 307,312 |

As described in Note 20 ("Restatement Of Prior Period"), the Company previously reported earnings per share for its Common Stock and Class B Common Stock on a combined basis, however, beginning with the quarter ended September 30, 2021 when the Class B Common Stock was first issued it should have reported earnings per share using the two-class method, under which earnings per share for its Common Stock and Class B Common Stock should have been separately calculated and reported, during these periods. Additionally, due to the error in calculating net income allocable to non-controlling interest that is further described in Note 20 ("Restatement Of Prior Period"), the numerator used in calculating earnings per share was incorrect beginning with the quarter ended March 31, 2021. The tables below present the restated basic and diluted earnings (loss) per share for the impacted interim periods for the years 2022 and 2021.

**RESTATED LOSS PER SHARE FOR THE THREE MONTHS ENDED MARCH 31, 2021**

| LOSS PER SHARE | |
|---|---|
| | For the Three Months Ended |
| | March 31, 2021 |
| Net Loss | (10,694,263) |
| Less: Preferred dividend requirements[1] | 2,309,672 |
| Net Loss attributable to Common Stockholders | $ (13,003,935) |
| | |
| Numerator for basic and diluted net loss per Common Stock share | $ (13,003,935) |
| | |
| Weighted average shares - basic and diluted | 13,651,521 |
| | |
| Basic and diluted loss per share | $ (0.95) |

(1) For the three months ended March 31, 2021, 2,361,000 shares of Common Stock are excluded from the computation of diluted net earnings per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt.

F-87

**RESTATED LOSS PER SHARE FOR THE THREE AND SIX MONTHS ENDED JUNE 30, 2021**

**LOSS PER SHARE**

| | For the Three Months Ended June 30, 2021 | | For the Six Months Ended June 30, 2021 | |
|---|---|---|---|---|
| Net Income (Loss) | | 2,427,409 | | (8,266,854) |
| Less: Net income attributable to non-controlling interest | | 1,010,951 | | 1,010,951 |
| Less: Preferred dividend requirements[1] | | 2,309,672 | | 4,619,344 |
| Net Loss attributable to Common Stockholders | $ | (893,214) | $ | (13,897,149) |
| | | | | |
| Numerator for basic and diluted net loss per Common Stock share | $ | (893,214) | $ | (13,897,149) |
| | | | | |
| Weighted average shares - basic and diluted | | 13,659,667 | | 13,655,617 |
| | | | | |
| Basic and diluted Loss per share | $ | (0.07) | $ | (1.02) |

(1) For the three and six months ended June 30, 2021, 2,361,000 shares of Common Stock are excluded from the computation of diluted net earnings per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt.

F-88

**RESTATED EARNINGS (LOSS) PER SHARE FOR THE THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2021**

| EARNINGS (LOSS) PER SHARE | | |
|---|---|---|
| | For the Three Months Ended September 30, 2021 | For the Nine Months Ended September 30, 2021 |
| **Numerator for basic and diluted earnings per Common Stock and Class B Common Stock share:** | | |
| Net Income (Loss) | $ 5,919,971 | $ (2,346,883) |
| Less: Net Income attributable to non-controlling interests | 1,046,304 | 2,057,255 |
| Net Income (Loss) attributable to CorEnergy Infrastructure Trust, Inc. | 4,873,667 | (4,404,138) |
| Less dividends / distributions: | | |
| Preferred dividend requirements | 2,388,130 | 7,007,474 |
| Common Stock dividends | 741,530 | 2,106,681 |
| **Total undistributed earnings (losses)** | $ 1,744,007 | $ (13,518,293) |
| | | |
| Common Stock undistributed earnings (losses) - basic | $ 1,670,907 | $ (13,311,613) |
| Class B Common Stock undistributed earnings (losses) - basic | 73,100 | (206,680) |
| **Total undistributed earnings (losses) - basic** | $ 1,744,007 | $ (13,518,293) |
| | | |
| Common Stock undistributed earnings (losses) - diluted | $ 1,744,007 | $ (13,311,613) |
| Class B Common Stock undistributed earnings (losses) - diluted | 73,100 | (206,680) |
| **Total undistributed earnings (losses) - diluted** | $ 1,817,107 | $ (13,518,293) |
| | | |
| Common Stock dividends | $ 741,530 | $ 2,106,681 |
| Common Stock undistributed earnings (loss) - basic | 1,670,907 | (13,311,613) |
| **Numerator for basic net earnings (loss) per Common Stock share** | $ 2,412,437 | $ (11,204,932) |
| | | |
| Class B Common Stock dividends | $ — | $ — |
| Class B Common Stock undistributed earnings (loss) - basic | 73,100 | (206,680) |
| **Numerator for basic net earnings (loss) per Class B Common Stock share** | $ 73,100 | $ (206,680) |
| | | |
| Common Stock dividends | $ 741,530 | $ 2,106,681 |
| Common Stock undistributed earnings (loss) - diluted | 1,744,007 | (13,311,613) |
| **Numerator for diluted net earnings (loss) per Common Stock share** | $ 2,485,537 | $ (11,204,932) |
| | | |
| Class B Common Stock dividends | $ — | $ — |
| Class B Common Stock undistributed earnings - diluted | 73,100 | (206,680) |
| **Numerator for diluted net earnings (loss) per Class B Common Stock share** | $ 73,100 | $ (206,680) |
| | | |
| **Denominator for basic net earnings (loss) per Common Stock and Class B Common Stock share:** | | |
| Common Stock weighted average shares outstanding - basic | 14,779,625 | 14,034,403 |
| Class B Common Stock weighted average shares outstanding - basic | 646,600 | 217,902 |
| | | |
| **Denominator for diluted net earnings (loss) per Common Stock and Class B Common Stock share:** | | |
| Common Stock weighted average shares outstanding - diluted[1][2] | 15,244,582 | 14,034,403 |
| Class B Common Stock weighted average shares outstanding - diluted[3] | 646,600 | 217,902 |
| | | |
| **Basic net earnings (loss) per share:** | | |
| Common Stock | $ 0.16 | $ (0.80) |
| Class B Common Stock | $ 0.11 | $ (0.95) |

Index to Financial Statements

| **Diluted net earnings (loss) per share:** | | | | |
|---|---|---|---|---|
| Common Stock | $ | 0.16 | $ | (0.80) |
| Class B Common Stock | $ | 0.11 | $ | (0.95) |

NOTES TO TABLE

(1) For purposes of the diluted net loss per share computation for Common Stock, all shares of Class B Common Stock are assumed to be converted at a ratio of 1 Class B Common Stock share to .68 Common Stock share; therefore, 100% of undistributed earnings (losses) is allocated to Common Stock.

(2) For the three months ended September 30, 2021, 2,361,000 shares of Common Stock are excluded from the computation of diluted net earnings per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt. For the nine months ended September 30, 2021, 2,825,957 shares of Common Stock are excluded from the computation of diluted net loss per share because their effect would be antidilutive. This is comprised of 464,957 shares of converted Class B Common Stock and 2,361,000 shares of the converted 5.875% convertible debt.

(3) For purposes of the diluted net earnings (loss) per share computation for Class B Common Stock, weighted average shares of Class B Common Stock are assumed not converted to Common Stock.

**RESTATED EARNINGS PER SHARE FOR THE THREE MONTHS ENDED MARCH 31, 2022**

### EARNINGS PER SHARE

| | For the Three Months Ended |
| --- | --- |
| | March 31, 2022 |
| **Numerator for basic and diluted earnings per Common Stock and Class B Common Stock share:** | |
| **Net Income** | $ 4,364,757 |
| Less: Net income attributable to non-controlling interests | 809,212 |
| **Net income attributable to CorEnergy Infrastructure Trust, Inc.** | 3,555,545 |
| Less dividends / distributions: | |
| Preferred dividend requirements | 2,388,130 |
| Common Stock dividends | 744,659 |
| **Total undistributed earnings** | $ 422,756 |
| | |
| Common Stock undistributed earnings - basic | $ 404,227 |
| Class B Common Stock undistributed earnings - basic | 18,529 |
| **Total undistributed earnings - basic** | $ 422,756 |
| | |
| Common Stock undistributed earnings - diluted | $ 422,756 |
| Class B Common Stock undistributed earnings - diluted | 18,529 |
| **Total undistributed earnings - diluted** | $ 441,285 |
| | |
| Common Stock dividends | $ 744,659 |
| Common Stock undistributed earnings - basic | 404,227 |
| **Numerator for basic net earnings per Common Stock share** | $ 1,148,886 |
| | |
| Class B Common Stock dividends | $ — |
| Class B Common Stock undistributed earnings - basic | 18,529 |
| **Numerator for basic net earnings per Class B Common Stock share** | $ 18,529 |
| | |
| Common Stock dividends | $ 744,659 |
| Common Stock undistributed earnings - diluted | 422,756 |
| **Numerator for diluted net earnings per Common Stock share** | $ 1,167,415 |
| | |
| Class B Common Stock dividends | $ — |
| Class B Common Stock undistributed earnings - diluted | 18,529 |
| **Numerator for diluted net earnings per Class B Common Stock share** | $ 18,529 |
| | |
| **Denominator for basic net earnings per Common Stock and Class B Common Stock share:** | |
| Common Stock weighted average shares outstanding - basic | 14,917,165 |
| Class B Common Stock weighted average shares outstanding - basic | 683,761 |
| | |
| **Denominator for diluted net earnings per Common Stock and Class B Common Stock share:** | |
| Common Stock weighted average shares outstanding - diluted[(1)(2)] | 15,382,122 |
| Class B Common Stock weighted average shares outstanding - diluted[3)] | 683,761 |
| | |
| **Basic net earnings per share:** | |
| Common Stock | $ 0.08 |

F-91

Table of Contents  Index to Financial Statements                    Glossary of Defined Terms

| | | |
|---|---|---|
| Class B Common Stock | $ | 0.03 |
| **Diluted net earnings per share:** | | |
| Common Stock | $ | 0.08 |
| Class B Common Stock | $ | 0.03 |

NOTES TO TABLE

(1) For purposes of the diluted net earnings per share computation for Common Stock, all shares of Class B Common Stock are assumed to be converted at a ratio of 1 Class B Common Stock share to .68 Common Stock share; therefore, 100% of undistributed earnings is allocated to Common Stock.

(2) For the three months ended March 31, 2022, 2,361,000 shares of Common Stock are excluded from the computation of diluted net earnings per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt.

(3) For purposes of the diluted net earnings per share computation for Class B Common Stock, weighted average shares of Class B Common Stock are assumed not converted to Common Stock.

**RESTATED EARNINGS (LOSS) PER SHARE FOR THE THREE AND SIX MONTHS ENDED JUNE 30, 2022**

| EARNINGS (LOSS) PER SHARE | | | |
|---|---|---|---|
| | For the Three Months Ended | | For the Six Months Ended |
| | June 30, 2022 | | June 30, 2022 |
| **Numerator for basic and diluted earnings per Common Stock and Class B Common Stock share:** | | | |
| **Net Income** | $ 2,170,126 | $ | 6,534,883 |
| Less: Net income attributable to non-controlling interests | 809,212 | | 1,618,424 |
| **Net income attributable to CorEnergy Infrastructure Trust, Inc.** | 1,360,914 | | 4,916,459 |
| Less dividends / distributions: | | | |
| Preferred dividend requirements | 2,388,130 | | 4,776,260 |
| Common Stock dividends | 748,031 | | 1,492,690 |
| **Total undistributed earnings** | $ (1,775,247) | $ | (1,352,491) |
| | | | |
| Common Stock undistributed earnings - basic | $ (1,697,802) | $ | (1,293,352) |
| Class B Common Stock undistributed earnings - basic | (77,445) | | (59,139) |
| **Total undistributed earnings - basic** | $ (1,775,247) | $ | (1,352,491) |
| | | | |
| Common Stock undistributed earnings - diluted | $ (1,775,247) | $ | (1,352,491) |
| Class B Common Stock undistributed earnings - diluted | (77,445) | | (59,139) |
| **Total undistributed earnings - diluted** | $ (1,852,692) | $ | (1,411,630) |
| | | | |
| Common Stock dividends | $ 748,031 | $ | 1,492,690 |
| Common Stock undistributed earnings - basic | (1,697,802) | | (1,293,352) |
| **Numerator for basic net earnings per Common Stock share** | $ (949,771) | $ | 199,338 |
| | | | |
| Class B Common Stock dividends | $ — | $ | — |
| Class B Common Stock undistributed earnings - basic | (77,445) | | (59,139) |
| **Numerator for basic net earnings per Class B Common Stock share** | $ (77,445) | $ | (59,139) |
| | | | |
| Common Stock dividends | $ 748,031 | $ | 1,492,690 |
| Common Stock undistributed earnings - diluted | (1,775,247) | | (1,352,491) |
| **Numerator for diluted net earnings per Common Stock share** | $ (1,027,216) | $ | 140,199 |
| | | | |
| Class B Common Stock dividends | $ — | $ | — |
| Class B Common Stock undistributed earnings - diluted | (77,445) | | (59,139) |
| **Numerator for diluted net earnings per Class B Common Stock share** | $ (77,445) | $ | (59,139) |
| | | | |
| **Denominator for basic net earnings per Common Stock and Class B Common Stock share:** | | | |
| Common Stock weighted average shares outstanding - basic | 14,989,942 | | 14,953,754 |
| Class B Common Stock weighted average shares outstanding - basic | 683,761 | | 683,761 |
| | | | |
| **Denominator for diluted net earnings per Common Stock and Class B Common Stock share:** | | | |
| Common Stock weighted average shares outstanding - diluted[1][2] | 15,454,899 | | 15,460,047 |
| Class B Common Stock weighted average shares outstanding - diluted[3] | 683,761 | | 683,761 |
| | | | |
| **Basic net earnings (loss) per share:** | | | |
| Common Stock | $ (0.06) | $ | 0.01 |
| Class B Common Stock | $ (0.11) | $ | (0.09) |

Table of Contents Index to Financial Statements Glossary of Defined Terms

| Diluted net earnings (loss) per share: | | | | |
|---|---|---|---|---|
| Common Stock | $ | (0.07) | $ | 0.01 |
| Class B Common Stock | $ | (0.11) | $ | (0.09) |

NOTES TO TABLE

(1) For purposes of the diluted net earnings (loss) per share computation for Common Stock, all shares of Class B Common Stock are assumed to be converted at a ratio of 1 Class B Common Stock share to .68 Common Stock share; therefore, 100% of undistributed earnings (losses) is allocated to Common Stock.

(2) For the three and sixth months ended June 30, 2022, 2,361,000 shares of Common Stock are excluded from the computation of diluted net loss per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt.

(3) For purposes of the diluted net loss per share computation for Class B Common Stock, weighted average shares of Class B Common Stock are assumed not converted to Common Stock.

**RESTATED LOSS PER SHARE FOR THE THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2022**

| LOSS PER SHARE | | |
|---|---|---|
| | For the Three Months Ended | For the Nine Months Ended |
| | September 30, 2022 | September 30, 2022 |
| **Numerator for basic and diluted earnings per Common Stock and Class B Common Stock share:** | | |
| **Net Loss** | $ (15,501,704) | $ (8,966,821) |
| Less: Net income attributable to non-controlling interests | 809,212 | 2,427,636 |
| **Net Loss attributable to CorEnergy Infrastructure Trust, Inc.** | (16,310,916) | (11,394,457) |
| Less dividends / distributions: | | |
| Preferred dividend requirements | 2,388,130 | 7,164,390 |
| Common Stock dividends | 753,043 | 2,245,733 |
| **Total undistributed earnings** | $ (19,452,089) | $ (20,804,580) |
| | | |
| Common Stock undistributed earnings - basic | $ (18,608,864) | $ (19,897,543) |
| Class B Common Stock undistributed earnings - basic | (843,225) | (907,037) |
| **Total undistributed earnings - basic** | $ (19,452,089) | $ (20,804,580) |
| | | |
| Common Stock undistributed earnings - diluted | $ (19,452,089) | $ (20,804,580) |
| Class B Common Stock undistributed earnings - diluted | (843,225) | (907,037) |
| **Total undistributed earnings - diluted** | $ (20,295,314) | $ (21,711,617) |
| | | |
| Common Stock dividends | $ 753,043 | $ 2,245,733 |
| Common Stock undistributed earnings - basic | (18,608,864) | (19,897,543) |
| **Numerator for basic net earnings per Common Stock share** | $ (17,855,821) | $ (17,651,810) |
| | | |
| Class B Common Stock dividends | $ — | $ — |
| Class B Common Stock undistributed earnings - basic | (843,225) | (907,037) |
| **Numerator for basic net earnings per Class B Common Stock share** | $ (843,225) | $ (907,037) |
| | | |
| Common Stock dividends | $ 753,043 | $ 2,245,733 |
| Common Stock undistributed earnings - diluted | (19,452,089) | (20,804,580) |
| **Numerator for diluted net earnings per Common Stock share** | $ (18,699,046) | $ (18,558,847) |
| | | |
| Class B Common Stock dividends | $ — | $ — |
| Class B Common Stock undistributed earnings - diluted | (843,225) | (907,037) |
| **Numerator for diluted net earnings per Class B Common Stock share** | $ (843,225) | $ (907,037) |
| | | |
| **Denominator for basic net earnings per Common Stock and Class B Common Stock share:** | | |
| Common Stock weighted average shares outstanding - basic | 15,089,708 | 14,999,570 |
| Class B Common Stock weighted average shares outstanding - basic | 683,761 | 683,761 |
| | | |
| **Denominator for diluted net earnings per Common Stock and Class B Common Stock share:** | | |
| Common Stock weighted average shares outstanding - diluted[1][2] | 15,554,665 | 15,464,527 |
| Class B Common Stock weighted average shares outstanding - diluted[3] | 683,761 | 683,761 |
| | | |
| **Basic net loss per share:** | | |
| Common Stock | $ (1.18) | $ (1.18) |
| Class B Common Stock | $ (1.23) | $ (1.33) |

Table of Contents                          Index to Financial Statements                          Glossary of Defined Terms

**Diluted net loss per share:**

| | | | | |
|---|---|---:|---|---:|
| Common Stock | $ | (1.20) | $ | (1.20) |
| Class B Common Stock | $ | (1.23) | $ | (1.33) |

NOTES TO TABLE

(1) For purposes of the diluted net loss per share computation for Common Stock, all shares of Class B Common Stock are assumed to be converted at a ratio of 1 Class B Common Stock share to .68 Common Stock share; therefore, 100% of undistributed earnings (losses) is allocated to Common Stock.

(2) For the three and nine months ended September 30, 2022, 2,361,000 shares of Common Stock are excluded from the computation of diluted net loss per share because their effect would be antidilutive. These shares are related to the 5.875% Convertible Debt.

(3) For purposes of the diluted net earnings (loss) per share computation for Class B Common Stock, weighted average shares of Class B Common Stock are assumed not converted to Common Stock.

F-96

Table of Contents
Index to Financial Statements
Glossary of Defined Terms

**22. SUBSEQUENT EVENTS**

The Company performed an evaluation of subsequent events through the date of the issuance of these financial statements and determined that no additional items require recognition or disclosure, except for the following:

On February 3, 2023, the Company suspended all dividends including dividends on its Common Stock, Series A Preferred Stock, and the Crimson Class A-1 Units. The Series A Preferred Stock and Crimson Class A-1 Units will accrue dividends for pay-out at an undetermined date in the future upon declaration by the Board of Directors.

During February 2023, the Company committed to a reduction in force plan to better align its cost structure given the difficult market and current economic environment. The separations resulted in $1.1 million of severance related expense for the three months ended March 31, 2023.

During March 2023, the Company committed to a plan to sell the MoGas and Omega asset group. The disposal group is available for sale in its present condition and an active program to locate a buyer has been initiated. Based on preliminary indications of interest, the transaction price is expected to exceed the carrying value of the asset group with significant cushion. The Company expects to close the sale during the third quarter of 2023 and as a result the held for sale criteria have been met subsequent to December 31, 2022 but prior to the issuance of the 2022 consolidated financial statements.

Table of Contents Index to Financial Statements Glossary of Defined Terms

**ITEM 16. FORM 10-K SUMMARY**

None.

<div align="center">

**CORENERGY INFRASTRUCTURE TRUST, INC.**

**SIGNATURES**

</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CORENERGY INFRASTRUCTURE TRUST, INC.**

(Registrant)

By:  /s/ Robert L Waldron
_____
**Robert L Waldron**
**President and Chief Financial Officer (Principal Financial Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ David J. Schulte<br>David J. Schulte | Chairman and Chief Executive Officer (Principal Executive Officer) | March 29, 2023 |
| /s/ Robert L Waldron<br>Robert L Waldron | President and Chief Financial Officer (Principal Financial Officer) | March 29, 2023 |
| /s/ Christopher M. Huffman<br>Christopher M. Huffman | Chief Accounting Officer (Principal Accounting Officer) | March 29, 2023 |
| /s/ Todd Banks<br>Todd Banks | Director | March 29, 2023 |
| /s/ Conrad S. Ciccotello<br>Conrad S. Ciccotello | Director | March 29, 2023 |
| /s/ John D. Grier<br>John D. Grier | Director | March 29, 2023 |
| /s/ Catherine A. Lewis<br>Catherine A. Lewis | Director | March 29, 2023 |
| /s/ Arkan Haile<br>Arkan Haile | Director | March 29, 2023 |

<div align="center">

F-98

</div>

Exhibit 21.1

**Subsidiaries of CorEnergy Infrastructure Trust, Inc.**
**As of December 31, 2022**

| Subsidiary | State of Incorporation or Formation |
| --- | --- |
| Cardinal Pipeline, L.P. | California |
| CorEnergy BBWS, Inc. | Delaware |
| CorEnergy Pipeline Company, LLC | Delaware |
| Corridor Bison, LLC | Delaware |
| Corridor InfraTrust Management, Inc. | Delaware |
| Corridor Leeds Path West, Inc. | Delaware |
| Corridor MoGas, Inc. | Delaware |
| Corridor Private Holdings, Inc. | Delaware |
| Corridor Public Holdings, Inc. | Delaware |
| Crimson California Pipeline, L.P. | Delaware |
| Crimson Midstream Holdings. LLC | Delaware |
| Crimson Midstream I Corporation | Delaware |
| Crimson Midstream Operating, LLC | Delaware |
| Crimson Midstream Services, LLC | Delaware |
| Crimson Pipeline, LLC | California |
| Four Wood Corridor, LLC | Delaware |
| Grand Isle Corridor, LP | Delaware |
| Grand Isle GP, Inc. | Delaware |
| Grand Isle LP, Inc. | Delaware |
| LCP Oregon Holdings, LLC | Delaware |
| MoGas Debt Holdco LLC | Delaware |
| MoGas Pipeline LLC | Delaware |
| Mowood, LLC | Delaware |
| Omega Gas Marketing, LLC | Delaware |
| Omega Pipeline Company, LLC | Delaware |
| Pinedale Corridor, LP | Delaware |
| Pinedale GP, Inc. | Delaware |
| Pinedale LP I, LLC | Delaware |
| San Pablo Bay Pipeline Company, LLC | Delaware |
| United Property Systems, LLC | Delaware |

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-3 No. 333-260733) of CorEnergy Infrastructure Trust, Inc.,

(2) Registration Statement (Form S-3 No. 333-259319) of CorEnergy Infrastructure Trust, Inc.,

(3) Registration Statement (Form S-8 No. 333-198799) pertaining to the CorEnergy Infrastructure Trust, Inc. Director Compensation Plan,

(4) Registration Statement (Form S-3 No. 333-228065) pertaining to the CorEnergy Infrastructure Trust, Inc. Dividend Reinvestment Plan, and

(5) Registration Statement (Form S-8 No. 333-265231) pertaining to the CorEnergy Infrastructure Trust, Inc. Omnibus Equity Incentive Plan,

of our report dated March 29, 2023, with respect to the consolidated financial statements of CorEnergy Infrastructure Trust, Inc. included in this Annual Report (Form 10-K) of CorEnergy Infrastructure Trust, Inc. for the year ended December 31, 2022.

/s/ Ernst & Young LLP

Kansas City, Missouri
March 29, 2023

**Exhibit 31.1**

### CERTIFICATIONS

I, David J. Schulte, certify that:

1.  I have reviewed this Annual Report on Form 10-K of CorEnergy Infrastructure Trust, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 29, 2023

/s/ David J. Schulte
David J. Schulte
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

### CERTIFICATIONS

I, Robert L Waldron, certify that:

1. I have reviewed this Annual Report on Form 10-K of CorEnergy Infrastructure Trust, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 29, 2023

/s/ Robert L Waldron
_____
Robert L Waldron
President and Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

**SECTION 906 CERTIFICATION**

Pursuant to U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2001, the undersigned officers of CorEnergy Infrastructure Trust, Inc. (the "Company"), hereby certify that the Annual Report on Form 10-K for the period ended December 31, 2022, filed with the Securities and Exchange Commission on the date hereof (the "Report"), fully complies with the requirements of Section13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ David J. Schulte
David J. Schulte
Chief Executive Officer (Principal Executive Officer)
Date: March 29, 2023

/s/ Robert L Waldron
Robert L Waldron
President and Chief Financial Officer (Principal Financial Officer)
Date: March 29, 2023

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this report. **A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.**

## **Exhibit D**

## **Liquidation Analysis**

**CorEnergy Infrastructure Trust, Inc. and Crimson Midstream Holdings, LLC**
Liquidation Analysis

| Crimson Midstream Holdings, LLC $ in Millions | Est. Value /Book Value | Percent Recovery | | Est. Recovery | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Crimson Assets** | | | | | |
| Cash and cash equivalents | $ 19.02 | 100% | 100% | 19.02 | 19.02 |
| Property and Equipment | 337.63 | 18% | 18% | 60.44 | 60.44 |
| Accounts and other receivables | 8.83 | 94% | 100% | 8.30 | 8.83 |
| Inventory | 2.28 | 80% | 90% | 1.82 | 2.05 |
| **Total Assets/Gross Liquidation Proceeds** | **$ 367.75** | **73%** | **77%** | **$ 89.58** | **$ 90.33** |
| | | | | | |
| **II. Crimson Administrative Claims & Liquidation Costs** | | | | | |
| Accrued Payroll and Benefits | | | | $ (4.25) | $ (4.25) |
| Pipeline Remediation | | | | (11.77) | (11.77) |
| Tank Remediation | | | | (13.00) | (6.50) |
| Land Remediation | | | | (5.50) | (3.30) |
| Wind Down Expenses | | | | (32.04) | (32.04) |
| Chapter 7 Trustee Fee | | | | (2.71) | (2.69) |
| **Total Administrative Claims and Liquidation Costs** | | | | **$ (69.27)** | **$ (60.55)** |
| | | | | | |
| **Proceeds after Admin Claims available for Creditors** | | | | **$ 20.30** | **$ 29.78** |
| | | | | | |
| **III. Distribution Scenarios** | | | | | |
| Employee Agreements | 3.87 | 100% | 100% | $ 3.87 | $ 3.87 |
| Contract Rejection Damages | 0.60 | 100% | 100% | 0.60 | 0.60 |
| Trade Payables | 1.58 | 100% | 100% | 1.58 | 1.58 |
| **Remaining Distributable Value** | | | | **$ 14.25** | **$ 23.73** |

| CorEnergy Infrastructure Trust, Inc. $ in Millions | Est. Value /Book Value | Percent Recovery | | Est. Recovery | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **IV. CorEnergy Assets** | | | | | |
| Cash and cash equivalents | 53.91 | 100% | 100% | $ 53.91 | $ 53.91 |
| Proceeds from Crimson Liquidation | | | | 14.25 | 23.73 |
| **Proceeds available for CorEnergy** | | | | **$ 68.15** | **$ 77.63** |
| | | | | | |
| **V. CorEnergy Administrative Claims & Liquidation Costs** | | | | | |
| Accrued Payroll and Benefits | | | | $ - | $ - |
| Wind Down Expenses | | | | (3.28) | (3.28) |
| Chapter 7 Trustee Fees | | | | (2.33) | (2.04) |
| **Total Administrative Claims and Liquidation Costs** | | | | **$ (5.61)** | **$ (5.32)** |
| | | | | | |
| **Proceeds after Admin Claims available for Creditors** | | | | **$ 62.55** | **$ 72.31** |
| | | | | | |
| **VI. Distribution Scenarios** | | | | | |
| Employee Agreements | $ 4.24 | 51% | 59% | $ 2.15 | $ 2.49 |
| Contract Rejection Damages | 0.18 | 51% | 59% | 0.09 | 0.11 |
| Trade Payables | 0.89 | 51% | 59% | 0.45 | 0.52 |
| Noteholders (Convertible Notes) | 118.20 | 51% | 59% | 59.86 | 69.20 |
| **Remaining Distributable Value** | **$ 123.51** | **51%** | **59%** | **$ -** | **$ -** |
| | | | | | |
| Preferred Stock | $ 129.53 | 0% | 0% | - | - |
| **Remaining Distributable Value** | | | | **$ -** | **$ -** |
| | | | | | |
| Common Stock | $ 0.02 | 0% | 0% | - | - |
| **Remaining Distributable Value** | | | | **$ -** | **$ -** |

## Exhibit E

**Estimated Total Enterprise Value
and Implied Equity Value**

### Estimated Total Enterprise Value and Implied Equity Value

The Debtor estimated the Total Enterprise Value of the Reorganized Debtors to be in the range of approximately $67.5 million - $75.0 million, with a mid-point of approximately $70.0 million. Based on assumed pro forma net debt of approximately $34 million[1], the Total Enterprise Value implies an Equity Value range of approximately $33 million – $41 million, with a mid-point of approximately $36 million.

| ($ in mm) | Low | Mid | High |
| --- | --- | --- | --- |
| Total Enterprise Value | $67 | $70 | $75 |
| Less: Net Debt[1] | (34) | (34) | (34) |
| Total Equity Value | $33 | $36 | $41 |

---

[1] Net debt based on total drawn debt of $46 million upon emergence, inclusive of approximately $1MM of PIK interest, less estimated cash on the balance sheet of approximately $12 million.

## **Exhibit F**

**Financial Projections**

# CorEnergy / Crimson Long-Term Financial Projections ($MM)

| | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Total Revenue** | **$107.6** | **$113.9** | **$117.9** | **$129.4** | **$126.2** |
| (-) Labor & Benefits | (15.1) | (15.7) | (16.4) | (17.1) | (17.8) |
| (-) Power & Utilities | (18.6) | (18.3) | (18.2) | (18.1) | (18.1) |
| (-) Asset Maintenance[1] | (21.7) | (21.6) | (15.3) | (19.3) | (15.9) |
| (-) Other Operating Expense | (26.8) | (27.6) | (28.4) | (29.3) | (30.2) |
| **Operating Income** | **$25.5** | **$30.7** | **$39.5** | **$45.5** | **$44.2** |
| (-) Total SG&A | (25.7) | (16.0) | (16.5) | (17.1) | (17.7) |
| (+) Adjustments[2] | 3.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Adjusted EBITDA** | **$3.4** | **$14.7** | **$23.0** | **$28.5** | **$26.6** |
| (+ / -) Change in Net Working Capital | (0.0) | (0.5) | (0.8) | (1.1) | 0.3 |
| (-) Maintenance CapEx[1] | (1.8) | (1.8) | (1.5) | (1.8) | (1.8) |
| (-) Commercial Projects CapEx | (2.0) | (0.6) | (2.8) | - | - |
| (-) Adjustments[3] | (3.6) | - | - | - | - |
| **Unlevered Free Cash Flow** | **($4.0)** | **$11.8** | **$17.9** | **$25.6** | **$25.2** |
| *Memo: AB-864 CapEx* [4] | ($1.5) | ($0.2) | ($2.3) | - | - |

(1) *Beginning in 2024, majority of maintenance capital expenditures will be reclassified to asset maintenance operating expense to reflect the reduced economic life of assets driven by the current regulatory environment.*
(2) *Represents one-time expenses and non-cash compensation expense.*
(3) *Represents one-time expenses.*
(4) *Budget does not include any maintenance capital expenditures related to AB-864 expenses. Assumes AB-864 expenses are reimbursed through a tariff surcharge during the forecast period resulting in a net neutral financial impact.*

CorEnergy

## Exhibit G

**Organizational Chart**

# CorEnergy Infrastructure Trust, Inc



Updated January 25, 2024